Appeal No. 21-55852

_____

## IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

LITTLE ORBIT, LLC
Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,
Defendants – Appellees

_____

On Appeal from the United States District Court for the Central District of California
Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge

_____

## APPELLANT'S APPENDIX RE EMERGENCY MOTION UNDER CIRCUIT RULE 27-3 FOR STAY OF ORDER PENDING APPEAL Vol. II of IV

_____

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LAW OFFICES OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
Telephone: (949) 677-6434
Attorneys for Plaintiff/Appellant, LITTLE ORBIT LLC

# INDEX TO APPENDIX

**DOCUMENT**

1.    *CORRECTED* NOTICE OF APPEAL ………………………    5

2.    DECLARATION OF MICHAEL C.   WHITTICAR IN SUPPORT OF
      DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING
      SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND
      FOR AN AWARD OF ATTORNEYS' FEES………………    18

3.    DECLARATION OF ERIC PETERSON IN SUPPORT OF DEFENDANTS'
      SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS
      SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF
      ATTORNEYS' FEES                                    22

4.    MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
      DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING
      SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND
      FOR AN AWARD OF ATTORNEYS' FEES                    49

5.    DEFENDANTS' SECOND NOTICE OF MOTION AND MOTION TO
      ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A
      MONEY JUDGMENT, AND FOR AN AWARD OF
      ATTORNEYS' FEES                                    68

6.    DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY IN
      SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET
      ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO
      DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS
      COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF
      AND FOR AN AWARD OF ATTORNEYS' FEES                72

7.    REPLY DECLARATION OF M. DANTON RICHARDSON IN SUPPORT
      OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE THE
      BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS'
      FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY
      THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN
      AWARD OF ATTORNEYS' FEES                           81

8.      PLAINTIFF LITTLE ORBIT LLC'S REPLY IN SUPPORT OF MOTION
        TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO
        DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS
        COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF
        AND FOR AN AWARD OF ATTORNEYS' FEES          86

9.      DECLARATION OF ERIC PETERSON IN SUPPORT OF
        DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET
        ASIDE BINDING SETTLEMENT TERMS SHEET          98

10.     DECLARATION OF MICHAEL C. WHITTICAR IN SUPPORT OF
        DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET\
        ASIDE BINDING SETTLEMENT TERMS SHEET          118

11.     DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET
        ASIDE BINDING SETTLEMENT TERMS SHEET          122

12.     PLAINTIFF LITTLE ORBIT LLC'S REQUEST FOR JUDICIAL NOTICE
        IN SUPPORT OF MOTION TO SET ASIDE THE BINDING
        SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND
        FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS
        SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF
        ATTORNEYS' FEES                              138

13.     DECLARATION OF MATTHEW SCOTT IN SUPPORT OF PLAINTIFF
        LITTLE ORBIT LLC'S MOTION TO SET ASIDE THE BINDING
        SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND
        FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS
        SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF
        ATTORNEYS' FEES                              177

14.     DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
        PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE THE
        BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS'
        FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY
        THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN
        AWARD OF ATTORNEYS' FEES                     216

15.   PLAINTIFF LITTLE ORBIT LLC'S\NOTICE OF MOTION AND
      MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS
      SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER
      THE ASSETS COVERED BY THE TERMS SHEET OR FOR
      ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS'
      FEES                                                        223

16.   ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF
      UNITED STATES MAGISTRATE JUDGE                             239

17.   JOINT STIPULATION AND REQUEST FOR COURT TO RETAIN
      JURISDICTION FOR AN ADDITIONAL SIXTY (60) DAYS FOR THE
      COURT TO HEAR DESCENDENT'S MOTION TO ENFORCE THE
      BINDING SETTLEMENT TERMS SHEET                             245

18.   FOURTH JOINT STIPULATION AND REQUEST FOR COURT TO
      RETAIN JURISDICTION FOR AN ADDITIONAL THIRTY
      (30) DAYS FOR THE PARTIES TO COMPLETE
      THEIR SETTLEMENT                                           249

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
***Attorneys for Plaintiff,***
LITTLE ORBIT LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>             Plaintiff,<br><br>     vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>             Defendants.<br>_____<br><br>DESCENDENT STUDIOS INC., a Texas corporation,<br><br>             Counterclaimant,<br><br>     vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>             Counter Defendant.<br>_____ | Case No.: 8:20-cv-00089-DOC-JDE<br><br>Judge:      Hon. David O. Carter<br><br>***CORRECTED*** **NOTICE OF APPEAL** |

1

**PLEASE TA E NOTICE** that Plaintiff, LITTLE ORBIT, LLC, appeals to the United States Court of Appeals for the Ninth Circuit from the Order of this Court                                        , denying Plaintiff LITTLE ORBIT LLC's Motion to Set Aside the Binding Settlement Terms Sheet (Dkt. 88) and granting Defendants Descendant Studios and Eric Peterson's Second Motion to Enforce the Binding Settlement Terms Sheet (Dkt. 96).  A true and correct copy of the foregoing Order is attached hereto as Exhibit A.

### REPRESENTATION STATE ENT

Pursuant to Ninth Circuit Rule 3-2(b), Petitioner submits this Representation Statement.

Counsel for Plaintiff LITTLE ORBIT, LLC is as follows:

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
Telephone: (949) 677-6434

Attorneys for Plaintiff, LITTLE ORBIT LLC

Counsel for Defendants DESCENDENT STUDIOS INC. and ERIC PETERSON is as follows:

NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

2

MICHAEL C. WHITTICAR (admitted pro hac vice)
mikew@novaiplaw.com
NOVA IP LAW, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740

Attorneys for Defendant DESCENDENT STUDIOS INC   ERIC PETERSON

DATED: August 5, 2021            **LA    OFFICES OF       DANTON RIC   ARDSON**

By: __/s/ M. Danton Richardson__
                    M Danton Richardson

*Attorney for Plaintiff/Counter-Defendant,*
LITTLE ORBIT LLC

3

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. 8:20-cv-00089-DOC-(JDEx)         Date: July 27, 2021

Title: LITTLE ORBIT LLC V. DESCENDENT STUDIOS INC. AND ERIC PETERSON

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

| Kelly Davis | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

**PROCEEDINGS (IN CHAMBERS):**     **ORDER DENYING PLAINTIFF'S MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS [88] AND GRANTING DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS [96]**

      Before the Court is Plaintiff Little Orbit LLC's ("Plaintiff") Motion to Set Aside the Binding Settlement Terms Sheet ("Motion to Set Aside") (Dkt. 88) and Defendants Descendant Studios and Eric Peterson's (collectively, "Defendants") Second Motion to Enforce the Binding Settlement Terms Sheet ("Motion to Enforce") (Dkt. 96). The Court finds this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; C.D. Cal. R. 7-15. The Court hereby **DENIES** the Plaintiff's Motion to Set Aside and **GRANTS** the Defendants' Motion to Enforce.

EXHIBIT

A

008

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                    Date: July 27, 2021

Page 2

## II.     Background

### A. Facts

In 1995, major video game developer and publisher Interplay Productions Corp. ("Interplay") released Descent, a first-person shooter ("FPS") game. Mot. to Set Aside at 6. Descent was a commercial success: together with its sequel, Descent II, it sold over 1.1 million units as of 1998. *Id.* at 7.

In or around November 1994, several former game developers, including Defendant Eric Peterson ("Peterson"), announced that they were forming Defendant Descendent Studios ("Descendent") to work on a game ("Game") similar to Descent in play style. *Id.* Peterson is and was the CEO of Descendant. *Id.*

Through a Kickstarter campaign, Descendent raised over $600,000 for the development of this new game. *Id.* Descendent also entered into a license agreement with Interplay to use the "Descent" name for the Game. *Id.*

Plaintiff is a worldwide video game developer and publisher. *Id.* at 6. When Descendent ran out of funds by August 2017, it reached out to Plaintiff for financial support to complete the development of the game in return for which Plaintiff would publish the video game. *Id.* at 7. The parties entered into a "Development Agreement" effective September 1, 2017. *Id.*

Plaintiff contends that Descendent "failed to meet any of the delivery dates" required by the Development Agreement. *Id.* As a result, the parties entered into a "Terms Sheet" addendum to "salvage the project and allow Descendent more time to complete" the Game. *Id.* Plaintiff asserts that Descendent "still continued to fail to meet the deliverable requirements and specifications[,] thereby breaching the Terms Sheet." *Id.* Because of the resulting delays, Descendent "ultimately failed to timely deliver the completed Game required under the specifications of the Agreement or otherwise comply with the Terms Sheet," and Interplay has correspondingly cancelled the license agreement. *Id.* at 8.

Plaintiff alleges that it made several payments under the Terms Sheet addendum. *Id.* However, on January 30, 2019, Plaintiff sent half of the payroll amount, because Descendent had missed two deadlines in a row. *Id.* On February 1, Descendent sent a "Notice of Breach" for non-payment. *Id.* Plaintiff cured the alleged breach by paying the

009

remaining half on February 4, and then filed its own "Notice of Breach" for Descendent's failure to meet its delivery requirements. *Id.* Descendent, however, failed to cure the alleged breach. *Id.* Plaintiff contends that this failure to cure relieves it of any obligation to make any further payments to Descendent, and subsequently filed this lawsuit. *Id.*

With the help of Magistrate John D. Early, the parties ultimately reached a settlement agreement ("Settlement Terms Sheet"). *Id.* at 5. Under this agreement, Plaintiff was to take over and complete the development of the Game under a license from Descendent covering "all Game IP," and would make certain payments in that regard. *Id.* Plaintiff argues, however, that Defendants have "admitted" that all Game IP, except for a snapshot version of the game code as it existed as of some unknown time, no longer exists. *Id.* The original artwork and the project history, among other assets, are missing. *Id.* Thus, Plaintiff filed this Motion to Set Aside to be relieved from any obligation to make payments under the Settlement Terms Sheet due to Defendants' failure to deliver to Plaintiff "all Game IP" as provided in the Settlement Terms Sheet. *Id.*

### B. Procedural History

Plaintiff filed its complaint with this Court on January 16, 2020. Complaint. (Dkt. 1). Plaintiff filed a Motion to Set Aside the Binding Settlement Terms Sheet on June 24, 2021 ("Motion to Set Aside") (Dkt. 88). Defendants opposed the Motion to Set Aside on July 2, 2021 ("Opposition") (Dkt. 91). On July 13, 2021, Plaintiff replied ("Reply") (Dkt. 94). Defendant filed a Motion to Enforce the Binding Settlement Terms Sheet on July 21, 2021 ("Motion to Enforce") (Dkt. 96).

### III.  Legal Standard

Federal Rule of Civil Procedure 60(b) provides that the Court may relieve a party from a final judgment or order. Pursuant to Rule 60(b), a court may set aside a final judgment only under specific conditions, including a showing of "(1) mistake, inadvertence, surprise, or excusable neglect . . . (3) fraud, misrepresentation, or misconduct by an opposing party; . . . [and] (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (3), (6).

Rule 60(b)(6) "has been used sparingly as an equitable remedy to prevent manifest injustice." *U.S. v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). Deferring to the Supreme Court's admonitions, the Ninth Circuit has held that Rule 60(b)(6) relief "may be had 'to accomplish justice,' but only under 'extraordinary

circumstances.'" *Id.* (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

## IV.   Discussion

### A.  Alleged Failure of Consideration and Fraud by Defendants

Plaintiff contends that Defendants' inability to deliver the Game IP assets constitutes a failure of consideration on their part. Mot. to Set Aside at 9. Plaintiff asserts that under the Settlement Terms Sheet, Defendants were to deliver all the Game IP assets, including all original artwork and project history, to Plaintiff. *Id.* However, on June 15, 2021, Defendants produced only a snapshot copy of the game code as it existed on some unknown date. *Id.* Peterson allegedly "advised that the 'project history no longer exists' and that all Plaintiff needs is the code (even claiming there was no obligation to deliver anything to Plaintiff)." *Id.* (quoting Declaration of Matthew Scott, Ex. D). As such, because of Defendants' failure of consideration in not delivering all Game IP assets, Plaintiff argues that it has the right to rescind the contract. *Id.* at 10.

Moreover, Plaintiff contends that Defendants' failure to deliver the full source code and the entire project history constitutes fraud. Plaintiff also claims that during the parties' settlement negotiations, Defendants "purposefully concealed the fact that the game assets had not been preserved as required by the Development Agreement." Mot. to Set Aside at 14. According to the Plaintiff, this "material omission" not only reflects Defendants' bad faith, but also constitutes fraud, because Defendants promised to deliver assets it knew it could not deliver. *Id.* Therefore, Plaintiff argues that the Court should set aside the Settlement Terms Sheet due to Defendants' fraudulent settlement. *Id.* at 11, 14.

Defendants assert that under the Settlement Terms Sheet, they were not obligated to provide "game software, revised game software, complete functional copies of each prior version of the game software, or separate files for the artwork." Opp'n. at 3. The deliverables were expressly stated and limited to "pre-order data, Kickstarter data, and early backer data," which have all been provided to Plaintiff. *Id.*; Settlement Terms Sheet § 10. Plaintiff "did not ask for copies of the game software during the negotiations of the [Settlement Terms Sheet]," and Plaintiff also neither sought nor demanded the "updated game code, the separate artwork, and the complete writable versions of all prior game code versions." *Id.* Defendants further argue that Plaintiff "does not need more than the [snapshot of the] game code [Defendants provided] to finish the game." *Id.* at 5. Defendants also point out that Plaintiff admitted that the "artwork already contained in

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                          Date: July 27, 2021

Page 5

the code can be used to complete the game." *Id.* Regardless, after Plaintiff filed the
Motion to Set Aside, Defendants correspondingly delivered all the Game IP to Plaintiff.
Reply at 3. Therefore, because Defendants have recovered from a third party and
provided Plaintiff with the original artwork source files, Defendants argue that this point
is moot, and that they did not commit material breach. Opp'n. at 6.

Additionally, Defendants claim that they have not committed fraud. Opp'n. at 11.
Defendants point out that Plaintiff "admitted that it merely *assumed* that [the Game IP]
assets had been stored," and that Plaintiff could not identify any "representation by the
Defendants that they still had or had stored the artwork source or executable copies of
every prior version of the game software before the [Settlement Terms Sheet] was
signed." *Id.* Furthermore, "neither delivery nor the state of the reportedly missing
historical deliverables were ever discussed during the settlement conference nor included
in the [Settlement Terms Sheet]." *Id.* at 12. As such, Defendants argue that Plaintiff failed
to demonstrate that Defendants committed fraud in not preserving and delivering the full
source code and the entire project history.

The Court agrees with the Defendants and finds that Plaintiff's claims are moot. A
case is moot when (1) "the issues presented are no longer live" or (2) the parties lack a
"legally cognizable interest in the outcome." *United States Parole Comm'n v. Geraghty*,
445 U.S. 388, 396 (1980) (internal quotations omitted). Once a case becomes moot,
courts are "required to dismiss it." *Dufresne v. Veneman*, 114 F.3d 952, 954 (9th Cir.
1997). Here, Plaintiff contends that Defendants' inability to deliver all Game IP assets
constitutes a failure of consideration. Plaintiff also argues that Defendants, in not
delivering these assets, have committed fraud. However, these claims are moot, because
Defendants have now delivered all the requested Game IP assets to Plaintiff, and the
issues presented are no longer live. As such, Plaintiff's claims regarding Defendants'
failure to deliver Game IP assets are moot.

**B. Plaintiff's Mistaken Definition of "Revenue"**

Plaintiff argues that the Settlement Terms Sheet should be set aside due to
Plaintiff's mistake in believing that the term "revenues" meant revenues after industry
standard and customary deductions. Mot. to Set Aside at 3. Defendants, on the other
hand, interpret "revenues" to mean that no such deductions are allowed. *Id.* Plaintiff
contends that Defendants' definition would "forc[e] Plaintiff to bear all of the expenses,
and would kill any hope of Plaintiff ever recovering its investment into the Game." Reply
at 7. As a result, Plaintiff claims that it will "suffer material harm if the agreement is

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                                      Date: July 27, 2021

Page 6

enforced" based on Defendants' definition. Mot. to Set Aside at 3. Thus, Plaintiff urges the Court to set aside the Settlement Terms Sheet due to Plaintiff's mistaken interpretation of the term "revenues."

Defendants argue that Plaintiff's basis for its interpretation of "revenues" is erroneous. Plaintiff claims that it construed "revenues" to be the same thing as "Net Sales" under the Development Agreement, which Defendants contend is "untrue, illogical[,] and objectively baseless." Mot. to Enforce at 6. The Development Agreement defines "Net Sales" to be "all monies paid to and received by [Plaintiff], including Net Payments, for sales and exploitation of the Game, net or less standard and customary deductions for returns . . .." Declaration of Matthew Scott, Ex. A. Defendants point out that the Development Agreement never defined "revenue" and its definition of "Net Sales" also does not use the terms "revenues" or "profits." Mot. to Enforce at 6. Furthermore, Defendants claim that the parties' relationship under the Settlement Terms Sheet "is not based on and looks nothing like their relationship under the Development Agreement." *Id.* at 7. In fact, Plaintiff's alleged breach and termination of the Development Agreement and the subsequent terms sheet addendum caused this litigation. *Id.* at 6. As such, there is no reasonable justification for Plaintiff to have defined "revenues" on the basis of the term "Net Sales" in the Development Agreement.

Additionally, Defendants assert that "it would be exceedingly inappropriate to set aside a settlement agreement based on a[n] *unilateral* mistake when the settlement was reached through lengthy negotiations including parties represented by counsel, with the assistance of the Court." Opp'n. at 9. Defendants argue that it is not unconscionable for Plaintiffs to pay Defendants a percentage of revenues or gross income, because the Settlement Terms Sheet was "carefully negotiated by skilled counsel at arm's length, Defendants own the relevant intellectual property to the [G]ame, and royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate." *Id.* at 10. Based on the agreement between the parties, "Defendants would receive royalties and payments based on a percentage of revenues, meaning gross income from sales and licensing." *Id.* at 11. Therefore, Defendants contend that there is no basis for setting aside the Settlement Terms Sheet based on Plaintiff's mistake. *Id.* at 10.

The Court finds that the Settlement Terms Sheet should not be set aside based on Plaintiff's mistaken definition of "revenues." Under Rule 60(b)(1), a court has the discretion to set aside a final judgment if there is a showing of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). A court, however, can also deny

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                    Date: July 27, 2021

Page 7

a Rule 60(b)(1) motion if "(1) the [plaintiff's] culpable conduct led to the default; (2) the [plaintiff] has no meritorious defense; or (3) the [defendant] would be prejudiced if the judgment is set aside." *Price v. Seydel*, 961 F.2d 1470, 1473 (9th Cir. 1992) (citing *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987)). Additionally, this tripartite test is "disjunctive," so the court may deny the motion on any part. *In re Hammer*, 940 F.2d 524, 526 (9th Cir. 1991).

Here, the Court finds that Plaintiff does not have a meritorious defense for mistakenly defining "revenues" as revenues after industry standard and customary deductions. The Plaintiff erroneously argues that its definition reasonably arises from the parties' prior course of conduct, referring to the Development Agreement. California law permits the use of extrinsic evidence "'to explain the meaning of a written contract . . . [if] the meaning urged is one to which the written contract terms are reasonable susceptible.'" *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 343 (2004) (quoting *BMW of North America, Inc. v. New Motor Vehicle Bd.*, 162 Cal.App.3d 980, 990, n. 4 (1984)). Plaintiff, however, wrongly relied on the Development Agreement: the agreement does not explicitly refer to or define the term "revenues." *See* Declaration of Matthew Scott, Ex. A. Additionally, the Development Agreement had been terminated, and the parties' relationship under the Settlement Terms Sheet also differs from that under the Development Agreement. Mot. to Enforce at 7. There was no reasonable basis for Plaintiff to mistakenly define "revenues," and thus, Plaintiff does not have a meritorious defense. Therefore, the Court finds that Plaintiff's mistake does not warrant setting aside the Settlement Terms Sheet.

### C. Due Date of First Payment and of Game Development and Release

Finally, Plaintiff argues that the date of the first payment should not run until June 29, 2021, when Defendants delivered the Game IP assets. Reply at 2. Plaintiff similarly argues that the date on which the one year starts to run for Plaintiff to complete the development and commercially release the Game should be June 29, 2021, or, at the very earliest, May 24, 2021 (the date that Judge Early determined Plaintiff's payment obligation should begin). *Id.*

Defendants, on the other hand, argue that Plaintiff is not entitled to any extensions of time, given that Plaintiff had "made virtually no effort to develop the game in the past eight months since the [Settlement Terms Sheet] was signed in November of 2020." Mot. to Enforce at 10. It was "completely irresponsible" for Plaintiff to wait so long to "make any effort to develop the game." *Id.* Defendants claim that they have formally demanded

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                    Date: July 27, 2021

Page 8

Plaintiff to "disclose the status of its development efforts, its financial condition, and the status of its fundraising efforts." *Id.* at 11. Defendants point to Plaintiff's failure to respond as evidence that Plaintiff has "done virtually nothing to finish the game . . . and lacks the funds to complete the game." *Id.* Additionally, Plaintiff allegedly has not yet paid Descendant the money it owes, despite now having all the necessary game assets. *Id.* As such, Defendants contend that Plaintiff is not entitled to any deadline extension, and request the Court to order Plaintiff to pay Defendants the money it owes.

The Court agrees with Defendants and finds that Plaintiff is not entitled to any deadline extension. Plaintiff argues that the deadline should run from when Defendants delivered the game IP assets. However, under the Settlement Terms Sheet, the Defendants were not required to provide the Game IP assets; the Defendants' obligations were limited to licensing the Game and delivering only a few specified items of customer data. *Id.* at 10-11. After signing the Settlement Terms Sheet and receiving the game code, Plaintiff could have started developing the Game. However, Plaintiff waited for several months before demanding the Game IP assets from Defendants, reflecting Plaintiff's own lack of effort and initiative in completing the Game. Therefore, the Court finds that Plaintiff is not entitled to any deadline extension, and orders Plaintiff to pay what it owes to Defendants.

Moreover, the Court orders Plaintiff to provide Defendants with proof of funds, bank and financial statements, and adequate assurance of due performance. Defendants claim that an Experian Credit Report shows that Plaintiff has a "'high risk' business credit score," and Defendants are accordingly concerned that Plaintiff lacks the funds to pay them. *Id.* at 1. Plaintiff has also failed to make the first two settlement payments to Defendants and has "plainly stated that it has no intention of making any of the agreed upon monetary settlement payments". *Id.* Thus, given these concerning circumstances, the Court orders Plaintiff to provide Defendants with proof of funds, bank and financial statements, and adequate assurance of due performance.

///

///

///

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                      Date: July 27, 2021

Page 9

## V.    Disposition

For the reasons set forth above, the Court **DENIES** Plaintiff's Motion to Set Aside Binding Settlement Terms Sheet, and **GRANTS** Defendant's Motion to Enforce Binding Settlement Terms Sheet. Additionally, the Court **DENIES** granting attorneys' fees to both sides.

The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                        Initials of Deputy Clerk: kd

CIVIL-GEN

## CERTIFICATE OF SER  ICE

I hereby certify that on this 5th Day of August 2021, the foregoing Notice of Appeal was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

4

NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
**Mintz Levin Cohn Ferris Glovsky and Popeo P.C.**
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

MICHAEL C. WHITTICAR (*admitted pro hac vice*)
mikew@novaiplaw.com
**Nova IP Law, PLLC**
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740

Attorneys for Defendant/Counterclaimant
DESCENDENT STUDIOS INC. and
Defendant ERIC PETERSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company, <br><br> Plaintiff, <br><br> vs. <br><br> DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual, <br><br> Defendants. | Case No. 8:20-cv-00089-DOC-JDE <br><br> **DECLARATION OF MICHAEL C. WHITTICAR IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES** <br><br> Date: August 23, 2021 <br> Time: 8:30 a.m. <br> Courtroom: 9D |
| DESCENDENT STUDIOS INC., a Texas corporation, <br><br> Counterclaimant, <br><br> vs. <br><br> LITTLE ORBIT LLC, a California Limited Liability Company, <br><br> Counterdefendant. | Judge: Hon. David O. Carter <br><br> Complaint Filed: 1/16/2020 |

I, Michael C. Whitticar, declare as follows:

1.     I am licensed to practice law in the Commonwealth of Virginia and have been admitted to practice before this court *pro hac vice* in this case.  I am an attorney with NOVA IP Law, PLLC ("Nova IP"), counsel for Defendants Descendent Studios Inc. and Eric Peterson ("Defendants").  I submit this declaration in support of Defendants' Second Motion to Enforce the Binding Settlement Terms Sheet, for a Money Judgment, and for an Award of Attorneys' Fees.

2.     I am over the age of 18 and make this declaration of my own knowledge.  I could and would competently testify as to the matters set forth below if called upon to do so.

3.     The Defendants have demanded, but have not received, the Little Orbit bank statements and its financial accounting software and reports from November 1, 2020 through the present, plus disclosures as to the status of Little Orbit's fund raising efforts and development efforts.

4.     In the settlement of disputes or litigation, it is common to have intellectual property ("IP") licenses which are not accompanied by any obligation by the licensor to deliver the IP to the settling licensee.  There is no implied obligation to deliver the licensed IP to the adverse party.

5.     Defendants noted in their opposition to the motion to set aside, and directly to Mr. Richardson by telephone, that Little Orbit has never actually stated or testified that it had not in fact had possession of or access to any of the allegedly missing game IP assets. Mr. Richardson said that that issue would be addressed in Little Orbit's reply brief.  It was not. Little Orbit still has provided no statements or testimony that it did not actually have or have access to any of the allegedly missing game IP assets.

6.     While the Defendants are content with the BSTS, they are always willing to engage in constructive re-negotiations with Little Orbit over the BSTS.  The Defendants simply need to get paid first.  Also, the Defendants want Little Orbit to

engage in reasonable, responsive, meaningful private negotiations, not just more threats and posturing, before again imposing on the Court to re-settle the same case. In fact, the Defendants have offered Little Orbit two potential paths for renegotiating the BSTS. (*See* Ex. B to the Richardson Reply Declaration). However, it is telling that Little Orbit has not made a single settlement proposal nor payment in the nearly four weeks since it skipped the first settlement payment and moved to set aside the BSTS.

7. Mr. Richardson, when we met and conferred by telephone on June 21, 2021, merely threatened to file a duplicative motion to set aside without stating what the basis for it would be and without asking whether Defendants would agree to it or could address or rectify the undeclared grounds for it.

8. Pursuant to Local Rule 7-3, I conferred in good faith by telephone with Danton Richardson, Plaintiff's counsel, on July 6th, 2021, in a good faith effort to resolve the issues presented in this motion. We have been unable to resolve these issues without the Court's intervention.

9. My attorney's fees incurred for preparing and drafting this motion and related documents to enforce the Settlement Agreement exceed the amount of $7, 500. My paralegal and I each have put over 20 hours each into preparing these documents. My rate is $250.00 per hour and my Paralegal's rate is $125.00 per hour.

I declare under penalty of perjury that the above is true and correct.

Executed This 21st Day of July, 2021, in Prince William County, Virginia.

_____
Michael C. Whitticar

# CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 21, 2021, I filed a copy of the following document(s):

**DECLARATION OF MICHAEL C. WHITTICAR IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**

   leo.law.55@gmail.com

- **Michael Danton Richardson**

   mdantonrichardson@yahoo.com


Executed on July 21, 2021, at Los Angeles, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto
Diane Hashimoto

NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

MICHAEL C. WHITTICAR (*admitted pro hac vice*)
mikew@novaiplaw.com
**NOVA IP LAW, PLLC**
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740

Attorneys for Defendant/Counterclaimant
DESCENDENT STUDIOS INC. and
Defendant ERIC PETERSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>Defendants. | Case No. 8:20-cv-00089-DOC-JDE<br><br>**DECLARATION OF ERIC PETERSON IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**<br><br>**[REDACTED VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]** |
| DESCENDENT STUDIOS INC., a Texas corporation,<br><br>Counterclaimant,<br><br>vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>Counterdefendant. | Date: August 23, 2021<br>Time: 8:30 a.m.<br>Courtroom: 9D<br><br>Judge: Hon. David O. Carter<br><br>Complaint Filed: 1/16/2020 |

1      I, Eric Peterson, declare as follows:

2      1.    I am over 18 years of age, of sound mind, and competent to testify to the facts stated herein. I have personal knowledge of the facts stated herein. I am the President of Descendent Studios, Inc. ("Descendent"). I submit this declaration in support of Defendants' Second Motion to Enforce the Binding Settlement Terms Sheet, for a Money Judgment, and for an Award of Attorneys' Fees.

7      2.    The facts stated in Defendants' Second Motion to Enforce the Binding Settlement Terms Sheet, for a Money Judgment, and for an Award of Attorneys' Fees are true and correct.

10      3.    Little Orbit admits that it now has all of the game assets purportedly necessary to complete the game, but it still has failed to make the first settlement payment.

13      4.    The Binding Settlement Terms Sheet ("BSTS") was signed on November 17, 2020, almost eight months ago. It required three payments from Little Orbit ("LO") to Descendent, two of which were due within 120 days of signing the original BSTS (or the first written memorialization). Neither of these first two payments has been made, and Little Orbit has plainly stated that it has no intention of making any of the agreed upon monetary settlement payments. Exhibit A is a genuine and authentic copy of an email message from Matthew Scott of Little Orbit to Eric Peterson (me) on or about March 23, 2021.

21      5.    Because Little Orbit has failed for the past seven months to make any of the agreed upon settlement payments, and again skipped the June 23, 2021 payment date as extended by the Court, Descendent is gravely concerned that Little Orbit lacks the funds to pay Descendent, is stalling for time, and lacks the intent and ability to make the settlement payments.[1] This is especially concerning given the projected $1

---

[1] Like the most recent Matthew Scott Declaration, the email attached as Exhibit A also strongly indicates that Little Orbit plans to skip all three agreed-upon settlement payments and to try to covertly impose its own misguided and erroneous definition of "Revenues," as being profits or gross income minus whatever expenses Little Orbit chooses to incur.

1    million or more in costs and expenses that will be needed for Little Orbit to adequately
2    complete and market the game. The Defendants' concern is heightened by the fact
3    that an Experian Credit Report shows that Little Orbit has a "high risk" business credit
4    score, and keeps less than ▮▮▮▮▮ in the bank.  A genuine and authentic copy of
5    that Experian credit report obtained by the Defendants is attached hereto as Exhibit
6    B.

       6.    In the negotiations leading up to the BSTS, the early ▮▮ revenue split
8    of the first ▮▮▮▮ in revenues was never stated nor agreed to be Descendent's <u>sole</u>
9    <u>or exclusive remedy</u> for any one or more <u>payments</u> (plural) that are not made <u>at all</u>,
10   and especially not for all three payments not being made <u>at all</u>.  It is clear that Section
11   4 was intended to address only the *timing* of payments, and not to establish an
12   exclusive remedy for Little Orbit failing to make one or more payments <u>ever or at all</u>.

       7.    If the game sells well, then the early ▮▮ split of ▮▮▮▮ provides
14   Descendent with no additional funds at all.  Rather, it only improves cash flow and
15   helps Descendent get *part* of the back-end ▮▮ revenue split paid *sooner*.  This
16   potential "early" ▮▮ split is exactly the same as Descendent's ▮▮ back-end split
17   on ▮▮▮▮ from the later revenue tranches.

       8.    Descendent did not intend to and would not have bargained away a minor
19   advance in cash flow as the only and exclusive remedy for Little Orbit skipping,
20   keeping and pocketing ▮▮▮▮ in settlement payments.  This is especially true
21   given that Little Orbit filed its meritless claims in the original litigation after Little
22   Orbit: (A) ran out of money, (B) shorted its payment due to Descendent, (C)
23   apologized for shorting the payment, (D) admitted that Little Orbit had run out of
24   money, and then (E) sued the Defendants shortly after they formally notified Little
25   Orbit of its payment default.  Attached as Exhibit C is a genuine and authentic copy
26   of the notice and demand letter first sent by the Defendants to Little Orbit on or about
27   February 1, 2019.  Attached as Exhibit D is a genuine and authentic copy of a Skype
28   message from Matthew Scott of Little Orbit to me in which he apologized for shorting

that payment and explained that Little Orbit had been having financial problems.

9. Matt Scott's reply declaration states that Little Orbit purportedly bargained for the right to skip all three settlement payments in exchange for only the early ▮▮▮ splits on the first $▮▮▮▮ in revenues. That was never in fact discussed nor agreed upon. The early ▮▮▮ splits on the first $▮▮▮ in revenues was never discussed or deemed to be Defendants' only or exclusive remedy for payment breaches as to all three payments. Rather, Section 4 of the BSTS makes this a remedy only for any single "payment" not being made "on time." It does not address, and was never discussed as applying to, the situation where all three payments are not made *at all*. While the parties discussed that Little Orbit may have trouble making the first settlement payment on time, we never discussed or agreed that Little Orbit could skip all three payments and that the early ▮▮▮ revenue split would be the Defendants' only remedy.

10. Because Little Orbit has missed the first three payment due dates, and given its prior history of defaulting on debts to Descendent, the Defendants have demanded adequate assurance of due performance of Little Orbit's financial and development obligations under the BSTS.

11. Specifically, the Defendants are concerned that Little Orbit lacks and has always lacked the funds necessary to make the settlement payments and complete development of the game. That concern is based in part on an Experian Credit report, which puts Little Orbit into the "high risk" category and further indicates that Little Orbit keeps less than $▮▮▮ in its bank account, which is far less than the $1 million or more necessary to complete the game and pay the Defendants.

12. The Defendants have demanded, but have not received, the Little Orbit bank statements and its financial accounting software and reports from November 1, 2020 through the present, plus disclosures as to the status of Little Orbit's fund raising efforts and development efforts. A genuine and authentic copy of that correspondence is attached as Exhibit E. Little Orbit has not provided the requested financial data,

development status disclosure, and financing status disclosure as adequate assurance.

13.   The BSTS was carefully negotiated by skilled counsel at arm's length. The Defendants own the relevant intellectual property to the game.  Royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate.

14.   Defendants' evidence would have clearly shown that Little Orbit's payment defaults and many unnecessary changes and failures to perform[2] were responsible for the cost overruns and delays based on which Little Orbit wrongfully terminated the Original Contracts (the Development Agreement and original terms sheet addendum) in February of 2019. (*See* Exs C & D).  Furthermore, the very same definition of "revenues" will apply to Descendent if - as now seems likely eight months into Little Orbit's one-year development deadline - the development rights revert back to Descendent in four months pursuant to Section 13 of the BSTS.

15.   Little Orbit breached and then terminated the Original Contracts in February of 2019, which is what caused this litigation, just after Descendent notified Little Orbit of its payment default because Little Orbit admittedly ran out of money and could not pay Descendent.

16.   The parties' relationship under the BSTS is not based on and looks nothing like their relationship under the Development Agreement.  To the contrary, under the BSTS, Descendent assumed absolutely no responsibility for performing any development work or services after transferring (only) certain expressly designated, discrete, limited items of customer information to Little Orbit.

17.   The parties simply did not base the payment splits in the BSTS on the Development Agreement. Rather, they were the product of back-and-forth dickering

---

[2] Like failing to complete the application program interface "API" that Little Orbit demanded and promised to complete itself but then failed to complete. Because Little Orbit never completed the API, breached its payment obligations to Descendent, and wrongfully terminated the Original Contracts, Descendent never had any obligation to convey the trademark license because the game was never completed or released.

1    and negotiations.

2        18.   There is no standard definition or set of deductions from royalty income

3    or net sales in game software development contracts.  The contract and deal that the

4    parties were negotiating in November of 2020 was not a development agreement but

5    a settlement agreement – one which left the Defendants with no obligation to deliver

6    anything nor to provide any further services (other than delivering a few discrete,

7    expressly designated items of customer data). (BSTS § 10).

8        19.   Little Orbit has trotted out one set of purportedly "crucial" deliverables

9    after another as its excuse for not wanting to pay and for not having made any

10   development efforts.  Little Orbit did not complain about any of these allegedly

11   missing purported deliverables for about four months after it was supposed to have

12   started development in November of 2020.  None of these works was either material

13   to the development process nor due to be delivered by Descendent, and Little Orbit

14   has never actually stated that it does not have them.

15       20.   The only asset that the Defendants have not previously completely

16   delivered in response to Little Orbit's improper and illegitimate demands is the

17   writable, executable copy of the game software archive history. This was lost (except

18   for the read-only files) when Little Orbit stopped paying on the Original Contracts

19   because it was out of money, terminated the Original Contracts and then completely

20   stopped paying.  As a result, Little Orbit rendered the Defendants unable to pay the

21   approximately $2,000 per month server maintenance fees to maintain the writable,

22   executable version of the game code history.

23       21.   The Defendants did make sure to keep and maintain the game code,

24   because we knew that the game code is all that is necessary to finish the game.  The

25   game code necessary to complete the development process had been delivered and

26   downloaded to Little Orbit in November of 2018.  In fact, Matt Scott of Little Orbit

27   downloaded the entire game software on or about November 20, 2018, with assistance

28   from Descendent, shortly before Little Orbit breached and then terminated the

Original Contracts, after being called out for shorting a due payment. The Skype messages, a genuine and authentic copy of which are attached as Exhibit G, were generated in connection with Descendent helping Little Orbit to download and acquire the November 2018 game code. The game code automatically updated daily through about February 15, 2019, the time of Little Orbit's wrongful termination. Little Orbit had and needed access to the daily updated game code to work on the different API that Little Orbit insisted on, promised to complete and then failed to complete.

22. Little Orbit did not provide any "requirements" or directions for off-site storage as required by Section 3.8 of the terminated Development Agreement. The "final version" of the game was never delivered due to Little Orbit's breach and wrongful termination of the Original Contracts, so the storage requirements and Section 3.8 are inapplicable by their express terms.

23. Little Orbit appears to admit in Paragraph 3 of Matt Scott's reply declaration that Little Orbit has made virtually no effort to develop the game in the past eight months since the BSTS was signed. This is truly inexcusable given that: (1) the game software is the only asset that was actually needed to complete development of the game; and (2) Defendants have now established through documentary and testimonial evidence (Ex. G), that Little Orbit has had actual possession of the game software since at least November of 2018.

24. Descendent provided the development history and art source repository on June 29, 2021. Had Little Orbit properly met and conferred and waited the required seven days until June 28, 2021 to file its motion, its motion would have been unnecessary because it would have been informed before filing its motion that the game history and art source files had been located and were in the process of being recovered.

25. Exhibit F to this declaration is a genuine and authentic copy of relevant portions of the transcript of the May 24, 2021 hearing in this case.

1    I declare under penalty of perjury that the above is true and correct.
2    Executed This 21st Day of July, 2021, in Austin, Texas.
3
4                                    _____
5                                           Eric Peterson
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

-7-

# EXHIBIT A

# [REDACTED PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

Case 8:20-cv-00989-DOC-JDE Document 96-2 Filed 07/21/21 Page 31 of 253 Page ID
#:1341
3/26/2021                    Fwd: FW: Spoke to Herve some more - novaipoffice@gmail.com - Gmail

**From:** Matt Scott <Matt.Scott@littleorbit.com>
**Sent:** Tuesday, March 23, 2021 7:05 PM
**To:** eric.peterson@feverpitchstudios.com
**Subject:** RE: Spoke to Herve some more



If your lawyer wants to push us on an answer — you have it. No extension needed. We are 100% onboard with the terms we agreed to in November according to our definitions. I'm not going to make any payments. We'll split the first $▮▮▮▮▮▮ He can raise a stink or re-approach the judge, but that's not going to do anything. Those terms are crystal clear. We don't need anyone's permission to move forward and release the game. There's a legally binding settlement that everyone agreed to that says we can take the game to market.

Whitticar can sue me in a year over the revenue definition to get a couple more bucks.

Thanks,
Matt

# EXHIBIT B

# [ENTIRE EXHIBIT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

# EXHIBIT C





Pete Meeke
Membe

512 660 5967 dire-
pmeeker@rcmhlaw.co

February 1, 2019

Matt Scott
Little Orbit, LLC
29863 Santa Margarita Parkway, Suite 110
Rancho Santa Margarita, California 92688

Re:     Descendent Studios, Inc.; Descent Video Game Development Agreement

Dear Mr. Scott:

We represent Descendent Studios, Inc. Yesterday, January 31, Descendant Studios received a $10,000 payment from Little Orbit. As you know, that payment was $20,000 less than the $30,000 due to Descendant Studios for its work on the Descent video game. This failure constitutes a material breach of the Development Agreement.

As a demonstration of good faith, Descendent Studios is continuing to uphold its contractual obligations under the expectation that Little Orbit will cure its breach. Little Orbit may cure this breach by depositing the sum of Fifty-Thousand ($50,000) U.S. Dollars to the customary bank account of Descendent Studios on or before 5:00pm CST on Friday, February 15, 2019, and by maintaining timely delivery of contractually-obligated payments thereafter. Attached is our client's January 31, 2019 invoice.

Failure to cure this material breach will delay the release of the Game, resulting in significant financial damages to both parties. Descendent Studios reserves its right to assert any and all rights and remedies to which it may be entitled under the Development Agreement and the law, including but not limited to termination of the agreement.

Descendent Studios would prefer to continue the Development Agreement and work toward completion and publishing of the Game, but only if Little Orbit honors its commitments and obligations under the Development Agreement.

Sincerely yours,

Pete Meeker
Enclosure

Reed, Claymon, Meeker & Hargett, PLLC

034

# EXHIBIT D

7/16/2021                                    MattScottAdmitsBreach.JPG



  Matthew, 4:00 PM

I'm having him organize everything, and then I'm going to have
Kyle sit with my UX person to map everything into the UI
templates

BTW - its worth saying: I am sorry about the unexpected non-
pay. That's on me. I had another payment that was supposed to
show up. We're still sorting it out.

4:04 PM

Thanks, I appreciate that - trust me when I say I want this to
work out - and we all benefit, there is no other way in which this
even remotely succeeds.....it all is like fractional if we get pissy.....

# EXHIBIT E

# [REDACTED PORTIONS OF EXHIBIT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

7/16/2021        Gmail - Demand For Adequate Assurance of Due Performance





Michael Whitticar <novaiplaw@gmail.com>

## Demand For Adequate Assurance of Due Performance

**Michael Whitticar** <mikew@novaiplaw.com>                 Fri, Jul 9, 2021 at 1:41 PM
To: Mr Danton Richardson <mdantonrichardson@yahoo.com>
Cc: Leo Lundberg <leo.law.55@gmail.com>, "Shamonki, Nada" <nishamonki@mintz.com>, "Hashimoto, Diane" <DEHashimoto@mintz.com>
Bcc: Eric Peterson <eric.peterson@feverpitchstudios.com>, Paralegal <novaipoffice@gmail.com>

Dear Danton:

Because Little Orbit has missed the first three payment due dates, and given its history of defaulting on debts to Descendent, Descendent and Mr. Peterson hereby demand adequate assurance of due performance of Little Orbit's financial and development obligations under the Binding Settlement Terms Sheet ("BSTS").

Specifically, Descendent and Mr. Peterson are concerned that Little Orbit lacks and has always lacked the funds necessary to make the settlement payments and complete development of the game.

An Experian credit report puts Little Orbit into the "high risk" category, and further indicates that Little Orbit keeps less than $      in its bank account,

That obviously is not sufficient to permit Little Orbit to complete development of, much less market and promote, the game at issue.

Please send us the accounting software data and reports from Little Orbit's accounting software, as well as Little Orbit's bank statements, from November 1, SinDSSS2020 through the present.

Failure to provide the requested information and adequate assurance will be deemed yet another material breach of the BSTS by Little Orbit.

Sincerely,

Michael C. Whitticar

NOVA IP Law, PLLC
7420 Heritage Village Plaza
Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Fax: 855-295-0740
www.novaiplaw.com
mikew@novaiplaw.com

 Gmail                                              **Michael Whitticar <novaiplaw@gmail.com>**

---

## Demand For Adequate Assurance of Due Performance

---

**Michael Whitticar** <mikew@novaiplaw.com>                                      Fri, Jul 9, 2021 at 3:29 PM
To: Mr Danton Richardson <mdantonrichardson@yahoo.com>
Cc: Leo Lundberg <leo.law.55@gmail.com>, "Shamonki, Nada" <nishamonki@mintz.com>, "Hashimoto, Diane"
<DEHashimoto@mintz.com>, Paralegal <admin@novaiplaw.com>
Bcc: Eric Peterson <eric.peterson@feverpitchstudios.com>

Also, we are eight month into Little Orbit's development period, and four months from its completion deadline.

Please let us know what progress Little Orbit has made toward completing the game and raising any necessary
funds, investment or capital to complete, market and promote the game.

This is also part of Defendants' demands for adequate assurance of due performance.

Sincerely,

Michael C. Whitticar
]
NOVA IP Law, PLLC
7420 Heritage Village Plaza
Suite 101
Gainesville, VA 20155
Telephone:  (571) 386-2980
Fax:  855-295-0740
www.novaiplaw.com
mikew@novaiplaw.com

[Quoted text hidden]

# EXHIBIT F



DEFENDANT'S EXHIBIT E

```
 1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    SOUTHERN DIVISION - SANTA ANA

 3

 4   LITTLE ORBIT LLC,              )   Case No. SACV 20-89-DOC (JDEx)
                                    )
 5        Plaintiff,                )   Santa Ana, California
                                    )   Monday, May 24, 2021
 6            v.                    )   12:00 P.M.
                                    )
 7   DESCENDENT STUDIOS INC.,       )   VIDEOCONFERENCE
     et al.,                        )
 8                                  )
          Defendants.               )
 9   _____)

10

11

12
                      TRANSCRIPT OF PROCEEDINGS
13              BEFORE THE HONORABLE JOHN D. EARLY
                   UNITED STATES MAGISTRATE JUDGE
14

15

16   Appearances:                 See Page 2

17   Deputy Clerk:                 Maria Barr

18   Court Reporter:               Recorded; CourtSmart

19   Transcription Service:        JAMS Certified Transcription
                                   16000 Ventura Boulevard #1010
20                                 Encino, California  91436
                                   (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
```

```
 1   APPEARANCES:

 2

 3   For the Plaintiff:      Law Office of M. Danton Richardson
                             By:  MICHAEL DANTON RICHARDSON
 4                           131 North El Molino Avenue, Suite 310
                             Pasadena, California  91101
 5                           (949) 677-6434
                             mdantonrichardson@yahoo.com
 6

 7

     For the Defendants:     Nova IP Law PLLC
 8                           By:  MICHAEL C. WHITTICAR
                             7420 Heritage Village Plaza, Suite 101
 9                           Gainsville, Virginia  20155
                             (571) 386-2980
10                           mikew@noaiplaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

10

1 execute a further, more detailed, written memorialization

2 (end reading).

3         So the parties contemplated it -- that it was

4 possible. It didn't happen. So now we're going to revert to

5 the settlement agreement that was put on the record way back

6 in -- on November 17th. But in fairness to plaintiff, I'm

7 not going to make that retroactive -- that his payment was

8 due 60 days from November 17th. I'm going to make that

9 payment due -- and I'm saying "60 days." Maybe it was

10 30 days -- from today. So plaintiff will have an opportunity

11 to comply. If he doesn't make that payment, then we'll see

12 where we are, but that's what we're going to do. I see --

13 I'm going to hold my tongue.

14         Please continue, Mr. Whitticar.

15         MR. WHITTICAR: So the second issue, Your Honor,

16 was that the plaintiff said that they were going to treat

17 revenues as some kind of net sales under the original

18 development agreement which was of course --

19         THE COURT: It's not -- that dispute is not ripe

20 for me. Okay? Come back to me, if you need to, if the first

21 payment is not made. I think revenue -- the meaning of it is

22 clear. It's not ambiguous. It was clear from the context of

23 the agreement itself, and from the parties course of dealing,

24 it was not unclear. It appears to me that the -- there's

25 been an effort made by plaintiff to create an ambiguity where

1  there was none, but it's not -- unless and until that first

2  payment is missed, you're asking me -- and I do think this is

3  fair from plaintiff -- you're asking me or Judge Carter to

4  make a advisory ruling when it's not before us.  We make

5  rulings on actual, live disputes.  Even if everybody says

6  it's going to be a dispute 60 days from now, I'm not walking

7  you guys through this.

8        You had a full and fair opportunity to put whatever

9  terms you wanted in a term sheet, in a settlement agreement,

10  and I said, I'll put whatever you -- whatever terms you want

11  will be what the settlement terms are.  This is what is

12  before us.  I find that it's not ambiguous and the meaning is

13  clear based on the course of dealing with the party and the

14  language used, and I'm not going beyond that unless there's

15  some particular ripe dispute.

16        MR. WHITTICAR:  Okay.  And then the third issue,

17  Your Honor, was them saying that they refused to market the

18  game or spend on marketing or user acquisition --

19        THE COURT:  Again, I -- I'm just going to repeat

20  myself.  It's not a ripe -- it's not ripe at this point.  I'm

21  not going to get into that.  The agreement is clear.  If you

22  hit a point where that has been violated, as opposed to them

23  expressing their agreement about what the -- their views on

24  what the agreement means, so be it, but let's get first

25  things first.  There's no more -- there's -- this is clear:

# EXHIBIT G


DEFENDANT'S EXHIBIT
G

Matthew, 4:58 PM

I use 2017, that would be my preference

Unreal 4.20.3?

Or 4.21

5:00 PM
4.20.3



Matthew, 5:02 PM

kk

pulling that down

confirming we can us vs2017

5:03 PM
yup





5:03 PM

yup

Matthew, 5:08 PM 😊

kk

how big is the ContentSource repo? 😊

5:14 PM

Huge

one sec

177gig

Be back in a few, testing.

Matthew, 5:55 PM 😊

squeaked by... 22GB free

Wednesday, November 21, 2018

1

**CERTIFICATE OF SERVICE**

2

I, the undersigned, certify and declare that I am over the age of 18 years,

3

employed in the County of Los Angeles, State of California, and am not a party to

4

the above-entitled action.

5

On July 21, 2021, I filed a copy of the following document(s):

6

**[REDACTED] DECLARATION OF ERIC PETERSON IN SUPPORT OF
DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING
SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR
AN AWARD OF ATTORNEYS' FEES**

7

8

By electronically filing with the Clerk of the Court using the CM/ECF system which
will send notification of such filing to the following:

9

10

- **Leo Edward Lundberg , Jr**

11

leo.law.55@gmail.com

12

- **Michael Danton Richardson**

13

mdantonrichardson@yahoo.com

14

15

Executed on July 21, 2021, at Los Angeles, California.  I hereby certify that I

16

am employed in the office of a member of the Bar of this Court at whose direction

17

the service was made.

18

/s/ Diane Hashimoto_____

19

Diane Hashimoto

20

21

22

23

24

25

26

27

28

NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

MICHAEL C. WHITTICAR (*admitted pro hac vice*)
mikew@novaiplaw.com
**NOVA IP LAW, PLLC**
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740

Attorneys for Defendant/Counterclaimant
DESCENDENT STUDIOS INC. and
Defendant ERIC PETERSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>Defendants. | Case No. 8:20-cv-00089-DOC-JDE<br><br>**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**<br><br>**[REDACTED VERSION OF DOCUMENT FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]** |
| DESCENDENT STUDIOS INC., a Texas corporation,<br><br>Counterclaimant,<br><br>vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>Counterdefendant. | Date: August 23, 2021<br>Time: 8:30 a.m.<br>Courtroom: 9D<br><br><br>Judge: Hon. David O. Carter<br><br>Complaint Filed: 1/16/2020 |

**TABLE OF AUTHORITIES**

**Page**

I.    FACTS……………............................................................................ 1

II.   ARGUMENT.................................................................................... 4

III.  LITTLE ORBIT IS NOT ENTITLED TO ANY EXTENSIONS OF TIME
      NOR TO ATTORNEYS' FEES ....................................................... 10

IV.   STATUS OF NEGOTIATIONS ...................................................... 12

V.    CONCLUSION ............................................................................... 13

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Coker Equipment Co., v. Witting*,
   366 Fed. Appx. 727 (9th Cir. 2010) ................................................................. 13

*Ekland Marketing Company of California, Inc. v. Lopez*,
   2007 U.S. Dist. LEXIS 48391 (E.D. Cal. June 5, 2007) .................................... 8

*Price v. U.S. Monolithics, LLC*,
   2005 U.S. Dist. LEXIS 53065 (S.D. Cal. 2005) ............................................... 13

*Vectren Communications Services v. City of Alameda*,
   2009 U.S. Dist. LEXIS 72811 (N.D. Cal. August 18, 2009) .............................. 8

**California Cases**

*Berman v. Bromborg*,
   56 Cal. App. 4th 936 (2d. Dist. Ct. App. 1997) .................................................. 5

*Branley v. Crosby Research Foundation, Inc.*,
   73 Cal. App. 2d 103 (1st Div. Ct. App. 1946) ..................................................... 8

*Donovan v. RRL Corp.*,
   26 Cal. 4th 261 (Cal. Sup. Ct. 2001) .................................................................. 6

*Rodriguez v. Oto*,
   212 Cal. App. 4th 1020 667, 672 (2013) ............................................................. 5

*Vaillette v. Fireman's Fraud Ins. Co.*,
   18 Cal. App. 4th 680 (4th Dist. Ct. App. 1993) .................................................. 5

*Wolf v. Walt Disney Pictures & Television*,
   162 Cal. App. 4th 1107 (2nd Dist. Ct. App. 2008) ............................................. 8

**California Statutes**

Cal. Civ. Code § 1636 .......................................................................................... 5

Cal. Civ. Code § 1638 .......................................................................................... 5

Cal. Civ. Code § 1655 .......................................................................................... 8

Cal. Civ. Code § 1656 ............................................................................8

Cal. Comm. Code § 2306(2) ...................................................................9

**Other Authorities**

Local Rule 7-3 ......................................................................................12

Brian A. Garner, <u>Black's Law Dictionary</u> (11th Ed. 2019) ..................5, 7

<u>Restatement (Second) of Contracts</u> § 153 ..............................................6

<u>Restatement (Second) of Contracts</u> § 251 ............................................13

## I. **FACTS**

1.    This second motion to enforce the BSTS is necessary due to Little Orbit's breach of the BSTS, most recently by failing to make the settlement payment which was due (once again) on June 23, 2021, and also by failing to provide adequate assurance of due performance upon demand.

2.    Little Orbit admits that it now has all of the game assets purportedly necessary to complete the game, but it still has failed to make the first settlement payment.

3.    The BSTS was signed on November 17, 2020, almost eight months ago. It required three payments from Little Orbit ("LO") to Descendent, two of which were due within 120 days of signing the original BSTS or first written memorialization.  Neither of these first two payments has been made, and Little Orbit has plainly stated that it has no intention of making any of the agreed upon monetary settlement payments.  (Ex. A to Peterson Declaration). (Peterson Declaration ¶ 3).

4.    Because Little Orbit has failed for the past seven months to make any of the agreed upon settlement payments, and again skipped the June 23, 2021 payment date as extended by the court, Descendent is gravely concerned that Little Orbit lacks the funds to pay Descendent, is stalling for time, and lacks the intent and ability to make the settlement payments.[1]  This is especially concerning given the projected $1 million or more in costs and expenses that will be needed for Little Orbit to adequately complete and market the game.  The Defendants' concern is heightened by the fact that an Experian Credit Report shows that Little Orbit has a "high risk" business credit score, and keeps less than ▮▮▮▮▮ in the bank.  (Ex. B to Peterson Declaration). (Peterson Declaration ¶ 5)

---

[1] The email attached as Exhibit A to the Peterson Declaration, like the most recent declaration from Little Orbit's Matthew Scott, also strongly indicates that Little Orbit plans to skip all three agreed-upon settlement payments and to try to covertly impose its own misguided and erroneous definition of "Revenues."

5. Descendent requests the Court to order Little Orbit to pay (at least) the first settlement payment plus $7,500.00 in attorneys' fees to the Defendants. In addition, pursuant to Section 4 of the BSTS, Little Orbit should be ordered to pay Descendent ▓ percent of the first ▓▓▓▓▓ in revenue or gross income received after Little Orbit defaulted on its payment obligation on June 23, 2021 (originally on December 17, 2020).

6. The ▓▓▓ split provided for in Section 4 of the BSTS is <u>not</u>, however, Descendent's sole remedy for Little Orbit's complete failure to make **all three payments** required under the Binding Terms Sheet, at Sections 1 through 3.

7. Section 4 of the BSTS simply provides as follows:

> 4. If any <u>payment</u> <u>not made</u> <u>on time</u>, LO pays Descendent ▓
> percent of the first ▓▓▓ in revenues after default.

(Docket No. 48-1) (emphasis supplied).

8. This was expressly stated as a remedy for any one "<u>payment</u>" (singular) that was not made "<u>on time</u>." It was never stated nor agreed to be Descendent's <u>sole or exclusive remedy</u> for any one or more <u>payments</u> (plural) that are not made <u>at all</u>, and especially not for all three payments not being made <u>at all</u>. Little Orbit has tried to stretch the language of Section 4 beyond its clear logical and plain grammatical meaning, because Little Orbit lacks the intention and also apparently the funds necessary to make the required settlement payments. However, it is clear that Section 4 was intended to address only the *timing* of payments, and not to establish an exclusive remedy for Little Orbit failing to make one or more payments <u>ever or at all</u>. (Peterson Declaration ¶ 6).

9. It should be noted that, if the game sells well, then the early ▓▓ split of ▓▓▓▓ provides Descendent with no additional funds at all. Rather, it only improves cash flow and helps Descendent get *part* of the back-end ▓▓ revenue split paid *sooner*. This potential "early" ▓▓ split is exactly the same as Descendent's ▓▓ back-end split on ▓▓▓▓ from the later revenue tranches.

Descendent did not intend to and would not have bargained away a minor advance in cash flow as the only and exclusive remedy for Little Orbit skipping, keeping and pocketing ███████ in settlement payments. This is especially true given that Little Orbit filed its frivolous claims in the original litigation after Little Orbit: (A) ran out of money, (B) shorted its payment due to Descendent, (C) apologized for shorting the payment, (D) admitted that Little Orbit had run out of money, and then (E) sued the Defendants shortly after they formally notified Little Orbit of its payment default. (Peterson Declaration: Exs. C and D). (Peterson Declaration ¶ 7).

10. Matt Scott's reply declaration contains many clear falsehoods. The most obvious and material of these, which Judge Early will hopefully recognize and remember, is that Little Orbit purportedly bargained for the right to skip all three settlement payments in exchange for only the ████ splits on the first ████████ in revenues. That was never discussed nor agreed upon. The ████ split on the first $████ in revenues was never discussed or deemed to be Defendants' only or exclusive remedy for payment breaches as to all three payments, and Section 4 of the BSTS makes this a remedy only for any single "payment" not being made "on time." It does not address, and was never discussed as applying to, the situation where all three payments are not made at all. While the parties discussed that Little Orbit may have trouble making the first settlement payments on time, they never discussed or agreed that Little Orbit could skip all three payments nor that the ████ revenue split would be the Defendants' only or exclusive remedy. (Peterson Declaration ¶ 9).

11. The fact that Matt Scott would swear to this demonstrably false statement (Scott Declaration ¶ 10) shows the fraudulent intent of Little Orbit in that it obviously lacked the intent to make the three settlement payments required by the BSTS.

12. Because Little Orbit has missed the first three payment due dates, and given its prior history of defaulting on debts to Descendent, the Defendants have

1    demanded adequate assurance of due performance of Little Orbit's financial and

2    development obligations under the BSTS. (Peterson Declaration Ex. E). (Peterson

3    Declaration ¶ 10).

4         13.     Specifically, the Defendants are concerned that Little Orbit lacks and

5    has always lacked the funds necessary to make the settlement payments and

6    complete development of the game. That concern is based in part on an Experian

7    Credit report, which puts Little Orbit into the "high risk" category and further

8    indicates that Little Orbit keeps less than $▮▮▮ in its bank account, which is far

9    less than the $1 million or more necessary to complete the game and pay the

10    Defendants. (Ex. B: Peterson Declaration). (Peterson Declaration ¶ 11).

11         14.     Therefore, the Defendants have demanded, but have not received, the

12    Little Orbit bank statements and its financial accounting software and reports from

13    November 1, 2020 through the present, plus disclosures as to the status of Little

14    Orbit's fund raising efforts and development efforts. By not providing the requested

15    financial data, development status disclosure, and financing status disclosure as

16    adequate assurance, Little Orbit has committed yet another material breach of the

17    BSTS. (Peterson Declaration ¶ 12).

18    **II.**    **<u>ARGUMENT</u>**

19         As the Court previously noted, the "revenues" of which Descendent is entitled

20    to ▮ percent of means "income from any and all sources; gross receipts."

21           I think revenue - the meaning of it is clear. It's not

22           ambiguous…..It appears to me that the--- there has been an effort
              made by Plaintiff to create an ambiguity where there was none….

23    (Peterson Declaration Ex. F at pp. 10-11).

24         These issues are objectively determined based on the parties' "objective

25    manifestations" of assent and intent made at the time of contracting. This rule exists

26    primarily to prevent and foreclose the type of backsliding and re-negotiating which

27    Little Orbit is improperly attempting in this case.

28

> California recognizes the objective theory of contracts. It is the objective intent, as evidenced by the words of the contract, rather than the subjective intent of one of the parties, that controls interpretation.
>
> …
>
> Thus, evidence of undisclosed subjective intent of the parties is irrelevant to determining the meaning of contractual language. Rather, it is the outward manifestation or expression of assent which is controlling. With respect to the interpretation of a written settlement agreement, one court has stated that the true, subjective but unexpressed intent of a party is immaterial and irrelevant.

*Berman v. Bromborg,* 56 Cal. App. 4th 936, 948, 65 Cal. Rptr. 2d. 777, 783 (2d. Dist. Ct. App. 1997), citing and quoting, (among others) *Vaillette v. Fireman's Fraud Ins. Co.,* 18 Cal. App. 4th 680, 686, 690, 22 Cal Rptr. 807, 810 (4th Dist. Ct. App. 1993).

"A signature on a written contract is an objective manifestation of assent." *Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1027, 151 Cal Rptr. 3rd 667, 672 (2013). "If the terms are unambiguous there is ordinarily no occasion for additional evidence of the parties' intent." *Id.* Their "actual intent," for purposes of contract law, "is that to which they manifested assent by executing the agreement." *Id.*

Thus, a party's secret, unexpected subjective interpretation of words is irrelevant in interpreting a contract:

> Ordinarily, the words of the document are to be given their plan meaning and understood in their common sense; the parties' expressed objective intent, not their unexpressed subjective intent, governs.
>
> The true, subjective, but unexpressed intent of a party is immaterial and irrelevant.

*Vaillette*, 18 Cal. App. 4th at 686, 690, 22 Cal Rptr. at 810 (4th Dist. Ct. App. 1993); Cal. Civ. Code §§ 1636, 1638. Here, the plain meaning and dictionary definition of "revenue" is "income from any and all sources, gross receipts."[2]

---

[2] According to Black's Law Dictionary, the very first definition of "Revenue" is "income from any and all sources; gross income or gross receipts." B.A. Garner, Black's Law Dictionary, p. 1577 (11th Ed. 2019).

In addition, there is no reason that paying Defendants a percentage of revenues or gross income would be unconscionable, as the BSTS was carefully negotiated by skilled counsel at arm's length, Defendants own the relevant intellectual property to the game, and royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate. (Peterson Declaration ¶ 13).

Furthermore, Defendants' evidence would have clearly shown that Little Orbit's payment defaults and many unnecessary changes and failures to perform[3] were responsible for the cost overruns and delays based on which Little Orbit wrongfully terminated the Original Contracts in February of 2019. (*See* Exs C & D). (Peterson Declaration ¶ 14). Furthermore, the very same definition of "revenues" will apply to Descendent if - as now seems likely eight months into Little Orbit's one-year deadline - the development rights revert back to Descendent in four months pursuant to Section 13 of the BSTS. Therefore, there is no basis for setting aside the BSTS based on Little Orbit's unilateral mistake nor as being unconscionable. *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 280-282 (Cal. Sup. Ct. 2001); Restatement (Second) of Contracts § 153.

Little Orbit's claim that it construed "revenue" not by its common dictionary definition but rather to be the same thing as "Net Sales" under the Development Agreement is untrue, illogical and objectively baseless. First, the Development Agreement never defined or used the terms revenues or profits, but rather the very distinct and different term "Net Sales."

Second, Little Orbit breached and then terminated the Development Agreement and the subsequent terms sheet addendum (the "Original Contracts") long ago in February of 2019, which is what caused this litigation, just after

---

[3] Like failing to complete the application program interface "API" that Little Orbit demanded and promised to complete itself but then failed to complete. Because Little Orbit never completed the API, breached its payment obligations to Descendent, and wrongfully terminated the Original Contracts, Descendent never had any obligation to convey the trademark license because the game was never completed or released. (Peterson Declaration ¶ 14 footnote 2).

Descendent notified Little Orbit of its payment default because Little Orbit admittedly ran out of money and could not pay Descendent.  (Exs. C & D : Peterson Declaration ¶ 15).

Third, the BSTS provided for "Mutual General Releases" (p. 2, ¶ 19), which completely cancelled and novated the Original Contracts.

Fourth, the parties' relationship under the BSTS is not based on and looks nothing like their relationship under the Development Agreement.  To the contrary, under the BSTS, Descendent assumed absolutely no responsibility for performing any development work or services after transferring (only) certain discrete, limited items of customer information to Little Orbit.  (BSTS ¶ 10).

The BSTS was a completely different animal from the terminated Development Agreement.  The BSTS simply and objectively was not a continuation of the Development Agreement in whole or in part.  There is no objectively logical or accurate reason that Little Orbit could have reasonably expected the meaning of a word not used or defined in the Development Agreement (Revenues) to have the same meaning as the Development Agreement's very different term (Net Sales) when "Revenues" was used in the very different BSTS.[4]  In addition, the parties simply did not base the payment splits in the BSTS on the Development Agreement.  Rather, they were the product of back-and-forth dickering and negotiations. (Peterson Declaration ¶ 16).

There is no standard definition or set of deductions from royalty income or net sales in game software development contracts.  In any event, the contract and deal

---

[4] Oddly, Little Orbit has argued at length about the meaning of the word "profits" and the parties' failure to discuss, "profits." Tellingly, "profits" is not a word that was ever used in the BSTS nor in the Development Agreement. Like "Net Sales," "profits" has a very different definition and connotation than revenues, as "profits" means profits or income after subtracting costs and operating expenses from "revenues." *See* Brian A. Garner, Black's Law Dictionary, p. 1463 (11th Ed. 2019) ("profit" means "the excess of revenues over expenditures in a business transaction; GAIN." Once again, Little Orbit and its counsel have confused "Revenues" with other, very dissimilar words and concepts.

1　that the parties were negotiating in November of 2020 was not a development

2　agreement but a settlement agreement – one which left the Defendants with no

3　obligation to deliver anything nor to provide any further services (other than

4　delivering a few discrete items of customer data). (BSTS § 10) (Peterson

5　Declaration ¶ 18).

6　　　　In short, as judged by the plain language dictionary definition of the words

7　they chose and used, as properly judged by their objective manifestations of assent

8　and meaning, and properly disregarding post-hoc subjective statements of Little

9　Orbit's inaccurate, baseless, purported secret meaning of "Revenues," the parties

10　agreed that Defendants would receive royalties and payments based on a percentage

11　of revenues, meaning gross income from sales and licensing.

12　　　　The excuses given by Little Orbit for not paying are simply and totally

13　without merit. Little Orbit has trotted out one set of purportedly "crucial" missing

14　deliverables after another as its excuse for not paying what it owes to Descendent.

15　It is important to note that Little Orbit did not complain about any of these allegedly

16　missing purported deliverables for almost five (5) months after it was supposed to

17　have started development in November of 2020.  (Peterson Declaration ¶ 19).

18　　　　By not starting development for 8 months after the BSTS was signed, (*see*

19　Matt Scott Declaration ¶ 3), Little Orbit materially breached its good faith best

20　efforts obligations, as an exclusive licensee, to deliver and market the game. *See*

21　*Branley v. Crosby Research Foundation, Inc.*, 73 Cal. App. 2d 103, 112 (1st Div.

22　Ct. App. 1946), citing Cal. Civ. Code §§ 1655,1656.  *See also Wolf v. Walt Disney*

23　*Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2nd Dist. Ct. App. 2008)

24　(covenant to use good faith and best efforts is "routinely implied" when licensor

25　grants exclusive licensing rights in exchange for a percentage of profits or

26　royalties); *Vectren Communications Services v. City of Alameda,* 2009 U.S. Dist.

27　LEXIS 72811 *13 (N.D. Cal. August 18, 2009); *Ekland Marketing Company of*

28　*California, Inc. v. Lopez,* 2007 U.S. Dist. LEXIS 48391 *4 (E.D. Cal. June 5, 2007).

*Cf.* Cal. Comm. Code §2306(2) (exclusive dealing contracts for the sale of goods require the buyer "to use best efforts to promote their sales.").

As explained in more detail in the Defendants' recent opposition (Docket No. 91), none of these allegedly missing purported deliverables was either material to the development process nor due to be delivered by Descendent, and Little Orbit has never even actually stated that it does not have them. (Peterson Declaration ¶ 19).

The only asset that the Defendants have not previously completely delivered in response to Little Orbit's improper and illegitimate demands is the writable, executable copy of the game software archive history. This was lost (except for the read-only files) when Little Orbit stopped paying on the Original Contracts because it was out of money, terminated the Original Contracts and then completely stopped paying. As a result, Little Orbit rendered the Defendants unable to pay the $2, 000 per month server maintenance fees to maintain the writable, executable version of the game code history. (Peterson Declaration ¶ 20).

The Defendants did make sure to keep and maintain the game code, because the Defendants knew that the game code is all that is necessary to finish the game. (Peterson Declaration ¶ 20). In fact, the game code necessary to complete the development process had been delivered to and downloaded by Little Orbit in November of 2018. In fact, Matt Scott of Little Orbit downloaded the entire game software on or about November 20, 2018, with assistance from Descendent, shortly before Little Orbit breached and then terminated the Original Contracts by shorting a due payment. The Skype messages attached to the Peterson Declaration as Exhibit G were generated in connection with Descendent helping Little Orbit to download and acquire the November 2018 game code. The game code automatically updated daily through about February 15, 2019, the time of Little Orbit's wrongful termination. Little Orbit had and needed access to the daily updated game code to build and work on the different API that Little Orbit insisted on, promised to complete and then failed to complete. (Peterson Declaration ¶ 21).

1    Little Orbit's purported reliance on the storage requirement in Section 3.8 of

2    the Development Agreement that Little Orbit materially breached, terminated,

3    novated and displaced is erroneous and misplaced for all of the reasons stated above

4    on pages 6 to 8 as to why the Original Contracts no longer apply.  In addition,

5    Section 3.8 of the Development Agreement is inapplicable by its express terms.

6    First, Little Orbit did not provide any "requirements" or directions for off-site

7    storage as required by Section 3.8.  Second, the "final version" of the game was

8    never delivered due to Little Orbit's breach and wrongful termination of the

9    Original Contracts.  Therefore, the storage requirements and Section 3.8 are

10   inapplicable by their express terms.  (Peterson Declaration ¶ 22).

11   **III.   LITTLE ORBIT IS NOT ENTITLED TO ANY EXTENSIONS OF TIME**

12   **NOR TO <u>ATTORNEYS' FEES</u>**

13   It is shocking and gravely disappointing that Little Orbit apparently admits in

14   Paragraph 3 of Matt Scott's reply declaration that Little Orbit has made virtually no

15   effort to develop the game in the past eight months since the BSTS was signed in

16   November of 2020.  This is truly inexcusable given that: (1) the game software is

17   the only asset that was actually needed to complete development of the game; and,

18   (2) Defendants have now established through documentary and testimonial evidence

19   (Ex. G) that Little Orbit has had actual possession of the game software since at

20   least November of 2018.  (Peterson Declaration ¶ 23). That by itself is a sufficient

21   basis for denying Little Orbit's request for the court to again extend its deadlines

22   and thereby re-write the BSTS.

23   The court previously found that the BSTS was the "written memorialization"

24   from which Little Orbit's deadlines began to run, and Little Orbit did not object to

25   nor file any exceptions to that finding.  It was completely irresponsible for Little

26   Orbit to wait five to eight months after the BSTS was signed to make any effort to

27   develop the game.

28   It is clear from the plain language of the BSTS that Defendants' obligations

1   were limited to LICENSING the game IP and delivering ONLY a few specified

2   items of customer data. (BSTS Sections 10 and 12). *Inclusio unius est exclusio*

3   *alterius* (the inclusion of one signifies the exclusion of the other).  In the settlement

4   of disputes or litigation, it is common to have IP licenses which are not

5   accompanied by any obligation by the licensor to deliver the IP to the settling

6   licensee.  There is no implied obligation to deliver the licensed IP to the adverse

7   party.  (Whitticar Declaration ¶ 4).  Because Defendants had no obligation to

8   DELIVER any game IP, Little Orbit cannot use its improper and illegitimate

9   demands for made-up IP deliverables as an excuse for its lack of development

10  efforts for the past eight months, for not making the payments due to Descendent,

11  nor to extend its deadlines. (Peterson Declaration ¶ 23).

12       Defendants have formally demanded that Little Orbit disclose the status of its

13  development efforts, its financial condition, and the status of its fundraising efforts.

14  (Ex. E).  Little Orbit's failure to respond is only further evidence that it has done

15  virtually nothing to finish the game for the past eight months and lacks the funds to

16  complete the game.  Mr. Richardson's offer that he "would propose" putting money

17  in escrow on or after the June 23, 2021 payment due date provides zero evidence

18  that Little Orbit actually had or has the money to actually be put into escrow.

19  (Richardson Declaration ¶ 4).  In fact, Little Orbit still has not paid the money it

20  owes Descendent despite acknowledging that it now has as all the necessary game

21  assets.

22       Defendants also noted in their opposition to the motion to set aside, and

23  directly to Mr. Richardson by telephone, that Little Orbit had never actually even

24  stated or testified that it had not in fact had possession of or access to any of the

25  allegedly missing game IP assets.  Mr. Richardson said that that issue would be

26  addressed in Little Orbit's reply brief. (Whitticar Declaration ¶ 5).  It was not.  In

27  fact, Little Orbit still has provided no statement or testimony stating that it did not

28  actually have or have access to any of the allegedly missing game IP assets.  At this

1   point, the court should either infer and conclude that Little Orbit actually had access

2   to the game IP assets, or the court should permit Defendants to depose Matt Scott on

3   those issues, and on the adequate assurance issues addressed above.

4         Little Orbit admits that it filed its motion to set aside only two days after (half-

5   way) conferring with Mr. Whitticar, in violation of Local Rule 7-3. Descendent

6   provided the development history and art source repository on June 29, 2021. Had

7   Little Orbit properly met and conferred and waited the required seven days until

8   June 28, 2021 to file its motion, its motion would have been unnecessary because it

9   would have been informed that the game history and art source files had been

10  located and were being recovered, all before filing its motion. (Peterson Declaration

11  ¶ 24). Instead, Little Orbit had such a great need and desire to skip the payment due

12  on June 23, 2021, that it prematurely filed its motion without waiting the required

13  seven days. Mr. Richardson's version of meeting and conferring two days before

14  filing was to merely threaten to file a duplicative motion to set aside without stating

15  what the basis for it would be and without asking whether Defendants would agree

16  to it or could address the undeclared grounds for it. (Whitticar Declaration ¶ 6).

17        Thus, Little Orbit's motion to set aside and/or extend deadlines should be

18  denied as premature and procedurally improper, and Little Orbit certainly should not

19  be awarded any attorneys' fees.

20        If Little Orbit actually has the funds to make first settlement payment, it can

21  make it at any time. However, there is simply no valid excuse for Little Orbit

22  missing the extended second deadline for this payment.

23  **IV.**   **STATUS OF NEGOTIATIONS**

24        While the Defendants are content with the BSTS, they are always willing to

25  engage in constructive re-negotiations with Little Orbit over the BSTS. The

26  Defendants simply need to get paid first. Also, the Defendants want Little Orbit to

27  engage in reasonable, responsive, meaningful private negotiations, not just more

28  threats and posturing, before again imposing on the Court to re-settle the same case.

1  (*See* Ex. B to Richardson Reply Declaration). In fact, the Defendants have offered

2  Little Orbit two potential paths for renegotiating the BSTS. (*Id.*) However, it is

3  telling that Little Orbit has not made a single settlement proposal in the four weeks

4  since it skipped the first settlement payment and moved to set aside the BSTS.

5  (Whitticar Declaration ¶ 6). This shows that Little Orbit is simply trying to delay

6  because it is unable and/or unwilling to pay. Little Orbit obviously is not interested

7  in sincere, meaningful efforts to renegotiate the BSTS, but is merely stalling for

8  time.

9  ## V.  CONCLUSION

10  In short, Little Orbit admits that it has all of the assets necessary to complete

11  the game, but it still has not made any of the settlement payments due to

12  Descendent. Therefore, Descendent requests the Court to order Little Orbit to pay

13  Descendent the funds that should have been paid within 120 days (or at least within

14  the first thirty days) after the BSTS was signed, to pay the Defendants █ percent of

15  the first $ ███ in revenues or gross income, and to pay the Defendants $7,500 in

16  attorneys' fees and litigation expenses incurred in enforcing the BSTS. (Whitticar

17  Declaration ¶ 9).

18  In addition, due to Little Orbit's prior bad payment history, breaching of the

19  BSTS, and poor credit report, Little Orbit should be required to provide the

20  Defendants with the previously requested proof of funds, bank and financial

21  statements, development status disclosure and fund-raising status disclosure, all as

22  adequate assurance of due performance. *Coker Equipment Co., v. Witting*, 366 Fed.

23  Appx. 727, 732 2010 U.S. App. LEXIS 2984 **4-6 (9th Cir. 2010) (the defendant

24  "breached the contract by failing to provide adequate assurance of due

25  performance"); *Price v. U.S. Monolithics, LLC*, 2005 U.S. Dist. LEXIS 53065 **1-

26  8 (S.D. Cal. 2005) (party may demand adequate assurance of due performance

27  under Restatement (Second) of Contracts § 251); Restatement (Second) of Contracts

28  § 251.

Dated: July 21, 2021

Respectfully submitted,

By: _____
           Counsel

Nada I. Shamonki (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY
AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com

Michael C. Whitticar (*admitted pro hac vice*)
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:   571-386-2980
Fax:  855-295-0740
E-mail: mikew@novaiplaw.com

*Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 21, 2021, I filed a copy of the following document(s):

**[REDACTED] MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**

  leo.law.55@gmail.com

- **Michael Danton Richardson**

  mdantonrichardson@yahoo.com


Executed on July 21, 2021, at Los Angeles, California. I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto
Diane Hashimoto

NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

MICHAEL C. WHITTICAR (*admitted pro hac vice*)
mikew@novaiplaw.com
**NOVA IP LAW, PLLC**
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740

Attorneys for Defendant/Counterclaimant
DESCENDENT STUDIOS INC. and
Defendant ERIC PETERSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>Plaintiff,<br><br>vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>Defendants. | Case No. 8:20-cv-00089-DOC-JDE<br><br>**DEFENDANTS' SECOND NOTICE OF MOTION AND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES** |
| DESCENDENT STUDIOS INC., a Texas corporation,<br><br>Counterclaimant,<br><br>vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>Counterdefendant. | Date: August 23, 2021<br>Time: 8:30 a.m.<br>Courtroom: 9D<br><br>Judge: Hon. David O. Carter<br><br>Complaint Filed: 1/16/2020 |

**TO PLAINTIFF AND ITS ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on August 23, 2021, at 8:30 a.m. or as soon thereafter as the matter can be heard by the above-entitled Court, in the Courtroom 9D of the United States District Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, CA, 92701, Defendants will, and hereby do, move the Court for an order enforcing the Binding Settlement Terms Sheet, for a money judgment, and for attorneys' fees.

This motion is made following the good faith conference of counsel pursuant to L.R. 7-3, which took place on July 6, 2021 (¶ 8 to the Michael C. Whitticar Declaration filed concurrently herewith).

This second motion to enforce the BSTS is necessary due to Little Orbit's breach of the Binding Settlement Terms Sheet ("BSTS"), most recently by failing to make the settlement payment which was due (once again) on June 23, 2021, and also by failing to provide adequate assurance of due performance upon demand.

Defendants seek to enforce the Binding Settlement Terms Sheet, monetary relief for missed settlement payments, an order requiring Plaintiff to provide adequate assurance of due performance, and an award of attorneys' fees.

The Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Eric Peterson and Michael C. Whitticar, the other papers and records on file in this action, and such further oral and documentary evidence as may come before the Court upon the hearing of this matter.

1  Dated:  July 21, 2021                Respectfully submitted,

2                                        By: _____

3                                              Counsel

4                                        Nada I. Shamonki (SBN 205359)

5                                        MINTZ LEVIN COHN FERRIS GLOVSKY
                                         AND POPEO P.C.
6                                        2029 Century Park East, Suite 3100

7                                        Los Angeles, CA 90067
                                         Telephone: (310) 586-3200
8                                        Facsimile: (310) 586-3202

9                                        Email: nshamonki@mintz.com

10                                       Michael C. Whitticar (*admitted pro hac vice*)

11                                       NOVA IP Law, PLLC
                                         7420 Heritage Village Plaza, Suite 101
12                                       Gainesville, VA 20155

13                                       Tel:  571-386-2980
                                         Fax:  855-295-0740
14                                       E-mail: mikew@novaiplaw.com

15
                                         *Counsel for Defendants*
16

17

18

19

20

21

22

23

24

25

26

27

28

# CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 21, 2021, I filed a copy of the following document(s):

**DEFENDANTS' SECOND NOTICE OF MOTION AND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET, FOR A MONEY JUDGMENT, AND FOR AN AWARD OF ATTORNEYS' FEES**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**

  leo.law.55@gmail.com

- **Michael Danton Richardson**

  mdantonrichardson@yahoo.com


Executed on July 21, 2021, at Los Angeles, California. I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto
Diane Hashimoto

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LEO E. LUNDBERG, JR. (State Bar No. 125951)
leo.law.55@gmail.com
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
***Attorneys for Plaintiff,***
LITTLE ORBIT LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>    Plaintiff,<br><br>  vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>    Defendants.<br>_____<br><br>DESCENDENT STUDIOS INC., a Texas corporation,<br><br>    Counterclaimant,<br><br>  vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>    Counter Defendant.<br>_____ | ) Case No.: 8:20-cv-00089-DOC-JDE<br>)<br>) Judge:      Hon. David O. Carter<br>)<br>) **DECLARATION OF MATTHEW**<br>) **SCOTT IN SUPPORT OF REPLY IN**<br>) **SUPPORT OF PLAINTIFF LITTLE**<br>) **ORBIT LLC'S MOTION TO SET ASIDE**<br>) **THE BINDING SETTLEMENT TERMS**<br>) **SHEET DUE TO DEFENDANTS'**<br>) **FRAUD AND FAILURE TO DELIVER**<br>) **THE ASSETS COVERED BY THE**<br>) **TERMS SHEET OR FOR**<br>) **ALTERNATIVE RELIEF AND FOR AN**<br>) **AWARD OF ATTORNEYS' FEES**<br>)<br>) **[FILED UNDER SEAL PURSUANT**<br>) **TO ORDER OF THE COURT DATED**<br>) **APRIL 20, 2021]**<br>)<br>) **Date:    May 24, 2021**<br>) **Time:   8:30 p.m.**<br>) **Ctrm:   9D**<br>)<br>)<br>) **Complaint filed: January 16, 2020** |

1

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORTOF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

072

## DECLARATION OF MATTHEW SCOTT

I, Matthew Scott, declare:

    1.    I am a managing member of Plaintiff, Little Orbit LLC ("Plaintiff" or "Little Orbit") in the above-captioned matter. The facts stated herein are within my own personal knowledge unless otherwise stated. If called to testify, I would and could testify competently to the facts stated in this declaration.

    2.    I make this declaration in support of reply in support of Plaintiff's Motion to Set Aside the Binding Settlement Terms Sheet Due to Defendants' Fraud and Failure to Deliver the Assets Covered by the Terms Sheet, or for Alternative Relief and for an Award of Attorneys' Fees.

    3.    On June 29, 2021, Defendant Eric Peterson sent links to what appears to be the full Game Project repository with code history and the full Source Art Assets. Little Orbit has been requesting these assets continuously since we signed the Binding Settlement Terms Sheet. Little Orbit has downloaded these files, and we are satisfied that the entire Game IP has been properly delivered. We are now prepared to move forward with development of the Game.

    4.    Little Orbit has repeatedly requested these assets since the BSTS was signed. It is regrettable that Defendant chose to lie about their existence and not to supply these assets until after we were forced to file our Motion to Set Aside. We made the motion in good faith based on Defendant and Defendant counsel's clear and unambiguous statements that such assets were destroyed which would have irreparably damaged our ability to finish development.

    5.    Unlike Defendant, I am not interested in relitigating the court case like they did in their response. That is a waste of time, and personally I think it is disrespectful to the Court's time having already agreed to the BSTS.

    6.    In fact, I am deeply frustrated that more than six months after agreeing to settle this case, both parties are still fighting in Court. From my perspective Little Orbit has acted in

2

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORTOF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

073

good faith. Despite my belief that Defendant committed material breaches during development of the Game, Little Orbit negotiated in good faith to reach the November BSTS. Even under our definitions and interpretation, we offered Defendant terms that were better than the Original Development Agreement from October 2017. The royalty amounts based on "Net Sales" were nearly identical, but I agreed to Defendant's request for an additional ███████ licensing payment. Little Orbit agreed to take on all costs to finish development, market, and publish, which were estimated to require at least an additional investment of ███████ by Little Orbit to complete and release the game to the public. I expected Defendant's counsel to produce the long form for the BSTS and that we would be near completion of the game by now.

7.      Instead, Defendants have engaged in a campaign of efforts to distort the already very generous BSTS into abusive terms with the sole purpose of pressuring Little Orbit to discard the hard fought BSTS in favor of a completely new deal. To understand this effort, there is some context which is necessary.

8.      Little Orbit terminated Defendant's Original Development Agreement in part because Defendant failed to assign the Interplay license. This breach continues to impact the project today. Because it was never assigned, Interplay had the ability to terminate the license effectively hamstringing Little Orbit and blocking our ability to release the Game using the planned "Descent" name.

9.      During the period leading up to the BSTS, I spoke with Interplay about securing a new license for use of the Descent name. Herve Caen, Interplay's CEO, indicated he would agree to the original terms that were in place prior to the termination of Defendant's development agreement.

10.      I knew there was risk that a new license deal might not get completed. Accordingly, the BSTS does not require a license with Interplay and allows for the game to be released under a different name.  I knew that not being able to use the "Descent" name would significantly hurt the game's performance and our ability to recoup. If we couldn't get

3

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORTOF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

074

the Interplay license, then it would make more financial sense not to increase Little Orbit's investment by making the licensing fee payment. I did not want to make the BSTS contingent on the Interplay license, but I also did not want to have to go back to court in the event of any non-payment of the license fee. Instead, I negotiated the simple remedy if Little Orbit decided not to pay all or part of the ████████ licensing fee. In lieu of the fee, we would increase Defendant's royalty from ████████ for a portion of the initial profits (*i.e.*, 50% of the first $700,000 in revenues). This insured the BSTS would be a lasting framework that allowed the Game to be released but also cover any eventuality for both parties to proceed.

11.     Directly after the BSTS was signed, I re-approached Herve Caen about proceeding with the new license. Unfortunately, he changed his mind and significantly altered the Descent license terms. He required ███████████████████████████████████████. Given Interplay's previously poor payment history, and the knowledge that we would be investing more money in the project to get it to market, there was no way I could agree to his terms without jeopardizing Little Orbit's ability to recoup our investment.

12.     The only option was for Little Orbit to proceed under the terms in the BSTS but ██████████████████████████████████████ As part of this decision-making process, I gave several updates to Defendants. During those discussions, Mr. Peterson made it clear that he felt Little Orbit should take Interplay's terms because he preferred ██████████ ████████████████ regardless of the extra loss in revenue and potential problems collecting money from Interplay.

13.     I think it is critical for the Court to understand Defendant and Little Orbit are in two very different financial positions with respect their investment into Descent. As such, they appear to have two different benchmarks for a successful resolution to the Game.

14.     Without re-litigating our claims, Defendant has made a business out of raising money to make the Game, but not finishing it and releasing it to consumers. In 2015, they raised money from Kickstarter to support their studio. When they ran out of money in 2016,

4

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

075

they raised money from Early Access to continue supporting their studio. When they ran out of money in 2017, they secured funding from Little Orbit that allowed them to continue operating their studio. At present Defendant has put in an insignificant amount of their own money and much if not all their efforts have been compensated with funding and equity in the Game. Soon after Little Orbit was forced to terminate the Development Agreement due to Descendent's continued failure to meet the contracts requirements, Descendent laid off all of its employees and ceased all operations. As a result, Defendants currently have no debt, no employees, and no overhead. Any monetary gain from the Game will go the Mr. Peterson as pure profit in the business.

15.    Conversely, Little Orbit's entire business model generates revenue by finishing and releasing games to its customers. We have shipped more than 22 different titles in the last 11 years. We have made extensive investments into the Game totaling over $2.5M with a significant portion of that coming from short term software loans. Little Orbit has been forced to not only pay high interest charges but also repay those loans under incredible financial stress since they were secured starting in 2017. The first ██████ loan was for a 12-month term from December 2017 to December 2018 with the agreement that the Game would be released in May 2018. I collateralized that loan with ████████████████████ ██████ All those assets had to be liquidated in 2020 and 2021 to repay that loan. Little Orbit continues to carry significant debt left from the project because it never was able to release the Game to players. Unlike Descendent, Little Orbit has a full staff of employees and office overhead. There is no easy payday here for us. Little Orbit will have to spend an additional ████████████ to finish development, market, and publish the Game. Any money we make on the game will go towards repaying the funds we borrowed that continue to accrue interest every day that goes by. In other words, we need the Game to be developed and released properly to ensure that our investment will be repaid. We cannot afford to let Defendants or any agent of the Defendants take endless time to finish the Game, to ship a poor quality game, or to bring on other parties like Interplay that might not pay or who would further dilute Little

5

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

076

Orbit's share of profits.

16.    Little Orbit is ready to proceed with finishing the Game, but there is still significant disagreement between the parties on two major parts of the BSTS. Under any objective analysis, Defendant already has deal terms that exceed the Original Development Agreement. Yet they are fighting for a definition of "revenues" that doubles or triples the value of their terms. At the same time, in a clear show of bad faith, they have altered their original misinterpretation of the payment terms from the long form memorialization of the BSTS by Defendants' counsel into a new more abusive interpretation that would require more and more upfront payments by Little Orbit.

17.    The best analogy for the BSTS is as a set of terms for two partners investing in a restaurant. While there is the initial period where the royalty for Little Orbit is higher, the ultimate target between the two partners is ██████████ Regardless of any capital and effort to build the site for the restaurant, design the menu, finish the logo, or train the staff, if both parties simply open the restaurant with no additional effort or funding, then the restaurant will fail. Restaurants are businesses that must be run in an ongoing fashion to generate sales. There are recurring costs required to market, pay payroll, buy food, and pay for the space. The restaurant is an investment between the two parties, and it has a Profit and Loss. The gross income <u>returned by an investment</u> is not the same thing as the gross revenue for the restaurant. The gross income returned by an investment is the split of profits after the restaurant covers all its expenses. In fact, all businesses, restaurants and game publishers included, operate on a profit margin. The profit margin is the percentage of profit leftover after all expenses have been deducted from money the business has made. In many cases, businesses have profit margins ranging from 10-15%. A healthy profit margin is 20-30%. An extremely good profit margin would be 50%.

18.    Defendants' definition of "revenues" as providing for ██████████ without any deductions for costs would require ██████████ received by the restaurant to go to them right off the top. Then Little Orbit would have to run the restaurant using their staff

6

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

077

and pay for all the expenses out of [REDACTED] In order for Little Orbit not to lose money, that means the restaurant would need to have a profit margin of higher than [REDACTED] That is simply not feasible, which is why restaurant investors (nor game publishers) never agree to this way of splitting revenues. Game publishing splits are no different. The ongoing nature of a Free-to-play game means that there every month, Little Orbit will be spending money to develop new features, generate new sellable virtual goods, market for new players, and pay for the environment that hosts the Game. Those are all costs that are standard in the industry and are deducted before any royalties are paid.

19.     If the Court were to determine that Defendants' definition of "revenues" is correct, the Court will be effectively making Little Orbit the indentured servant of Defendants and rewarding Defendants' abusive legal tactics to re-trade on the already generous terms of the BSTS.

20.     With all of this in mind, I took a commonsense approach to negotiating the BSTS. I intended for split of income from our investment to match the terms of the Original Development Agreement. To say that the BSTS was negotiated in a vacuum as an entirely different agreement is an argument made by Defendants in bad faith. They know their interpretation is not feasible. They are using it as leverage to secure new and better terms for themselves.

21.     One might argue that Defendants' definition of revenue is so abusive that Little Orbit should simply default [REDACTED] and turn over the Game to Defendant for them to finish and release. At first glance, this would appear to turn the tables, and Defendants would be at the same severe disadvantage they are pushing onto Little Orbit. However, that view would be incorrect. <u>Defendants have no money, income or ability to fund the completion of the Game.</u> This means Defendants would need to secure a publishing deal with another publisher like Interplay, which previously failed to twist a new licensing deal to their advantage. Under those new terms, Interplay would fund, market, and publish just like Little Orbit would have. Interplay would also get to deduct all expenses because that is the

7

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORTOF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

078

only reasonable way to compete the development of the Game. But Interplay would also demand a significant portion of the remaining profits in consideration for their involvement. The amount to be received by Defendants is virtually unchanged from Little Orbit's definition of revenues, except Defendants would secure ongoing funding for their studio. The amount received by Little Orbit will be dramatically lower, all but insuring we never earn back the money we invested. On top of that Descendent Studios has a proven track record for not completing the Game, and there is no clause in the BSTS that enforces any time limit for Defendants to finish and release the Game. That means Little Orbit could be stuck paying interest on our loans indefinitely without any revenue from the Game to pay them off. Lastly, and most importantly, Interplay has a track record for not paying their developers. In fact, the original developer who created Descent for Interplay back in the 1990's had to sue to collect on back owed payments. So even if Defendants finish the game and Interplay publishes, Little Orbit still has a chance of not receiving any revenue. But that is clearly what Defendants have been pushing for as they think it is a better deal for them (it is not) but would be a much worse deal for Little Orbit.

22.     A deal with Interplay is Defendants' clear goal. There is direct proof of his desire to discard the hard fought BSTS and engage in the above scenario already. A declaration from Plaintiff's counsel was submitted as Exhibit A in our Motion to Set Aside. This exhibit contains an email exchange where Defendant's counsel asserts that they have won their abusive definition of revenue. In that email exchange, Defendant's counsel attempts to leverage pressure on Little Orbit to let "Eric and Interplay finish the game as DESCENT".

I declare the foregoing to be true and correct under penalty of perjury under the laws of the United States. Executed on July 12, 2021, in Orange, California.



Matthew Scott, Declarant

1

2

# CERTIFICATE OF SERVICE

3       I hereby certify that on this 12th Day of July 2021, the foregoing **DECLARATION OF**

4  **MATTHEW SCOTT IN SUPPORT REPLY IN SUPPORT OF PLAINTIFF LITTLE**

5  **ORBIT LLC'S MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS**

6  **SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS**

7  **COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN**

8  **AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was

served on the following counsel of record via email:

8       Michael C. Whitticar; VSB No. 32968
        NOVA IP Law, PLLC

9       7420 Heritage Village Plaza, Suite 101
        Gainesville, VA 20155

10      Tel:   571-386-2980

11      Fax:  855-295-0740
        Email: mikew@novaiplaw.com

12      Counsel for Defendants

13
        NADA I. SHAMONKI (SBN 205359)

14      MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.

15      2029 Century Park East, Suite 3100
        Los Angeles, CA 90067

16      Telephone: (310) 586-3200
        Facsimile: (310) 586-3202

17      Email: nshamonki@mintz.com
        Counsel for Defendants

18

19

20                                  /s/ M. Danton Richardson
                                       M. Danton Richardson

21

22

23

24

25

26

27

28

9

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF REPLY
IN SUPPORTOF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

080

1 M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
2 LEO E. LUNDBERG, JR. (State Bar No. 125951)
leo.law.55@gmail.com
3 LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
4 Pasadena, CA 91101
*Attorneys for Plaintiff,*
5 LITTLE ORBIT LLC
6

7 **UNITED STATES DISTRICT COURT**
8 **CENTRAL DISTRICT OF CALIFORNIA**

9 LITTLE ORBIT LLC, a California Limited ) Case No.: 8:20-cv-00089-DOC-JDE
Liability Company, )
10 ) Judge: Hon. David O. Carter
11 Plaintiff, )
) **REPLY DECLARATION OF M.**
12 vs. ) **DANTON RICHARDSON IN SUPPORT**
) **OF PLAINTIFF LITTLE ORBIT LLC'S**
13 ) **MOTION TO SET ASIDE THE**
DESCENDENT STUDIOS INC., a Texas ) **BINDING SETTLEMENT TERMS**
14 corporation, and ERIC PETERSON, an ) **SHEET DUE TO DEFENDANTS'**
individual, ) **FRAUD AND FAILURE TO DELIVER**
15 ) **THE ASSETS COVERED BY THE**
16 Defendants. ) **TERMS SHEET OR FOR**
) **ALTERNATIVE RELIEF AND FOR AN**
17 _____ ) **AWARD OF ATTORNEYS' FEES**
18 DESCENDENT STUDIOS INC., a Texas )
corporation, ) **Date: July 28, 2021**
19 ) **Time: 8:30 a.m.**
20 Counterclaimant, ) **Ctrm: 9D**
)
21 vs. ) **[FILED UNDER SEAL PURSUANT**
22 ) **TO ORDER OF THE COURT DATED**
LITTLE ORBIT LLC, a California Limited ) **APRIL 20, 2021]**
23 Liability Company, )
)
24 Counter Defendant. ) **Complaint filed: January 16, 2020**
25 _____ )
26
27
28

## REPLY DECLARATION OF M. DANTON RICHARDSON

I, M. Danton Richardson, declare:

1.     I am an attorney licensed to practice law in California and before this Court and I am the attorney of record for Plaintiff Little Orbit LLC in the above-captioned matter.  The facts stated herein are within my own personal knowledge unless otherwise stated.  If called to testify, I would and could testify competently to the facts stated in this declaration.

2.     I make this Reply declaration in support of Plaintiff's Motion to Set Aside the Binding Settlement Terms Sheet Due to Defendants' Fraud and Failure to Deliver the Assets Covered by the Terms Sheet, or for Alternative Relief and for an Award of Attorneys' Fees.

3.     As set forth in my supporting declaration I met and conferred with Defendants' counsel via telephone conference which occurred on June 21, 2021, in an effort to address the various issues between the parties.  Those issues included Defendants' breach of the agreement by failing to deliver a copy of all of the game IP assets to Little Orbit.  Mr. Whitticar's response was that there was no such obligation under the Binding Settlement Terms Sheet so no agreement could be reached.

4.     On June 23, 2021, I followed up with Mr. Whitticar via email and made a proposal as follows:

> I will make one final proposal to try to clear the way for the parties to try to resolve their current differences either between themselves or with the aid of another session with Judge Early - I would propose that LO deposit the amount of the first required payment - ███ - to my trust account and that your side agree to put a hold on the deadline for that payment while we try to work things out. If you truly want to explore resolution this should be easily agreeable.

A true and correct copy of the foregoing email is attached as Exhibit B.  I never received any response from Mr. Whitticar.

5.     Plaintiff has incurred $7,420 in attorneys' fees in preparing and submitting Reply papers in support of Plaintiff's Motion to Set Aside the Binding Settlement Terms Sheet.  This is based on 21.2 hours at the hourly rate charged Plaintiff in the amount of $350 per hour.  This brings the total Plaintiff has incurred in connection with this Motion to $15,995.

2

REPLY DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

082

I declare the foregoing to be true and correct under penalty of perjury under the laws of the United States.  Executed on July 12, 2021, in San Gabriel, California.

/s/ M. Danton Richardson
M. Danton Richardson, Declarant

# EXHIBIT B


# [THIS EXHIBIT IS BEING FILED UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th Day of July 2021, the foregoing **REPLY DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel: 571-386-2980
Fax: 855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

4

REPLY DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

085

1  M. DANTON RICHARDSON (State Bar No. 141709)
   mdantonrichardson@yahoo.com
2  LEO E. LUNDBERG, JR. (State Bar No. 125951)
   leo.law.55@gmail.com
3  LAW OFFICES OF M. DANTON RICHARDSON
4  131 N. El Molino Ave., Suite 310
   Pasadena, CA 91101
5  *Attorneys for Plaintiff,*
6  LITTLE ORBIT LLC

7              **UNITED STATES DISTRICT COURT**
               **CENTRAL DISTRICT OF CALIFORNIA**
8

9  LITTLE ORBIT LLC, a California Limited          ) Case No.: 8:20-cv-00089-DOC-JDE
   Liability Company,                              )
10                                                 ) Judge: Hon. David O. Carter
11              Plaintiff,                          )
                                                    ) **PLAINTIFF LITTLE ORBIT LLC'S**
12       vs.                                        ) **REPLY IN SUPPORT OF MOTION TO**
                                                    ) **SET ASIDE THE BINDING**
13  DESCENDENT STUDIOS INC., a Texas               ) **SETTLEMENT TERMS SHEET DUE TO**
14  corporation, and ERIC PETERSON, an            ) **DEFENDANTS' FRAUD AND FAILURE**
    individual,                                    ) **TO DELIVER THE ASSETS COVERED**
15                                                 ) **BY THE TERMS SHEET OR FOR**
16              Defendants.                         ) **ALTERNATIVE RELIEF AND FOR AN**
                                                    ) **AWARD OF ATTORNEYS' FEES**
17  _____        )
18                                                 ) **[FILED UNDER SEAL PURSUANT**
    DESCENDENT STUDIOS INC., a Texas               ) **TO ORDER OF THE COURT DATED**
19  corporation,                                   ) **APRIL 20, 2021]**
                                                    )
20              Counterclaimant,                    ) **Date: July 26, 2021**
21                                                 ) **Time: 8:30 a.m.**
         vs.                                        ) **Courtroom: 9D**
22                                                 )
    LITTLE ORBIT LLC, a California Limited         )
23  Liability Company,                             )
                                                    )
24              Counter Defendant.                  )
25  _____        )
26

27

28
                                        1

# I.    INTRODUCTION

It now appears that contrary to Defendants Descendent Studios Inc. ("Descendent") and Eric Peterson's ("Peterson") (collectively "Defendants") prior unequivocal statement that all of the game IP "no longer exists," the Defendants were somehow able to obtain and provide a copy of same to Plaintiff Little Orbit LLC ("Plaintiff" or "Little Orbit") on June 29, 2021, AFTER the filing of the instant Motion.

It is unfortunate that it took the filing of the instant Motion to prompt Defendants to turn over all of the Game IP assets covered by the subject Binding Settlement Terms Sheet ("BSTS"). Given Defendants' failure and refusal to turn over such assets    even recently making the claim such assets "no longer exist"    Little Orbit had no choice but to bring the instant Motion.  It appears, however, that the recent production of the game IP to Plaintiff provides the licensed assets and the Motion is therefore moot on that score.  But there are still several important issues that the parties still need the Court to address:

1)    The meaning of "revenues" as used in the BSTS and whether, if Defendants are correct in their interpretation, Plaintiff's consent was the result of a mistake as to the meaning of "revenues" and whether Plaintiff will suffer material harm if the contract is enforced using Defendants' claimed meaning of "revenues";

2)    The date the first payment should be due under the BSTS    Judge Early determined that the deadline would run from the date of the prior hearing    May 24, 2021    given the parties failure to enter into a long form agreement which was the starting date under the BSTS; however, given Defendants' failure to turn over the Game IP until June 29, 2021, the payment obligation should not run until that date;

3)    The date on which the one year starts to run for Little Orbit to complete the development and commercially release the Game, which should be one year from the time Defendants finally produced the Game IP (June 29, 2021) or at the very earliest, May 24, 2021, the date that Judge Early determined Little Orbit's payment obligation should commence    the same date should likewise apply to the one year as well; and

4)    Plaintiff's right to attorneys' fees for having to bring this Motion, which is what prompted Defendants to finally provide Plaintiff with the licensed game IP.

Defendants spend a lot of time in their Opposition arguing their view of the merits of the underlying dispute and argue without any evidence that Little Orbit cannot make the payments provided for in the BSTS. What Defendants fail to disclose is that Little Orbit offered to place the first required payment in their counsel's trust account pending the parties efforts to resolve this dispute but Defendants refused that offer, forcing the bringing of the instant Motion given the deadline to make that first payment. Reply Declaration of M. Danton Richardson, ¶ 4. As set forth in the Motion, given Defendants' failure to turn over all of the game IP assets and their resent claim that such assets "no longer exists" Plaintiff had no choice but to bring this Motion.

Defendants admit that counsel discussed the filing of this Motion but argue that the grounds were not discussed and Plaintiff did not wait seven days. However, the failure of Defendants to maintain and be able to turn over the game IP assets was expressly discussed as being a failure of consideration. Defendants' response was they had not such obligation and therefore no agreement could be reached on that point. Moreover, given the pendency of the payment deadline, one which should not be required if there was a failure of consideration as was the indications at the time, Plaintiff felt it was necessary to file the Motion by the payment due date of June 23, 2021. Richardson Reply Decl., ¶ 3. The Court should exercise its discretion to consider the motion even if there was a failure to meet and confer, which there was no such failure, as same would have been futile.

## II. ARGUMENT

### A. Defendant's Have Now Apparently Finally Delivered Only a a Result of the Filing of the Instant Motion the Game IP Asset Covered by the BSTS

Defendants do not deny nor address any of the authorities cited by Plaintiff providing that a party may rescind a contract based on a failure of consideration. Rather, Defendants instead argue (1) they are not obligated to provide Little Orbit with a copy of the game IP covered by the BSTS because there is no specific provision requiring such delivery; and (2) they have turned over all of the game IP to Little Orbit, although Defendants fail to mention that only happened on June 29, 2021 AFTER the filing of the instant Motion.

3

### 1. Defendant Expressly Represented to Plaintiff the Project History No Longer Exists Which Was Understandably Prompted this Motion

Defendants do not deny that the BSTS provides a license to Little Orbit covering "all game IP" but yet, with apparent conviction, Defendants still claim they were never obligated to turn over a copy of all of the licensed assets to Little Orbit because the BSTS did not expressly provide for such a turn over. Worse, however, Defendants also disingenuously claim they "never told Little Orbit that the prior versions of the game software or artwork or other deliverables were destroyed" Opp at 5:15-16 but that argument is merely playing word games. While Mr. Peterson never used the word "destroyed" that is effectively what Mr. Peterson expressly stated in his email to Mr. Scott dated June 15, 2021, which prompted the subject Motion:

> That the full source code repository with the entire project history ***doesn't exist***- Little Orbit needs no such thing, they have the source code. ***there is no project history***, when Little Orbit breached their obligations, ***the servers could no longer be continued***.
>
> ***project history no longer exists***

See Scott Decl., Exhibit D (emphasis added). Little Orbit submits that it is a fair conclusion to refer to something as being "destroyed" which once existed, but which no longer exists because "servers could no longer be continued." Most notably, Defendants do not challenge the fact Mr. Peterson made the foregoing statements instead choosing to play word games by the foregoing conclusory denial rather than actually addressing the substance at issue.

### 2. The License Provided to Little Orbit by the BSTS Implicitly Would Require Defendant to Provide Little Orbit with a Copy of All Game IP as that is Which was Covered by the License

It is most of absurd of Defendants to claim that they are not obligated to provide Little Orbit with a copy of the game IP where the very purpose of the BSTS was a license covering "all game IP." It should be obvious that a license of intellectual property assets is worthless without providing access to those assets and it is not only absurd but most disingenuous of Defendants to argue otherwise. In fact, whether the agreement expressly requires such a

4

turnover, the duty of good faith and fair dealing applicable to all contracts in California certainly would.

Further, it appears that Defendants believe that because Little Orbit had a copy of the game source code as it existed at some point in time prior to the termination of the Development Agreement that somehow excuses Defendants from turning over all of the "game IP" as covered by the BSTS. Defendants' belief is betrayed by the fact that the BSTS does not state that it only provides Little Orbit with a license which only covers the source code that was provided to Little Orbit prior to the termination. The BSTS could have certainly stated as much if some prior version of the source code and only that source code was all that was supposed to be covered by the parties' agreement. But there is no such limitation. Rather, the agreement is clear and express and refers to "all game IP" which clearly includes everything ("all"), not simply the source code. This is especially important here because the very purpose of the license was to allow Little Orbit to complete development of a partially completed game, not simply release an already completed project. In order to complete the development of the game one needs the "building blocks" that have been created thus far so those building blocks can be used to not only complete the initial PC (computer) based version of the game but also so such assets can be re-configured to also work on other gaming platforms. As the BSTS provides at paragraph

In fact, here it must be remembered that the BSTS is a summary "terms" sheet spelling out the key deal points. It does not go into any great detail nor does it contain very many specifics   just the key terms including that Little Orbit received a license covering "all game IP" for the express purpose of completing the development of the game and releasing it commercially, not only in PC form (*i.e.*, for personal computers) but also all other gaming platforms such as Sony's PlayStation and Microsoft's   box as well as online.

Defendants argue "that their deliverables under the BSTS were expressly stated and limited therein. They included and were limited to  pre-order data, Kickstarter data, and early backer data.'"   Opp at 3:2-4  But that is not the case as those items were listed because they would not otherwise be included in a license of the "game IP." The simple fact is that a license

5

DEFENDANTS' REPLY RE MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

of "all game IP" implicitly requires a turnover of all such "game IP."  Such a license does not implicitly require a turnover of "pre-order data, Kickstarter data, and early backer data" as those items do not naturally constitute part of the game IP. Therefore it was expressly necessary to separately spell out an obligation to turn over such data.

### 3. It Appears Defendants Have After the Filing of the Instant Motion Finally Provided Little Orbit it Copy of the Game IP Assets Covered by the License

It does now appear that Defendants have belatedly provided a copy of the game IP assets which will allow Little Orbit to complete development of the game.  But it is important to note that only occurred on June 29, 2021, after the filing of the instant Motion.

### 4. The Deadline for Little Orbit the Game Should Run from When Defendants Finally Turned Over the License Asset

Paragraph 13 of the BSTS provides that "If Little Orbit does not release and sell game in *year from signing written memorialization*, Descendent may terminate the license, Descendent can do the game, pays Little Orbit ▆▆ of revenues up to total payout cap of ▆▆ ▆▆ (emphasis added).  Given the months of delay in providing a copy of the licensed assets, the time for Little Orbit to commercially release the PC version of the game should be deemed to run from the delivery date of the licensed assets    June 29, 2021.

As Judge Early found: "In fairness, as the parties did not execute a  further, more detailed written memorialization,' to the extent the Settlement Agreement used the phrase  within __ days of signing  a written memorialization' as a triggering event, such triggering date shall be the date of this Report."  Report and Recommendation dated May 24, 2021.[1]  At the very least,

---

Defendants inexplicably claim the first settlement payment "was due six months ago"  Opp at 8:15  (obviously trying to make Little Orbit look bad for allegedly not having made such payment six months ago) but that clearly is not the case.  Rather, the first payment was due "within 30 days of signing written memorialization."  BSTS,  1.

that same logic should apply to the running of Little Orbit's deadline to complete the (PC version) of the game as that deadline likewise was expressly set to start on the signing of a long form agreement which has never happened.

**B.    If the Court Finds that the Applicable Definition of Revenue Prevents Little Orbit from Making Gaming Industry Standard and Customary Deductions in Calculating Royalties, Such are the Type of Deductions Spelled out in the Parties' Development Agreement, then the Court Should Vacate the Settlement Based on the Clear Error on the Part of Little Orbit Which Would Cause it to Suffer Substantial and Material Harm**

**1.    The Court Should Determine the Meaning of Revenue as used in the BSTS and Should Find that the BSTS Allows for the Deduction of Industry Standard Deductions before Calculating Royalties**

Plaintiff's consent to the Settlement Terms Sheet was given under the belief that the term "revenues" meant revenues after industry standard and customary deductions as already agreed to between the parties in the Development Agreement.  After all, the parties were negotiating to resolve a dispute regarding that very agreement and it provided the foundation for the parties' negotiations.  However, if Defendants' position is adopted by the Court, then Plaintiff's consent was given by mistake (*i.e.* believing that customary deductions could be made before determining the parties' revenue split) and Plaintiff will suffer substantial and material harm if the contract is enforced without allowing for customary deductions.  Scott Decl., 16-22.  This is so because such a meaning would greatly change the amounts that have to be paid to Defendants, which forcing Plaintiff to bear all of the expenses, and would kill any hope of Plaintiff ever recovering its investment into the Game.

In essence, Defendants' interpretation of "revenues" not only has no relation with the terms of the Development Agreement in dispute but is totally contrary standard industry practices.  In fact, under Defendants' interpretation of "revenues" Defendants would reap up to ███ of the benefits from sales of the game without having to bear any of the customary costs that go into producing those revenues.  In such event, Plaintiff would have to bear all of the costs out of its share of royalties, which is wholly inequitable and inconsistent with the original

agreement and the standard in the gaming industry.  Scott Decl., *d.*  See also Fed. R. Civ. P. 60(b)(1); and *i r. r i d i e . . i*, 175 Cal.App.4th 1306, 1332-33 (2009) ("A contract may also be rescinded if the consent of the rescinding party was given by mistake. (Civ. Code,  1689, subd. (b)(1).)  The party attempting to void the contract as a result of mistake must also show that it would suffer material harm if the agreement were enforced, though that need not be a pecuniary loss.").

### 2.  Standard Di tionary Definition  Allo  for  Re enue  to Mean In ome after E pen e

Defendants continue to argue that the meaning of "revenues" should be interpreted based on "its common dictionary definition"  Opp at 10:16-17) totally ignoring the parties' prior course of conduct, the fact the prior Development Agreement was the starting point for the parties' negotiations and standard industry practice.  But even resorting to "common dictionary definitions" does not support Defendants' argument that the use of "revenues" means no deductions can be made.

Defendants' argument regarding the meaning of "revenues" being "gross revenues" and not allowing for any deductions is based on their cherry-picking one aspect of the definition from Black's Law dictionary - "income from any and all sources; gross income or gross receipts"  notwithstanding the fact that no one consulted Black's Law Dictionary in putting together the terms used in the BSTS.  Most importantly, however, the definition of "revenue" from Mirriam-Webster's Dictionary includes the following: "the gross income returned by an investment."  (Black's contains a similar alternative meaning: "The periodic yield or interest from investment.").

Here that "investment" would include the amounts invested into the game and its ongoing marketing, sales commissions, hosting costs, and other expenses. Additionally, that same definition from Mirriam-Webster's also makes clear that "profit" is a synonym for "revenue". Likewise, "income" is a synonym for "revenue."  See Scott Decl.,  12 and Request for Judicial Notice, Exhibits A - D.

The problem here is the meaning of "revenues" is still not clear. Defendants have focused on Magistrate Early's finding the term is not ambiguous to conclude Defendants' proposed meaning must be the correct meaning, but that totally ignores the rest of what Magistrate Early said:

> THE COURT: It s not -- that dispute is not ripe for me. Okay Come back to me, if you need to, if the first payment is not made. I think revenue -- the meaning of it is clear. It s not ambiguous. *t as lear fro t e onte t of t e a ree ent itself, and fro t e arties o rse of dealin , it as not n lear*

Transcript, 10:19-24 (Peterson Decl., Exhibit C).

Little Orbit submits that "the parties course of dealing" would include the fact the Development agreement which provided for royalties to be determined after certain industry standard costs were deducted.

Defendants argue that the term "revenues" as used in the BSTS is different that the term "net sales" as used in the Development Agreement and while that is technically true (and raises the question whethere Defendants purposefully used a different word notwithstanding the context of the parties' negotiations just to be able to make their current argument) the parties did not cross check the words used in the BSTS with the specific words used in the Development Agreement in the rush to put the key deal points to paper. The key is the context of the parties course of dealing, including how royalties were calculated in the Development Agreement, and standard industry customs and practices.

### 3. Settlement A reement are Not Stri tly Con trued

Contrary to Defendants' unsupported claim, settlement agreements are not "strictly construed." In fact, they are treated as any other contract and are subject to the same defenses including failure of consideration and mistake. This principle was forth in the Motion and has not been rebutted by Defendants:

> "A settlement agreement is a contract, and the legal principles which apply to contracts generally apply to settlement contracts.

9

Citation. " *Mi er r i . . ed*
*r .* ., 103 Cal.App.4th 30, 35-36, 126 Cal.Rptr.2d 400, 403
(2002) (quoting *eddi r d i . . i* , 60
Cal.App.4th 793, 810-11, 71 Cal.Rptr.2d 265(1998).)

Motion at 9:27-10:4.

**C.    Little Or it Did Not Ar ue, Nor Ha t e Court Addre ed, t e Mi ta e at I ue in t i Motion**

Defendants argue that Little Orbit's "mistake" argument was previously made and already rejected by the Court. However, Little Orbit did not previously argue mistake but that there was no meeting of the minds   "Under California contract law, where there has been no meeting of the minds there is no contract." Opposition at 3:16-17. It is the "no meeting of the minds" argument that was rejected by the Court   "The parties had a  meeting of the minds' regarding the meaning of the terms used in the Settlement Agreement, with such terms being unambiguous in the context in which they were used." Report and Recommendation dated May 24, 2021, Finding No. 3 (dkt 79). Additionally, the current Motion is based on Fed. R. Civ. P. 60(b) and California Civ. Code   1689(b)(1), neither of which were addressed by Little Orbit in the subject prior opposition.

**D.    Defendant ' S ould e Ordered to Pay for Plaintiff' Attorney ' Fee in Conne tion it t i Motion**

Because Defendants failed to turn over "all game IP" and Defendants' statements to Little Orbit that such game IP "no longer exists" Defendants should pay Plaintiff's attorneys' fees in having to bring this Motion. It was Defendants' failure to comply with the BSTS by turning over the licensed game IP assets which prompted the filing of this Motion and that failure is not excused by Defendants' belatedly producing the licensed assets only after this Motion was filed.

## III.  CONCLUSION

Defendants' belated turn-over of the game IP assets does not excuse their previous failure and refusal to provide Little Orbit with a copy of those assets months ago.  In fact, that failure and refusal    even going so far as to claim such assets "no longer exist" was clearly in bad faith, in breach of Defendants' duty of good faith and fair dealing and forced Plaintiff to incur the costs necessary to bring this Motion.  Accordingly, Plaintiff should be awarded its fees for bringing the instant Motion.  This Court should also find that Little Orbit's obligations under the BSTS did not start to run until those assets were provided to Little Orbit on June 29, 2021.

Additionally, the Court should determine the meaning of "revenues" as used in the BSTS because if Defendants are correct in their interpretation, then the BSTS was clearly entered into by Little Orbit by mistake and Little Orbit would suffer substantial and material harm if the contract is enforced without allowing for customary deductions and the Court should, in that event, set aside the BSTS.


DATED: July 12, 2021            **LAW OFFICES OF M. DANTON RICHARDSON**


                                By:   /s/ M. Danton Richardson
                                        M Danton Richardson

                                ***Attorney for Plaintiff,***
                                Little Orbit LLC

DEFENDANTS' REPLY RE MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

# CERTIFICATE OF SERVICE

I hereby certify that on this 12th Day of July, 2021, the foregoing **PLAINTIFF LITTLE ORBIT LLC'S REPLY IN SUPPORT OF MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

DEFENDANTS' REPLY RE MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

NADA I. SHAMONKI (SBN 205359)
nshamonki@mintz.com
**MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202

MICHAEL C. WHITTICAR (*admitted pro hac vice*)
mikew@novaiplaw.com
**NOVA IP LAW, PLLC**
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740

Attorneys for Defendant/Counterclaimant
DESCENDENT STUDIOS INC. and
Defendant ERIC PETERSON

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>                    Plaintiff,<br><br>     vs.<br><br>DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual,<br><br>                    Defendants. | Case No. 8:20-cv-00089-DOC-JDE<br><br>**DECLARATION OF ERIC PETERSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE BINDING SETTLEMENT TERMS SHEET**<br><br>Date:     July 26, 2021<br>Time:     8:30 a.m.<br>Courtroom: 9D |
| DESCENDENT STUDIOS INC., a Texas corporation,<br><br>                    Counterclaimant,<br><br>     vs.<br><br>LITTLE ORBIT LLC, a California Limited Liability Company,<br><br>                    Counterdefendant. | Judge: Hon. David O. Carter<br><br>Complaint Filed:     1/16/2020 |

I, Eric Peterson, declare as follows:

1.  I am over 18 years of age, of sound mind, and competent to testify to the facts stated herein. I have personal knowledge of the facts stated herein. I am the President of Descendent Studios, Inc. ("Descendent"). I submit this declaration in support of Defendants' opposition to Plaintiff's Motion to Set Aside Binding Settlement Terms Sheet.

2.  The facts stated in Defendants' opposition to Plaintiff's Motion to Set Aside Binding Settlement Terms Sheet are true and correct.

3.  In the original underlying litigation, Defendants first notified Little Orbit of its default in failing to make payments when due. A genuine and authentic copy of that notice is attached hereto as Exhibit A.

4.  Little Orbit then wrote Descendent and admitted that the payment delay was due to its own inability to pay. A genuine and authentic copy of the relevant Skype message is attached hereto as Exhibit B.

5.  Little Orbit nevertheless retaliated by wrongfully terminating the Development Agreement and the original Terms Sheet Addendum (the "Original Contracts") based on purported delays by Descendent, which were ultimately the fault and responsibility of Little Orbit in failing to ever complete a revised and updated API or "application program interface" that Little Orbit had requested and taken responsibility for completing.

6.  Defendants have delivered to Little Orbit the game software, updated and revised game software, and the separate source files for the artwork.

7.  The reason that these additional delivery obligations were not put into the Binding Settlement Terms Sheet (the "BSTS") was that the Plaintiff Little Orbit had been given copies of the game software before it wrongfully terminated the Original Contracts. Little Orbit did not ask for copies of the game software during the negotiations of the BSTS, and the Defendants assumed that that was because Little Orbit was satisfied with the version of the game code that it had. The updated game

1    code, the separate artwork source, and the complete writable versions of all prior

2    game code versions were neither sought nor demanded in the BSTS nor during its

3    negotiation.

4        8.    In the BSTS and the negotiation thereof, Little Orbit did not request and

5    the Defendants did not promise to deliver or provide any of the purported missing

6    items about which Little Orbit is now complaining, now that it has failed (again) to

7    make the first settlement payment on time.

8        9.    The allegedly "missing" game software versions, which the Defendants

9    never promised or agreed to provide, nevertheless have been provided by the

10   Defendants to the extent the Defendants have the ability to provide them. These

11   include the game software code at the time Little Orbit wrongfully terminated the

12   Original Contracts after Little Orbit had been notified that it was in default for not

13   paying Descendent, the latest updated version of the game code including a small

14   amount of debugging and the old Descendent API that Little Orbit did not like and

15   had broken its promise to re-do, the artwork source file and read-only copies of all

16   prior versions of the game code.

17       10.    The Defendants have provided Little Orbit with a library showing

18   historical images and versions of the game software.  It just does not contain a fully

19   functioning, executable version of all prior versions and iterations of the game

20   software.  That is not necessary to complete development of the game.

21       11.    There is a reason that the Defendants have been unable to provide a

22   complete library of executable copy of all prior versions of the game code.  When

23   Little Orbit wrongfully stopped making payments to Descendent under the Original

24   Contracts, the Defendants had to lay off their staff and had no money to keep paying

25   for the servers on which the allegedly missing items were stored.

26       12.    The old artwork source files that Little Orbit recently demanded have

27   been recovered recently from an old remote, third-party computer and provided to

28   Little Orbit.  However, any time Descendent provides the supposedly "missing"

materials, Little Orbit comes up with a different allegedly "crucial" missing item as an excuse for not making the settlement payment. Descendent now has delivered virtually all of the allegedly missing items, but Little Orbit still has not made the overdue settlement payment.

13. All of these allegedly missing items were items to which Little Orbit had access and which it could have downloaded when or before it stopped making payments in January 2019. Little Orbit had access to all of these items, and during the settlement conference the Defendants were operating under the belief that Little Orbit had downloaded them before Little Orbit wrongfully stopped making payments and terminated the Original Contracts. Any competent developer would have done so and known to do so.

14. Little Orbit committed the first material breach of the Original Contracts when it wrongfully stopped making payments to Descendent and was notified by Descendent of Little Orbit's default and breach.

15. The BSTS (Section 19) provided for mutual general releases and displaced the parties' obligations under the Original Contracts.

16. The Defendants have never told Little Orbit that the prior versions of the game software or artwork or other deliverables were destroyed.

17. The Defendants have never represented that they had a complete, executable, writable history of all prior historical versions of the game software.

18. To the contrary, in an email dated April 13, 2019, Matt Scott admitted to Defendants that he had merely "assumed" that the prior versions were still available on the repository or "github repo." A genuine and authentic copy of that e-mail is attached hereto as Exhibit D.

19. Little Orbit does not need more than the game code to finish the game. The Defendants provided the source code and all the data in the game. Little Orbit can take it from there and finish the game. It can access everything in the game.

20.     Little Orbit is incorrect in saying that "Without the project history, we have no way of knowing what original source art was either not yet imported into the game code or, which for whatever reason, may have been removed from the source code. Those assets are now lost."

21.     This is untrue because the project history is available in "read only" format in what the Defendants provided. Little Orbit admitted that: "<u>While the artwork already contained in the code can be used to complete the game</u>, those assets are of poor quality when trying to meet the higher resolutions provided for in newer platforms such as Xbox X and PlayStation 5."

22.     What Little Orbit admits is true. The artwork contained in the code is enough to finish the PC version of the game, which is all Little Orbit is obligated to do by November 17, 2021.  Additionally, Little Orbit was correctly informed that the artwork can be extracted from the game code.  In any event, the Defendants have now recovered from a third party and provided the original artwork source files from a remote computer.  So this point is moot, and there is no material breach by the Defendants.

23.     Defendants believed during the settlement conference and still believe that Little Orbit still had the copy of the game code that was delivered to it, before Little Orbit wrongfully skipped paying on and terminated the Original Contract. Any competent developer would have known to download these items before skipping payments and before terminating and breaching the Original Contracts.

24.     Little Orbit's secret, unexpressed intent that "Revenues" allegedly meant "Net Sales" or "Profits" was never expressed to Defendants, who had no idea of that purported intent and understanding for weeks after the BSTS was signed.

25.     The BSTS was carefully negotiated by skilled counsel at arm's length.

26.     Defendants own the relevant intellectual property to the game and royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate.

27.     Defendants' evidence would have clearly shown that Little Orbit's many payment defaults and unnecessary changes and failures to perform or pay were responsible for the cost overruns and delays based on which Little Orbit wrongfully terminated Original Contracts in February of 2019.

28.     During the settlement conference, the parties did not discuss the difference between "revenues" and "net revenues" because "net revenues" is a nonsense term that would mean margins or profits.

29.     Little Orbit breached and then terminated the Original Contracts long ago in February of 2019, which is what caused this litigation.

30.     The parties' relationship under the Binding Settlement Terms Sheet is not based on and looks nothing like their relationship under the Development Agreement.  To the contrary, under the BSTS, Descendent assumed absolutely no responsibility for performing any development.  The BSTS was not a continuation of the Development Agreement in whole or in part.

31.     The parties did not base the payment splits in the BSTS on the Development Agreement.  Rather, they were the product of back-and-forth dickering and negotiations.

32.     The parties agreed that Defendants would receive royalties and payments based on a percentage of revenues, meaning gross income from sales and licensing.

33.     Little Orbit admitted that it merely <u>assumed</u> that those assets had been stored, apparently based on the inapplicable provisions of the Original Contracts which Little Orbit had first materially breached and then wrongfully terminated.  A genuine and authentic copy of that email is attached hereto as Exhibit D.

34.     Neither delivery nor the state of the reportedly missing historical deliverables were ever discussed during the settlement conference nor included in the BSTS.

35.    Attached hereto as Exhibit C is a genuine and authentic copy of excerpts from the hearing transcript in this case from the hearing dated May 24, 2021.

I declare under penalty of perjury that the above is true and correct.

Executed This 2nd Day of July, 2021, in Austin, Texas.

Eric Peterson

-6-

# EXHIBIT A



Pete Meeker
Member

512 660 5967 direct
pmeeker@rcmhlaw.com

February 1, 2019

Matt Scott
Little Orbit, LLC
29863 Santa Margarita Parkway, Suite 110
Rancho Santa Margarita, California 92688

Re:     Descendent Studios, Inc.; Descent Video Game Development Agreement

Dear Mr. Scott:

We represent Descendent Studios, Inc.   Yesterday, January 31, Descendant Studios received a $10,000 payment from Little Orbit.  As you know, that payment was $20,000 less than the $30,000 due to Descendant Studios for its work on the Descent video game.  This failure constitutes a material breach of the Development Agreement.

As a demonstration of good faith, Descendent Studios is continuing to uphold its contractual obligations under the expectation that Little Orbit will cure its breach.  Little Orbit may cure this breach by depositing the sum of Fifty-Thousand ($50,000) U.S. Dollars to the customary bank account of Descendent Studios on or before 5:00pm CST on Friday, February 15, 2019, and by maintaining timely delivery of contractually-obligated payments thereafter.  Attached is our client's January 31, 2019 invoice.

Failure to cure this material breach will delay the release of the Game, resulting in significant financial damages to both parties.  Descendent Studios reserves its right to assert any and all rights and remedies to which it may be entitled under the Development Agreement and the law, including but not limited to termination of the agreement.

Descendent Studios would prefer to continue the Development Agreement and work toward completion and publishing of the Game, but only if Little Orbit honors its commitments and obligations under the Development Agreement.

Sincerely yours,

Pete Meeker
Enclosure

Reed, Claymon, Meeker & Hargett, PLLC

# EXHIBIT B



Matthew, 4:00 PM

I'm having him organize everything, and then I'm going to have Kyle sit with my UX person to map everything into the UI templates 

BTW - its worth saying: I am sorry about the unexpected non-pay. That's on me. I had another payment that was supposed to show up. We're still sorting it out. 

4:04 PM

Thanks, I appreciate that - trust me when I say I want this to work out - and we all benefit, there is no other way in which this even remotely succeeds.....it all is like fractional if we get pissy.....

# EXHIBIT C

<pre>
 1                    UNITED STATES DISTRICT COURT
                      CENTRAL DISTRICT OF CALIFORNIA
 2                    SOUTHERN DIVISION - SANTA ANA

 3

 4   LITTLE ORBIT LLC,          )   Case No. SACV 20-89-DOC (JDEx)
                                )
 5        Plaintiff,            )   Santa Ana, California
                                )   Monday, May 24, 2021
 6            v.                )   12:00 P.M.
                                )
 7   DESCENDENT STUDIOS INC.,   )   VIDEOCONFERENCE
     et al.,                    )
 8                              )
          Defendants.           )
 9   _____)

10

11

12
                        TRANSCRIPT OF PROCEEDINGS
13              BEFORE THE HONORABLE JOHN D. EARLY
                   UNITED STATES MAGISTRATE JUDGE
14

15

16   Appearances:                  See Page 2

17   Deputy Clerk:                  Maria Barr

18   Court Reporter:                Recorded; CourtSmart

19   Transcription Service:         JAMS Certified Transcription
                                    16000 Ventura Boulevard #1010
20                                  Encino, California  91436
                                    (661) 609-4528
21

22

23

24
     Proceedings recorded by electronic sound recording;
25   transcript produced by transcription service.
</pre>

```
 1  APPEARANCES:

 2

 3  For the Plaintiff:       Law Office of M. Danton Richardson
                             By:  MICHAEL DANTON RICHARDSON
 4                           131 North El Molino Avenue, Suite 310
                             Pasadena, California  91101
 5                           (949) 677-6434
                             mdantonrichardson@yahoo.com
 6

 7

 8  For the Defendants:      Nova IP Law PLLC
                             By:  MICHAEL C. WHITTICAR
 9                           7420 Heritage Village Plaza, Suite 101
                             Gainsville, Virginia  20155
10                           (571) 386-2980
                             mikew@noaiplaw.com
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1 execute a further, more detailed, written memorialization

2 (end reading).

3          So the parties contemplated it -- that it was

4 possible. It didn't happen. So now we're going to revert to

5 the settlement agreement that was put on the record way back

6 in -- on November 17th. But in fairness to plaintiff, I'm

7 not going to make that retroactive -- that his payment was

8 due 60 days from November 17th. I'm going to make that

9 payment due -- and I'm saying "60 days." Maybe it was

10 30 days -- from today. So plaintiff will have an opportunity

11 to comply. If he doesn't make that payment, then we'll see

12 where we are, but that's what we're going to do. I see --

13 I'm going to hold my tongue.

14          Please continue, Mr. Whitticar.

15          MR. WHITTICAR: So the second issue, Your Honor,

16 was that the plaintiff said that they were going to treat

17 revenues as some kind of net sales under the original

18 development agreement which was of course --

19          THE COURT: It's not -- that dispute is not ripe

20 for me. Okay? Come back to me, if you need to, if the first

21 payment is not made. I think revenue -- the meaning of it is

22 clear. It's not ambiguous. It was clear from the context of

23 the agreement itself, and from the parties course of dealing,

24 it was not unclear. It appears to me that the -- there's

25 been an effort made by plaintiff to create an ambiguity where

1  there was none, but it's not -- unless and until that first

2  payment is missed, you're asking me -- and I do think this is

3  fair from plaintiff -- you're asking me or Judge Carter to

4  make a advisory ruling when it's not before us.  We make

5  rulings on actual, live disputes.  Even if everybody says

6  it's going to be a dispute 60 days from now, I'm not walking

7  you guys through this.

8          You had a full and fair opportunity to put whatever

9  terms you wanted in a term sheet, in a settlement agreement,

10 and I said, I'll put whatever you -- whatever terms you want

11 will be what the settlement terms are.  This is what is

12 before us.  I find that it's not ambiguous and the meaning is

13 clear based on the course of dealing with the party and the

14 language used, and I'm not going beyond that unless there's

15 some particular ripe dispute.

16         MR. WHITTICAR:  Okay.  And then the third issue,

17 Your Honor, was them saying that they refused to market the

18 game or spend on marketing or user acquisition --

19         THE COURT:  Again, I -- I'm just going to repeat

20 myself.  It's not a ripe -- it's not ripe at this point.  I'm

21 not going to get into that.  The agreement is clear.  If you

22 hit a point where that has been violated, as opposed to them

23 expressing their agreement about what the -- their views on

24 what the agreement means, so be it, but let's get first

25 things first.  There's no more -- there's -- this is clear:

1

2

3

4                              CERTIFICATE

5            I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa                    May 29, 2021
     Julie Messa, CET**D-403            Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

# EXHIBIT D

**From:** Matt Scott <Matt.Scott@littleorbit.com>
**Sent:** Tuesday, April 13, 2021 12:50 PM
**To:** eric.peterson@feverpitchstudios.com
**Subject:** Re: Latest version of Descent code and assets

I'm not interested in your deal. Interplay could have been a neutral party, but Herve blew it.

Just have your lawyer do what he's going to do. I'm done waiting.

I assumed you still had the gitlab repo and that you could just re-add us. Highly disappointing that you havent preserved the project history.

l can setup a Dropbox folder and give you edit rights. Then you can drop the code repo in there and let it sync overnight.

## CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 2, 2021, I filed a copy of the following document(s):

**DECLARATION OF ERIC PETERSON IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE BINDING SETTLEMENT TERMS SHEET**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**
  leo.law.55@gmail.com
- **Michael Danton Richardson**
  mdantonrichardson@yahoo.com

Executed on July 2, 2021, at Los Angeles, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto_____
       Diane Hashimoto

1    NADA I. SHAMONKI (SBN 205359)
     nshamonki@mintz.com
2    **MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
     2029 Century Park East, Suite 3100
3    Los Angeles, CA 90067
     Telephone:  (310) 586-3200
4    Facsimile:   (310) 586-3202

5    MICHAEL C. WHITTICAR (*admitted pro hac vice*)
     mikew@novaiplaw.com
6    **NOVA IP LAW, PLLC**
     7420 Heritage Village Plaza, Suite 101
7    Gainesville, VA 20155
     Telephone:  (571) 386-2980
8    Facsimile:  (855) 295-0740

9    Attorneys for Defendant/Counterclaimant
     DESCENDENT STUDIOS INC. and
10   Defendant ERIC PETERSON

11              **UNITED STATES DISTRICT COURT**

12            **CENTRAL DISTRICT OF CALIFORNIA**

| | |
|---|---|
| 13  LITTLE ORBIT LLC, a California | Case No. 8:20-cv-00089-DOC-JDE |
| 14  Limited Liability Company, | **DECLARATION OF MICHAEL C.** |
| 15                  Plaintiff, | **WHITTICAR IN SUPPORT OF DEFENDANTS' OPPOSITION TO** |
| 16     vs. | **PLAINTIFF'S MOTION TO SET ASIDE BINDING SETTLEMENT** |
| 17 | **TERMS SHEET** |
| 18  DESCENDENT STUDIOS INC., a | |
|     Texas corporation, and ERIC | Date:     July 26, 2021 |
| 19  PETERSON, an individual, | Time:    8:30 a.m. |
| 20              Defendants. | Courtroom: 9D |
| 21  DESCENDENT STUDIOS INC., a | |
| 22  Texas corporation, | |
| 23          Counterclaimant, | Judge: Hon. David O. Carter |
| 24     vs. | Complaint Filed:   1/16/2020 |
| 25  LITTLE ORBIT LLC, a California | |
| 26  Limited Liability Company, | |
| 27         Counterdefendant. | |
| 28 | |

I, Michael C. Whitticar, declare as follows:

1.      I am licensed to practice law in the Commonwealth of Virginia and have been admitted to practice before this court *pro hac vice* in this case.  I am an attorney with NOVA IP Law, PLLC ("Nova IP"), counsel for Defendants Descendent Studios Inc. and Eric Peterson ("Defendants").  I submit this declaration in support of Defendants' opposition to Plaintiff's Motion to Set Aside Settlement Binding Terms Sheet.

2.      I am over the age of 18 and make this declaration of my own knowledge. I could and would competently testify as to the matters set forth below if called upon to do so.

3.      Little Orbit failed to meet and confer about setting aside the Binding Settlement Terms Sheet ("BSTS") at least seven days before filing that motion.   On June 21, 2021, Mr. Richardson for Little Orbit called me for Defendants and requested that the June 23 payment deadline (then two days away) be suspended while Little Orbit tries to renegotiate the BSTS.   I responded that Defendants are happy to engage in negotiations but that I doubted that they would further extend or suspend the payment deadline.  Little Orbit through Mr. Richardson then threatened that Little Orbit would file a motion to set aside the BSTS if Defendants would not suspend or extend the payment deadline.

4.      Little Orbit and Mr. Richardson did not state or seek to discuss any alleged basis for setting aside BSTS and did not ask whether Defendants would agree to that.

5.      I have been engaged as counsel in intellectual property litigation nationwide for over twenty-five years.  In settlement of litigation or disputes over intellectual property, licenses are often provided without any requirement that the owner or licensor deliver the technology or intellectual property to the licensed party. There is no implied or implicit requirement that the technology be provided, especially where the other party is believed or accused of being in possession of the

technology or intellectual property.

6.    Defendants have not refused to continue negotiations over Little Orbit's many attempts to modify, renegotiate and repudiate the BSTS.  To the contrary, Defendants have proposed at least two different general sets of modifications that would permit Little Orbit to modify and attempt to renegotiate the BSTS.

7.    What Defendants have insisted upon is that Little Orbit make the settlement payment that was first due six months ago, and which was again due on the date Little Orbit filed its motion to set aside the BSTS.  They have also requested and demanded that Little Orbit engage in meaningful, reasonable, responsive private negotiations before burdening the Court with re-settling a case that already has been settled.

8.    The term "Net Sales" was never discussed during the mediation or the parties' settlement negotiations.

I declare under penalty of perjury that the above is true and correct.

Executed This 2nd Day of July, 2021, in Prince William County, Virginia.

_____
Michael C. Whitticar

# CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 2, 2021, I filed a copy of the following document(s):

**DECLARATION OF MICHAEL C. WHITTICAR IN SUPPORT OF DEFENDANTS' OPPOSITION TO MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**

  leo.law.55@gmail.com

- **Michael Danton Richardson**

  mdantonrichardson@yahoo.com


Executed on July 2, 2021, at Los Angeles, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto
Diane Hashimoto

1   NADA I. SHAMONKI (SBN 205359)
    nshamonki@mintz.com
2   **MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.**
    2029 Century Park East, Suite 3100
3   Los Angeles, CA 90067
    Telephone: (310) 586-3200
4   Facsimile: (310) 586-3202

5   MICHAEL C. WHITTICAR (*admitted pro hac vice*)
    mikew@novaiplaw.com
6   **NOVA IP LAW, PLLC**
    7420 Heritage Village Plaza, Suite 101
7   Gainesville, VA 20155
    Telephone: (571) 386-2980
8   Facsimile: (855) 295-0740

9   Attorneys for Defendant/Counterclaimant
    DESCENDENT STUDIOS INC. and
10  Defendant ERIC PETERSON

11              **UNITED STATES DISTRICT COURT**

12             **CENTRAL DISTRICT OF CALIFORNIA**

13  LITTLE ORBIT LLC, a California       Case No. 8:20-cv-00089-DOC-JDE

14  Limited Liability Company,
                                         **DEFENDANTS' OPPOSITION TO**
15                          Plaintiff,   **PLAINTIFF'S MOTION TO SET**
                                         **ASIDE BINDING SETTLEMENT**
16          vs.                          **TERMS SHEET**

17  DESCENDENT STUDIOS INC., a           **[REDACTED VERSION OF**
                                         **DOCUMENT FILED UNDER SEAL**
18  Texas corporation, and ERIC          **PURSUANT TO ORDER OF THE**
    PETERSON, an individual,             **COURT DATED APRIL 20, 2021]**
19

20                          Defendants.
    ─────────────────────────────────    Date:        July 26, 2021
21  DESCENDENT STUDIOS INC., a           Time:        8:30 a.m.
    Texas corporation,                   Courtroom: 9D
22

23                          Counterclaimant,

24          vs.

25  LITTLE ORBIT LLC, a California       Judge: Hon. David O. Carter
    Limited Liability Company,
26                                       Complaint Filed:    1/16/2020

27                          Counterdefendant.

28

                              122

1

<h1 align="center">TABLE OF CONTENTS</h1>

2

**PAGE**

3

I. FACTS ........................................................................................................... 1

4

5
   A.  The Best Defense is a Good Offense........................................................ 1

6
   B.  Little Orbit Recycles Previously Rejected Excuses ................................. 2

7
   C.  The Allegedly Missing Deliverables ........................................................ 2

8
   D.  Little Orbit Failed to Meet and Confer..................................................... 6

9
II. ARGUMENT.................................................................................................. 7

10

11
   A.  There Was No Implied Duty to Deliver All Prior Versions of
       Everything to Do With The Game. ........................................................ 7

12
   B.  Defendants Have Not Refused to Renegotiate (They Just Want to Get

13
       Paid)......................................................................................................... 8

14
   C.  Any Alleged Unilateral Mistake by Little Orbit is No Defense.................. 8

15
   D.  Defendants Committed No Fraud.............................................................. 11

16
III.  CONCLUSION ............................................................................................. 12

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*U.S. v. Armour & Co.*,
   402 U.S. 673 (1971)................................................................8

*U.S. v. ITT Continental Baking Co.*,
   420 U.S. 223 (1975)................................................................8

**California Cases**

*Barhan v. Barhan*,
   33. Cal. 2nd 416, 427 (Cal. Sup. Ct. 1949) ............................................. 7

*City of Orange v. San Diego County Employees Retirement Association*,
   103 Cal. App. 4th 45 (2nd Dist. Ct. App. 2002)....................................... 7

*Donovan v. RRL Corp.*,
   26 Cal. 4th 261 (Cal. Sup. Ct. 2001) ..................................................... 10

*Villa v. Cole*,
   4 Cal App. 4th 1326 (1st Dist. Ct. App. 1992)....................................... 7

**Other Authorities**

Local Rule 7-3 ............................................................................................. 6

Restatement (Second) of Contracts § 153 ................................................ 10

1       Defendants and counterclaim Plaintiffs Eric Peterson and Descendent Studios,

2 by counsel, hereby respectfully submit this opposition to Plaintiff Little Orbit's

3 Motion to Set Aside Binding Settlement Terms Sheet ("BSTS").

4 **I. FACTS**

5 **A. The Best Defense is a Good Offense**

6       On the date that this first settlement payment was (again) due pursuant to this

7 Court's order dated May 24, 2021, which the district judge accepted on June 17,

8 2021, Little Orbit once again decided to jump the line and file a motion to try to

9 cover up for its inability and unwillingness to make payments due to the

10 Defendants.

11       In the original underlying litigation, Defendants first notified Little Orbit of its

12 default in failing to make payments when due. (Ex. A to the Declaration of Eric

13 Peterson ("Peterson Decl.") in support of this opposition). Little Orbit then wrote

14 Descendent and admitted that the payment delay was due to its own inability to pay.

15 (Ex. B to Peterson Decl.). Obviously a proponent of the old adage that the best

16 defense is a good offense, Little Orbit nevertheless retaliated by wrongfully

17 terminating the Development Agreement and the Original Terms Sheet Addendum

18 (the "Original Contracts") based on purported delays by the Defendant, which were

19 ultimately the fault and responsibility of Little Orbit in failing to ever complete a

20 revised and updated API or "application program interface" that Little Orbit has

21 requested and taken responsibility for completing.

22       Similarly here, Little Orbit has lacked the willingness and ability to make the

23 first ███████ settlement payment for the seven months since the BSTS was signed

24 and agreed upon in November of 2020. After Little Orbit repeatedly denied,

25 misconstrued and failed to abide by the actual terms of the BSTS, the Court noted

26 that Little Orbit was trying to change and avoid the clear and unambiguous meaning

27 of "revenue" under the BSTS.

28

I think revenue---the meaning of it is clear. It's not ambiguous….. It appears to me that the ----there's been an effort made by Plaintiff to create an ambiguity where there was none….

(Ex. C to Peterson Decl., pp. 10-11).

**B. Little Orbit Recycles Previously Rejected Excuses**

Most of the points raised in Little Orbit's motion to set aside simply repeat arguments that the Court previously rejected in finding there to be a valid and binding settlement agreement. The following Little Orbit arguments were rejected by the court after having been raised in Little Orbit's opposition (Docket No. 68) to Defendants' motion to enforce the settlement agreement:

- Descendent cannot deliver the (supposedly) bargained for assets. (Oppo. at p. 8).

- Little Orbit committed a mistake as to the meaning of "revenues." (Oppo. at p. 3).

**C. The Allegedly Missing Deliverables**

In finding that the BSTS was a binding and enforceable agreement, the Court considered and rejected virtually the same argument Little Orbit makes here regarding the alleged failure by Defendants to provide deliverables allegedly due under the BSTS. In fact, on page 8 of Little Orbit's opposition to Defendants' motion to enforce the BSTS, Little Orbit made essentially the same breach and failure of consideration arguments about alleged failure to deliver other versions of the game code. (Docket No. 68 at p. 10).

The only new wrinkle here to Little Orbit's previously rejected arguments about failure to provide additional game software deliverables is that Little Orbit is now complaining about not having access to the historical game artwork source files and executable versions of every prior version of the software game code. However, this is still the same general claim and contention that the Court already rejected. And if Little Orbit actually has been working on finishing the game since November (as it should have been) then it obviously knew long ago that it did not

1  have these items.

2  In response, Defendants point out that their deliverables under the BSTS were

3  expressly stated and limited therein.  They included and were limited to "pre-order

4  data, Kickstarter data, and early backer data."  (BSTS § 10).  All of these have been

5  provided to Little Orbit.

6  Simply put, nothing in the BSTS obligated the Defendants to provide game

7  software, revised game software, complete functional copies of each prior version of

8  the game software, or separate files for the artwork.  Nevertheless, the Defendants

9  have largely delivered that.

10  The reason additional delivery obligations were not put into the BSTS --- at

11  least from the perspective of the Defendants—was that the Plaintiff Little Orbit had

12  been given copies of the game software before it wrongfully terminated the

13  Development Agreement and the original Terms Sheet Addendum (the "Original

14  Contracts").  Little Orbit did not ask for copies of the game software during the

15  negotiations of the BSTS, and the Defendants assumed that that was because Little

16  Orbit was satisfied with the version of the game code that it had.  The updated game

17  code, the separate artwork, and the complete writable versions of all prior game

18  code versions were neither sought nor demanded in the BSTS nor during its

19  negotiation.

20  It is crucial to note that in the BSTS and the negotiation thereof, Little Orbit

21  did not request and the Defendants did not promise to deliver or provide any of the

22  purported missing items about which Little Orbit is now complaining, now that it

23  has failed (again) to make the first settlement payment on time.

24  The allegedly "missing" game software versions which the Defendants never

25  promised or agreed to provide, nevertheless have been provided by the Defendants

26  to the extent they would be useful to Little Orbit and the Defendants have the ability

27  to provide them.  These include the game software code at the time Little Orbit

28  wrongfully terminated the Original Contracts after Little Orbit had been notified

1    that it was in default for not paying Descendent, an updated version of the game

2    code including a small amount of debugging and the old Descendent API that Little

3    Orbit did not like and had broken its promise to re-do, the artwork source file and

4    read-only copies of all prior versions of the game code.

5         The Defendants have provided Little Orbit with a library showing historical

6    images and versions of the game software.  It just does not contain a fully

7    functioning, executable version of all prior versions and iterations of the game

8    software.  That is not necessary to complete development of the game.

9          There is a reason that the Defendants have been unable to provide a complete

10   library of executable copy of all prior versions of the game code.  When Little Orbit

11   wrongfully stopped making payments to Descendant under the Original Contracts,

12   the Defendants had to lay off their staff and had no money to keep paying for the

13   servers on which the allegedly missing items were stored.  The old artwork source

14   files that Little Orbit recently demanded have been recovered recently from an old

15   remote, third-party computer and provided to Little Orbit.  However, any time

16   Descendent provides the supposedly "missing" materials, Little Orbit comes up with

17   a different allegedly "crucial" missing item as an excuse for not making the

18   settlement payment.  Descendent now has delivered virtually all of the items, and

19   Little Orbit still has not made the settlement payment.

20        All of these allegedly missing items were items to which Little Orbit had

21   access and which it could have downloaded when or before it stopped making

22   payments in January 2019.  Little Orbit had access to all of these items, and the

23   Defendants were operating under the belief that Little Orbit had downloaded them

24   before Little Orbit wrongfully stopped making payments and terminated the

25   Original Contracts.  Any competent developer would have done so and known to do

26   so.  Note that Little Orbit never actually states that it did not download and save and

27   does not actually have these items.  It just tries to use Descendent's alleged inability

28

1    to provide them to try to cancel the BSTS and avoid making the settlement

2    payments.

3         Little Orbit's argument that the Defendants are in breach because the Original

4    Contracts required Descendent to keep and maintain certain items is clearly

5    specious.  First, Little Orbit committed the first material breach of the Original

6    Contracts when it wrongfully stopped making payments to Descendent and was

7    notified by Descendent of Little Orbit's default and breach.  Second, as the result of

8    Little Orbit's wrongful breach and termination, the final game was not finished or

9    delivered, so the four-year storage requirement does not apply by its express terms.

10   Third, the BSTS (Section 19) provided for mutual general releases and clearly

11   novated, released and displaced the parties' obligations under the Original

12   Contracts, so it is specious and without merit for Little Orbit to now assert that the

13   Defendants somehow are still responsible for their pre-settlement contractual

14   obligations (which do not apply by their express terms).

15        The Defendants have never told Little Orbit that the prior versions of the game

16   software or artwork or other deliverables were destroyed.  They have never

17   represented that they had a complete, executable, writable history of all prior

18   historical versions of the game software.

19        To the contrary, in an email dated April 13, 2019, Matt Scott admitted to

20   Defendants that he had merely "assumed" that the prior versions were still available

21   on the repository or "github repo."  (Ex. D to Peterson Decl.).

22        Little Orbit does not need more than the game code to finish the game.  The

23   Defendants provided the source code and all the data in the game.  Little Orbit can

24   take it from there and finish the game.  It can access everything in the game.

25        Little Orbit is incorrect in saying that "Without the project history, we have no

26   way of knowing what original source art was either not yet imported into the game

27   code or, which for whatever reason, may have been removed from the source code.

28   Those assets are now lost."

This is untrue because the project history is available in "read only" format in what the Defendants provided.  Little Orbit admitted that: "<u>While the artwork already contained in the code can be used to complete the game</u>, those assets are of poor quality when trying to meet the higher resolutions provided for in newer platforms such as Xbox X and PlayStation 5."

What Little Orbit admits is true.  The artwork contained in the code is enough to finish the PC version of the game, which is all Little Orbit is obligated to do in the first year.  Additionally, Little Orbit was correctly informed that the artwork can be extracted from the game code.  In any event, the Defendants have now recovered from a third party and provided the original artwork source files from a remote computer.  So this point is moot, and there is no material breach by the Defendants.

**D. <u>Little Orbit Failed to Meet and Confer</u>**

Little Orbit's motion to set aside the BSTS should be denied for the additional reason that Little Orbit failed to meet and confer about setting aside the BSTS at least seven days before filing the motion -or at all- as required by Local Rule 7-3. On or about June 22 or 23, 2021, Mr. Richardson for Little Orbit called Mr. Whitticar for Defendants and requested that the June 23 payment deadline be suspended while Little Orbit tries to renegotiate the BSTS.  Mr. Whitticar responded that Defendants are happy to engage in negotiations but that he doubted that they would further extend or suspend the payment deadline.  Little Orbit through Mr. Richardson then threatened that Little Orbit would file a motion to set aside the BSTS if Defendants would not suspend or extend the payment deadline.

Little Orbit and Mr. Richardson did not state or seek to discuss any purported basis for setting aside the BSTS and did not ask whether Defendants would agree to that.  Therefore, Little Orbit failed to confer in good faith before filing its motion to set aside, which is merely a transparent attempt to avoid the payment obligations which it obviously cannot fulfill.

1   Little Orbit therefore also failed to certify in its notice of Motion that it

2   conferred in good faith about the Motion to Set Aside as required by Local Rule 7-3.

3   Little Orbit's motion to set aside is therefore premature and unnecessary and is due

4   to be stricken and dismissed.

5   **II. <u>ARGUMENT</u>**

6   **A. <u>There Was No Implied Duty to Deliver All Prior Versions of Everything to</u>**

7   **<u>Do With The Game.</u>**

8   Little Orbit fails to cite <u>any</u> authority whatsoever for its key argument that new

9   delivery of all past and prior versions the game code was an "implicit" requirement

10  of the BSTS.  In this case, the Defendants believed that Little Orbit still had the

11  copy of the game code that was delivered to it, before Little Orbit wrongfully

12  skipped paying on and terminated the Original Contract.  Any competent developer

13  would have known to download these items before skipping payments and before

14  terminating and breaching the Original Contracts.  Little Orbit has never actually

15  stated that it had not done so.

16  In settlement of litigation or in disputes over intellectual property, licenses are

17  often provided without any requirement that the owner or licensor deliver the

18  technology or intellectual property to the licensed party.  (¶ 5 to Michael C.

19  Whitticar Declaration ("Whitticar Decl.") in support of this opposition).

20  In addition, settlement agreements, as agreements that are carefully negotiated

21  between adversaries with different goals and who are often hostile to each other, are

22  to be strictly construed but are still favored in law and public policy. *See City of*

23  *Orange v. San Diego County Employees Retirement Association*, 103 Cal. App. 4th

24  45, 55 (2nd Dist. Ct. App. 2002) (settlement agreements are highly favored as

25  protective of peace and good will in the community, as well as reducing the expense

26  and persistence of litigation); *Villa v. Cole*, 4 Cal App. 4th 1326, 1338 (1st Dist. Ct.

27  App. 1992) (settlements of litigation are favored and should be enforced). *See also*

28  *Barhan v. Barhan*, 33. Cal. 2nd 416, 427 (Cal. Sup. Ct. 1949) (marriage settlements

are to be strictly construed); *U.S. v. ITT Continental Baking Co.*, 420 U.S. 223, 238 (1975) (consent decrees must be strictly construed); *U.S. v. Armour & Co.*, 402 U.S. 673, 621-82 (1971) (same, due to careful negotiation and parties' cross purposes).

Settlement agreements are favored in law, and parties like Little Orbit should not be permitted to evade and repudiate settlement agreements just because they have buyer's remorse and dislike the outcomes they have negotiated in arms-length negotiations with the assistance of counsel and the Court.

**B. Defendants Have Not Refused to Renegotiate (They Just Want to Get Paid).**

For whatever relevance it has, the Defendants have not refused to continue negotiations over Little Orbit's many attempts to repudiate the BSTS. In fact, the Defendants have proposed at least two different sets of modifications that would permit Little Orbit to modify and attempt to renegotiate the BSTS. (¶ 6 to Whitticar Decl.).

What the Defendants have insisted on is that Little Orbit make the settlement payment that was due six months ago, and then again on June 23, 2021, but was not made. (¶ 7 to Whitticar Decl.). However, Little Orbit obviously lacks the funds to make the first settlement payment seven month after the BSTS was signed. Thus, on the very same day that the first payment was due for the second time, Little Orbit filed its questionable motion to set aside the BSTS mostly repeating the same contentions that it argued in Little Orbit's opposition to the Defendants' motion to enforce the BSTS (and which the Court has rejected). Defendants have also requested and demanded that Little Orbit actually bother to engage in reasonable, responsive, good faith private negotiations before imposing on the Court to re-settle a dispute that already has been settled. (¶ 7 to Whitticar Decl.).

**C. Any Alleged Unilateral Mistake by Little Orbit is No Defense.**

Little Orbit's request to set over the BSTS on the grounds of unilateral mistake by Little Orbit was-like is breach allegations - previously made and rejected by the Court. Little Orbit made this mistake claim in its Opposition to Defendants' motion

1   to enforce the BSTS on page 3. (Docket No. 68). The court rejected these
2   arguments in finding that there was a binding and enforceable settlement agreement.
3   Little Orbit did not object to or file any exceptions to the report and
4   recommendation before it was confirmed by the district court by order dated June
5   17th, 2021. Thus, Little Orbit's unilateral mistake claim was previously made and
6   rejected, and Little Orbit is not permitted a second bite at the apple.

7   It would be exceedingly inappropriate to set aside a settlement agreement
8   based on a <u>unilateral</u> mistake when the settlement was reached through lengthy
9   negotiations including parties represented by counsel, with the assistance of the
10  Court. Settlement agreements are favored in law and policy and should not be set
11  aside even in the unlikely event of an actual unilateral mistake. *Supra* pp. 7-8.

12  The Court had it correct when Judge Early noted at the prior motion to enforce
13  hearing that there was a clear, agreed to and unambiguous meaning of "revenues,"
14  but that Little Orbit just became unhappy with the settlement and is trying to "create
15  an ambiguity where there was none." (Ex. C to Peterson Decl.: May 24, 2021
16  hearing transcript at pp. 10-11).

17  To the extent Little Orbit contends that its unilateral mistake as to the meaning
18  of "revenues" makes the BSTS unconscionable, nothing could be further from the
19  truth. Section 13 of the BSTS applies the same "revenues" term to Descendent. So,
20  if Little Orbit cannot finish the game applying the plain language dictionary
21  definition of "revenues," it can make the settlement payments and then turn
22  completion of the game over to Descendent pursuant to Section 13 of the BSTS.

23  Here, Little Orbit's secret, unexpressed intent that "revenues" allegedly meant
24  "Net Sales" or "Profits" was never expressed to Defendants, who had no idea of that
25  purported intent and understanding for weeks after the BSTS was signed. In
26  addition, given the vast differences between the BSTS and the Development
27  Agreement, there is no reason that Defendants should have known about Little

28

1   Orbit's erroneous and incorrect interpretation.[1]  Thus there is no basis for setting

2   aside the BSTS or any part of it based on any alleged unilateral mistake of fact by

3   Little Orbit.

4       In addition, there is no reason that paying Defendants a percentage of revenues

5   or gross income would be unconscionable, as the BSTS was carefully negotiated by

6   skilled counsel at arm's length, Defendants own the relevant intellectual property to

7   the game, and royalties are typically based on revenues and not on margins or

8   profits, which are subjective and easy to manipulate.  Furthermore, Defendants'

9   evidence would have clearly shown that Little Orbit's many payment defaults and

10  unnecessary changes and failures to perform were responsible for the cost overruns

11  and delays based on which Little Orbit wrongfully terminated Original Contracts in

12  February of 2019.  (*See* Exs. A and B to Peterson Decl.).  Therefore, there is no

13  basis for setting aside the BSTS based on a mistake.  *See Donovan v. RRL Corp.*, 26

14  Cal. 4th 261, 280-282 (Cal. Sup. Ct. 2001); Restatement (Second) of Contracts §

15  153.

16      Little Orbit's claim that it construed "revenue" not by its common dictionary

17  definition but rather to be the same thing as "Net Sales" under the Development

18  Agreement is untrue, illogical and objectively baseless.  First, the Development

19  Agreement never defined or used the terms revenues or profits, but rather the very

20  distinct and different term "Net Sales."

21       Second, Little Orbit breached and then terminated the Development

22  Agreement and the subsequent terms sheet addendum long ago in February of 2019,

23  which is what caused this litigation.

24      Third, the BSTS provided for "Mutual General Releases" (p. 2, ¶ 19), which

25  completely cancelled the Original Contracts.

26

27

_____

28  [1] To be sure, the parties did not discuss the difference between "revenues" and "net
    revenues" because "net revenues" is a nonsense term that would mean margins or
    profits.

Fourth, the parties' relationship under the Binding Settlement Terms Sheet is not based on and looks nothing like their relationship under the Development Agreement. To the contrary, under the BSTS, Descendent assumed absolutely no responsibility for performing any development work or services after transferring (only) certain customer information to Little Orbit.

The BSTS was a completely different animal from the terminated Development Agreement. The BSTS simply and objectively was not a continuation of the Development Agreement in whole or in part. There is no objectively logical or accurate reason that Little Orbit could have reasonably expected the meanings of words not used or defined in the Development Agreement (revenues) when used in the BSTS to have the same meaning as the very different Development Agreement's very different term (Net Sales). In addition, the parties simply did not base the payment splits in the BSTS on the Development Agreement. Rather, they were the product of back-and-forth dickering and negotiations.

In short, as judged by the plain language dictionary definition of the words they chose and used, as properly judged by their objective manifestations of assent and meaning, and properly disregarding post-hoc subjective statements of Little Orbit's inaccurate, baseless, purported secret meaning of "Revenues," the parties agreed that Defendants would receive royalties and payments based on a percentage of revenues, meaning gross income from sales and licensing. There was no unilateral mistake and any such mistake would not justify setting aside the BSTS.

**D. <u>Defendants Committed No Fraud.</u>**

Regarding fraud, Little Orbit can point to no representation by the Defendants that they still had or had stored the artwork source or executable copies of every prior version of the game software before the BSTS was signed. Little Orbit admitted that it merely <u>assumed</u> that those assets had been stored, apparently based on the inapplicable provisions of the Original Contracts which Little Orbit had first materially breached and wrongfully terminated. (Ex. D to Peterson Decl.).

1    In addition, the alleged materiality of Little Orbit's mere assumption is

2    disproven by the fact that neither delivery nor the state of the reportedly missing

3    historical deliverables were ever discussed during the settlement conference nor

4    included in the BSTS (although Little Orbit asserts that the current version of the

5    source code was discussed).  Mere assumptions made by Little Orbit based on its

6    strained and incorrect reading of the Original Contracts which Little Orbit had

7    breached, terminated, released in the BSTS and then novated through the BSTS

8    certainly are not sufficient to permit Little Orbit to further evade its payment

9    obligations nor to set aside or rescind the settlement agreement.

10   **III.  <u>CONCLUSION</u>**

11   For the foregoing reasons, Little Orbit's motion to set aside the BSTS is

12   procedurally deficient, substantively without merit and due to be denied.

13   Dated:  July 2, 2021                        Respectfully submitted,

14

15   By: _____

16                                                      Counsel

17   Nada I. Shamonki (SBN 205359)
     MINTZ LEVIN COHN FERRIS GLOVSKY
18   AND POPEO P.C.
     2029 Century Park East, Suite 3100
19   Los Angeles, CA 90067
     Telephone: (310) 586-3200
20   Facsimile: (310) 586-3202
     Email: nshamonki@mintz.com
21

22   Michael C. Whitticar (*admitted pro hac vice*)
23   NOVA IP Law, PLLC
     7420 Heritage Village Plaza, Suite 101
24   Gainesville, VA 20155
     Tel:   571-386-2980
25   Fax:  855-295-0740
     E-mail: mikew@novaiplaw.com
26

27   *Counsel for Defendants*

28

**CERTIFICATE OF SERVICE**

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action.

On July 2, 2021, I filed a copy of the following document(s):

**[REDACTED] DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION TO SET ASIDE BINDING SETTLEMENT TERMS SHEET**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

- **Leo Edward Lundberg , Jr**

  leo.law.55@gmail.com

- **Michael Danton Richardson**

  mdantonrichardson@yahoo.com

Executed on July 2, 2021, at Los Angeles, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto_____

Diane Hashimoto

1  M. DANTON RICHARDSON (State Bar No. 141709)
   mdantonrichardson@yahoo.com
2  LEO E. LUNDBERG, JR. (State Bar No. 125951)
   leo.law.55@gmail.com
3  LAW OFFICES OF M. DANTON RICHARDSON
4  131 N. El Molino Ave., Suite 310
   Pasadena, CA 91101
5  *Attorneys for Plaintiff,*
6  LITTLE ORBIT LLC

7              **UNITED STATES DISTRICT COURT**
              **CENTRAL DISTRICT OF CALIFORNIA**
8

9  LITTLE ORBIT LLC, a California Limited      ) Case No.: 8:20-cv-00089-DOC-JDE
   Liability Company,                          )
10                                             ) Judge:      Hon. David O. Carter
                                               )
11             Plaintiff,                      )
                                               ) **PLAINTIFF LITTLE ORBIT LLC'S**
12     vs.                                     ) **REQUEST FOR JUDICIAL NOTICE IN**
                                               ) **SUPPORT OF MOTION TO SET ASIDE**
13                                             ) **THE BINDING SETTLEMENT TERMS**
   DESCENDENT STUDIOS INC., a Texas            ) **SHEET DUE TO DEFENDANTS'**
14 corporation, and ERIC PETERSON, an          ) **FRAUD AND FAILURE TO DELIVER**
   individual,                                 ) **THE ASSETS COVERED BY THE**
15                                             ) **TERMS SHEET OR FOR**
                                               ) **ALTERNATIVE RELIEF AND FOR AN**
16             Defendants.                     ) **AWARD OF ATTORNEYS' FEES**
17  _____  )
                                               )
18 DESCENDENT STUDIOS INC., a Texas            )
19 corporation,                                ) **Date: July 26, 2021**
                                               ) **Time: 8:30 a.m.**
20             Counterclaimant,                ) **Courtroom: 9D**
                                               )
21     vs.                                     )
                                               )
22                                             )
   LITTLE ORBIT LLC, a California Limited      )
23 Liability Company,                          )
                                               )
24             Counter Defendant.              )
25  _____  )

26

27

28

                                1

**TO ALL PARTIES AND THEIR COUNSEL OF RECORD:**

Plaintiff Little Orbit LLC does not believe the Court should consider the (partial) dictionary definition of "revenue" from Black's Law Dictionary referred to by Defendants. However, should the Court determine to consider dictionary definitions, then Little Orbit respectfully requests that the Court take judicial notice of the following pursuant to Fed. R. Evid. 201:

1) The entire definition of "revenue" from Black's Law Dictionary – Exhibit A;

2) The definition of "revenue" from Mirriam-Webster's Dictionary – Exhibit B;

3) The definition of "profit" from Mirriam-Webster's Dictionary ("profit" is a synonym for "revenue" as evidenced by Exhibit B) – Exhibit C; and

4) The definition of "income" - from Mirriam-Webster's Dictionary ("income" is a synonym for "revenue" as evidenced by Exhibit B) – Exhibit D.

Fed. R. Evid. 201(c)(2) provides that a court "must take judicial notice if a party requests it and the court is supplied with the necessary information." Plaintiff has done so by this Request.

Fed. R. Evid. 201(d) provides that a "The court may take judicial notice at any stage of the proceeding."

The foregoing definitions should also be considered for purposes of optional completeness pursuant to Fed. R. Evid. 106: "If a party introduces all or part of a writing or recorded statement, an adverse party may require the introduction, at that time, of any other part — or any other writing or recorded statement — that in fairness ought to be considered at the same time."

DATED: June 24, 2021 **LAW OFFICES OF M. DANTON RICHARDSON**

By: ___/s/ M. Danton Richardson___
M Danton Richardson

***Attorney for Plaintiff,***
Little Orbit LLC

# EXHIBIT A

Black's Law Dictionary (11th ed. 2019), revenue

## REVENUE

Bryan A. Garner, Editor in Chief

Preface | Guide | Legal Maxims | Bibliography

**revenue** (15c)  **1.** Income from any and all sources; gross income or gross receipts. **2.** The total current income of a government, however derived; esp., taxes. **3.** The government department or branch of the civil service that collects taxes, esp. national taxes. **4.** A tax officer. — Also termed *revenuer.* **5.** A source of income. — Also termed *revenue stream.* **6.** The periodic yield or interest from investment.

- **general revenue.** (17c) The income stream from which a state or municipality pays its obligations unless a law calls for payment from a special fund. See *general fund* under *fund* (1).

- **land revenue.** (17c) Revenue derived from lands owned by the Crown in the United Kingdom. • Since, over the years, crown lands have been largely granted to subjects, they are now transferred within very narrow limits. See *Crown land* under *land*.

- **marginal revenue.** (1932) The amount of revenue earned from the sale of one additional unit.

- **public revenue.** (16c) A government's income, usu. derived from taxes, levies, and fees.

Westlaw. © 2019 Thomson Reuters. No Claim to Orig. U.S. Govt. Works.

**End of Document**    © 2021 Thomson Reuters. No claim to original U.S. Government Works.



EXHIBIT

A

WESTLAW    © 2021 Thomson Reuters. No claim to original U.S. Government Works.    1

# EXHIBIT B



SINCE 1828

Q

GAMES THESAURUS WORD OF THE DAY BLOG SHOP

- LOG IN
- REGISTER
- ⌄
  settings
- SAVED WORDS

revenue

✕
Q

EXHIBIT

**B**₄₃

dictionary
thesaurus
 view recents

Login or Register
Hello,
GAMES  THESAURUS  WORD OF THE DAY  BLOG  SHOP  SETTINGS

- 🚩 SAVED WORDS    view recents

# revenue

noun, often attributive
🚩 Save Word

To save this word, you'll need to log in.

Log In

rev·e·nue | \ ˈre-və-ˌnü 🔊, - ˌnyü \

## Definition of *revenue*

1 **:** the total income produced by a given source a property expected to yield a large annual revenue
2 **:** the gross income returned by an investment
3 **:** the yield of sources of income (such as taxes) that a political unit (such as a nation or state) collects and receives into the treasury for public use
4 **:** a government department concerned with the collection of the national revenue

⬇ Synonyms ⬇ More Example Sentences ⬇ Learn More about *revenue*

Keep scrolling for more

## Synonyms for *revenue*

Synonyms

- earnings,
- gain(s),
- income,
- incoming(s),
- proceeds,
- profit,
- return,
- yield

Visit the Thesaurus for More ⊗

## Examples of *revenue* in a Sentence

The factory lost *revenue* because of the strike by the workers. The firm is looking for another source of *revenue*.
See More ⊕⊖
Recent Examples on the Web Following that, Priority Two establishments that lost 70% or more of their *revenue* in the same time period will receive funds over the next 14 days. — Taylor Mims, *Billboard,* "Shuttered Venue Operators Grant Payments Will Start Arriving Next Week," 10 May 2021 Every quarter, kweliTV pays out 60% of its *revenue* to filmmakers on its platform. — John General, *CNN,* "She was tired of seeing Black stereotypes on TV. So she started her own streaming service," 8 May 2021

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'revenue.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

See More ⊕⊖

## First Known Use of *revenue*

15th century, in the meaning defined at sense 1

144

## History and Etymology for *revenue*

Middle English, return, revenue, from Anglo-French, from *revenir* to return, from Latin *revenire*, from *re-* + *venire* to come — more at come

Keep scrolling for more

## Learn More about *revenue*

Share *revenue*

Post the Definition of revenue to Facebook    Share the Definition of revenue on Twitter 

Time Traveler for *revenue*



## The first known use of *revenue* was in the 15th century

See more words from the same century

## Dictionary Entries near *revenue*

revengingly

revenons à nos moutons

revent

revenue

revenue account

revenue act

revenue bond

See More Nearby Entries

## Phrases Related to *revenue*

the Inland Revenue

the Internal Revenue Service

## Statistics for *revenue*

Last Updated

13 May 2021

Look-up Popularity

Top 1% of words

Cite this Entry

"Revenue." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/revenue. Accessed 17 May. 2021.

**Style:** MLA
MLA⊘ Chicago⊘ APA⊘ Merriam-Webster⊘

Keep scrolling for more

More Definitions for *revenue*

revenue

*noun*

Case 8:20-cv-03052-PX Document 1-4 Filed, 10/22/21, Page 146 of 253



## English Language Learners Definition of *revenue*

finance
**:** money that is made by or paid to a business or an organization
**:** money that is collected for public use by a government through taxes

See the full definition for *revenue* in the English Language Learners Dictionary

revenue

noun

rev·e·nue | \ ˈre-və-ˌnü , -ˌnyü \

## Kids Definition of *revenue*

1 **:** money that is made by or paid to a business or organization sales *revenues*
2 **:** money collected by a government (as through taxes)

revenue

noun, often attributive

rev·e·nue | \ ˈre-və-ˌnü, -ˌnyü \

## Legal Definition of *revenue*

1 **:** the total income produced by a given source a property expected to yield a large annual revenue
2 **:** the gross income returned by an investment
3 **:** the yield of sources of income (as taxes) that a political unit (as a nation or state) collects and receives into the treasury for public use
4 **:** a government department concerned with the collection of national revenue

More from Merriam-Webster on *revenue*

Thesaurus: All synonyms and antonyms for *revenue*

Nglish: Translation of *revenue* for Spanish Speakers

Britannica English: Translation of *revenue* for Arabic Speakers

Comments on *revenue*

What made you want to look up *revenue*? Please tell us where you read or heard it (including the quote, if possible).

**SHOW COMMENTS** ⊕



# divers 🔊

__See Definitions and Examples »__

Get Word of the Day daily email!

Your email address       SUBSCRIBE

__Test Your Vocabulary__

Words Used by Nabokov Quiz



- Choose the best definition or synonym for the word in bold: "There are some **eructations** that sound like cheers — at least, mine did." *Lolita*

| a sneeze | a clearing of the throat |
| a belch | a groan |

Test your knowledge - and maybe learn something along the way.

TAKE THE QUIZ

Spell words. Make bears.

TAKE THE QUIZ

**Love words? Need even more definitions?**

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**

---

WORDS AT PLAY

·

### The Words of the Week - 5/14/2021

Words from the week of 5/14/2021

·

### The History of 'Bodice'

For our romance readers

·

### The Ups and Downs of 'Raise' and 'Raze'

Are you building something up or tearing it down?

·

### The Words of the Week - 5/7/2021

Words from the week of 5/7/2021

ASK THE EDITORS

·

### 'All Intensive Purposes' or 'All Intents and Purposes'?

We're intent on clearing it up

149

·

## 'Nip it in the butt' or 'Nip it in the bud'?

We're gonna stop you right there

·

## Literally

How to use a word that (literally) drives some pe...

·

## Is Singular 'They' a Better Choice?

The awkward case of 'his or her'

WORD GAMES

·

## Words Used by Nabokov Quiz

How familiar are you with Nabokov's unfamiliar ...

**TAKE THE QUIZ**

·

## Star Wars Words Quiz

Is the Force strong in you?

**TAKE THE QUIZ**

·

## True or False?

Test your knowledge - and maybe learn something a...

**TAKE THE QUIZ**

·

## AlphaBear 2

AlphaBear 2

**PLAY THE GAME**

**Research, Treatment and Care, Personalized to You.**
City of Hope

**Plan Ahead with Your FSA funds! Shop FSA Store**
FSAstore

## Learn a new word every day. Delivered to your inbox!

Your email address

›

### OTHER MERRIAM-WEBSTER DICTIONARIES

- LEARNER'S ESL DICTIONARY
- VISUAL DICTIONARY
- SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- BRITANNICA ENGLISH - ARABIC TRANSLATION
- NGLISH - SPANISH-ENGLISH TRANSLATION

### FOLLOW US

Browse the Dictionary: A B C D E F G H I J K L M N O P Q R S T U V W X Y Z 0-9

Home | Help | Apps | About Us | Shop | Advertising Info | Dictionary API | Contact Us | Join MWU | Videos | Word of the Year | Puku | Vocabulary Resources | Law Dictionary | Medical Dictionary | Privacy Policy | Terms of Use | Do Not Sell My Info

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary

© 2021 Merriam-Webster, Incorporated

151

# EXHIBIT C



SINCE 1828

GAMES THESAURUS WORD OF THE DAY BLOG SHOP

- LOG IN
- REGISTER
- ⌄
  settings
-  SAVED WORDS

profit

⨯
🔍

┌─────────────┐
│   EXHIBIT   │
│      C      │
└─────────────┘

153

dictionary
thesaurus
view recents

Login or Register
Hello,
GAMES   THESAURUS   WORD OF THE DAY   BLOG   SHOP   SETTINGS

- SAVED WORDS      view recents

# profit

noun, often attributive
Save Word

To save this word, you'll need to log in.

Log In

prof·it | \ ˈprä-fət  \

## Definition of *profit*

(Entry 1 of 2)

1 : a valuable return : gain
2 : the excess of returns over expenditure in a transaction or series of transactions especially : the excess of the selling price of goods over their cost
3 : net income usually for a given period of time
4 : the ratio of profit for a given year to the amount of capital invested or to the value of sales
5 : the compensation accruing to entrepreneurs for the assumption of risk in business enterprise as distinguished from wages or rent

profit

verb
profited; profiting; profits

Definition of *profit* (Entry 2 of 2)

intransitive verb

1 : to be of service or advantage : avail
2 : to derive benefit : gain
3 : to make a profit

transitive verb

: to be of service to : benefit

Other Words from *profit*    Synonyms    Example Sentences    Learn More about *profit*

Keep scrolling for more

## Other Words from *profit*

Noun

profitless \ ˈprä-fət-ləs \ adjective
profitwise \ ˈprä-fət-ˌwīz \ adverb

## Synonyms for *profit*

Synonyms: Noun

- earnings,
- gain,

154

- [lucre](#),
- [net](#),
- [payoff](#),
- [proceeds](#)
- [return](#)

Synonyms: Verb

- [advantage](#),
- [avail](#),
- [benefit](#),
- [help](#),
- [serve](#)

[Visit the Thesaurus for More](#) 

## Examples of *profit* in a Sentence

Noun The company made a *profit* this year. *Profits* are up from last year.
See More ⊕ ⊖
Recent Examples on the Web: Noun The city has received a $10,000 grant from the National Endowment for the Arts for the mural, and Aurora Downtown, the not-for-*profit* group that administers the city's downtown special service area, is matching it with another $10,000. — [Steve Lord, *chicagotribune.com,* "Aurora to see summer of downtown murals," 15 May 2021](#) Powerful allies, including a state attorney general and a federal judge, agreed that she and other students in Massachusetts had been defrauded by the defunct for-*profit* chain Corinthian Colleges. — [*BostonGlobe.com*, "Student loan borrowers perplexed by Biden administration's continued defense of Trump-era lawsuits," 14 May 2021](#)

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'profit.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. [Send us feedback](#).

See More ⊕ ⊖

## First Known Use of *profit*

Noun

14th century, in the meaning defined at [sense 1](#)

Verb

14th century, in the meaning defined at [intransitive sense 1](#)

## History and Etymology for *profit*

Noun

Middle English, from Anglo-French, from Latin *profectus* advance, profit, from *proficere*

Keep scrolling for more

## Learn More about *profit*

Share *profit*



[Post the Definition of profit to Facebook](#)  [Share the Definition of profit on Twitter](#)

Time Traveler for *profit*



## The first known use of *profit* was in the 14th century

[See more words from the same century](#)

## Dictionary Entries near *profit*

[profiling machine](#)

5/17/2021, 3:32 PM

profilograph

profilometer

profit

profitable

profit and loss

profit and loss statement

See More Nearby Entries

## Phrases Related to *profit*

at a profit

profit margin

profit motive

## Statistics for *profit*

Last Updated

17 May 2021

Look-up Popularity

Top 1% of words

Cite this Entry

"Profit." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/profit. Accessed 17 May. 2021.

**Style:** MLA
MLA  Chicago ⊘ APA ⊘ Merriam-Webster ⊘

Keep scrolling for more

More Definitions for *profit*

profit

*noun*
🔊

## English Language Learners Definition of *profit*

 (Entry 1 of 2)

**:** money that is made in a business, through investing, etc., after all the costs and expenses are paid **:** a financial gain
formal **:** the advantage or benefit that is gained from doing something

profit

*verb*

English Language Learners Definition of *profit* (Entry 2 of 2)

**:** to get an advantage or benefit from something
**:** to be an advantage to (someone) **:** to help (someone)
**:** to earn or get money *by* or *from* something

See the full definition for *profit* in the English Language Learners Dictionary

profit

*noun*

prof·it | \ ˈprä-fət \

## Kids Definition of *profit*

(Entry 1 of 2)

**1 :** the gain after all the expenses are subtracted from the total amount received Their business shows a *profit* of $100 a week.
**2 :** the gain or benefit from something She began to see the *profit* of exercising.

Other Words from *profit*

profitless \ -las \ adjective

profit

[verb](#)
profited; profiting

Kids Definition of *profit* (Entry 2 of 2)

**1 :** to get some good out of something : [gain](#) You'll *profit* from the experience.
**2 :** to be of use to (someone) The agreement *profited* us all.

profit

[noun](#)
prof·it

# **Legal Definition of *profit***

**1 :** gain in excess of expenditures: as
**a :** the excess of the selling price of goods over their cost
**b :** net income from a business, investment, or capital appreciation — compare [earnings](#), [loss](#)
**2 :** a benefit or advantage from the use of property

More from Merriam-Webster on *profit*

Thesaurus: [All synonyms and antonyms for *profit*](#)

Nglish: [Translation of *profit* for Spanish Speakers](#)

Britannica English: [Translation of *profit* for Arabic Speakers](#)

Britannica.com: [Encyclopedia article about *profit*](#)

Comments on *profit*

What made you want to look up *profit*? Please tell us where you read or heard it (including the quote, if possible).

**SHOW COMMENTS** ⊕

**WORD OF THE DAY**



**divers** 🔊

__See Definitions and Examples__ »

Get Word of the Day daily email!

Your email address          **SUBSCRIBE**

**Test Your Vocabulary**

Words Used by Nabokov Quiz



- • Choose the best definition or synonym for the word in bold: "There are some **eructations** that sound like cheers—at least, mine did." *Lolita*

| a clearing of the throat | a groan |
| a belch | a sneeze |

Test your knowledge - and maybe learn something along the way.

TAKE THE QUIZ

Spell words. Make bears.

TAKE THE QUIZ



**Click to find out more about a new promotion**

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

**MERRIAM-WEBSTER UNABRIDGED**

159

WORDS AT PLAY

•

## The Words of the Week - 5/14/2021

Words from the week of 5/14/2021

•

## The History of 'Bodice'

For our romance readers

•

## The Ups and Downs of 'Raise' and 'Raze'

Are you building something up or tearing it down?

•

## The Words of the Week - 5/7/2021

Words from the week of 5/7/2021

ASK THE EDITORS

•

## 'All Intensive Purposes' or 'All Intents and Purposes'?

We're intent on clearing it up

•

## 'Nip it in the butt' or 'Nip it in the bud'?

We're gonna stop you right there

•

## Literally

160

How to use a word that (literally)
drives some pe...

•

**Is Singular 'They' a Better
Choice?**

The awkward case of 'his or her'

WORD GAMES

•

**Words Used by Nabokov
Quiz**

How familiar are you with
Nabokov's unfamiliar ...

TAKE THE QUIZ

•

**Star Wars Words Quiz**

Is the Force strong in you?

TAKE THE QUIZ

•

**True or False?**

Test your knowledge - and maybe
learn something a...

TAKE THE QUIZ

•

**AlphaBear 2**

AlphaBear 2

PLAY THE GAME

**Research, Treatment and Care, Personalized to You.**
**City of Hope**

**How To Score A Better Mortgage With Quicken Loans**
**Quicken Loans**

**Learn a new word every day. Delivered to your inbox!**

Your email address

›

OTHER MERRIAM-WEBSTER DICTIONARIES

- LEARNER'S ESL DICTIONARY
  - VISUAL DICTIONARY
  - SCRABBLE® WORD FINDER

- MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
  - BRITANNICA ENGLISH - ARABIC TRANSLATION
  - NGLISH - SPANISH-ENGLISH TRANSLATION

FOLLOW US

•   •   •   •

Browse the Dictionary:   A   B   C   D   E   F   G   H   I   J   K   L   M   N   O   P   Q   R   S   T   U   V   W   X   Y   Z   0-9

Home  |  Help  |  Apps  |  About Us  |  Shop  |  Advertising Info  |  Dictionary API  |  Contact Us  |  Join MWU  |  Videos  |
Word of the Year  |  Puku  |  Vocabulary Resources  |  Law Dictionary  |  Medical Dictionary  |  Privacy Policy  |  Terms of Use  |
Do Not Sell My Info

Browse the Thesaurus  |  Browse the Medical Dictionary  |  Browse the Legal Dictionary

© 2021 Merriam-Webster, Incorporated

# EXHIBIT D



SINCE 1828

🔍

GAMES THESAURUS WORD OF THE DAY BLOG SHOP

- LOG IN
- REGISTER
- ⌄
  settings
- 🔖 SAVED WORDS

EXHIBIT

D



income

dictionary
thesaurus

view recents

Login or Register
Hello,
GAMES THESAURUS WORD OF THE DAY BLOG SHOP SETTINGS

-  SAVED WORDS    view recents

# income

noun
Save Word

To save this word, you'll need to log in.

Log In

in·come | \ ˈin-ˌkəm also ˈin-kəm or ˈiŋ-kəm \

## Definition of *income*

1 **:** a gain or recurrent benefit usually measured in money that derives from capital or labor also **:** the amount of such gain received in a period of time has an income of $30,000 a year

2 **:** a coming in **:** entrance, influx fluctuations in the nutrient income of a body of water

⬇ Synonyms ⬇ More Example Sentences ⬇ Learn More about *income*

Keep scrolling for more

## Synonyms for *income*

Synonyms

- earnings,
- gain(s),
- incoming(s),
- proceeds,
- profit,
- return,
- revenue,

- yield

Visit the Thesaurus for More ⟫

## Examples of *income* in a Sentence

Any *income* from investments must be reported. Farming is his main source of *income*.
See More ⊕⊖
Recent Examples on the Web Turnkey apartment buildings provide an opportunity for passive *income* and long-term wealth building. — Eric Martel, *Forbes*, "How To Determine Your Investment Strategy For Apartment Buildings," 10 May 2021 But jumping the gun could be dangerous: Lowering reserves too quickly and then needing to rebuild them could hurt companies' credibility and reduce *income*, accountants and advisers say. — Mark Maurer, *WSJ*, "Banks Releasing Loan Reserves Face Tricky Accounting Estimates as Economy Improves," 10 May 2021

These example sentences are selected automatically from various online news sources to reflect current usage of the word 'income.' Views expressed in the examples do not represent the opinion of Merriam-Webster or its editors. Send us feedback.

See More ⊕⊖

## First Known Use of *income*

14th century, in the meaning defined at sense 2

Keep scrolling for more

## Learn More about *income*

Share *income*

 Post the Definition of income to Facebook  Share the Definition of income on Twitter 

Time Traveler for *income*



## The first known use of *income* was in the 14th century

See more words from the same century

From the Editors at Merriam-Webster

9 Financial Words With Surprising...

## 9 Financial Words With Surprising Origins

A capital bruise, a budget of news, the fund of a bottle, and more

# Dictionary Entries near *income*

in combination

in combination with

incombustible

income

income account

income basis

income bond

See More Nearby Entries

# Phrases Related to *income*

(income) tax return

discretionary income

disposable income

## Statistics for *income*

Last Updated

12 May 2021

Look-up Popularity

Top 2% of words

Cite this Entry

"Income." *Merriam-Webster.com Dictionary*, Merriam-Webster, https://www.merriam-webster.com/dictionary/income. Accessed 17 May. 2021.

**Style:** MLA
MLA ✓ Chicago ✓ APA ✓ Merriam-Webster ✓

Keep scrolling for more

More Definitions for *income*

income

*noun*



167

# English Language Learners Definition of *income*

**:** money that is earned from work, investments, business, etc.

[See the full definition for *income* in the English Language Learners Dictionary](#)

income

[noun](#)

in·come | \ ˈin-ˌkəm 🔊 \

## Kids Definition of *income*

**:** a gain usually in money that comes in from labor, business, or property

income

[noun](#)
in·come

# Legal Definition of *income*

**:** a gain or recurrent benefit usually measured in money that derives from capital or labor also **:** the amount of such gain received in a period of time an income of $20,000 a year

More from Merriam-Webster on *income*

Thesaurus: [All synonyms and antonyms for *income*](#)

Nglish: [Translation of *income* for Spanish Speakers](#)

Britannica English: [Translation of *income* for Arabic Speakers](#)

Britannica.com: [Encyclopedia article about *income*](#)

Comments on *income*

What made you want to look up *income*? Please tell us where you read or heard it (including the quote, if possible).

**SHOW COMMENTS** ⊕

**WORD OF THE DAY**

_____

# divers 

See Definitions and Examples »

Get Word of the Day daily email!

| Your email address | **SUBSCRIBE** |
| --- | --- |

SCHEDULE SERVICE  ▸

## Subaru Genuine Oil
**Specially formulated for your Subaru boxer engine.**

**Subaru Pacific**
Hawthorne, CA

**Test Your Vocabulary**

169

## Words Used by Nabokov Quiz

- Choose the best definition or synonym for the word in bold: "There are some **eructations** that sound like cheers—at least, mine did." *Lolita*

| | |
|---|---|
| **a sneeze** | **a clearing of the throat** |
| **a groan** | **a belch** |

---

Test your knowledge - and maybe learn something along the way.

TAKE THE QUIZ

---

Spell words. Make bears.

TAKE THE QUIZ

---

Case 8:20-bk-03561-CED Doc 134-2 Filed 04/13/21 Page 171 of 253 Case ID #:1184

## Love words? Need even more definitions?

Subscribe to America's largest dictionary and get thousands more definitions and advanced search—ad free!

171

Case 8:20-cv-00993-JVS-ADS Document 242-1 Filed 05/17/21 Page 172 of 253 Page ID #:1185

**MERRIAM-WEBSTER UNABRIDGED**

**WORDS AT PLAY**

- ### The Words of the Week – 5/14/2021

  Words from the week of 5/14/2021

- ### The History of 'Bodice'

  For our romance readers

- ### The Ups and Downs of 'Raise' and 'Raze'

  Are you building something up or tearing it down?

- ### The Words of the Week – 5/7/2021

  Words from the week of 5/7/2021

**ASK THE EDITORS**

- ### ['All Intensive Purposes' or 'All Intents and Purposes'?](#)

  We're intent on clearing it up

- ### ['Nip it in the butt' or 'Nip it in the bud'?](#)

  We're gonna stop you right there

- ### [Literally](#)

  How to use a word that (literally) drives some pe...

- ### [Is Singular 'They' a Better Choice?](#)

  The awkward case of 'his or her'

#### WORD GAMES

- ### [Words Used by Nabokov Quiz](#)

How familiar are you with
Nabokov's unfamiliar ...

**TAKE THE QUIZ** ❯

•

### Star Wars Words Quiz

Is the Force strong in you?

**TAKE THE QUIZ** ❯

•

### True or False?

Test your knowledge - and maybe
learn something a...

**TAKE THE QUIZ** ❯

•

### AlphaBear 2

AlphaBear 2

**PLAY THE GAME** ❯



**Learn a new word every day. Delivered to your inbox!**

Your email address

OTHER MERRIAM-WEBSTER DICTIONARIES

- ### LEARNER'S ESL DICTIONARY
- ### VISUAL DICTIONARY
- ### SCRABBLE® WORD FINDER

- ### MERRIAM-WEBSTER'S UNABRIDGED DICTIONARY
- ### BRITANNICA ENGLISH - ARABIC TRANSLATION
- ### NGLISH - SPANISH-ENGLISH TRANSLATION

**FOLLOW US**

Browse the Dictionary: A  B  C  D  E  F  G  H  I  J  K  L  M  N  O  P  Q  R  S  T  U
V  W  X  Y  Z  0-9

Home | Help | Apps | About Us | Shop | Advertising Info | Dictionary API |
Contact Us | Join MWU | Videos | Word of the Year | Puku |
Vocabulary Resources | Law Dictionary | Medical Dictionary | Privacy Policy |
Terms of Use | Do Not Sell My Info

Browse the Thesaurus | Browse the Medical Dictionary | Browse the Legal Dictionary

© 2021 Merriam-Webster, Incorporated

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th Day of June, 2021, the foregoing **PLAINTIFF LITTLE ORBIT LLC'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

1   M. DANTON RICHARDSON (State Bar No. 141709)
    mdantonrichardson@yahoo.com
2   LEO E. LUNDBERG, JR. (State Bar No. 125951)
3   leo.law.55@gmail.com
    LAW OFFICE OF M. DANTON RICHARDSON
4   131 N. El Molino Ave., Suite 310
    Pasadena, CA 91101
5   *Attorneys for Plaintiff,*
6   LITTLE ORBIT LLC

7                    **UNITED STATES DISTRICT COURT**
8                   **CENTRAL DISTRICT OF CALIFORNIA**

9   LITTLE ORBIT LLC, a California Limited    ) Case No.: 8:20-cv-00089-DOC-JDE
    Liability Company,                        )
10                                            )
                                              ) Judge:       Hon. David O. Carter
11                Plaintiff,                  )
                                              ) **DECLARATION OF MATTHEW**
12        vs.                                 ) **SCOTT IN SUPPORT OF PLAINTIFF**
                                              ) **LITTLE ORBIT LLC'S MOTION TO**
13                                            ) **SET ASIDE THE BINDING**
    DESCENDENT STUDIOS INC., a Texas          ) **SETTLEMENT TERMS SHEET DUE**
14  corporation, and ERIC PETERSON, an        ) **TO DEFENDANTS' FRAUD AND**
    individual,                               ) **FAILURE TO DELIVER THE ASSETS**
15                                            ) **COVERED BY THE TERMS SHEET OR**
16                Defendants.                 ) **FOR ALTERNATIVE RELIEF AND**
                                              ) **FOR AN AWARD OF ATTORNEYS'**
17  _____ ) **FEES**
18  DESCENDENT STUDIOS INC., a Texas          )
    corporation,                              ) **[FILED UNDER SEAL PURSUANT**
19                                            ) **TO ORDER OF THE COURT DATED**
20                Counterclaimant,            ) **APRIL 20, 2021]**
                                              )
21        vs.                                 ) **Date:   May 24, 2021**
                                              ) **Time:  8:30 p.m.**
22                                            ) **Ctrm:  9D**
    LITTLE ORBIT LLC, a California Limited    )
23  Liability Company,                        )
                                              )
24                Counter Defendant.          ) **Complaint filed: January 16, 2020**
25  _____ )

26

27
                                       1
28  _____
                                    DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
                                    MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
                                    CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

## DECLARATION OF MATTHEW SCOTT

I, Matthew Scott, declare:

1.     I am a managing member of Plaintiff, Little Orbit LLC ("Plaintiff" or "Little Orbit") in the above-captioned matter.  The facts stated herein are within my own personal knowledge unless otherwise stated.  If called to testify, I would and could testify competently to the facts stated in this declaration.

2.     I make this declaration in support of Plaintiff's Motion to Set Aside the Binding Settlement Terms Sheet Due to Defendants' Fraud and Failure to Deliver the Assets Covered by the Terms Sheet, or for Alternative Relief and for an Award of Attorneys' Fees.

3.     Little Orbit is a worldwide video game developer and publisher formed in January 2010 with a focus on AAA license-based entertainment products.  Little Orbit has developed and published games on all relevant gaming platforms and continues to pioneer electronic entertainment for consumers of all ages.  Over 20 games have been published by Little Orbit including "Kung Fu Panda: Showdown of Legendary Legends", "Adventure Time: Finn and Jake Investigations", "Young Justice", "Falling Skies the Game", "APB Reloaded," and "Fallen Earth."

4.     It is my understanding that Defendant Descendent Studios ("Descendent") was formed by Defendant Eric Peterson and others to develop a new version of the groundbreaking "Descent" video game previously released by InterPlay (the "Game").  They ran an initial Kickstarter campaign in 2015 which raised over $600,000. After running out of funding, they released a partial game in Steam's Early Access program which brought in more money. Then when Descendent ran out of funds again, in August of 2017 it solicited Little Orbit's financial assistance in completing development of the Game and promised not only to deliver a completed game but an assignment of the "Descent" license which Descendent had obtained from InterPlay as part of the "Development Agreement" the parties entered into.  This Development Agreement allowed for Little Orbit to have a higher royalty amount till it recouped 200 percent of its development fees, and it allowed for standard video

2

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

178

game industry deductions to be subtracted before calculating any royalty payable to Defendant. Some of these standard deductions included marketing, sales commissions, server hosting, localization costs, returns, licensor royalties such as the Unreal Engine, and VAT expenses. Effectively, since the Game would require a large amount of ongoing costs, the parties agreed that after an initial recoup by Little Orbit, they would split the profits with ▇ percent going to Little Orbit and ▇ percent going to Descendent. However over the course of development, the Game suffered lengthy delays that forced Little Orbit to take on all studio development costs of Defendants for about 8 months. Additionally, Little Orbit had to cover significant budget overruns in localization and music. It was agreed between Defendant and Little Orbit that those costs would be added to the development fee total for Little Orbit to recoup against. Attached hereto as **E    i  it A** is a true and correct copy of the Development Agreement in issue in this action.

5.      Little Orbit instituted this action as a result of Descendent's breach of its contractual obligations under the Development Agreement and a Terms Sheet addendum by failing to timely deliver a completed Game meeting the specifications and requirements of the parties' agreements and also failing to complete the assignment of the "Descent" trademark license (and other claims as more fully addressed in the First Amended Complaint in this action). Attached hereto as **E    i  it B** is a true and correct copy of the Terms Sheet addendum in issue in this action.

6.      Little Orbit's original commitment to fund the completion of the Game was ▇▇▇▇▇ but given Descendent's delays and repeated failure to meet the required development milestones Little Orbit's investment in the Game ultimately totaled over ▇▇▇▇▇ even though the Game was far from complete when Little Orbit finally terminated the Agreement due to Descendent's failure to deliver.

7.      Shortly after receiving the notice of breach from Little Orbit, Defendant immediately revoked all access to Descendent's Source Code and Source Art Asset repositories hosted by a third-party provider known as ▇▇▇▇▇. This was done to

3

intentionally prevent Little Orbit from proceeding with the Game on their own. The Source Code repository contained the history and complete Game project code that had been created, modified, or deleted since the Game's inception prior to the 2015 Kickstarter campaign. The Source Art Asset repository contained the original full resolution artwork that was paid for during the Game's development since the Game's inception. These Source Art Assets consisted of the original artwork for 3D models, 2D textures, audio files and more. They included full resolution sculptures in 3D Max, Maya, Zbrush and more. They included high resolution texture files in Photoshop, GIMP, and more. They included uncompressed WAV files. These are distinctly different art assets from the compressed or lower resolution versions that were exported into the Game project specifically to match the Unreal Engine specifications for the platforms that were being developed for during 2014-2019 such as lower end PCs,   box One, or PS4.

8.     The parties participated in a Settlement Conference with Magistrate Judge Early on November 17, 2020.  During the negotiations between the parties, through Judge Early, as well as some separate discussions I had with Mr. Peterson, the focus was on which company would have the right, and in turn the substantial financial obligation, to complete and release the Game. It was quickly agreed to be Plaintiff given that Defendants have no current employees, Descendent Studios is not an operational entity, and the still substantial investment needed to complete the Game.

9.     The royalty split agreed to between the parties in the Settlement Terms Sheet nearly exactly matched what was agreed to in the parties' original Agreement and it was my understanding, given that prior split was the reference point and foundation for such discussions, would be subject to the same standard deductions as provided for in the Development Agreement.  It was my understanding that we were negotiating over the royalty rate, not the costs and expenses which could be deducted from revenues in paying such royalty.  I never understood otherwise as Defendants never brought up any claim nor argument that the standard industry accepted deductions would not be allowed.  Most importantly, I would never have

4

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

180

agreed to any settlement providing for a ▆▆ royalty that escalated to a ▆▆ royalty if standard deductions were not to be allowed as that would greatly reduce the potential profitability of investing another ▆▆▆▆▆ on top of the already ▆▆▆▆▆ invested in the development of the Game by Little Orbit.

10. During my discussions with Mr. Peterson during the Settlement Conference he confirmed that his team had continued work on the Game after the termination of the Development Agreement. That was good to know as that meant it would take less time and funds to complete the development of the Game and I relied on that representation in entering into the settlement on behalf of Little Orbit.

11. When the parties attempted to agree on a long form agreement which would provide further specificity and clarity to the summary deal points in the Settlement Terms Sheet Defendants focused on the word "revenues" in an effort to improve their terms by recasting the definition to mean "gross revenues" and claiming the deal did not allow for any deductions in determining the applicable royalty payable to Defendants under the deal, not even standard industry deductions or those that the parties had previously agreed to in the Development Agreement giving rise to this dispute. As noted above, the Development Agreement allowed for standard deductions to be subtracted before calculating any royalty payable to Descendent based on profits. Some of these standard deductions included marketing, sales commissions, server hosting, localization costs, returns, licensor royalties such as the Unreal Engine, and VAT expenses, which are all industry standard deductions.

12. Defendants' argument regarding the meaning of "revenues" being "gross revenues" and not allowing for any deductions is based on their cherry-picking one aspect of the definition from Black's Law dictionary - "income from any and all sources; gross income or gross receipts." The definition of "revenue" from Mirriam-Webster's Dictionary includes the following: "the gross income returned by an investment." Here that "investment" would include the amounts invested into the game and its ongoing marketing, sales commissions, hosting costs, and other expenses. Additionally, that same definition also makes clear that "profit" is a

5

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF MOTION TO SET ASIDE SETTLEMENT TERMS SHEET CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

181

synonym for "revenue". Likewise, "income" is a synonym for "revenue." A split of gross revenue is simply not done in the video game industry. There are too many ongoing expenses to account for that could end up requiring the party who bears all the expenses to lose money on the project. To contemplate otherwise, would mean that during our settlement I agreed to give Defendant a deal that increased by more than double when compared to their terms in the original Agreement. It would mean that Little Orbit agreed to fund all the ongoing expenses out of its █ percent split including costly user acquisition which can sometimes account for 30 percent or higher of gross revenue. Had I agreed, that would mean reducing Little Orbit's share from █ percent to █ percent or lower after our expenses, while Descendent's portion would remain untouched. Once we factor in ongoing development costs, hosting costs, and other expenses, it is likely Little Orbit would be doing all the work to bring the Game to market, successfully operate it by acquiring users and creating ongoing content, but lose money.

13. The parties also had a disagreement as to what would happen should Plaintiff fail to make any or all of the required █████ in up-front payments. The Settlement Terms Sheet provides that ██████████████████████████████████████ ████████████████." See Settlement Terms Sheet, paragraph 4 (emphasis added).

14. Defendants recently brought a Motion to Enforce the Settlement Terms Sheet given the parties disagreements as to the meaning of the term "revenues" and the appliable penalty should Plaintiff not make any of the required up-front payments, among other issues. The matter was referred to Magistrate Early which recommended that the Motion be denied but further providing that the time for Plaintiff's payment obligations would start to run as of the date of the hearing, May 24, 2021. This Court recently confirmed that recommendation and entered an Order thereon on June 21, 2021. As a result, the first payment due under the Settlement Terms Sheet is due on ████████.

15. During our efforts to resolve the impasse between the parties regarding the long form agreement, I had discussions with Mr. Peterson regarding the turn-over of the Game assets being licensed so my team could work on completing the Game. At first Mr. Peterson refused to

6

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

182

turn over the assets claiming that Little Orbit already had a copy from prior to the termination of the Agreement. When I reminded Mr. Peterson of his statements to me regarding his team's additional months of work on the Game and that this was not something that Little Orbit had been provided to date, Mr. Peterson recently admitted to me that the updated Game assets had been destroyed. Attached hereto as **E    i  it C** is a true and correct copy of the email string in which Mr. Peterson makes such admission.

16. Defendants effectively denied anything was destroyed in their Reply to the Motion to Enforce and disputed the scope of the additional work that was done after termination, claiming it amounted to only a week's worth of additional work: "If the Court decides that Little Orbit is entitled to ▮▮▮▮▮ work done to remove Little Orbit's mistakes, then Defendants are willing to convey or transfer the "additional" ▮▮▮▮▮▮ reversing Little Orbit's development path." Reply at 8:2-5.

17. Since the hearing Plaintiff has been attempting to resolve the disagreements regarding the Settlement Terms Sheet, including multiple requests that the parties schedule a time with Judge Early (who offered to assist the parties resolve their differences during the hearing on the Motion to Enforce) but to no avail as Defendants have refused. Plaintiff has also requested that the deadline for the first payment required by the Terms Sheet be held in suspense while the parties attempt to work out their differences either directly or with the assistance of Judge Early. Again, Defendants have steadfastly refused.

18. After multiple requests, Defendants finally provided Plaintiff with a copy of the game code (not "all game IP") on June 15, 2021, only 8 days before the June 23, 2021 first payment deadline. In response, Plaintiff again made demand that Defendants turn over all of the game IP   "the full source code and the entire project history." Mr. Peterson promptly responded back:

> That doesn't exist   Little Orbit needs no such thing, they have the
> source code. There is no project history, when Little Orbit breached
> their obligations, the servers could no longer be continued.

7

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

183

The project history no longer exists.

What we have supplied is the source and project which allows them to build the game code   and by the way, that is not RE  UIRED under our binding agreement   we did it to help.

See Peterson email, June 15, 2021, Exhibit D.

19.       As confirmed by the foregoing, Defendants have now admitted the "project history no longer exists."  This is a shocking admission by Mr. Peterson as it shows there has been a blatant failure of consideration under the Settlement Terms Sheet as Defendants have admitted they cannot deliver the "game IP" covered by the license.  Interestingly, Mr. Peterson claims "the servers could no longer be continued," in an apparent attempt to blame this on Plaintiff but there was nothing that prevented the servers from being "continued" by Defendants or in any way interfered with Descendent's obligation to maintain the repository of the game IP. Defendant could have simply turned over access after Little Orbit's repeated requests when access was removed. Defendant could have asked Little Orbit to help pay to keep the Source Code and Source Art Asset repositories intact.  In fact, the Development Agreement makes clear in Paragraph 3.8 that Descendent was obligated to maintain a back-up of all of the game assets for "a period of 4 years":

> During Development of the Game, Developer shall ensure that it maintains a duplicate or "back up" copy of all software, work in progress and related materials developed or acquired by Developer, such copy to be maintained on a regular up to date basis and in separate, secure and off-site storage according to Publisher s reasonable requirements as reasonably directed by Publisher from time to time. Developer will be responsible for reconstructing the latest version of the Game without any additional cost to Publisher with each Milestone. After delivering the final version, Developer must maintain a copy of the final assets and media masters for a period of 4 years, and must provide a replacement to Publisher upon request.

8

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

184

The parties agreed at the beginning of the project that Descendent would continue to the use their █████████ Source Code and Source Art Asset repositories as they had been since before 2015. That was the agreed format including project history that should have been preserved according to the original Agreement, and that was the format that should have been preserved during the course of litigation while the parties attempted to resolve this dispute.

20.     As provided in the Settlement Terms Sheet in paragraph 12: ██████████ ████████████████████████████████ Implicit in such a license is the ability to deliver to the licensing party ███████████ yet Defendants have now confirmed that such assets  with the exception of a snapshot of the developed code as of some unspecified date   have been destroyed notwithstanding Descendent's contractual obligation to maintain those assets.

21.     The failure of Defendants to maintain the game assets and project history greatly limits the ability of anyone to pick up the work and complete the development of the Game.  Defendants failed to disclose that they had destroyed the Source Code and Source Art Assets, including all original art works and project history either before or during the parties' negotiations during the Settlement Conference.  That was a material omission by Defendants obviously done for the express purpose of fraudulently obtaining a commitment from Little Orbit to take over and complete the game all the while knowing that key assets have been destroyed.

22.     Defendants have argued that the code alone is all that is needed.  That is not true.  The game code alone is of limited use and is not what was promised to Plaintiff under a license covering "all game IP."  The original game assets (*i.e.*, "all game IP") are crucial to the completion of the game for numerous reasons:

- The project was essentially never finished. Little Orbit terminated the Development Agreement because Descendent missed required milestones for 9 months in a row. During the final months, Descendent made a chaotic effort to complete the game that included changing major systems and altering every screen in the game. In order to pick up and complete the development of the game, Little Orbit will need access to the project history to review the changes to each screen so Little Orbit can make sure the intended logic was implemented properly. If it is

9

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

185

not working, Little Orbit would be able to use the project history to determine the correct logic.

- No documentation was provided by Defendants when Little Orbit terminated. Therefore, Little Orbit has no knowledge capture or written guidance on what remained to be finished or what was removed to save on time. Without the project history, this will all need to be done by manually reviewing each section of code and guessing about its completeness. This will be costly and faulty. Little Orbit is sure to miss areas of the game or functionality that were modified without our knowledge.

- Back in 2014, the Game was originally developed for older PCs. In 2017, Little Orbit funded the addition of platforms like   box One and Playstation 4. However, it is now 2021 and the game will not ship until at least 2022. The foregoing platforms have all been replaced and the game must now work on new platforms such as   box   and Playstation 5 which have higher resolution standards. Part of Little Orbit's work in completing the game will be to go back to the Source Art Assets and re-export new Game Project assets that meet the new platform requirements. Without access to this original art, all of the original production work is lost.

- Source Art Assets go through lots of revisions. Again, the project history makes it obvious which asset was exported to the game at a specific time. There is no way to know if the snapshot of code provided by Defendant has the latest art assets, and without the Source Art Asset repository we have nothing to compare to.

- Without the project history, we have no way of knowing what original source art was either not yet imported into the game code or, which for whatever reason, may have been removed from the source code. Those assets are now lost.

- While the artwork already contained in the code can be used to complete the game, those assets are of poor quality when trying to meet the higher resolutions provided for in the newer platforms such as   box   and Playstation 5.

By destroying both repositories, Defendants have permanently and irreversibly damaged the Game and its value.

23.    The failure of Defendants to be able to deliver to Little Orbit "all game IP" as covered by the Settlement Terms Sheet constitutes a total failure of consideration.  At the very least, it greatly increases the scope of work   and the required investment of capital - that will be

10

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

186

required to recreate high resolution artwork and complete the game by any party that would want to undertake that task using only a snapshot of source code as it existed as of some unspecified date.

24.     Mr. Peterson's admission also confirms yet another breach of the terms of the Development Agreement, namely, paragraph 3.8 which required Descendent to maintain a "secure" copy of all of the game assets with an "off-site storage" facility for 4 years following delivery of the final version of the Game. 4 years from the date of termination meant that Descendent was obligated to preserve the repositories into 2023.  See paragraph 3.8, page 6, of Exhibit A.

I declare the foregoing to be true and correct under penalty of perjury under the laws of the United States.  Executed on June 23, 2021, in Orange, California.

Matthew Scott, Declarant

11

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

187

# EXHIBIT A

# [THIS EXHIBIT IS BEING FILED UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

# DEVELOPMENT AGREEMENT

**THIS AGREEMENT** is made effective as of September 1, 2017.

## PARTIES:

(1)     Descendent Studios Inc., a Texas corporation with an office at 9600 Escarpment Boulevard, Suite 745, Austin, Texas 78749 ("Developer"); and

(2)     Little Orbit LLC, a California limited liability company with an office at 29863 Santa Margarita Parkway, Suite 110, Rancho Santa Margarita, California 92688 ("Publisher").

## INTRODUCTION:

(A)     Developer is a developer of computer games.

(B)     Publisher is a developer and publisher of computer games.

(C)     Publisher wishes to engage Developer to develop games for publishing by Publisher in accordance with the terms of this Agreement.

**IT IS THEREFORE AGREED as follows:**

## 1     DEFINITIONS

1.1     The following terms shall have the following meanings:

| | |
|---|---|
| **Additional Fees** | Means other fees that are fully recoupable from Royalties earned by Developer under this Agreement: (a) all payments made by Publisher to Developer, or on behalf of Developer to any other persons or entities for creating or adding art, animation, video, graphics, sound, music, narration, audio, format, motion capture, or other features to the Game; and (b) all other costs expended by Publisher with respect to the completion of the Game, including, but not limited to, payments for music, voice over sessions and/or motion capture. |
| **Alpha** | Means a code feature complete version of the Game. All features code and functionality implemented and working as they will in the final commercial release on a representation of final delivery media and free from any software defects that prevent verification of the abovementioned. The Game is complete in terms of code, functionality, game flow, and in accordance with the Specification (as may be amended in accordance with the terms hereof) and can be verified as such. The Game is ready for delivery to Publisher's quality assurance department for verification and the complete Final testing cycle. Remaining tasks include debugging, performance and memory optimizations, continued creation and enhancement of assets, and game balancing and tuning. All licensor comments from Pre-Alpha must be addressed. The game must be ready for ESRB submission and obtain licensor's Alpha approval. The PS3 version must be a Stage 2 Submission candidate, if Stage 2 has not been gained. A source code and asset delivery of the Alpha version is also |



PHONE (949) 589.4900 · LITTLEORBIT.COM

DS000043

required to obtain Alpha approval.

| | |
|---|---|
| **Archive** | Means all of the final source code, third party tools, assets (art, video, music, sound, VO, etc) and documentation of the version of the Game that is approved by Platform Licensors. The Archive will come with the necessary instructions for Little Orbit to rebuild the Game. |
| **Beta** | Means a code feature and content complete version of the Game. Game balancing, tuning and optimization is complete, and all assets set forth in Specification (as may be amended in accordance with the terms hereof) are present. Game must also have licensor's Beta approval and any Platform Licensor Stage approvals. (for example, Sony Stage 2) A source code and asset delivery of the Beta version is required to obtain Beta approval. |
| **Change** | Means a change to the Game that amounts to a material deviation from the Specification. |
| **Date of Execution** | Shall be the date first set forth above. |
| **Defect** | Means a fault, error or malfunction in software which materially adversely affects the operation of the Game and any material deviation in a Game from its Specification or commonly accepted standards for normal and correct operation, in each case having regard to the Milestone and applicable stage of Development, other than those waived by Publisher. |
| **Develop / Development** | Means design, develop, build, program, modify, produce and otherwise create. |
| **Development Fees** | Means the sum or sums payable by Publisher in respect of the Development of the Game, Changes and any additional software comprised therein, as more specifically set out in Schedule 3 which are non-refundable except pursuant to termination by Section 14.1.1. |
| **Development Schedule** | Means the schedule setting out the process of completion of the Development of the Game and Development Fees due as specified in Schedule 3. |
| **Developer Technology** | Means the proprietary software, development tools, software libraries and game engines of Developer which are of general use or applicability in video games and which predate this Agreement. |
| **Fees** | Means the Development Fees and Royalties payable by Publisher to Developer in respect of this Agreement. |
| **Final Version** | Means the Milestone that is intended to be the complete and fully operational version of the Game without Defects and meeting the Specification and identified in the Development Schedule as the "final version". |
| **First Playable** | Means a playable version of the Game that is not yet suitable for submission to Publisher for review and bug testing. At least 25% of the Game's features and at least 25% of the Game's levels must be complete. |
| **Game** | Means the computer Game and associated software programs in object code executable form, as more specifically described in the Schedule 1. |
| **Game Design Document/GDD** | Means the document that describes the complete design specification for the Game |



*Final*

as follows: (1) It should include, but not be limited to, detailed information on gameplay dynamics, player interface, controller assignments, story-line, interactive objects, all opening scenes, option screens, gameplay area environments, transition screens, win/loss screens, storyboards, etc.; (2) it should describe in detail all information about the featured characters, including concept art, behaviors, abilities, weaknesses and their relationship to the story; (3) ) it should break the Game into its root elements Levels, missions, plots, scenes, maps, etc. and detail each of these elements to the fullest extent possible; (4) it should include a detailed description of the program including a synopsis, a description of the interface, navigation and logic flowchart, and a description of the art and style design, level designs and maps; (5) it should determine requirements for voiceover, sound effects and music; and (6) ) it should serve as a blueprint, not only to all members of the development team who must share the vision and manifest it within those parameters, but also to Publisher, who will rely on it for its assumed accuracy, and as a chief resource for early marketing of the Game.

**Gold Master Candidate/GMC** Means the version of the Game that is ready to submit to digital distributors, PC manufacturers, and Platform Licensors. The game must have all pre-cert/pre-check issues resolved, it's ESRB certificate and licensor's final approval.

**Intellectual Property Rights** Means copyright, design rights, database right, patents and any rights to inventions, know-how, personality or image rights, performance rights, trade and business names, trade secrets, logos and devices, copyrights, trade and service marks (whether registered or unregistered) and any applications therefor and all rights in confidential information.

**Localized Version** Means the versions of the Game localized in and for the languages listed on Schedule 1.

**Milestone(s)** Means the Date of Execution and all subsequent dates set forth in Schedule 3, on or prior to which Developer is required to submit work to Publisher that meets the requirements set forth for that Milestone which shall be subject to Publisher, licensor(s) and third party approval.

**MCC** Means a detailed document (checklist) created by Developer with the help of Publisher listing each agreed upon milestone build with a breakdown of what items, assets or game features will be implemented in each milestone build. A completed MCC shows how the game development is progressing and keeps all parties up-to-date on any changing features. In addition it is used to approve each milestone. Details in this document must include implementation of the following along with any other features specific to this game: art assets (including characters, objects, animations and menus) levels, mini-games, save/load, career, single player, unlockables, video (including intro and outro movies), music, sound effects, controller and online/ad-hoc functionality. Also referred to as **Milestone Completion Checklist**.

**Net Payments** Means actual cash payments Publisher receives from OEM distribution or sublicensing arrangements of the Game. If a Game is distributed with one or more other products for a single price (said distributed products being referred to herein as

PHONE (949) 589 4900 · LITTLEORBIT.COM

DS000045

a "Bundle"), the Net Payments attributable to the Game for the purpose of calculating Net Sales shall be determined by pro-rating the payments from the Bundle according to the recommended retail price for each said product contained in the Bundle at the time of manufacture of such Bundle.

| | |
|---|---|
| **Net Sales** | Means all monies paid to and received by Publisher, including Net Payments, for sales and exploitation of the Game, net or less standard and customary deductions for returns, markdowns/price protection, discounts and allowances, cash discounts, rebates, trade/marketing credits, merchandising fees, direct advertising and marketing costs, shipping and handling, licensor royalties, localization costs, network transportation/bandwidth download charges, hosting/server infrastructure costs, commissions, bad debt/fraudulent charges, and cost of goods (including manufacturing costs, amounts paid to third parties, and amounts paid for any hardware or other content sold as a bundle with the Game, but excluding Fees payable to Developer hereunder and Additional Fees) |
| **Parties** | Means Developer and Publisher together. |
| **Platforms** | Means the hardware and/or software platforms described in Schedule 1. |
| **Platform Licensor** | Means the manufacturer and/or operator of each Platform as described in Schedule 1. |
| **Pre-Alpha** | Means a feature complete version of the game. Pre-Alpha will be delivered to licensor for feedback as well as be a candidate for Platform Licensor Stage 2 approval. The Game will be playable on the specific console media. |
| **Publish** | Means use, produce, reproduce, publish, market, distribute, sell, license, disseminate, diffuse, perform, display, exhibit, show, play, rent, hire, lend, make available, communicate to the public and otherwise exploit. |
| **Publisher Materials** | Means all copy, content, graphics, images, software, data and other materials provided by Publisher (or by a third party on behalf of Publisher) to be incorporated into (or used in association with) the Game by Developer including without limitation all characters, titles, catch phrases, artistic representations, rules, names, and all trademarks, trade names, trade dress of Publisher embodied therein and all audio visual assets and pre-existing source code, game engines, computer code, art assets, graphics, content, text and sound files that are by provided by Publisher (or by a third party on behalf of Publisher) and those materials specifically described as Publisher Materials in the Development Schedule. |
| **Quarters** | Means three month periods calculated from the Date of Execution; quarterly shall be construed accordingly. |
| **Royalties** | Means the royalty payment described in Schedule 1. |
| **Specification** | Means the written specification prepared by the Parties describing the design and technical features of the Game, the Platforms and the functional and performance criteria for the Game as set out in Schedule 1 and Schedule 2. |
| **Technical Design Document** | Means the document that describes the technical features of the Game and the design |



PHONE (949) 589 4900   LITTLEORBIT COM

DS000046

of the organizational structure of all game systems and implementation guidelines as follows: (1) it will provide an explanation of the behaviors of all the major entities in the design and their relationship to the technical sub-systems required to facilitate the scope of the design; it will determine any risks and dependencies associated with the design; it will provide a mechanism to determine the technical scope of any given component so that it can be scheduled accurately; (4) it will include details about the team working on the project, a description of the tools, engines and libraries used to complete the project and a risk/contingency analysis, and (5) it will describe the core tools that will be used to build the game, the details which are already in-house, and those that have to be procured or created. Also referred to as **TDD**

**Term**          Means from the Date of Execution and for the longer of the term of the copyright of the Game software and any trademark or other rights thereto or while any Games remain for sale by Publisher.

**2.      Operative Provision**

2.1.    In consideration of the mutual and respective rights and obligations of the Parties under this Agreement:

    2.1.1.    Developer agrees to Develop the Game in accordance with the Specification and the Development Schedule, with time being of the essence.

    2.1.2.    Developer agrees to grant to Publisher in accordance with the terms of this Agreement the right and licenses described hereunder as required to Publish the Game on the Platforms; and

    2.1.3.    Publisher agrees to pay the Fees to Developer as and when due.

**3.      Development**

3.1.    The Development of the Game shall commence on the date specified in the Development Schedule.

3.2.    Developer agrees to:

    3.2.1.    Undertake all Development work necessary for the Development of the Game; and

    3.2.2.    Comply with all relevant legal requirements in relation to the Development of the Game.

3.3.    Publisher and Developer agree to communicate on a regular basis to discuss the Development, the Game and any Milestone, work in progress, give feedback and undertake preliminary evaluation, review, comment and testing.

3.4.    Developer will incorporate Publisher's feedback and address Publisher's concerns regarding the Game and its individual components.

3.5.    Developer shall deliver to Publisher, by the completion date set out in the Development Schedule the Final Version of the Game, together with written instructions necessary for normal and competent operation of the Game.

3.6.    The Game shall be delivered with the design goal that Publisher will require no changes or corrections, such that the version of the Game used and implemented by Publisher will be taken directly from the version delivered without further alteration.

3.7    Risk in the Game and each part thereof will pass to Publisher upon delivery. If subsequently the Game is (in whole or in part) destroyed damaged or lost, Developer will upon request replace the same subject to Publisher paying its reasonable fees and expenses (if any).



PHONE (949) 589 4900 · LITTLEORBIT.COM

DS000047

3.8 During Development of the Game, Developer shall ensure that it maintains a duplicate or "back up" copy of all software, work in progress and related materials developed or acquired by Developer, such copy to be maintained on a regular up to date basis and in separate, secure and off-site storage according to Publisher's reasonable requirements as reasonably directed by Publisher from time to time. Developer will be responsible for reconstructing the latest version of the Game without any additional cost to Publisher with each Milestone. After delivering the final version, Developer must maintain a copy of the final assets and media masters for a period of 4 years, and must provide a replacement to Publisher upon request.

3.9. Developer shall pre-test the Game and all Milestones due hereunder prior to delivery to Publisher and shall correct any and all bugs, errors and defects and remedy any Defects and provide Publisher with a patch, build or new version of the Game containing such corrections within seven days of Publisher's request.

3.10. Developer shall ensure that the Game shall bear such logos and proprietary legends as Publisher requests.

**4. Localization**

4.1. Developer shall produce at its expense without any additional cost to Publisher (other than that provided for hereunder and included in the Development Fees) Localized Versions in the languages listed in Schedule 1.

4.2. Any additional Localized Versions shall be subject to the written agreement of the Parties in accordance with section 6 below.

4.3. The license granted hereunder shall extend to each Localized Version upon completion, which shall be deemed a Game and subject to the terms of this Agreement.

**5. Evaluation**

5.1 Throughout the Development of the Game

    5.1.1. Developer shall deliver to Publisher the Milestones in accordance with the Development Schedule

    5.1.2. Following delivery of each Milestone, Publisher shall have 10 working days to examine, test and evaluate the Milestone to determine whether it contains any Defects;

    5.1.3. In the event that Publisher discovers no Defect, Publisher shall provide Developer with a written acceptance ("Acceptance Notice");

    5.1.4. In the event that Publisher discovers a Defect, Publisher shall notify Developer in writing ("Correction Notice"); and

    5.1.5. On receipt of a Correction Notice, Developer shall investigate and correct all Defects and deliver to Publisher a corrected Milestone without the Defect within 10 working days after notification.

5.2. In the event that Publisher fails to deliver an Acceptance Notice or Correction Notice by the due date, Developer shall remind Publisher in writing (including email) and Publisher shall not then unreasonably withhold or delay said Acceptance or Correction Notice

5.3. The process described in clause 5.1 shall be repeated until such time as the applicable Game has no Defects (other than those agreed to be waived) and Publisher notifies Developer of its acceptance OR the process described at clause 5.1 shall have been undertaken on two or more occasions and Publisher is still not satisfied that the Game has no Defects, whereupon Publisher shall be entitled to terminate this Agreement and recover from Developer all Development Fees and other payments made to Developer hereunder.

5.4. Following the issuing of an Acceptance Notice by Publisher in respect of the Final Version for each Platform, Publisher shall submit such Final Versions to the applicable Platform Licensor as is required to give approval in order for the Game to be published.

5.5. In the event that such Platform Licensor does not accept or approve any such Final Version, Publisher shall



DS000048

notify Developer in writing giving such reasons as it has ("Rejection Notice").

5.6. On receipt of a Rejection Notice Developer shall make such corrections as are required and resubmit the Corrected Final Version to Publisher within a reasonable time to make the corrections, following which Publisher shall submit the corrected Final Version to the applicable Platform Licensor and in the event that such Platform Licensor does not accept or approve any such Final Version Game, Publisher shall either give Developer another Rejection Notice in which case the process described in this clause 5.1 shall be repeated at Publisher's discretion or Publisher shall be entitled to terminate this Agreement and recover from Developer all Development Fees and other payments made to Developer hereunder.

5.7. Developer shall provide Publisher with all such assistance and advice, as it shall from time to time reasonably require in the process of testing and evaluating the Game and each Milestone.

## 6. Change orders

6.1. Developer shall develop the Game in accordance with Publisher's requirements and any change or alteration that does not amount to a material deviation from the Specification and any Change that does not result in a material increase in the work to be undertaken by the Developer shall be implemented and undertaken promptly on Publisher's request.

6.2. In the event that Publisher requires a Change that does result in a material increase in the work to be undertaken by the Developer shall use its best efforts to accommodate such Change without any variation to the Development Schedule or Development Fees and shall notify Publisher in writing in the event of any anticipated material variation to the Development Schedule and Development Fees whereupon Publisher and Developer shall, prior to such Change being effective or implemented, agree or reject such variation to the Development Schedule and Development Fees as Developer proposes.

6.3. Until any such Change and such variation to the Development Schedule and Development Fees as Developer proposes are formally agreed between Publisher and Developer in writing, Developer will continue to perform this Agreement and Develop the Game as if the Change had not been proposed, unless Publisher requests otherwise.

6.4. All and any Changes to the Game shall be reflected and accompanied by appropriate amendments to the Specification (and where agreed in writing the Development Schedule and Development Fees).

## 7. Payment

7.1. Publisher shall pay to Developer the Development Fees by wire transfer to Developer's nominated bank account in accordance with the Development Schedule within 7 days following receipt of Developer's invoice therefor.

7.2. Following commercial release of the Game, Publisher shall pay to Developer the Royalties on a Quarterly basis, within 60 days of the end of each Quarter.

7.3. Publisher shall retain 30 percent (30%) of the Royalties otherwise earned by Developer on a rolling 12 month basis as a reserve for charges, credits, lost and/or damaged goods, write offs, allowances, markdowns and/or returns.

7.4. All Royalties and Development Fees shall be payable in US Dollars and all sums are expressed to be exclusive of Value Added Tax or any other applicable sales tax or duties which shall additionally be paid by Publisher.

7.5. Any overpayment of Development Fees or Royalties shall be refunded on request.



7.6.    In the event of any delay within the Developer's control in the delivery of the Final Version of the Game for each Platform by the due date, Publisher shall be entitled to reduce Development Fees by 1% per day of such delay and the Royalty by 3% per week of such delay. The Parties agree that the foregoing represents an accurate pre-estimate of the actual loss suffered by Publisher as a result of such delay.

7.7.    A final account in respect of all remaining Royalties due from Publisher to Developer will be rendered by no longer than six months after the expiry or termination of this Agreement.

7.8.    Publisher will deliver to Developer a Quarterly statement, which contains all the information reasonably required to enable Developer to ascertain the sums due to it.

7.9.    Publisher shall keep full and proper books of account relating to the sales of units of the Game and the Royalties payable under this Agreement. Developer or its representative shall have the right during normal business hours, on reasonable notice and no more than one time per year to inspect and audit and take copies of these books of account. However, in the event that such audit reveals an underpayment of Royalties by Publisher in excess of 10 percent (10%) of the total sums due and payable hereunder supported by appropriate documentation, Publisher shall reimburse Developer its reasonable out-of-pocket audit costs. Developer shall not audit the same records more than once. If Developer has any objection to a Royalty statement, specific notice thereof must be given to Publisher within two (2) years of the date of the applicable statement. Each Royalty statement will become conclusively binding on Developer, and Developer will not have the right to object or institute any audit or action against Publisher in connection with any Royalty accounting, unless the action is commenced within such two (2) year period. Publisher will make up such shortfall as is discovered hereunder within 14 days of receipt of Developer's invoice therefore.

## 8.      Rights

8.1.    All and any Intellectual Property Rights in the Publisher Materials shall belong to, vest in and be the exclusive property of Publisher and Developer shall do all such things as shall be necessary to effect the same.

8.2.    Subject to Section 8.3 below, all Intellectual Property Rights in the Game and the Developer Technology shall belong to, vest in and be the exclusive property of Developer.

8.3.    Developer hereby grants to Publisher a non-exclusive, perpetual, irrevocable right and license to use the Game, including without limitation the Game object and source code, animations, 3d models, textures and all copyrights and trademarks related to the Game, in relation to the Publishing of the Game in any and all media and ports, conversions, spin offs and derivatives thereof. For the purpose of clarity, the rights to Developer Technology, or proprietary engine source code, are not included as part of this Agreement.

8.4.    Publisher hereby grants a non-exclusive, fully paid up, worldwide, royalty free license to Developer to use the Publisher Materials for the purpose only of this Agreement.

8.5.    Subject to Section 8.3 each of the Parties agrees and understands that it shall not use the trademarks of the other in any way other than in the furtherance of and pursuant to this Agreement and each further agrees, understands and acknowledges that it acquires no rights to such trademarks by its adoption or use thereof in connection with the Game so that all goodwill therein shall accrue to the owner and that owner is free to use any such trademarks in connection with another work or Game at any time before or after the term of this Agreement.

## 9.      Confidentiality

9.1.    Developer and Publisher agree to:

    9.1.1.   Keep confidential all information (written or oral) concerning the business and affairs of the other



that it shall have obtained or received as a result of discussions leading up to or the entering into or performance of this Agreement (the 'Information'):

9.1.2      Not without the other's written consent to disclose the Information in whole or in part to any other person save those of its personnel and representatives involved in the Development and who have a need to know the same; and

9.1.3.     Use the Information solely in connection with the Game and not for its own benefit or the benefit of any third party.

9.2.    The provisions of clause 9.1 above shall not apply to the whole or any part of the Information to the extent that it is: (a) already in the other's possession other than as a result of a breach of this clause, (b) in the public domain, (c) is obtained or derived prior or subsequent to the date of this Agreement from a third party which is lawfully in possession of such information and does not hold such information subject to any confidentiality or non-use obligations is independently developed by such party without use of the other party's Information, or (d) is required to be disclosed by one of the Parties pursuant to applicable law or under a government or court order.

9.3.    Each of Developer and Publisher hereby undertakes to the other to make all relevant employees agents and sub-contractors aware of the confidentiality of the Information and the provisions of this clause 9 and without prejudice to the generality of the foregoing to take all such steps as shall from time to time be necessary to ensure compliance by its employees agents and sub-contractors with the provisions of this clause 9.

9.4.    Notwithstanding the provisions of this clause 9, both Parties shall be entitled to refer, in the course of promoting or advertising its business to the Game and its involvement in the Game and any matters in the public domain.

## 10.    Publisher Warranties

10.1.    Publisher represents and warrants that:

10.1.1.     It is entitled to enter into and perform this Agreement on its terms;

10.1.2.     It shall act as principal on its own account and not as agent for Developer and will not hold itself out as being able to bind Developer in any way other than as expressed by this Agreement;

10.1.3.     It shall ensure that its employees and personnel co-operate with Developer in connection with the Development of the Game as is reasonably necessary; and

10.1.4.     To the best of its knowledge and belief the Publisher Materials (and every part thereof) shall not infringe the Intellectual Property Rights of any third party.

## 11.    Developer Warranties

11.1    Developer represents and warrants that:

11.1.1.     It is entitled to enter into and perform this Agreement on its terms;

11.1.2.     It shall Develop the Game in a good and workmanlike manner and to the standards of a high quality game developer and the Game shall be of sound workmanship, satisfactory quality and free of Defects;

11.1.3      Developer has employed and will continue to employ for the entire development of each Game, an adequate development team. Such development team shall be of the minimum number and skill level of a first class developer. Further, as set forth on Schedule 4, attached hereto and incorporated herein, such development team members shall be exclusively dedicated to



development of such Game for the periods specified therein. In the event that a majority of the development team currently employed by Developer and assigned to any Game as set forth on Schedule 4 leaves, terminates or in any other manner ends their employee relationship with Developer, Developer shall promptly give Publisher written notice thereof.

11.1.4.  Developer has sufficient personnel and resources to complete the Game in a timely manner;

11.1.5.  The Game will operate substantially in accordance with the Specification when Published and be capable of the standards of performance set out in the Specification;

11.1.6.  The Game and all Publishing and use of it will not infringe the Intellectual Property Rights of any third party and nor give rise to any liability to any third party;

11.1.7.  Developer is responsible for acquiring all rights necessary for the supply of the Game on the terms of this Agreement, including without limitation the rights to use the Unreal Engine, the Descent name, and all of Developer's proprietary code without violating any Intellectual Property Rights of any third party. For the purpose of clarity Developer is liable for all licensing fees regardless of total cost.

11.1.8.  It has not disposed of any right, title or interest in or to the Game or Intellectual Property Rights in it, or otherwise dealt with the same in any way that is inconsistent with the terms of this Agreement;

11.1.9.  It will not challenge the Intellectual Property Rights or rights of use of Publisher in the Game and will not do any act which may undermine, prejudice or invalidate any such rights;

11.1.10  The Game will not contain any content or material which is technically harmful, such as computer viruses, worms, logic bombs or other malicious software or harmful data, or is defamatory, untrue, discriminatory, obscene, inflammatory, racist, sexually explicit, or otherwise is unlawful or which gives rise to civil or criminal liability; and

11.1.11.  The Game will not contain any hidden game play feature(s) or graphical assets not expressly disclosed to Publisher in writing (e.g. "Easter Eggs") or otherwise contained within the Specification.

## 12. Indemnity

12.1.  Each Party shall indemnify and hold harmless the other from and against all loss, damage and expense awarded by a court of competent jurisdiction (or settled with the other's prior written consent, such consent not to be unreasonably withheld or delayed) resulting from any third party claim arising out of the breach by it of any of its obligations, warranties or representations in this Agreement and from claims, demands, actions, causes of action and judgments arising out of and attributable to the infringement of any Intellectual Property Rights of any third party in the Publishing of the Game caused by it BUT EXCEPTING where such claims arise out of the act or omission of the other Party. Developer and Publisher shall discuss in good faith with due expedience the manner in which such allegation shall then be handled and in the event that either Party is required to be indemnified hereunder the indemnifying party shall have conduct of any such action, demand or claim and the other Party shall not do anything to compromise or settle the same without the indemnifying Party's prior written consent.

## 13. Liability

13.1.  Nothing in this Agreement shall exclude liability for death or personal injury.

13.2.  Subject to clause 13.1, Publisher shall not be liable to Developer in respect of any default for loss of profits goodwill or any type of special indirect or consequential loss (including loss or damage suffered by Developer



PHONE (949) 589 4900   LITTLEORBIT.COM

DS000052

arising under this Agreement even if such loss was reasonably foreseeable or Developer had been advised of the possibility of Publisher incurring the same).

13.3    Subject to clause 13.1 above and except in respect of the indemnities at clause 12 above, Publisher's aggregate liability shall be limited to the sums due to Developer hereunder.

13.4    To the extent not expressly set out in this Agreement and to the extent permissible by law, Developer excludes all conditions and warranties in relation to the Game, which would otherwise be implied by law to the fullest extent permissible by law.

**14.    Duration and Termination**

14.1    This Agreement shall come into force on the Date of Execution and shall continue in force until terminated:

14.1.1    Forthwith by the Publisher within 60 days without reason; or

14.1.2    Forthwith by either Party if the other commits any other material breach of any term of this Agreement and which (in the case of a breach capable of being remedied) shall not have been remedied within 28 days of a written request to remedy the same subject to clause 5 above;

14.1.3    Forthwith by either Party if the other shall be subject to bankruptcy or reorganization proceedings that are not dismissed within 30 days; or

14.1.4    Automatically at the end of the Term.

14.2    As soon as reasonably practicable following termination of this Agreement for any reason, Developer will deliver to Publisher all materials assigned to Publisher under clause 8.1 above including, without limitation, the Publisher Materials and related animations, 3d models, and textures which exists at the time of termination, all completed Milestone(s), and all work-in-progress. For the purpose of clarity, the Developer Technology or proprietary engine source code will not be released to the Publisher or a third party. Publisher shall retain sole ownership of all materials assigned under and in accordance with this Agreement and in particular clause 8.1 above and shall have the absolute and exclusive right to use such assigned materials in completion of the Game (if applicable) or in any manner it chooses, including in or relating to other works, without payment of compensation or liability to Developer.

14.3    Any termination of this Agreement pursuant to Section 14.1.1 will immediately cause all Development Fees received by Developer to convert to a 12 month term loan with 12% annual interest starting from the date of termination.

14.4    Any termination of this Agreement pursuant to this clause shall be without prejudice to any other rights or remedies a party may be entitled to hereunder or at law and shall not affect any accrued rights or liabilities of either party nor the coming into or continuance in force of any provision hereof which is expressly or by implication intended to come into or continue in force on or after such termination.

**15.    General**

15.1    This Agreement sets out the entire agreement and understanding between the Parties with respect to the subject matter thereof and supersedes all prior non-fraudulent oral and written representations, arrangements and understandings between the Parties relating thereto.

15.2    Developer shall not be entitled to assign this Agreement or any rights and obligations hereunder without the prior written consent of the Publisher, such consent not to be unreasonably withheld. Publisher may and shall give Developer notice of any assignment, transfer or sub-license of this Agreement or any rights and obligations hereunder.

15.3    This Agreement shall be binding upon and endure for the benefit of the successors in title of the Parties hereto.



P HONE (949) 589 4900   LITTLEORBIT.COM

DS000053

15.4. Nothing in these terms shall be deemed to constitute a partnership or agency relationship between the Parties and neither of the Parties shall do or suffer to be done anything whereby it may be represented as a partner or agent of the other party.

15.5. If at any time any part of this Agreement is or becomes unenforceable, such part will be construed as far as possible to reflect the Parties' intentions and the remainder of the provisions will remain in full force and effect.

15.6. No forbearance, delay or indulgence by either party in enforcing the provisions of this Agreement shall prejudice or restrict the rights of that party nor shall any waiver of rights operate as a waiver of any subsequent breach of this Agreement. The fact that the Fees are "non-refundable" in no way limits Publisher's right to a refund of such amount or to seek such amounts as damages in connection with a prior, contemporaneous or subsequent breach of this Agreement by Developer.

15.7. This Agreement may be executed in counterparts, each of which will be deemed an original Agreement for all purposes and which collectively will constitute one and the same Agreement.

15.8. The headings used in this Agreement are for ease of reference only and shall not affect its interpretation.

15.9. Unless the context otherwise requires, in this Agreement a reference to any gender includes all genders, a reference to the singular includes the plural and vice versa and a reference to any statute or similar instrument shall be construed as including amendments and re-enactments.

15.10. This Agreement is made and shall be construed in accordance with the laws of the State of California and each Party agrees to submit to the exclusive jurisdiction of courts located in Orange County, California.

SIGNED by the Parties or their duly authorized representatives

**SIGNED** by      ) Eric Peterson

Duly authorized for and   $10-3-17$   ) CEO

On behalf of      ) Descendent Studios Inc.

**Developer**      ) Descendent Studios Inc.


**SIGNED** by      ) Matthew Scott

Duly authorized for and   09/25/2017   ) Manager

On behalf of      ) Little Orbit LLC

**Publisher**      )

PHONE (949) 589 4900   LITTLEORBIT.COM

DS000054

# SCHEDULE 1

## Project Definition / Specifications

**Game Title:** Descent Underground (working title)

**Platforms:** PC, Xbox One, PS4

**Ratings** ESRB, equivalent for all PAL territories. T rating

**Platform Licensors:** Microsoft, Sony

**SKUs:** PC, PS4, Xbox 1

**Licensor:** Interplay

**Ratings Royalties:** 15% of Net Sales on retail sales of the Game and 25% of Net Sales on digital sales of the Game until Publisher has recouped 200% of the Development Fees, and then 30% of Net Sales on retail sales and 50% of Net Sales on digital sales thereafter

**Languages:** English

For the avoidance of doubt, Publisher shall be responsible for all costs for any voice over talent and recording fees, for both the English version and any Localized Versions if those are added to the game. Publisher shall also be responsible for providing localized text strings for non-English versions.



PHONE (949) 589 4900 - LITTLEORBIT.COM

DS000055



LITTLE ORBIT LLC.
29895 Santa Margarita Pkwy, #105
Rancho Santa Margarita, CA 92688

LITTLE ORBIT EUROPE LTD.
50 Broadway, London, SW1H 0RG

## SCHEDULE 2

### Game Description – Preliminary Concept Document

### Overview

Descendent Studios Inc. is developing a reboot of the Descent franchise using modern, high-fidelity game systems. Descent was one of the most iconic and revolutionary game franchises of the 1990s and the name has considerable brand awareness.

Descent: Underground invites players to pilot spacecraft fighting for resources and fame inside hazardous asteroid mines. It melds the full movement freedom of the originals with modern role-play based team play, compelling story, and exciting improvements in graphics, artificial intelligence, meta-game, e-sports, and virtual reality!

**8 Game Modes**

- Anarchy - (Multiplayer) Kill everything!
- Conquest - (Multiplayer) Capture control points and hold them to win!
- Corporate War - (Multiplayer) Harvest ore and bring it back to your base to win!
- Miner Mayhem - (Multiplayer) Find the lost miners and rescue them back to your base!
- Survival - (Multiplayer) (Single-Player) Defeat waves of increasingly harder enemies!
- Team Anarchy - (Multiplayer) Defend your teammates! Kill everything else!
- Test Flight - (Single-Player) Practice flying around the arena maps... in relative safety!
- Vs. AI - (Multiplayer) (Single-Player) Fight bots in the arena maps!

**Full Single-Player Campaign**

- Many hours of action, plus enhanced replayability featuring difficulty settings, online co-op, achievements, and progression unlocks.
- Variety of mission objectives, including seek-and-destroy, capture, rescue, and espionage.

**Multiplayer Meta-game**

- Progression: Leveling up and tech tree unlocks.
- Economy: In-game economy for unlocking tech tree and cosmetics.
- E=Sports Ready: Tournaments, Teams, Leaderboards, and Ladders!
- Cosmetics: Skins, decals, and ship geometry



DS000056



LITTLE ORBIT
25852 Santa Margarita Pkwy, #105
Rancho Santa Margarita, CA 92688

LITTLE ORBIT EUROPE LTD.
93 Broadway, London, SW1H 0BS

## SCHEDULE 3

### Milestone and Payment Schedule

**Development Fee:**

1. Publisher will pay to Developer an aggregate of $500,000 on the dates and following the completion of the Milestones described in the attached Development Milestones spreadsheet;

2. Publisher will pay for art work as described on the attached Art Tracking spreadsheet; and

3. Publisher will pay for Xbox One and PS4 development.

All items marked as (PubRes) are the responsibility of publisher

## Upon Execution of this agreement: $75,000

## Milestone 1 October 23 - $50,000

Milestone Velocity update

Matchmaking design complete

Assess LO Store Integration

All Missions detailed writeups, and briefings

Base Gen 1 Ships art complete

1st mission playable

## Milestone 2 December 1, 2017 - $50,000

4 missions playable

8 campaign missions in graybox

Base Gen 2 Ships art complete

Gamestorm Design Complete

Base Gen 4 ships complete

Economy design complete

8 campai

Gamestorm



PHONE (949) 589.4900 — LITTLEORBIT.COM

DS000057



**Little Orbit**

LITTLE ORBIT
29601 Santa Margarita Pkwy, #105
Rancho Santa Margarita, CA 92688

LITTLE ORBIT EUROPE LTD.
50 Broadway, London, SW1H 0RG

**Milestone 3 – January 16, 2018  $75,000**

Milestone Velocity update 2 (glassegg)

8 missions playable

Pilot ratings testable implementation

12 campaign missions grey-box

4 missions art complete (PubRes)

Economy initial implementation

**Milestone 4  February 15, 2018 $50,000**

12 Missions playable

GameStorm Code Complete

Tech Tree Code Complete

Economy Code complete

All bots art complete (PubRes)

Base Gen 3 Ships art complete (PubRes)

8 missions art complete (PubRes)

**Milestone 5 Alpha March 15, 2018 $50,000**

16 missions playable

Economy complete

SFX Complete

VFX Complete

Ship customization code complete

Tech Trees art complete (PubRes)

GameStorm art Complete (PubRes)

All environment art complete (PubRes)

12 missions art complete (PubRes)

VO recorded (PubRes)



PHONE (949) 589 4900 - LITTLEORBIT.COM

204

DS000058

**Little Orbit**

LITTLE ORBIT
26663 Santa Margarita Pkwy, #105
Rancho Santa Margarita, CA 92688

LITTLE ORBIT EUROPE LTD.
50 Broadway, London, SW1H 0RG

### Milestone 6 Beta April 15, 2018 $75,000

3 new multi-player maps playable

VO & Music Complete

Ship customizations art complete (PubRes)

Mission briefings art complete (PubRes)

Ship gen 1-3 customization art complete (PubRes)

All missions art complete (PubRes)

### Milestone 7 May 15, 2018 Release Candidate PC $75,000

PC Demo available

Launcher updated

Additional ship customizable pieces (PubRes)

3 New multi-player maps art complete (PubRes)

Ship gen

Milestone





LITTLE ORBIT LLC
29851 Santa Margarita Pkwy, #105
Rancho Santa Margarita, CA 92688

LITTLE ORBIT EUROPE LTD.
50 Broadway, London, SW1H 0RG

## SCHEDULE 4

## KEY DEVELOPMENT TEAM MEMBERS

For the period of time from the Date of Execution of this Agreement until final approval by either Publisher or licensors, as the case may be, these employees or independent contractors of Developer, shall be the key development team for the Games and work on the Games pursuant to Section 11.1.3 of this Agreement:

| TITLE | NAME |
|---|---|
| Game Director | Eric Peterson |
| CTO | Jason Spangler |
| Creative Director | Rob Irving |
| Art Director | Michael Morian |
| Meta Game Director | Keith McCormic |
| 3D Artist | Tobias Loeffler |
| | |
| | |
| | |
| | |

Game Dir

Dated:        September 1, 2017





PHONE (949) 589 4900 · LITTLEORBIT.COM

DS000060

# EXHIBIT B

# [THIS EXHIBIT IS BEING FILED UNDER SEAL
PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

# TERMS SHEET

This Terms Sheet sets forth certain key terms concerning the amendment and restatement of the existing Development Agreement dated September 1, 2017 ("Development Agreement"), by and between Little Orbit, LLC (**"Little Orbit"**) and Descendent Studios, Inc. (**"Descendent"**) the specifics of which amended and restated agreement are to be negotiated in good faith by the parties within thirty (30) days following execution of this Terms Sheet (the **"Restated Agreement"**). Until such time as the Restated Agreement is signed by the parties, this Terms Sheet shall be binding upon the parties. Unless otherwise defined in this Terms Sheet, capitalized terms will have the meanings ascribed to such terms in the Development Agreement.

The key terms to be incorporated into the Restated Agreement are summarized as follows:

1.      Little Orbit gets a non-exclusive license to the entire code base and assets of the Game, and Descendent gets a non-exclusive license to the code and assets for the platforms Little Orbit has funded for the Game. (assets as well as code).

2.      Little Orbit agrees to continue funding Descendent's $60,000 monthly payroll in return for services and deliverables by Descendent in connection with the Game until December 31, 2019, so long as such services and deliverables from Descendent are provided in a timely manner and provided Descendent does not materially breach its obligations in providing such services and deliverables.

3.      To secure the obligations of Descendent, Descendent grants Little Orbit a first priority and senior security interest in the Game and related IP, including the Descent trademark. Descendent will promptly execute any and all reasonable documents for Little Orbit to evidence and perfect Little Orbit's security interest in such assets.

4.      Little Orbit has the exclusive right to purchase the Game, including all related IP until December 31, 2019 for $1,000,000 and for 25% of net profits of the Game (from Xbox One, PS4, Switch and PC).

5.      In the current Development Agreement, Little Orbit is entitled to recoup Development Fees at 200%. Descendent agrees that such 200% recoupment includes, VO, Localization, Marketing and any other external fees or costs paid by Little Orbit in relation to the Game.

6.      Any debt to be taken on by Descendent which encumbers Descendent's rights and IP in the Game will need Little Orbit's approval.

7.      There is no 3-month hold on digital revenue; rather, it will be delivered by the 15th day of each month for digital revenue received in the preceding calendar month.

8.      Descendent gives Little Orbit the rights to use the Descent trademark as long as Little Orbit is current with royalty payments to Descendent, its successors and assigns and is not otherwise in default under the terms of the Restated Agreement.

1

9.    Descendent grants Little Orbit the exclusive worldwide publishing rights for the Game as long as Little Orbit is current with royalty payments to Descendent, its successors and assigns and is not otherwise in default under the terms of the Restated Agreement. Notwithstanding the foregoing, Descendent agrees to assign the Trademark License Agreement dated March 6, 2015, by and between Interplay Entertainment Corp. and Descendent, to Little Orbit, subject to the approval of Interplay.

Unless otherwise amended by this Terms Sheet, the terms and provisions of the existing Development Agreement shall remain in effect.

Dated: November 28 , 2018

**LITTLE ORBIT, LLC**                        **DESCENDENT STUDIOS, INC.**

By: _____          By: _____
      Matthew Scott, Manager                      Eric K. Peterson, President

2

# EXHIBIT C

---

**From:** eric.peterson@feverpitchstudios.com
**Sent:** Tuesday, April 13, 2021 11:16 AM
**To:** Matt Scott
**Subject:** RE: Latest version of Descent code and assets

Yep, after you guys stopped paying, the ■ Repo and servers went away. Also all the build server stuff is gone – will need to rebuild that on your own.

I will need to dig the machines out of storage to get the game code.

I think we are all done waiting, we had a deal 4 months ago…..should have had the long form done by now……but whatever.

EP

# EXHIBIT D

# [PORTIONS OF THIS EXHIBIT ARE BEING FILED UNDER SEAL PURSUANT TO ORDER OF THE COURT DATED APRIL 20, 2021]

## RE: Backer Data & Link to DU Code

From: eric.peterson@feverpitchstudios.com

To: mdantonrichardson@yahoo.com; matt.scott@littleorbit.com; mikew@novaiplaw.com; admin@novaiplaw.com

Date: Tuesday, June 15, 2021, 12:35 PM PDT

That doesn't exist – Little Orbit needs no such thing, they have the source code. There is no project history, when Little Orbit breached their obligations, the servers could no longer be continued.

The project history no longer exists.

What we have supplied is the source and project which allows them to build the game code – and by the way, that is not REQUIRED under our binding agreement – we did it to help.

Eric

**From:** Mr Danton Richardson <mdantonrichardson@yahoo.com>
**Sent:** Tuesday, June 15, 2021 2:18 PM
**To:** 'Matt Scott' <matt.scott@littleorbit.com>; 'Michael Whitticar' <mikew@novaiplaw.com>; 'NOVA IP Office' <admin@novaiplaw.com>; eric.peterson@feverpitchstudios.com
**Subject:** Re: Backer Data & Link to DU Code

Little Orbit needs access to the full source code repository with the entire project history. Please advise as to when you will be providing same.

M. Danton Richardson

Law Offices of M. Danton Richardson

131 N. El Molino Avenue, Suite 310

Pasadena, California 91101

(949) 677-6434

On Monday, June 14, 2021, 08:19:54 AM PDT, eric.peterson@feverpitchstudios.com <eric.peterson@feverpitchstudios.com> wrote:

Matt & Danton,

Now that the judge has ruled that our deal in November is binding, and that a meeting of the minds was indeed reached. I wanted to reach out and send over what we are required as part of the agreement.



Also, even though we are not required to send a version of the game code over, as Little Orbit has the code already, we decided in the best interests of everyone we would give a convenient download link to the Game Project, this is everything anyone would need to take the game to the finish line.

Here is a link to that code base, please let me know whom other than Matt should need access to the code – we have given Matt access to this link.

https://drive.google.com/drive/folders/1tgGShOATcMXI0ccyeBq6R1ODkfgNGhCA

Also, now that the judge said in the meeting:

"I think revenue -- the meaning of it is clear. It's not ambiguous. It was clear from the context of the agreement itself, and from the parties course of dealing, it was not unclear. It appears to me that the -- there's been an effort made by plaintiff to create an ambiguity where there was none."

This makes it quite clear that no negotiation is needed for any recoup, and that the deal stands as negotiated.

The Transcript of the meeting is available to download if you would like to read it, but that is verbatim from the document.

As the judge also said, and he recalls the back and forth vividly, the first payment is due 30 days from our meeting on May 24th, which is June 23rd, we look forward to that first ███████ payment.

Have a great day!

Eric

214

2/2

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd Day of June 2021, the foregoing **DECLARATION OF MATTHEW SCOTT IN SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

12

DECLARATION OF MATTHEW SCOTT IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION No. 8:20-cv-00089-DOC-JDE

215

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LEO E. LUNDBERG, JR. (State Bar No. 125951)
leo.law.55@gmail.com
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
*Attorneys for Plaintiff,*
LITTLE ORBIT LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company, | ) Case No.: 8:20-cv-00089-DOC-JDE |
| | ) |
| Plaintiff, | ) Judge:   Hon. David O. Carter |
| | ) |
| vs. | ) **DECLARATION OF M. DANTON** |
| | ) **RICHARDSON IN SUPPORT OF** |
| DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual, | ) **PLAINTIFF LITTLE ORBIT LLC'S** |
| | ) **MOTION TO SET ASIDE THE** |
| | ) **BINDING SETTLEMENT TERMS** |
| | ) **SHEET DUE TO DEFENDANTS'** |
| Defendants. | ) **FRAUD AND FAILURE TO DELIVER** |
| | ) **THE ASSETS COVERED BY THE** |
| | ) **TERMS SHEET OR FOR** |
| | ) **ALTERNATIVE RELIEF AND FOR AN** |
| | ) **AWARD OF ATTORNEYS' FEES** |
| DESCENDENT STUDIOS INC., a Texas corporation, | ) **Date:   July 28, 2021** |
| | ) **Time:  8:30 a.m.** |
| Counterclaimant, | ) **Ctrm:  9D** |
| | ) |
| vs. | ) **[FILED UNDER SEAL PURSUANT** |
| | ) **TO ORDER OF THE COURT DATED** |
| LITTLE ORBIT LLC, a California Limited Liability Company, | ) **APRIL 20, 2021]** |
| | ) |
| | ) |
| Counter Defendant. | ) **Complaint filed: January 16, 2020** |

1

DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

216

## DECLARATION OF M. DANTON RICHARDSON

I, M. Danton Richardson, declare:

1.      I am an attorney licensed to practice law in California and before this Court and I am the attorney of record for Plaintiff Little Orbit LLC in the above-captioned matter.  The facts stated herein are within my own personal knowledge unless otherwise stated.  If called to testify, I would and could testify competently to the facts stated in this declaration.

2.      I make this declaration in support of Plaintiff's Motion to Set Aside the Binding Settlement Terms Sheet Due to Defendants' Fraud and Failure to Deliver the Assets Covered by the Terms Sheet, or for Alternative Relief and for an Award of Attorneys' Fees.

3.      Since the hearing Plaintiff has been attempting to resolve the disagreements regarding the Settlement Terms Sheet, including multiple requests that the parties schedule a time with Judge Early (who offered to assist the parties resolve their differences during the hearing on the Motion to Enforce) but to no avail as Defendants have refused. Plaintiff has also requested that the deadline for the first payment required by the Terms Sheet be held in suspense while the parties attempt to work out their differences either directly or with the assistance of Judge Early.  Again, Defendants have steadfastly refused all the while insisting that Plaintiff must make the required first payment under the Settlement Terms Sheet notwithstanding Defendants' failure to deliver "all game IP".

4.      I met and conferred with Defendants' counsel via telephone conference on June 2021, in an effort to address the various issues between the parties and I also again requested that Defendants agree to set up a further conference with Judge Early in an attempt to resolve the parties' differences including the issues regarding Defendants' destruction of the game assets subject to the license.  I also requested that Defendants agree to hold the payment deadlines called for the Settlement Terms Sheet in suspense while the parties attempted to work out their differences regarding the Settlement Terms Sheet.  Mr. Whitticar advised he would discuss it with his clients and get back to me the next morning.

2

DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

217

5.      On June 22, 2021, I followed up with Mr. Whitticar regarding our discussion and Mr. Whitticar emailed his response advising that Defendants was interested in continuing to talk but insisting that the first payment under the Settlement Terms Sheet must be paid on June 23, 2021.  Attached hereto and incorporated herein as Exhibit A is a true and correct copy of the June 23, 2021, email string between Mr. Whitticar and I.

6.      During the Settlement Conference in this matter the parties never discussed royalties being calculated any differently that what had already been agreed to between the parties in the Development Agreement in dispute.  Rather the focus was on what adjustment would be made to the royalty split as part of the settlement.  The parties never discussed the meaning of the term "revenues" nor did Defendants ever raise any claim that such term meant that Plaintiff would not be allowed the various standard deductions provided for in the Development Agreement in calculating the royalties that would be due to Descendent.

7.      Likewise, the parties never discussed Black's Law Dictionary definition of revenues.  Given the negotiations were to settle the parties' dispute regarding the Development Agreement, any variation from that agreement needed to be expressly addressed as was the royalty rate which was ultimately agreed to vary slightly from the Agreement.  The Development Agreement provided the foundation for the parties discussion and was a better only source for determining what deductions could be made in determining the royalties due to Descendent than any generic legal definition never consulted and unrelated to the Agreement in dispute.

8.      Plaintiff has incurred $8,575 in attorneys' fees in preparing and submitting Plaintiff's Motion to Set Aside the Binding Settlement Terms Sheet.  This is based on 24.5 hours at the hourly rate charged Plaintiff in the amount of $350 per hour.

I declare the foregoing to be true and correct under penalty of perjury under the laws of the United States.  Executed on June 23, 2021, in San Gabriel, California.

_____*M.____i___rd*_____
M. Danton Richardson, Declarant

3

DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

218

# EXHIBIT A


# [THIS EXHIBIT IS BEING FILED UNDER SEAL
# PURSUANT TO ORDER OF THE
# COURT DATED APRIL 20, 2021]

## Re: Descendent - following up

From: Michael Whitticar (mikew@novaiplaw.com)

To: mdantonrichardson@yahoo.com

Cc: eric.peterson@feverpitchstudios.com; dehashimoto@mintz.com; leo.law.55@gmail.com; nishamonki@mintz.com

Date: Tuesday, June 22, 2021, 03:58 PM PDT

No we will not suspend the payment deadlines. It has been seven months.

The first payment is due tomorrow.

Sincerely,

Michael C. Whitticar

> On Tue, Jun 22, 2021 at 6:18 PM Mr Danton Richardson <mdantonrichardson@yahoo.com> wrote:
>
> Thank you for the response. I will discuss it with my client and get back to you but also want to confirm whether your side will agree to holding the payment deadlines in suspense pending our efforts to resolve these matters? Please advise. Thanks
>
> **M. Danton Richardson**
> **Law Offices of M. Danton Richardson**
> 131 N. El Molino Avenue, Suite 310
> Pasadena, California 91101
> (949) 677-6434
>
>
> On Tuesday, June 22, 2021, 09:48:31 AM PDT, Michael Whitticar <mikew@novaiplaw.com> wrote:
>
> Eric is out with his son at a soccer tournament for at least a few more days.
>
> He would like to try direct settlement negotiations to see how close we can get before going back to the magistrate.
>
> I would recommend focusing on two approaches:
>
> (1) █████████████████████████████████████████
>
> (2) ███████████████████████████████████████████████
> █████████
>
> Either way, we feel the project will only be successful if it is named DESCENT.
>
> Eric strongly prefers Option 1. ████████████████████████████████
> ███████████████████████████████████████████████████████
>
> As for the artwork you mentioned, I am told that it is all in the game software delivered to your client as well as in the game software that your client had when it cancelled the contract. It can be pulled out of the game software by running it through a separate program or process. If Mr. Scott has any questions about how to do that, Eric can give him some guidance on that.

In any event, the Binding Settlement Terms Sheet did not require any deliverables from Eric or Descendant.

Sincerely,


Michael C. Whitticar


NOVA IP Law, PLLC
7420 Heritage Village Plaza
Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Fax: 855-295-0740
www.novaiplaw.com
mikew@novaiplaw.com


On Tue, Jun 22, 2021 at 12:26 PM Mr Danton Richardson <mdantonrichardson@yahoo.com> wrote:

Hey Michael,

Good talking yesterday. Where are we on this?

M. Danton Richardson
Law Offices of M. Danton Richardson
131 N. El Molino Avenue, Suite 310
Pasadena, California 91101
(949) 677-6434

--
NOVA IP Law, PLLC
7420 Heritage Village Plaza
Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Fax: 855-295-0740
www.novaiplaw.com
mikew@novaiplaw.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 23rd Day of June 2021, the foregoing **DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF PLAINTIFF LITTLE ORBIT LLC'S MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:   571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

4

DECLARATION OF M. DANTON RICHARDSON IN SUPPORT OF
MOTION TO SET ASIDE SETTLEMENT TERMS SHEET
CIVIL ACTION No. 8:20-CV-00089-DOC-JDE

222

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LEO E. LUNDBERG, JR. (State Bar No. 125951)
leo.law.55@gmail.com
LAW OFFICES OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
*Attorneys for Plaintiff,*
LITTLE ORBIT LLC

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company, | ) Case No.: 8:20-cv-00089-DOC-JDE |
| | ) |
| | ) Judge: Hon. David O. Carter |
| Plaintiff, | ) |
| | ) **PLAINTIFF LITTLE ORBIT LLC'S** |
| vs. | ) **NOTICE OF MOTION AND MOTION** |
| | ) **TO SET ASIDE THE BINDING** |
| | ) **SETTLEMENT TERMS SHEET DUE TO** |
| DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual, | ) **DEFENDANTS' FRAUD AND FAILURE** |
| | ) **TO DELIVER THE ASSETS COVERED** |
| | ) **BY THE TERMS SHEET OR FOR** |
| | ) **ALTERNATIVE RELIEF AND FOR AN** |
| Defendants. | ) **AWARD OF ATTORNEYS' FEES** |
| | ) |
| _____ | ) **[FILED UNDER SEAL PURSUANT** |
| | ) **TO ORDER OF THE COURT DATED** |
| DESCENDENT STUDIOS INC., a Texas corporation, | ) **APRIL 20, 2021]** |
| | ) |
| | ) **Date: July 26, 2021** |
| Counterclaimant, | ) **Time: 8:30 a.m.** |
| | ) **Courtroom: 9D** |
| vs. | ) |
| | ) |
| LITTLE ORBIT LLC, a California Limited Liability Company, | ) |
| | ) |
| | ) |
| Counter Defendant. | ) |
| _____ | ) |

1

**TO DEFENDANTS AND THEIR ATTORNEYS OF RECORD:**

PLEASE TAKE NOTICE that on July 28, 2021, at 8:30 a.m. or as soon thereafter as the matter can be heard by the above-entitled Court, in Courtroom 9D of the United States District Court for the Central District of California, located at 411 West Fourth Street, Santa Ana, CA, 92701, Plaintiff Little Orbit LLC will, and hereby does, move the Court for an order setting aside the Binding Settlement Terms Sheet due to Defendants' failure to turn over the licensed assets covered by the Settlement Terms Sheet, or alternatively for other relief, and for attorneys' fees for having to bring this Motion.

This motion is made following a good faith conference of counsel pursuant to L.R. 7-3, which took place on June 21, 2021 (¶¶ 4-5 to the Declaration of M. Danton Richardson, filed concurrently herewith). No agreement could be reached so this Motion is presented to the Court for determination.

1. As provided in the "Binding Settlement Terms Sheet" in paragraph ███████ ████████████████████████████████████ Implicit in such a license is the ability to deliver to the licensing party ███████

2. This Motion to Set Aside the Binding Settlement Terms Sheet is necessary due to the fact Defendants have now admitted that all of the game IP assets with the exception of a snapshot of the developed code as of some unspecified date have been destroyed notwithstanding Descendent's contractual obligation to maintain those assets.

3. The Defendants' failure to deliver "all game IP", including the original artwork and project history, as covered by the license provided to Plaintiff under the Settlement Terms Sheet frustrates the very purpose of the parties' settlement agreement and greatly inhibits the ability to complete development of the video Game in issue, the very purpose of such agreement.

4. Pursuant to paragraph 3.8 of the Development Agreement in dispute Descendent was required to maintain a "secure" copy of all of the game assets with an "off-site storage" facility for 4 years following delivery of the final version of the Game. See paragraph 3.8, page 6, of Exhibit A.

2

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

5. Defendants have now admitted they did not maintain the required secure repository for all of the game IP assets and have admitted that those assets have all been destroyed with the exception of a snapshot of the game code as of some unknown date - which means Defendants cannot deliver the bargained for assets which are the subject of the Settlement Terms Sheet.

6. Given Defendants' breach of the Settlement Terms Sheet by failing to deliver to Plaintiff all of the game IP assets as required, Plaintiff should be relieved of any obligation to make the payments to Defendants required by the Settlement Terms Sheet and the Court should set aside that agreement for a failure of consideration.

7. Alternatively, the settlement terms must be adjusted in light of Defendants' failure to preserve and deliver all of the "game IP" licensed to Plaintiff.

8. The Settlement Terms Sheet should alternatively be set aside due to Plaintiff's mistake in believing that the term "revenues" meant revenues after industry standard and customary deductions already agreed to between the parties in the Development Agreement if Defendants' position is correct that no such deductions are allowed. Plaintiff will suffer material harm if the agreement is enforced in that if no deductions are to be allowed that greatly changes the amounts that have to be paid to Defendants and kills any hope of Plaintiff ever recovering its ██████████ investment into developing the Game. In essence, under Defendants interpretation of "revenues" Defendants would reap all of the benefits from sales and Plaintiff would have to bear all of the costs, which is wholly inequitable and inconsistent with the original agreement and the standard in the gaming industry.

WHEREFORE, Plaintiff respectfully asks the Court to set aside the Settlement Terms Sheet or, alternatively, provide for other relief to compensate for Defendants' failure to preserve and deliver all of the game IP. Additionally, pursuant ████████████████████ ████████ the Court should also order Defendants to pay Plaintiff's reasonable attorney's fees in the amount of $8,575incurred in having to bring this Motion.

This Motion is based on this Notice of Motion, the accompanying Memorandum of Points and Authorities, the Declarations of Matthew Scott and M. Danton Richardson, the other

3

papers and records on file in this action, and such further oral and any and all other evidence as may come before the Court upon the hearing of this matter.

DATED: June 23, 2021          **LAW OFFICES OF M. DANTON RICHARDSON**


By: ___/s/ M. Danton Richardson_____
         M Danton Richardson

***Attorney for Plaintiff,***
Little Orbit LLC

## I.     INTRODUCTION

This Motion concerns Defendant Descendent Studios Inc. ("Descendent") and Eric Peterson's ("Peterson") (collectively "Defendants") recent admission that the game assets which are the subject of the Settlement Terms Sheet have been destroyed and Defendants cannot deliver the bargained for assets which are the subject of the Settlement Terms Sheet.  The inability of the Defendants to deliver a complete and up to date copy of the original game assets, including all original artwork and project history, constitutes a total failure of consideration and the Settlement Terms Sheet should be set aside by this Court.

The case was originally brought as a result of Descendent's breach of its contractual obligations under a Development Agreement and a Terms Sheet addendum by failing to timely deliver a completed video Game (which was planned to be released under the "Descent" brand) (the "Game") meeting the specifications and requirements of the parties' agreements and also failing to complete the assignment of the "Descent" trademark license (and other claims as more fully addressed in the First Amended Complaint in this action).  The parties ultimately reached a settlement agreement (the "Settlement Terms Sheet") with the help of Magistrate John D. Early which provided that Plaintiff would take over and complete the development of the Game under a license from Descendent covering "all game IP" and would make certain payments in that regard.

The agreed license covered "all game IP."  However, Defendants have admitted that all game IP has been destroyed with the exception of a snapshot version of the game code as it existed as of some unknown time.  Plaintiff has no way of knowing if that code is the latest version of the game code.  More importantly, that code is but one part of the game IP covered under the Settlement Terms Sheet.  What is missing is all of the original artwork and the project history among other assets.

The first payment Plaintiff is required to make under the Settlement Terms Sheet is due on ▮▮▮▮▮▮▮▮▮  By this Motion Plaintiff seeks a determination from the Court that Plaintiff is relieved from any obligation to make any payments called for under the Terms Sheet due to Defendants failure to deliver to Plaintiff "all game IP" as provided in the Settlement Terms Sheet.

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

## II.   ATTEMPTS TO RESOLVE THE PARTIES DISPUTES

Since the hearing on Defendants' Motion to Enforce Plaintiff has been attempting to resolve the disagreements regarding the Settlement Terms Sheet, including multiple requests that the parties schedule a time with Judge Early (who offered to assist the parties resolve their differences during the hearing on the Motion to Enforce) but to no avail as Defendants have refused. Plaintiff has also requested that the deadline for the first payment required by the Terms Sheet be held in suspense while the parties attempt to work out their differences either directly or with the assistance of Judge Early.  Again, Defendants have steadfastly refused all the while insisting that Plaintiff must make the required first payment under the Settlement Terms Sheet notwithstanding Defendants' failure to deliver "all game IP".   Richardson Decl.,      3 and 5, and Exhibit A.

As a result, Plaintiff has been forced to bring this Motion given the payment required under the Settlement Terms Sheet which Plaintiff should not have to pay given the failure of consideration for that payment obligation.

## III.   FACTUAL BACKGROUND

Little Orbit is a worldwide video game developer and publisher formed in January 2010 with a focus on AAA license-based entertainment products.  Little Orbit has developed and published games on all relevant gaming platforms and continues to pioneer electronic entertainment for consumers of all ages.  Over 20 games have been published by Little Orbit including "Kung Fu Panda: Showdown of Legendary Legends", "Adventure Time: Finn and Jake Investigations", "Young Justice", "Falling Skies the Game", "APB Reloaded," and "Fallen Earth.".

In 1995 Interplay Productions Corp., a major video game developer and publisher, released a game known as Descent, a first-person shooter ("FPS") game.  Descent popularized a subgenre of FPS games using the "six degrees of freedom" which is the movement of a rigid body (the game player's avatar) in three-dimensional space in six different ways: forward/back, up/down, left/right, yaw, pitch, roll. Descent was also the first FPS to entirely feature 3D

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

graphics.  Descent was a commercial success, selling over 1.1 million units, together with its sequel, Descent II, as of 1998.

In or around November of 2014, several former game developers working on a game known as Star Citizen, including Defendant Eric Peterson ("Peterson"), announced that they were forming Defendant Descendent Studios ("Descendent") to work on a game similar to Descent in play style, with the working title "Ships That Fight Underground."  Peterson is/was the CEO of Descendent and the key player in this saga for Descendent.

Descendent raised funds for the development of this new version of the "Descent" video game through a Kickstarter campaign which raised over $600,000 based on the popularity of the Descent game among fans.  Descendent also entered into a license agreement with Interplay to use the "Descent" name for the new game.

By August of 2017, however, Descendent was out of funds.  Peterson/Descendent approached Little Orbit about providing the financial support necessary to complete the development of the game in return for which Little Orbit would publish the re-named video game, "Descent: Underground."  The parties' discussions led to Little Orbit and Descendent entering into a "Development Agreement" effective September 1, 2017 (the "Agreement").  See Exhibit "1".

To induce Little Orbit to enter into the Development Agreement Peterson/Descendent made numerous representations regarding Descendant's alleged staff and capabilities to complete the game which Little Orbit later discovered to be false given the inexperience of those working on the game and the constant problems and shortcomings in the work by Descendent including missing various milestones and multiple planned release dates.

In fact, even though Little Orbit paid Descendent all sums required under the Agreement ██████ Descendent failed to meet any of the delivery dates required by the parties' Agreement.  In an effort to salvage the project and allow Descendent more time to complete the Game, the parties entered into a "Terms Sheet" addendum which modified and supplemented the Agreement.  See Exhibit "2".  Pursuant to the Terms Sheet, Little Orbit committed to ██

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

█████████████████ going forward in the amount of ██████████ "in return for services and deliverables by Descendent in connection with the Game    so long as such services and deliverables are provided in a timely manner and provided Descendent does not materially breach its obligations in providing such services and deliverables."  Descendent still continued to fail to meet the deliverable requirements and specifications thereby breaching the Terms Sheet.

The Game was originally planned for a May 2018 retail release date.  As a result of Descendent's slow and problematic progress, the release date for the Game was pushed back to a November 2018 release date.  Further delays by Descendent required the release date for the Game to be pushed back a final time to a February 2019, which likewise was not met. Descendent ultimately failed to timely deliver the completed Game required under the specifications of the Agreement or otherwise comply with the Terms Sheet.

Little Orbit made a couple of payments under the Terms Sheet addendum but on January 30, 2019, Little Orbit sent 50% of the payroll amount because Descendent had missed two deadlines in a row.  Instead of trying to fix the problems in its deliverables and earn the entirety of the payment, on February 1st, Descendent instead sent a "Notice of Breach" for non-payment. On February 4th, Little Orbit paid the remaining 50% to cure the alleged breach and then filed its own Notice of Breach" for Descendent's failure to meet its delivery requirements. Descendent failed to cure within the allowed 30 day period thereby relieving Little Orbit of any obligation to make any further payments to Descendent.

Descendent also breached the Terms Sheet by failing to provide the assignment of the Trademark License Agreement by and between Interplay Entertainment Corp. and Descendent. Plaintiff has since been informed that Interplay has cancelled that license agreement so the game cannot be released using the "Descent" trademark absent a new agreement being entered into with Interplay.

As a result of the above Plaintiff filed this lawsuit.

8

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

The parties participated in a settlement conference before Magistrate John D. Early on November 17, 2021, which resulted in the parties agreeing to certain "deal points" set forth in a "Settlement Terms Sheet." It was anticipated the parties would enter into a long form agreement which would flesh out the substance of the agreement but the parties were never able to agree on a long form agreement due to various disputes as to the "fine print" for the parties' agreement. One area of disagreement was the meaning of "revenues" which Defendants have since contended means "gross revenues" and does not allow for any deductions before determining the royalties payable to Defendants. This totally ignores the custom in the industry and the fact that the Development Agreement in dispute between the parties provides for various deductions before determining royalties and, in Plaintiff's view, that prior course of dealing was the starting point in arriving at the agreed royalties payable under the Settlement Terms Sheet.

Defendants brought a Motion to Enforce the Settlement Terms Sheet which was referred to Judge Early and was denied. Since that time, even though Plaintiffs have repeatedly asked Defendants to deliver to Plaintiff all of the game IP assets, on June 15, 2021, Defendants finally produced only a snapshot copy of the game code as it existed on some unknown date. Plaintiff pressed the matter and demanded delivery of "the full source code and the entire project history." In response, Mr. Peterson advised that the "project history no longer exists" and that all Plaintiff needs is the code (even claiming there was no obligation to deliver anything to Plaintiff). Declaration of Matthew Scott ("Scott Decl."), Exhibit D.

The code delivered is inadequate for a number of reasons (addressed below) but most importantly, the terms of the Settlement Terms Sheet provides for a license of "all game IP" not just the code.

## IV. ARGUMENT

### A. Defendant's Cannot Deliver the Bargained for Game IP Asset Which Constitute a Failure of Consideration by Defendants Under the Settlement Term Sheet

"A settlement agreement is a contract, and the legal principles which apply to contracts

9

generally apply to settlement contracts.  Citation. ” *Sully-Miller Contracting Co. v. Gledson/Cashman Constr., Inc*., 103 Cal.App.4th 30, 35-36, 126 Cal.Rptr.2d 400, 403 (2002) (quoting *Weddington Productions, Inc. v. Flick*, 60 Cal.App.4th 793, 810-11, 71 Cal.Rptr.2d 265(1998).)

California law allows a party to seek rescission for failure of consideration. See Cal. Civ. Code   1689(b)(2), (3), (4). The right to rescind exists even if "there has been a partial performance by the party against whom the right is exercised." *Coleman v. Mora*, 263 Cal.App.2d 137, 150, 69 Cal.Rptr. 166 (1968) (citations omitted). However, "a failure of consideration must be  material,' or go to the  essence' of the contract before rescission is appropriate." *Wyler v. Feuer*, 85 Cal.App.3d 392, 403-04, 149 Cal.Rptr. 626 (1978) (citations omitted). "Whether a breach constitutes a failure of consideration sufficient to be deemed material and thus to warrant rescission of a contract is a question of fact . . . ." *Fed. Deposit Ins. Corp. v. Air Fla. Sys., Inc*., 822 F.2d 833, 840 (9th Cir. 1987) (citations omitted).

> "A contract must be so interpreted as to give effect to the mutual intention of the parties as it existed at the time of contracting, so far as the same is ascertainable and lawful." (Civ. Code, sec. 1636.)  "A contract may be explained by reference to the circumstances under which it was made, and the matter to which it relates." (Civ. Code, sec. 1647.) "If the terms of a promise are in any respect ambiguous or uncertain, it must be interpreted in the sense in which the promisor believed, at the time of making it, that the promisee understood it." (Civ. Code, sec. 1649.) "In cases of uncertainty not removed by the preceding rules, the language of a contract should be interpreted most strongly against the party who caused the uncertainty to exist. The promisor is presumed to be such party; . . ." (Civ. Code, sec. 1654.)

*Detwiler v. Clune*, 77 Cal.App. 562, 567-68 (1926).

Moreover,
> " i f the consideration for the obligation of the rescinding party, before it is rendered to him, fails in a material respect from any cause" a party may rescind a contract. (Civ. Code,   1689, subd. (b)(4).)  A contract may also be rescinded if the consent of the rescinding party was given by mistake. (Civ. Code,   1689, subd. (b)(1).)  The party attempting to void the contract as a result of

mistake must also show that it would suffer material harm if the agreement were enforced, though that need not be a pecuniary loss. *Guthrie v. Times-Mirror Co.* (1975) 51 Cal.App.3d 879, 886  124 Cal. Rptr. 577 .)

*Habitat Tr. for Wildlife, Inc. v. City of Rancho Cucamonga*, 175 Cal.App.4th 1306, 1332-33 (2009).

As noted in the "Settlement Terms Sheet" in paragraph ███████████████ ███████████████████████████████  Such a license would require, at the very least, that the Defendants be able to provide Plaintiff ████████ in order to effectuate the license.  The game IP includes not only the game code as continued to be developed by Defendants for several months after the termination of the parties' prior Agreement, but all original artwork and the project history among other audio, media and software assets.  In fact, the Development Agreement entered into between the parties addressed the game assets in Paragraph 3.8 as follows:

> During Development of the Game, Developer shall ensure that it maintains a duplicate or "back up" copy of all software, work in progress and related materials developed or acquired by Developer, such copy to be maintained on a regular up to date basis and in separate, secure and off-site storage according to Publisher s reasonable requirements as reasonably directed by Publisher from time to time. Developer will be responsible for reconstructing the latest version of the Game without any additional cost to Publisher with each Milestone. After delivering the final version, Developer must maintain a copy of the final assets and media masters for a period of 4 years, and must provide a replacement to Publisher upon request.

Scott Decl., Exhibit A.

Defendants failed to disclose that they did not maintain the game assets, including all original artwork and project history, in the required third party repository either before or during the parties' negotiations at the Settlement Conference.  That is a material omission as the absence of such original materials greatly limits the ability of anyone to pick up the work and complete the development of the Game.  Even if the Game can be completed using the code as it

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

existed on a certain unspecified date, that task will be that much harder, and exponentially more expensive, without access to all of the underlying original artwork, audio files, project history and other materials.

The original game assets are crucial to the completion of the game for numerous reasons:

- The project was essentially never finished. Little Orbit terminated the Development Agreement because Descendent missed required milestones for 9 months in a row. During the final months, Descendent made a chaotic effort to complete the game that included changing major systems and altering every screen in the game. In order to pick up and complete the development of the game Little Orbit will need access to the project history to review the changes to each screen so Little Orbit can make sure the intended logic was implemented properly. If it is not working, Little Orbit would be able to use the project history to determine the correct logic.

- No documentation was provided by Defendants when Little Orbit terminated. Therefore, Little Orbit has no knowledge capture or written guidance on what remained to be finished or what was removed to save on time. Without the project history, this will all need to be done by manually reviewing each section of code and guessing about its completeness. This will be costly and faulty. Little Orbit is sure to miss areas of the game or functionality that were modified without its knowledge.

- Back in 2014, the Game was originally developed for older PCs. In 2017, Little Orbit funded the addition of platforms like   box One and Playstation 4. However, it is now 2021 and the game will not ship until at least 2022. The foregoing platforms have all been replaced and the game must work on new platforms such as   box   and Playstation 5 which have higher resolution standards. Part of Little Orbit's work in completing the game will be to go back to the Source Art Assets and re-export new Game Project assets that meet the new platform requirements. Without access to this original art, all of the original production work is lost.

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

- Source Art Assets go through lots of revisions. Again, the project history makes it obvious which asset was exported to the game at a specific time. There is no way to know if the snapshot of code provided by Defendant has the latest art assets, and without the Source Art Asset repository we have nothing to compare to.

- Without the project history, we have no way of knowing what original source art was either not yet imported into the game code or, which for whatever reason, may have been removed from the source code. Those assets are now lost.

- While the artwork already contained in the code can be used to complete the game, those assets are of poor quality when trying to meet the higher resolutions provided for in the newer platforms such as    box    and Playstation 5.

Scott Decl.,    22.

Defendants' have confirmed they cannot deliver those IP assets and therefore there is a failure of consideration regarding the Settlement Terms Sheet as Defendants are unable to deliver the Game assets that were promised to Plaintiff pursuant to that agreement.  Plaintiff would suffer material harm if forced to comply with the terms of the Settlement Terms Sheet, because it would be required to attempt to recreate the game artwork and game history which could not be assured to be accurate reconstructions of those assets.

**B.    T e Court S ould Va ate t e Settlement Ba ed on t e Bad Fait  and De eption of Defendant  and t eir Purpo eful Con ealment of Pertinent Fa t  Affe tin  Criti al Element  and Term  of t e Settlement A reement**

Fed. R. Civ. P. 60(b) provides a mechanism by which a court may relieve a party from a final judgment or order. Among the grounds for relief are: (1) "mistake, inadvertence, surprise, or excusable neglect;" (2) fraud, misrepresentation, or misconduct of an opposing party; and (3) "any other reason that justifies relief."  Fed. R. Civ. P. 60(b)(3), (6).

> In some circumstances, a party's repudiation of a settlement agreement that terminated a litigation constitutes an extraordinary circumstance that justifies vacating the court's prior dismissal order under Rule 60(b)(6). *Keeling v. Sheet Metal Workers Intern. Ass'n, Local Union*, 162 937 F.2d 408, 410 (9th Cir. 1991). Such "repudiation" must result in "complete frustration" of

13

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

the settlement agreement, or demonstrate "bad
faith noncompliance." *Id.*, at 410-11. Rule 60(b)(6) relief is
warranted only in exceptional circumstances, such as where "the
breach of the Settlement Agreement has deprived plaintiffs of all
benefits of the agreement or where there are no other remedies for
the breach." *Tweed v. Schuetzle*, 2009 U.S. Dist. LE  IS 32946, 2009
WL 874609, at  5 n.2 (D. N.D. 2009).

*Paxton v. Schillings*, No. 1:12-cv-00136-REB, 2016 U.S. Dist. LE  IS 200249, at  4 (D. Idaho
Mar. 23, 2016).

This court, pursuant to Rule 60(b) of the Federal Rules of Civil Procedure, has the
authority to vacate the court-approved Settlement Agreement and set aside the dismissal of this
action based that followed. See *Triangle Capital Corp. v. I.M.C. Mgmt. Corp.*, 127 F.R.D. 444,
446 (D. Mass. 1989) (citing *U.S. v. Baus*, 834 F.2d 1114, 1123 (1st Cir. 1987); Wright   Miller,
Federal Practice and Procedure: Civil   2860, at 187-88 (1973).)

Such relief is appropriate and necessary here as there has been a total failure of
consideration as Defendants have admitted they cannot deliver "all game IP" as required under
the Settlement Terms Sheet.  Worse, during the parties settlement negotiations Defendants
purposefully concealed the fact that the game assets had not been preserved as required by the
Development Agreement.  Such bad faith by Defendants eviscerates any consent by Plaintiff to
the Settlement Terms Sheet.  In fact, Plaintiff submits that it is fraudulent for a party to license
assets it knows have been destroyed.  Put simply, that party is promising to deliver assets it
knows it cannot deliver.  That is a textbook case of fraud and justifies setting aside the
Settlement Terms Sheet and the dismissal of this action entered by the Court based on that
fraudulent settlement.

Furthermore, Plaintiff's consent to the Settlement Terms Sheet was given under the
mistaken belief (if Defendants' position is correct) that the term "revenues" meant revenues
after industry standard and customary deductions already agreed to between the parties in the
Development Agreement.  Plaintiff will suffer material harm if the contract is enforced in that if
no deductions are to be allowed that greatly changes the amounts that have to be paid to
Defendants and kills any hope of Plaintiff ever recovering its investment into the Game.  In

14

essence, under Defendants' interpretation of "revenues" Defendants would reap all of the benefits from sales and Plaintiff would have to bear all of the costs, which is wholly inequitable and inconsistent with the original agreement and the standard in the gaming industry.  Scott Decl.,    9 and 11-13.   See also Fed. R. Civ. P. 60(b)(1); *Habitat Tr. for Wildlife, Inc*., *supra*.

### C.    Defendant ' S ould  e Ordered to Pay for Plaintiff' Attorney ' Fee  in Conne tion  it  t i  Motion

The Settlement Terms Sheet provides that the ███████████████████████████ ███████████████████████████████████████████████████████████ ██████████████ Plaintiff has incurred $8,575 in fees in researching and preparing this Motion and supporting documents.  Plaintiff requests that Plaintiff be declared the substantially prevailing party as to this Motion and awarded the foregoing attorneys' fees against Defendants.

## V.    CONCLUSION

Defendants have failed to deliver the original game assets necessary to effectuate the license provided for in the Settlement Terms Sheet.  This constitutes a blatant failure of consideration.  Additionally, Defendants' offering and agreeing to license assets it knew had been destroyed and which it could not deliver was fraudulent.  As a result, the Court should set aside the Settlement Terms Sheet and the dismissal entered based thereon and also award Plaintiff its attorneys' fees in having to bring this Motion.

DATED: June 23, 2021              **LAW OFFICES OF M. DANTON RICHARDSON**

By:   /s/ M. Danton Richardson
                M Danton Richardson

***Attorney for Plaintiff,***
Little Orbit LLC

15

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

## CERTIFICATE OF SERVICE

I hereby certify that on this 23rd Day of June, 2021, the foregoing **PLAINTIFF LITTLE ORBIT LLC'S NOTICE OF MOTION AND MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS SHEET DUE TO DEFENDANTS' FRAUD AND FAILURE TO DELIVER THE ASSETS COVERED BY THE TERMS SHEET OR FOR ALTERNATIVE RELIEF AND FOR AN AWARD OF ATTORNEYS' FEES** was filed with the Court's CM/ECF system and was served on the following counsel of record via email:

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

/s/ M. Danton Richardson
M. Danton Richardson

DEFENDANTS' MOTION TO SET ASIDE
SETTLEMENT TERMS SHEET
CIVIL ACTION NO. 8:20-cv-00089-DOC-JDE

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | |
|---|---|
| LITTLE ORBIT LLC, | ) Case No. 8:20-cv-00089-DOC (JDE) |
| Plaintiff, | ) |
| v. | ) ORDER ACCEPTING FINDINGS ) AND RECOMMENDATION OF |
| DESCENDENT STUDIOS INC., et al., | ) UNITED STATES MAGISTRATE ) JUDGE ) |
| Defendants, | ) ) |
| And Related Counterclaims. | ) ) |

Pursuant to 28 U.S.C. § 636, the Court has reviewed the records on file, including the Motion to Enforce Binding Settlement Terms Sheet filed by Defendants Descendent Studios, Inc. and Eric Peterson ("Defendants") (Dkt. 61, 65 (under seal), collectively, "Motion"), all papers filed in support of an in opposition to the Motion, and the Report and Recommendation of the assigned United States Magistrate Judge filed after a hearing before the Magistrate Judge and after the Court had referred the Motion to the Magistrate Judge. No party filed timely objections to the Report and Recommendation.

The Court accordingly accepts the findings and recommendation of the Magistrate Judge.

IT IS THEREFORE HEREBY ORDERED that:

1. The Report and Recommendation (Dkt. 79) is approved and accepted;

2. The Motion (Dkt. 61, 65) is DENIED;

3. To the extent the Settlement Agreement (Dkt. 48-1 (under seal)) used the phrase "within [__] days of signing [a] written memorialization" or similar language as a triggering event, such trigger date shall be the date of the Report and Recommendation, that is, May 24, 2021; and

4. The parties' cross-requests for an award of attorneys are denied.

Dated: <u>June 17, 2021</u>

*David O. Carter*

DAVID O. CARTER
United States District Judge

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

SOUTHERN DIVISION

| | | |
|---|---|---|
| LITTLE ORBIT, LLC, a California Limited Liability Company, | ) ) ) | No. SACV 20-00089-DOC (JDEx) |
| | ) | REPORT AND |
| Plaintiff, | ) ) | RECOMMENDATION OF UNITED STATES MAGISTRATE |
| v. | ) ) | JUDGE |
| | ) | |
| DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual, | ) ) ) ) | |
| | ) | |
| Defendants. | ) ) | |
| | ) | |
| AND RELATED COUNTERCLAIMS. | ) ) | |

This Report and Recommendation is submitted to the Honorable David O. Carter, United States District Judge, pursuant to 28 U.S.C. § 636, General Order 05-07 of the United States District Court for the Central District of California, and the Court's May 19, 2021 Order (Dkt. 77).

On November 17, 2020, following a settlement conference, "the parties reached a settlement of the matter, the material terms of which are contained in a writing, signed electronically with the parties' and counsels' consent," a

copy of which was filed under seal. <u>See</u> Dkt. 48, 48-1 (under seal). Although the material terms of the Settlement Agreement are filed under seal, the Court finds the following matters contained in the Settlement Agreement are not confidential. The document is titled "Settlement Terms"; the document obligates "Little Orbit" to pay "Descendent" certain sums within certain dates measured, at least in part, from the "signing [of a] written memorialization"; and "[e]ach party intends to be bound by this Agreement and recognize that <u>it is a final and binding Settlement Agreement</u> even though the parties <u>may</u> draft and execute <u>a further</u>, more detained written memorialization." Dkt. 48-1 (emphasis added).

On April 16, 2021, Defendants Descendent Studios Inc and Eric Peterson ("Defendants") filed a Motion to Enforce the Settlement Agreement, with a request for attorneys' fees, (Dkt. 61, collectively referred to herein with Dkt. 65 as "Motion"), with a supporting Memorandum of Points and Authorities ("Dkt. 61-1, "Mem.") and evidence (Dkt. 61-2, 61-3), portions of which were later approved for filing under seal (Dkt. 65, 65-1 to 65-3).

On May 3, 2021, Plaintiff Little Orbit LLC ("Plaintiff") filed an Opposition to the Motion (Dkt. 67, "Opp."), with supporting evidence (Dkt. 67-1) and objections to Defendants' evidence (Dkt. 67-1), portions of all of which were authorized to be filed under seal.

On May 10, 2021, Defendants filed a Reply (Dkt. 73), additional evidence (Dkt. 73-1), responses to Plaintiff's evidentiary objections (Dkt. 73-2), and objections to Plaintiff's evidence (Dkt. 73-3).[1]

---

[1] After the close of briefing, on May 17, 2021, without prior authorization, Plaintiff filed a request for judicial notice. Dkt. 75. Local Rule 7-10 provides for the filing of a reply memorandum in support of a motion, and directs: "Absent prior written order of the Court, the opposing party shall not file a response to the reply." As it was filed without authorization, the Court does not consider Dkt. 75.

On May 19, 2021, the Judge Carter issued an order referring the Motion to the assigned Magistrate Judge with a hearing, by videoconference, set for May 24, 2021 at 12:00 p.m. The videoconference hearing on the Motion proceeded on that date and time, and after the argument of counsel, the undersigned took the Motion under submission.

With respect to the parties' evidentiary objections, the Court has considered only admissible evidence in connection with this Report.

Considering the admissible evidence and the arguments of counsel, the Court finds as follows:

1. The Settlement Agreement (Dkt. 48-1) is, as it states, "a final and binding Settlement Agreement even though the parties" contemplated that they "may draft and execute a further, more detailed written memorialization";

2. The fact that the parties did not execute a further, more detailed written memorialization did not render the "final and binding Settlement Agreement" unenforceable;

3. The parties had a "meeting of the minds" regarding the meaning of the terms used in the Settlement Agreement, with such terms being unambiguous in the context in which they were used;

4. In fairness, as the parties did not execute a "further, more detailed written memorialization," to the extent the Settlement Agreement used the phrase "within [__] days of signing [a] written memorialization" as a triggering event, such triggering date shall be the date of this Report;

5. Due to finding (4), above, the Motion is premature and thus should be denied;
   and

/ / /

3

6. Neither side is a "prevailing party" in connection with the Motion because neither side obtained the relief sought in connection with brining or opposing the Motion.

IT IS THERFORE RECOMMENDED that the District Judge issue an order: (1) approving and accepting this Report and Recommendation; (2) denying the Motion (Dkt. 61, 65); (3) directing that to the extent the Settlement Agreement (Dkt. 48-1) used the phrase "within [___] days of signing [a] written memorialization" or similar language as a triggering event, such triggering date shall be the date of this Report; and (4) denying the parties' cross-requests for an award of attorneys' fees.

Dated: May 24, 2021

_____
JOHN D. EARLY
United States Magistrate Judge

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LEO E. LUNDBERG, JR. (State Bar No. 125951)
leo.law.55@gmail.com
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101

*Attorneys for Plaintiff,*
LITTLE ORBIT LLC

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| LITTLE ORBIT LLC, a California Limited Liability Company, | ) Case No.: 8:20-cv-00089-DOC-JDE |
| | ) |
| | ) Judge: Hon. David O. Carter |
| Plaintiff, | ) |
| | ) **JOINT STIPULATION AND REQUEST** |
| vs. | ) **FOR COURT TO RETAIN** |
| | ) **JURISDICTION FOR AN ADDITIONAL** |
| DESCENDENT STUDIOS INC., a Texas corporation, and ERIC PETERSON, an individual, | ) **SIXTY (60) DAYS FOR THE COURT** |
| | ) **TO HEAR DESCENDENT'S MOTION** |
| | ) **TO ENFORCE THE BINDING** |
| Defendants. | ) **SETTLEMENT TERMS SHEET** |
| | ) |
| _____ | ) |
| | ) |
| DESCENDENT STUDIOS INC., a Texas corporation, | ) |
| | ) |
| Counterclaimant, | ) |
| | ) |
| vs. | ) |
| | ) |
| LITTLE ORBIT LLC, a California Limited Liability Company, | ) |
| | ) |
| Counter Defendant. | ) |
| | ) |
| _____ | ) |

1

STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

WHEREAS the parties reached a settlement of this matter during a Settlement Conference with Hon. John D. Early on November 17, 2020;

WHEREAS pursuant to said settlement the Court dismissed this action in a Minute Order entered November 25, 2020, and further ordered that "The Court retains jurisdiction for sixty (60) days to vacate this order and reopen the action upon showing of good cause that the settlement has not been consummated"; and

WHEREAS the parties are still working to finalize their settlement, including necessary negotiations with a third party as provided for in the parties' agreement to settle as worked out by Magistrate Early, and jointly desire for the Court to retain jurisdiction for an additional sixty (60) days;

WHEREAS Defendants respectfully request an additional sixty days for Descendent to submit a Motion to Enforce the Binding Settlement Terms Sheet and to have it heard by the Court.

NOW THEREFORE the parties hereby stipulate to and jointly request the Court to extend its earlier Minute Order and retain jurisdiction for an additional sixty (60) days.

**IT IS SO STIPULATED.**

Respectfully Submitted this 16th Day of April, 2021:

By: /s/ M. Danton Richardson
Counsel

M. Danton Richardson (State Bar No. 141709)
Leo E. Lundberg, Jr. (State Bar No. 125951)
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
E-mail: mdantonrichardson@yahoo.com
     leo.law.55@gmail.com
*Counsel for Plaintiff*

2

STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

By: /s/ Michael C. Whitticar
        Counsel

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND
POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
*Counsel for Defendants*

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax:  855-295-0740
E-mail: mikew@novaiplaw.com
*Counsel for Defendants*
*Admitted Pro Hac Vice*

3

STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

# CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action. On April 16, 2021, I filed a copy of the following document(s):

**JOINT STIPULATION AND REQUEST FOR COURT TO RETAIN JURISDICTION FOR AN ADDITIONAL (60) DAYS FOR THE COURT TO HEAR DESCENDENT'S MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS SHEET**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

    M. Danton Richardson
    Leo E. Lundberg, Jr.
    LAW OFFICE OF M. DANTON RICHARDSON
    131 N. El Molino Ave., Suite 310
    Pasadena, CA 91101
    E-mail: mdantonrichardson@yahoo.com
            leo.law.55@gmail.com
    Counsel for Plaintiff

    Michael C. Whitticar; VSB No. 32968
    NOVA IP Law, PLLC
    7420 Heritage Village Plaza, Suite 101
    Gainesville, VA 20155
    Tel:  571-386-2980
    Fax: 855-295-0740
    Email: mikew@novaiplaw.com
    Counsel for Defendants

    NADA I. SHAMONKI (SBN 205359)
    MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
    2029 Century Park East, Suite 3100
    Los Angeles, CA 90067
    Telephone: (310) 586-3200
    Facsimile: (310) 586-3202
    Email: nshamonki@mintz.com
    Counsel for Defendants

Executed on April 16, 2021, at Los Angeles, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

                      /s/ Diane Hashimoto
                      Diane Hashimoto

4

STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION No. 8:20-CV-00089-DOC-JDE

1  M. DANTON RICHARDSON (State Bar No. 141709)
   mdantonrichardson@yahoo.com
2  LEO E. LUNDBERG, JR. (State Bar No. 125951)
   leo.law.55@gmail.com
3  LAW OFFICE OF M. DANTON RICHARDSON
4  131 N. El Molino Ave., Suite 310
   Pasadena, CA 91101
5

6  *Attorneys for Plaintiff,*
   LITTLE ORBIT LLC
7

8              **UNITED STATES DISTRICT COURT**
9              **CENTRAL DISTRICT OF CALIFORNIA**

10 LITTLE ORBIT LLC, a California Limited ) Case No.: 8:20-cv-00089-DOC-JDE
11 Liability Company,                     )
                                          ) Judge:    Hon. David O. Carter
12         Plaintiff,                      )
                                          ) **FOURTH JOINT STIPULATION AND**
13     vs.                                ) **REQUEST FOR COURT TO RETAIN**
                                          ) **JURISDICTION FOR AN ADDITIONAL**
14 DESCENDENT STUDIOS INC., a Texas       ) **THIRTY (30) DAYS FOR THE PARTIES**
15 corporation, and ERIC PETERSON, an     ) **TO COMPLETE THEIR SETTLEMENT**
   individual,                            )
16                                        )
17         Defendants.                    )
                                          )
18                                        )
   _____    )
19                                        )
   DESCENDENT STUDIOS INC., a Texas       )
20 corporation,                           )
                                          )
21         Counterclaimant,               )
                                          )
22                                        )
23     vs.                                )
                                          )
24 LITTLE ORBIT LLC, a California Limited )
   Liability Company,                     )
25                                        )
                                          )
26         Counter Defendant.             )
                                          )
27 _____    )

28

                              1

FOURTH STIPULATION AND JOINT REQUEST FOR COURT
                                   TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
                                   CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

1   WHEREAS the parties reached a settlement of this matter during a Settlement

2   Conference with Hon. John D. Early on November 17, 2020;

3   WHEREAS pursuant to said settlement the Court dismissed this action in a Minute Order

4   entered November 25, 2020, and further ordered that "The Court retains jurisdiction for thirty

5   (30) days to vacate this order and reopen the action upon showing of good cause that the

6   settlement has not been consummated";

7   WHEREAS, on December 23, 2020, the parties filed a stipulation for the Court to retain

8   jurisdiction for an additional thirty (30) days for the parties to complete their settlement, which

9   the Court granted that same day;

10  WHEREAS, on January 22, 2021, the parties filed a second stipulation for the Court to

11  retain jurisdiction for an additional thirty (30) days for the parties to complete their settlement,

12  which the Court granted that same day;

13  WHEREAS, on February 18, 2021, the parties filed a second stipulation for the Court to

14  retain jurisdiction for an additional thirty (30) days for the parties to complete their settlement,

15  which the Court granted that same day;

16  WHEREAS the parties still need additional time, as they are still working to finalize their

17  settlement, including necessary negotiations with a third party as provided for in the parties'

18  agreement to settle as worked out by Magistrate Early, and jointly desire for the Court to retain

19  jurisdiction for an additional thirty (30) days;

20  NOW THEREFORE the parties hereby stipulate to and jointly request the Court to

21  extend its earlier Order and retain jurisdiction for an additional thirty (30) days.

22  **IT IS SO STIPULATED.**

23  Respectfully Submitted this 18th Day of March, 2021:

24

25  By: */s/ M. Danton Richardson*
         Counsel

26  M. Danton Richardson (State Bar No. 141709)
    Leo E. Lundberg, Jr. (State Bar No. 125951)
27  LAW OFFICE OF M. DANTON RICHARDSON
28  131 N. El Molino Ave., Suite 310

2

FOURTH STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

Pasadena, CA 91101
E-mail: mdantonrichardson@yahoo.com
　　　leo.law.55@gmail.com
*Counsel for Plaintiff*

By: /s/ *Michael C. Whitticar*
　　　Counsel

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND
POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
*Counsel for Defendants*

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:　571-386-2980
Fax:　855-295-0740
E-mail: mikew@novaiplaw.com
*Counsel for Defendants*
*Admitted Pro Hac Vice*

3

251

FOURTH STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION No. 8:20-CV-00089-DOC-JDE

## CERTIFICATE OF SERVICE

I, the undersigned, certify and declare that I am over the age of 18 years, employed in the County of Los Angeles, State of California, and am not a party to the above-entitled action. On March 19, 2021, I filed a copy of the following document(s):

**FOURTH JOINT STIPULATION AND REQUEST FOR COURT TO RETAIN JURISDICTION FOR AN ADDITIONAL THIRTY (30) DAYS FOR THE PARTIES TO COMPLETE THEIR SETTLEMENT**

By electronically filing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following:

M. Danton Richardson
Leo E. Lundberg, Jr.
LAW OFFICE OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
E-mail: mdantonrichardson@yahoo.com
        leo.law.55@gmail.com
Counsel for Plaintiff

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel:  571-386-2980
Fax: 855-295-0740
Email: mikew@novaiplaw.com
Counsel for Defendants

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com
Counsel for Defendants

Executed on March 19, 2021, at Los Angeles, California.  I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

/s/ Diane Hashimoto
Diane Hashimoto

4

FOURTH STIPULATION AND JOINT REQUEST FOR COURT
TO RETAIN JURISDICTION AN ADDITIONAL THIRTY DAYS
CIVIL ACTION NO. 8:20-CV-00089-DOC-JDE

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

## Form 15. Certificate of Service for Electronic Filing

*Instructions for this form:* http://www.ca9.uscourts.gov/forms/form15instructions.pdf

**9th Cir. Case Number(s)** | Appeal No. 21-55852

I hereby certify that I electronically filed the foregoing/attached document(s) on this date with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the Appellate Electronic Filing system.

**Service on Case Participants Who Are Registered for Electronic Filing:**

☒ I certify that I served the foregoing/attached document(s) via email to all registered case participants on this date because it is a sealed filing or is submitted as an original petition or other original proceeding and therefore cannot be served via the Appellate Electronic Filing system.

**Service on Case Participants Who Are <u>NOT</u> Registered for Electronic Filing:**

☐ I certify that I served the foregoing/attached document(s) on this date by hand delivery, mail, third party commercial carrier for delivery within 3 calendar days, or, having obtained prior consent, by email to the following unregistered case participants *(list each name and mailing/email address)*:

**Description of Document(s)** *(required for all documents)*:

APPELLANT'S APPENDIX RE
EMERGENCY MOTION UNDER CIRCUIT RULE
27-3 FOR STAY OF ORDER PENDING APPEAL
Vol. II of IV

**Signature** | s/ M. Danton Richardson | **Date** | August 24, 2021

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at* forms@ca9.uscourts.gov

**Form 15** | *Rev. 12/01/2018*