Appeal No. 21-55852

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
_____

LITTLE ORBIT, LLC

Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,

Defendants – Appellees

_____

On Appeal from the United States District Court for the Central District of California

Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge
_____

**RESPONDENTS' OPPOSITION TO MOTION TO EXTEND PAGE LIMIT FOR MOTION TO STAY**
_____

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel: 571-386-2980
Fax: 855-295-0740
Email: mikew@novaiplaw.com

Nada I. Shamonki (SBN 205359)
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com

*Attorneys for Defendants/Appellees*
*Descendent Studios Inc. and Eric Peterson*

Respondents Descendent Studios Inc. and Eric Peterson respectfully submit this opposition to Petitioner's motion to file a motion for stay pending appeal in excess of the applicable page limits.

Petitioner Little Orbit's motion should be denied because: (1) the motion for a stay is full of irrelevant background information about the underlying settlement and litigation; and, (2) the motion for a stay is full of improper, disputed assertions as to factual issues for which there are no citations to the record and no factual support in the record.

On the version of Little Orbit's excessively long motion to stay and brief attached as Exhibit A, the irrelevant background information is highlighted in yellow and the unsupported and disputed factual statements are highlighted in orange.

**WHEREFORE,** Respondents respectfully request that Little Orbit's motion to exceed the page limit be denied, and that its motion for a stay pending appeal be stricken.

Dated: September 3, 2021        By: _____

                                              Michael C. Whitticar
                                              Nada I. Shamonki

                                         *Attorneys for Defendants/Appellees*
                                         *Descendent Studios Inc. and Eric Peterson*

# EXHIBIT A

Appeal No. 21-55852



## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

LITTLE ORBIT, LLC
Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,
Defendants – Appellees

On Appeal from the United States District Court for the Central District of
California
Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge

## APPELLANT'S EMERGENCY MOTION UNDER CIRCUIT RULE
## 27-3 FOR STAY OF ORDER PENDING APPEAL

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LAW OFFICES OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
Telephone: (949) 677-6434

Attorneys for Plaintiff/Appellant, LITTLE ORBIT LLC

1

## CIRCUIT RULE 27-3 CERTIFICATE

The undersigned counsel certifies that the following is the information

required by Circuit Rule 27-3:

**(1) Telephone numbers and addresses of the attorneys for the parties**

**Counsel for Appellant:**

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LAW OFFICES OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
Telephone: (949) 677-6434

**Counsel for Appellees:**

Michael C. Whitticar; VSB No. 32968 (admitted *pro have vice*)
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Telephone: (571) 386-2980
Facsimile: (855) 295-0740
Email: mikew@novaiplaw.com

NADA I. SHAMONKI (SBN 205359)
MINTZ LEVIN COHN FERRIS GLOVSKY AND POPEO P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com

## (2) Facts showing the existence and nature of the emergency

As set forth more fully in the Motion, emergency relief is needed to maintain the *status quo* between the parties pending this appeal and to prevent Little Orbit's rights under the Binding Settlement Terms Sheet ("BSTS") from being terminated by the lapse of time rendering this appeal moot. This need is best evidenced by an August 9, 2021, email sent by Defendants' counsel stating: "Descendent will be terminating the BSTS and the IP license contained therein for material breach based on Little Orbit not complying with the Court order."[1] If this is allowed to happen, Little Orbit will lose the millions of dollars it has invested in the development of the Game.

## (3) When and how opposing counsel was notified

The undersigned counsel notified counsel for Defendants via a telephone conference on August 10, 2021, of Plaintiff's intent to file this motion and its substance. Service will be effected by electronic service through the CM/ECF system and via email.

---

[1] A true and correct copy of the email is attached hereto as **Exhibit B**.

3

### (4) Submissions to the District Court

Plaintiff did not seek a stay from the District Court given there was no

practical way to present such a Motion to the District Court, which would have

surely been denied, and then pursue such a Motion before this Court before

Defendants could seek termination of the license provided under the at issue BSTS

pursuant to which another payment is due on or before September 21, 2021.


### (5) Decision requested by

A ruling on this Emergency Motion is needed as soon as possible but not

later than September 21, 2021, as Defendants have already threatened "Descendent

will be terminating the BSTS and the IP license contained therein for material

breach based on Little Orbit not complying with the Court order" and September

21, 2021, is when the next payment is due under the BSTS.


DATED: August 24, 2021          **LAW OFFICE OF M. DANTON**
                                **RICHARDSON**


                           By: ___/s/ M. Danton Richardson_____
                                     M Danton Richardson

                                *Attorney for Plaintiff/Appellant,*
                                LITTLE ORBIT LLC

## I.    INTRODUCTION

Appellant, LITTLE ORBIT, LLC ("Little Orbit"), appeals from a July 27, 2021, Order denying Little Orbit's Motion to Set Aside a Binding Settlement Terms Sheet ("BSTS") and granting Defendants/Appellees DESCENDENT STUDIOS INC. and ERIC PETERSON's (collectively "Descendent") subsequently filed Second Motion to Enforce the BSTS without even waiting for Little Orbit to submit an opposition thereto.[2]  The BSTS was hastily drafted during a settlement conference with Magistrate Judge John D. Early and merely set forth a short-hand version of key deal points lacking details or specifics and for which there was no meeting of the minds on key issues, or clear mistake on the part of Little Orbit.

The District Court considered Defendants' Motion to Enforce in ruling on Little Orbit's Motion, effectively treating it as a sur-reply, as was obviously intended by Defendants since their Motion expressly referred to and addressed points raised in Little Orbit's Motion in violation of the Court's own courtroom rules and Local Rule 7-10.  Had Little Orbit been giving a chance to respond, it would have supplied bank statements to show financial stability and ample funds

---

[2] A true and correct copy the District Court's July 27, 2021, Order is attached hereto as **Exhibit A**.

5

to complete the Game. Little Orbit would have proved via email communications from Defendants that they refused to turn over the game code multiple times until well into June 2021, more than six full months after the BSTS was signed, and the lack of current game code was the real reason Little Orbit could not start development. Additionally, the multiple Stipulations and Requests by the parties for the District Court to extend its jurisdiction reflect the parties were still actively engaged in negotiating the terms of a long form agreement as well as an agreement with a third party (InterPlay) as late as April 16, 2021: "WHEREAS the parties are still working to finalize their settlement, including necessary negotiations with a third party as provided for in the parties' agreement to settle as worked out by Magistrate Early, and jointly desire for the Court to retain jurisdiction for an additional sixty (60) days." [April 16, 2021, Stipulation and Request for Court to Retain Jurisdiction, App. Vol. 4, at 245].

The District Court not only granted Defendants' Motion without providing Little Orbit an opportunity to respond, but thereby deprived Little Orbit the opportunity to show the falsity of Defendants' newly raised arguments. The District Court even expressly and repeatedly referred to points made in Defendants' Motion as grounds for denying Little Orbit's Motion (again, without the benefit of any response from Little Orbit). The District Court's handling of the

6

two Motions was blatantly unfair, deprived Little Orbit of due process and resulted in a ruling based on a false set of facts.

An emergency Order staying the District Court's July 27, 2021, Order is necessary to maintain the *status quo* pending this appeal and to prevent Little Orbit's rights under the BSTS from being terminated by the lapse of time rendering this appeal moot. This need is best evidenced by an August 9, 2021, email from Defendants' counsel stating: "Descendent will be terminating the BSTS and the IP license contained therein for material breach based on Little Orbit not complying with the Court order."[3]

Without a Stay of the Order, Little Orbit's appeal will become moot and Little Orbit will be irreparably harmed by the loss of its investment of millions of dollars in the video game.

## II.   BACKGROUND FACTS

This dispute arises out of a Development Agreement for a video Game. Little Orbit is a worldwide video game developer and publisher of over 20 games on all relevant gaming platforms including "Kung Fu Panda: Showdown of

---

[3] A true and correct copy of the email is attached hereto as **Exhibit B**.

Legendary Legends", "Adventure Time: Finn and Jake Investigations", "Young Justice", "Falling Skies the Game", "APB Reloaded," and "Fallen Earth." Little Orbit continues to pioneer electronic entertainment for consumers of all ages. Scott Decl., ¶ 3 [App. Vol II, at 178].

Defendant Descendent Studios ("Descendent") was formed by Defendant Eric Peterson and others to develop a new version of the groundbreaking "Descent" video game previously released by InterPlay (the "Game"). They ran an initial Kickstarter campaign in 2015 which raised over $600,000. After running out of funding, they released a partial game in Steam's Early Access program which brought in more money. Then when Descendent ran out of funds again, in August of 2017 it solicited Little Orbit's financial assistance in completing development of the Game and promised not only to deliver a completed game but an assignment of the "Descent" license which Descendent had obtained from InterPlay as part of the "Development Agreement" the parties entered into. This Development Agreement allowed for Little Orbit to have a higher royalty amount till it recouped 200 percent of its development fees, and it allowed for standard video game industry deductions to be subtracted before calculating any royalty payable to Defendant. Some of these standard deductions included marketing, sales commissions, server hosting, localization costs, returns, licensor royalties such as the Unreal Engine, and VAT expenses. Effectively, since the Game would require a large amount of

ongoing costs, the parties agreed that after an initial recoup by Little Orbit, they would split the profits with ▇ percent going to Little Orbit and ▇ percent going to Descendent. However, over the course of development, the Game suffered lengthy delays that forced Little Orbit to take on all studio development costs of Defendants for about 8 months. Additionally, Little Orbit had to cover significant budget overruns in localization and music. *Id.* at ⁋ 4.

Little Orbit instituted this action as a result of Descendent's breach of its contractual obligations under the Development Agreement and a Terms Sheet addendum by failing to timely deliver a completed Game meeting the specifications and requirements of the parties' agreements and also failing to complete the assignment of the "Descent" trademark license (and other claims as more fully addressed in the First Amended Complaint in this action). *Id.* at ⁋ 5.

Little Orbit's original commitment to fund the completion of the Game was ▇▇▇▇▇ but given Descendent's delays and repeated failure to meet the required development milestones Little Orbit's investment in the Game ultimately totaled over ▇▇▇▇ even though the Game was far from complete when Little Orbit finally terminated the Agreement due to Descendent's failure to deliver. *Id*. at ⁋ 6.

Shortly after receiving the notice of breach from Little Orbit, Defendant immediately revoked all access to Descendent's Source Code and Source Art Asset repositories hosted by a third-party provider known as Gitlabs.com. This was done

to intentionally prevent Little Orbit from proceeding with the Game on their own. The Source Code repository contained the history and complete Game project code that had been created, modified, or deleted since the Game's inception prior to the 2015 Kickstarter campaign. The Source Art Asset repository contained the original full resolution artwork that was paid for during the Game's development since the Game's inception. These Source Art Assets consisted of the original artwork for 3D models, 2D textures, audio files and more. They included full resolution sculptures in 3D Max, Maya, Zbrush and more. They included high resolution texture files in Photoshop, GIMP, and more. They included uncompressed WAV files. These are distinctly different art assets from the compressed or lower resolution versions that were exported into the Game project specifically to match the Unreal Engine specifications for the platforms that were being developed for during 2014-2019 such as lower end PCs, Xbox One, or PS4. *Id*. at ¶ 7.

The parties participated in a Settlement Conference with Magistrate Judge Early on November 17, 2020. During the negotiations between the parties, through Judge Early, as well as some separate discussions Mr. Scott had with Mr. Peterson, the focus was on which company would have the right, and in turn the substantial financial obligation, to complete and release the Game. It was quickly agreed to be Little Orbit given that Defendants have no current employees, Descendent Studios

is not an operational entity, and the still substantial investment needed to complete the Game. *Id*. at ⁋ 8.

The royalty split agreed to between the parties in the BSTS nearly exactly matched what was agreed to in the parties' original Agreement and it was my understanding, given that prior split was the reference point and foundation for such discussions, would be subject to the same standard deductions as provided for in the Development Agreement. It was Little Orbit's understanding that it was negotiating over the royalty rate, not the costs and expenses which could be deducted from revenues in paying such royalty. Little Orbit never understood otherwise as Defendants never brought up any claim nor argument that the standard industry accepted deductions would not be allowed. Most importantly, Little Orbit would never have agreed to any settlement providing for a ███ royalty that escalated to a ███ royalty if standard deductions were not to be allowed as that would greatly reduce the potential profitability of investing another million dollars on top of the already ████████ invested in the development of the Game by Little Orbit. *Id*. at ⁋ 9.

Between December 2020 and April 2021, the parties attempted to flesh out the substance of the BSTS into a long form agreement, but the parties were never able to agree due to a couple of key disputes as to the "fine print" regarding some of the terms. During this same time, Little Orbit attempted to negotiate a new

trademark license agreement with InterPlay, but those efforts were ultimately

unsuccessful as InterPlay demanded significantly more onerous terms than under

the original license agreement. [April 16, 2021, Stipulation and Request for Court

to Retain Jurisdiction, App. Vol. 4, at 245].

In May of 2021, Descendent brought their first Motion to Enforce the BSTS

once the parties' efforts to enter into a long form agreement broke down, claiming

Little Orbit was in breach for not having made payments due. That Motion was

referred to Judge Early and was denied as premature. Given the parties failure to

enter into a long form agreement, Magistrate Early also determined that the

triggering date for the timing of the payments due under the BSTS would run from

the date of the hearing (May 24, 2021). A true and correct copy of Judge Carter's

Order adopting Magistrate Early's ruling is attached hereto as **Exhibit C.**

Even though Little Orbit previously and repeatedly asked Descendent to

deliver all of the game IP assets covered by the BSTS, no game code or assets were

delivered. Finally on June 15, 2021, Descendent produced a snapshot copy of the

game code as it existed on some unknown date. It is critical to note that up until

that time, Little Orbit was not in possession of the current game code to meet their

obligation in the BSTS and finish development of the Game. When Little Orbit

demanded Descendent deliver "the full source code and the entire project history,"

Mr. Peterson advised that the "project history no longer exists" and that all Little

Orbit needed is the code (even claiming there was no obligation to deliver anything to Little Orbit). [Scott Decl., ₱ 18, App. Vol. II at 183-84]

The code alone is inadequate for a number of reasons[4] but most importantly, the terms of the BSTS provides for a license of "all game IP" – not just the code. [BSTS, No. 12, App. Vol. IV at 164] Little Orbit was left no choice but to file its Motion to Set Aside the BSTS. [App. Vol. II at 223]

In response, Descendent argued that it had provided all that was needed to complete the game in providing the un-editable "snapshot" of the game code from some earlier date and later filed its own second motion to enforce the BSTS. [App. Vol II at 68] This second motion argued new claims and asserted that Little Orbit owed Descendent the first two payments totaling ███████ despite the fact that the second payment in the BSTS is due 120 days from signing the long form agreement, or May 24, 2021, according to Judge Early's ruling. 120 days from May 24, 2021, is September 21, 2021. Additionally, Defendants asserted Little Orbit would be in material breach by missing the first and second payment and the remedy would be for Little Orbit to forfeit all rights to the Game. Lastly, they argued that the 12-month timeline for completing development should start from

_____

4 Such reasons are addressed in the Scott Decl., ₱ 22, App. Vol II at 185-86.

13

the November 17, 2020, date of the BSTS, notwithstanding the fact the Defendants had only recently delivered a copy of the game code. Little Orbit believes Defendants made this argument, in spite of knowing they intentionally withheld the game code and other assets until June 15, 2021, because by shortening the development time, Defendants obliviously hoped to prevent Little Orbit from completing the Game on time. Had Little Orbit been given the opportunity to oppose the motion, it would have clearly proven Defendants' repeated refusal to turn over the current game code until June 15, 2021, and Little Orbit would have pointed out that Judge Carter had already determined that May 24, 2021, would be the trigger date for obligations in the BSTS running from the execution of a "written memorialization" which includes the one-year deadline to release the Game.

It is clear Judge Carter was mistaken in his ruling citing "After signing the Settlement Terms Sheet and receiving the game code, Plaintiff could have started developing the Game." The parties signed the BSTS on November 17, 2020, but Descendent did not deliver game code till June 15, 2021, nearly seven months later, and did not deliver the rest of the Game IP and source assets until June 29, 2021. This latter delivery of the full game IP and source assets on June 29, 2021, was obviously prompted by and only occurred as a result of Little Orbit filing its Motion to Set Aside. Prior to the filing of Plaintiff's Motion Defendants had

14

maintained that such assets "no longer exist." It took a motion for the Defendants to finally locate and provide such assets.

The District Court issued its Order denying Little Orbit's Motion and granting Descendent's Second Motion to Enforce the BSTS without allowing Little Orbit to file an opposition thereto. This appeal followed.

## III. LEGAL STANDARDS

A court must consider four factors in evaluating whether to issue a stay: "(1) whether the stay applicant has made a strong showing that he is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Nken v. Holder*, 556 U.S. 418, 434, 129 S. Ct. 1749 (2009). "The first two factors of the traditional standard are the most critical." *Id.*

A moot action is one where "the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Murphy v. Hunt*, 455 U.S. 478, 481, 102 S.Ct. 1181, 1183 (1982) (per curiam). "[A] case 'becomes moot only when it is impossible for a court to grant any effectual relief whatever to the prevailing party.'" *Chafin v. Chafin*, 568 U.S. 165, 172, 133 S. Ct. 1017, 1023

(2013) (quoting *Knox v. Service Employees*, 567 U.S. 298, 307, 132 S.Ct. 2277,

2287 (2012) (internal quotation marks omitted).)

## IV. ARGUMENT

An immediate stay pending appeal is warranted. Little Orbit is likely to

prevail on appeal and Little Orbit will be irreparably harmed without a stay. A

stay will not substantially harm Defendants, and the public interest supports a stay.

### A. Little Orbit Is Likely to Succeed on The Merits

#### 1. The District Court Granted Defendants' Motion to Enforce without Allowing Little Orbit to File a Response Thereto

The District Court granted Defendants' Motion to Enforce just 6 days after it

was filed and before Little Orbit's opposition was due, in violation of FRCP (Rule

7(c)(2)), Central District Local Rule 7-9, the Judge's own rules and denied Little

Orbit due process and fundamental fairness. The essence of procedural due

process is that "[persons] whose property interests are at stake are entitled to

'notice and an opportunity to be heard.'" *Dusenbery v. United States*, 534 U.S.

161, 167, 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002) (quoting *United States v. James

Daniel Good Real Prop.*, 510 U.S. 43, 48, 114 S. Ct. 492, 126 L. Ed. 2d 490,

(1993)).

Descendent's Motion to Enforce the BSTS raised four (4) disagreements: 1)

the meaning of the term "revenues"; 2) the remedy for failure to make the up-front

payments called for in the BSTS; 3) whether the ███ split of the first ███████ in revenues provided for in Paragraph 4 of the BSTS is Descendent's sole remedy for Little Orbit's failure to make the three payments required under the BSTS, at Paragraphs 1 through 3; and 4) that Little Orbit has threatened not to market or promote the Game if Descendents' definition of "Revenues" as gross income or gross receipts is enforced or accepted. Descendent's position on each of these issues is untenable and without merit.

### 2. There was No Meeting of the Minds Regarding the Meaning of "Revenues"

Descendent readily admitted the interpretation of "revenues" was never discussed during the mediation that led to the BSTS.[5] Descendant further admitted the original Agreement used the term "Net Sales"[6] but jumped to the conclusion that because "Net Sales" was never discussed during the mediation and settlement negotiations "Revenues" as used in the BSTS means gross income and gross receipts.[7] That is not the case. Little Orbit always believed the primary terms dealing with the income would be consistent with the parties' original Agreement

---

[5] Descendent's Motion to Enforce the BTST. [App Vol II at 69:4-6]

[6] Motion at p. 2:14-15. [App Vol II at 69:14-15]

[7] Motion at p. 2:16-19. [App Vol II at 69:16-19]

which allowed Little Orbit to deduct certain costs prior to splitting income. The language was clear on payments and the splitting revenues in the Agreement and did not need redefinition. It is quite apparent there was never a meeting of the minds regarding the essential term "revenues" and, therefore, no binding agreement at the Settlement Conference. The very fact that Descendent had to define "revenues" as meaning "gross revenues" in its Motion evidences the term "revenues" - in and of itself is – is not clear and needed further definition, which the parties were unable to resolve in trying to enter into a long form agreement.

The settlement discussions focused on the percentages to be split between the Parties – not on changing the definition or calculation applicable to income to be generated by the game. In fact, there was not a single mention of changing the type of deductions that would be made before paying out royalties to Descendent. Little Orbit's intention in the settlement and its understanding of "revenues" was to give Descendent the same general split they would have earned from the agreement in dispute between the parties. In doing so Little Orbit made a very generous offer to erase any penalty for Descendent's misconduct alleged in the Complaint and made clear it would continue to pursue the lawsuit if settlement negotiations failed. Descendent's later claim that no deductions should be allowed would give it exponentially better terms than the original Agreement and saddle Little Orbit with all costs associated with the release and maintenance of the game.

That would be grossly unfair and totally contrary to the parties' prior Agreement and course of conduct, which provided the starting point for the parties' negotiations, not to mention industry custom and practice.

It also would be contrary to the spirit of cooperation the parties came to in agreeing to the BSTS, which requires Little Orbit to fully fund the approximately additional ▓▓▓▓▓ dollars it will take to complete the development of the game, on top of the already more than ▓▓▓▓▓ Little Orbit invested in the development of the game. There was simply no logical reason for Little Orbit to assume all the liabilities yet give such one-sided reward to Descendant especially considering Little Orbit believed it would prevail in the lawsuit. If "revenues" is going to be given such an interpretation, agreeing to same was clearly a mistake on the part of Little Orbit.

Some examples of industry standard deductions include ongoing monthly User Acquisition marketing costs that can cost upwards of 30% of gross revenue. Without initial and ongoing marketing, the Game will fail to attract players and stop earning money. Furthermore, the Game requires ongoing content and features to be added. Without new content, players get bored and leave the Game. Additionally, the Game provides multi-player functionality which must be supported by servers in "hosting sites" that allow players from around the world to access the game through the internet. The costs associated with maintaining such

host sites are a standard "cost of doing business" which are customarily deducted before any royalty payments are determined. Without the servers, the multi-player functionality, which accounts for half of the Game's features, will not work.

In support of their Motion Little Orbit supplied the Mirriam-Webster's dictionary definition for "revenues" as "the gross income returned by an investment". [Scott Decl., ⁋ 12, App Vol II at 181-82; and Request for Judicial Notice, Exhibits A – D, App Vol II 138]. This view is consistent with Little Orbit's perspective while negotiating the BSTS. It acknowledges that both parties have invested funds or time into the Game, and like all investments, income is returned as profits after deducting the costs of operating the investment.

The original Development Agreement contained royalties for Descendent that scaled up to ▮▮ after removing defined deductions. Despite the horrific history of working together, Little Orbit intended the BSTS to essentially give Descendent their original terms which consisted of royalties that scaled up to ▮▮. However, Defendants' attempt to recast the definition of "revenues" to "gross revenues" radically changes the ▮▮ split contemplated in the BSTS.

In Defendants' scenario, Descendent would get ▮▮ of the money charged to the end player regardless of the distribution and other costs required to keep the Game online. Descendent's definition not only ignores the previous context of the agreements between the parties, but it also dismisses the definition for "revenues"

20

that Little Orbit supplied which matches the previous agreement. It also presents a scenario that is far from sustainable as a business model. Defendants' definition would leave Little Orbit in a situation where, after spending an additional ▮▮▮▮ or so dollars to launch the game, Little Orbit would lose money every month. It would be the equivalent of two investors agreeing to put money into a restaurant, but one investor arguing they get ▮▮▮ of every $1 spent by customers, while the other investor spends all their time actually operating the restaurant, paying for food, funding the staff, and covering the rent all out of their ▮▮▮ Companies make money based on their profit margin, the percentage difference between the cost of bringing something to market and the money they collect from it being sold. Companies rarely achieve profit margins over 20-30%. Using Descendent's definition of "revenues", which only leaves ▮▮▮ of gross revenue for Little Orbit, it would be impossible to pay for 30% distribution and 30% User Acquisition marketing without losing money, and that does not take into account any costs for ongoing development or server hosting. (It is in this context that the statement by Mr. Scott that Little Orbit would not spend on marketing must be understood. That statement occurred, without advice of counsel, during the back and forth between the parties trying to work out their disagreement as to the meaning of "revenues." The point was, if Little Orbit is saddled with all the costs it may not spend on marketing like it otherwise would.)

It is important to note that Descendent is out of business and has no staff or other overhead. By contrast, Little Orbit has millions in debt related to the failure to ship the Game. This means that any money earned by Descendent from the Game will be profit. But Little Orbit would need to earn ████████ dollars just to break even on their investment. It is critical that Little Orbit be given a fair chance to finish development and take the Game to market. Descendent has no revenue to finish the Game. If Defendants take control of the development, they will need to seek a third party like InterPlay to pay for the remaining work and to publish the game. InterPlay or any other publisher would require the same definition of "revenues" that Little Orbit reasonably believed was appliable as that is the way this business operates - such publisher will deduct all costs before paying royalties to Descendent. This will drastically reduce the amount of money received by Little Orbit and all but insure there will be no chance for Little Orbit to recoup the money it has invested.

At bottom, there was never a meeting of the minds on all essential terms of the settlement agreement and therefore the BSTS is not an enforceable agreement under California law.

### 3. The Order Does Not Address the Remedy Provision Regarding Missing any Payments

Descendant also argued the BSTS required three payments from Little Orbit to Descendent, two of which were due within 120 days of signing a written memorialization, and neither of those first two payments has been made. First of all, payments were due from the date the parties entered into a "written memorialization" not from the date of the Settlement Conference as argued by Defendants in their Motion. Rather, the District Court started the clock running on May 24, 2021. See Order Dated June 17, 2021. Second, even if Little Orbit had not paid any of the upfront payments provided for in the BSTS the remedy for such nonpayment was expressly set forth as follows: "4. If any payment not made on time, LO pays Descendent ██████ of first ████ in revenues after default."[8] Descendent now interprets this as intending to address only the timing of payments, and not to establish an exclusive remedy for Little Orbit's failure to make one or more payments. However, the express language is quite the contrary. It expressly states that if "ANY" payment is not made on time Little Orbit is to pay Descendent ██ of the first ███████ in revenues. The language expressly provides for Descendent's remedy in the event Little Orbit defaults on ANY

---

[8] See BSTS, All Vol IV at 164.

payment. The purpose of the clauses read together was to provide for either money upfront to Defendants, but if that was not paid, the Defendants would get a bigger share of the first ███████ in revenues (███████) as opposed to the otherwise applicable split (███). To read that clause as Defendants are now trying – that is – Descendent gets the upfront payments AND the bigger percentage of the first ███████ in revenues, would turn the remedy clause into an unlawful penalty.[9]

Read as Defendants contend, the penalty provision would constitute an unenforceable illegal penalty under Cal. Civil Code section 1671, subdivision (b): "[A] provision in a contract liquidating the damages for the breach of the contract is valid unless the party seeking to invalidate the provision establishes that the provision was unreasonable under the circumstances existing at the time the contract was made."

In interpreting this statute, the California Supreme Court has noted: "A liquidated damages clause will generally be considered unreasonable, and hence

---

9 See *Ridgley v. Topa Thrift & Loan Ass'n,* 17 Cal.4th 970, 977-78, 73 Cal.Rptr.2d 378, 382 (1998) ("[a]n amount disproportionate to the anticipated damages is termed a 'penalty.' A contractual provision imposing a 'penalty' is ineffective, and the wronged party can collect only the actual damages sustained." *Perdue v. Crocker National Bank* (1985) 38 Cal. 3d 913, 931 [216 Cal. Rptr. 345, 702 P.2d 503]; *see also Ebbert v. Mercantile Trust Co. (1931) 213 Cal. 496, 499 [2 P.2d 776]* ["[A]ny provision by which money or property would be forfeited without regard to the actual damage suffered would be an unenforceable penalty."].)

unenforceable under section 1671 [, subdivision](b), if it bears no reasonable relationship to the range of actual damages that the parties could have anticipated would flow from a breach. The amount set as liquidated damages 'must represent the result of a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained.' [Citation.] In the absence of such relationship, a contractual clause purporting to predetermine damages 'must be construed as a penalty.' " (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378, 953 P.2d 484).

That is clearly the case here just on the face of such clause as it would add up to a ▮▮▮▮▮ penalty for simply being late with any one or more of the payments required. A penalty of almost double the total amount due of ▮▮▮▮▮ (or 7 times either of the required ▮▮▮▮ payments) simply cannot be, as a matter of law, an estimate of "a fair average compensation for any loss that may be sustained" for simply being late with a payment. Rather, as is clear, such penalty was to make up for any or all missed payments. Otherwise, it would be an unenforceable illegal penalty as the amount bears no rational relation to any alleged loss that could be suffered by Defendants simply for a payment being late.

### 4. Defendants' Motion Provided a False Narrative Accusing Little Orbit of Being Unable to Fund the Payments Provided for Under the BSTS or Development of the Game

Little Orbit was not allowed any opportunity to respond to Defendants' claims in their Motion that Little Orbit should be required to provide Defendants' "with proof of funds, bank and financial statements, and adequate assurance of due performance." It should be remembered that Descendent is out of business and never developed a single product which has made it to market. Little Orbit, on the other hand, is an active entity with over 20 video games in the market place. Even the evidence presented by Defendants reflects Little Orbit had $170,000 on hand as of the time the first payment of ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮. Thus, this false narrative that Little Orbit cannot afford the at issue payments is just that – false. In fact, as it previously offered to do but which was rejected by Defendants' counsel, Little Orbit has since deposited $250,000 into its attorney's client trust account to show proof of the funds necessary to cover the upfront payments should those need to be made. Richardson Decl., ⁋ 6.

### 5. The District Court Improperly Considered the Un-Responded to Arguments in Defendants' Motion to Persuade it to Deny Little Orbit's Motion to Set Aside

In denying Little Orbit's Motion to Set Aside the BSTS based on Little Orbit's mistaken understanding of the term "revenues" (if Defendant's interpretation of same as "gross revenues" were to prevail) the District Court found

"There was no reasonable basis for Plaintiff to mistakenly define 'revenues,'"
based on its finding that "the Development Agreement had been terminated, and
the parties' relationship under the Settlement Terms Sheet also differs from that
under the Development Agreement. Mot. to Enforce at 7." As can be seen, the
District Court relied on Defendants' recently filed Motion to Enforce to rule on
Little Orbit's Motion to Set Aside without ever allowing Little Orbit to address the
additional evidence and argument raised by Defendants in their Motion. This
wrongfully allowed Defendants to submit a "sur-reply" to the District Court which
should not have been allowed nor considered by the District Court in ruling on
Little Orbit's Motion. In fact, Judge Carter's own Courtroom rules do not allow a
sur-reply without prior authorization by the Court: "No supplemental brief(s) or
sur-reply briefs may be filed without leave of Court. Local Rule 7-10."
https://www.cacd.uscourts.gov/honorable-david-o-carter

Local Rule 7-10 provides: "Reply Papers. A moving party may, not later
than fourteen (14) days before the date designated for the hearing of the motion,
serve and file a reply memorandum, and declarations or other rebuttal evidence.
Absent prior written order of the Court, the opposing party shall not file a response
to the reply." (Emphasis added.) Descendent did not obtain prior approval from
the District Court to file its Second Motion to Enforce Settlement and it was,

therefore, an unauthorized sur-reply to the extent it sought to address matters at issue in Little Orbit's Motion to Set Aside.

Had Little Orbit been allowed the chance to respond to Defendants' Second Motion to Enforce, Little Orbit would have shown that the royalty splits are only slightly different than those provided in the Agreement. From Little Orbit's point of view at least, the Agreement was the starting point and the foundation to the parties' settlement negotiations. It did not matter that the Agreement had been terminated – that very agreement is what was in dispute in this action and whether it had been rightfully or wrongfully terminated and which party breached the Agreement.[10] Defendants argue as if the BSTS was an entirely new agreement

---

10 Defendants argue in their Motion that Little Orbit breached the development agreement by "failing to complete the application program interface 'API' that Little Orbit demanded and promised to complete itself but then failed to complete." Motion at p. 6, footnote 3. API refers to a software interface that allows two applications to talk with each other based on a set of definitions and protocols. What Little Orbit failed to advise the District Court was that under the Agreement, the API was the responsibility of Descendent. However, the evidence would show Descendent was unable to deliver working APIs and after multiple attempts to get Descendent to complete the required APIs Little Orbit stepped in to help to complete the APIs after it became clear Descendent could not do so. There are multiple APIs – each has a definition of functions and parameters and 2 sides to implement, the game side and the server side. Little Orbit tried to help to complete the server side of the APIs out of frustration given Descendent's failings. Descendent never delivered the definition or implements to core pieces of the APIs from the game side so Little Orbit was never able to complete the server side of the API. In any event, Little Orbit trying to help with the API cannot be a breach by Little Orbit as the API was still Descendent's responsibility.

unrelated to anything before it but that argument is absurd given what came before regarding the development of the Game, *i.e.*, the prior relationship as defined in the Agreement, was, in fact, the starting point for the parties' settlement negotiations. In other words, those settlement discussions did not start from scratch, nor did they occur in a vacuum. So, it is only logical that the parties' prior relationship as defined by the Agreement informed the parties in their negotiations.

### 6. The District Court Erred in Ruling that the One Year for Little Orbit to Release the Game Runs from November 2020

The District Court also denied Little Orbit's request to confirm that the one-year time period for Little Orbit to release the game should run from the time Descendent finally turned over the game IP assets on "June 29, 2021, or, at the very earliest, May 24, 2021 (the date that Judge Early determined Plaintiff's payment obligation should begin)." Notably, the District Court had previously accepted Judge Early's recommendation by its Order dated June 19, 2021, which expressly held that:

> To the extent the Settlement Agreement (Dkt. 48-1 (under seal)) used the phrase "within [ ] days of signing [a] written memorialization" or similar language as a triggering event, such trigger date shall be the date of the Report and Recommendation, that is, May 24, 2021;"

A true and correct copy of this Order is attached as **Exhibit C**.

As such, the triggering date for the release of the game – which is also based on the same "triggering event" language - should have been no earlier that May 24, 2021. Nonetheless, contrary to its own prior ruling, the District Court accepted the un-responded to arguments made by Defendants (*i.e.*, that Little Orbit had delayed developing the game) to deny Little Orbit's Motion and find that "Plaintiff is not entitled to any deadline extension, and orders Plaintiff to pay what it owes to Defendants."

First and foremost, Little Orbit was not seeking any "deadline extension" for the release of the game but simply confirmation that such deadline ran from no earlier than May 24, 2021, based on the District Court's own earlier ruling that the "triggering language" in issue started the deadline on May 24, 2021.[11] By citing to the Defendants' Motion to Enforce in denying Little Orbit's Motion the District Court again improperly considered those not yet responded to arguments in Defendants' Motion as an improper sur-reply.

By not waiting for Little Orbit to file its response to Defendants' Motion the District Court only considered one side of the argument and totally bought into Defendants' false characterization of the issue as Little Orbit delaying

---

11 It really should not have started running until the date "all game IP assets" had been provided to Little Orbit on June 29, 2021.

development and then seeking an "extension." That was not the case as explained

above and, as noted, the District Court's ruling is contrary to the District Court's

earlier ruling that the "trigger date shall be the date of the Report and

Recommendation, that is, May 24, 2021." That prior ruling was law of the case (if

not final) and should have been followed in ruling on Little Orbit's Motion. *Askins*

*v. United States Dep't of Homeland Sec.*, 899 F.3d 1035, 1042 (9th Cir. 2018)

("The law-of-the-case doctrine generally provides that 'when a court decides upon

a rule of law, that decision should continue to govern the same issues in subsequent

stages in the same case.'" (Citing *Musacchio v. United States*, 136 S.Ct. 709, 716,

193 L.Ed.2d 639 (2016)).

### 7. The District Court Erred In finding that Two Payments were Due under the BSTS

The District Court also found "Plaintiff has also failed to make the *first two*

*settlement payments* to Defendants and has 'plainly stated that it has no intention

of making any of the agreed upon monetary settlement payments'. *Id.*" Order at p.

8 (emphasis added). But this is plainly false as there was only one payment that

had become due by the time of the District Court's ruling as the second payment is

not due until 120 days from the "triggering date", which under the District Court's

June 17, 2021, Order (Exhibit C) is May 24, 2021. That means the second

payment is not due until no earlier than September 21, 2021, and the District

Court's finding the second payment had not been made is clearly erroneous.

### 8. The District Court Should Have Conducted an Evidentiary Hearing Regarding the Parties Dispute as its Terms

Given the fact the parties were disputing the terms of the settlement, the

District Court should have scheduled the matter for an evidentiary hearing:

> Ordinarily, a district court is empowered to enforce a settlement agreement through summary proceedings. *Callie v. Near*, 829 F.2d 888, 890 (9th Cir. 1987); *see also Russell v. Puget Sound Tug & Barge Co*., 737 F.2d 1510, 1511 (9th Cir. 1984). However, where the parties dispute the existence or terms of the agreement, an evidentiary hearing is required. *Callie*, 829 F.2d at 890.

*Adams v. Johns-Manville Corp.,* 876 F.2d 702, 708 (9th Cir. 1989).

An evidentiary hearing is needed. Having failed to conduct such a hearing,

the District Court's Order should be reversed, and the matter remanded for an

evidentiary hearing.

### 9. Little Orbit Will Do What is Reasonably Required to Market the Game Once the Issues Regarding the BSTS Are Resolved

Little Orbit made no such threat not to promote or market the Game.

Plaintiff has invested substantial funds into the Game and is not willing to abandon

its investment. It will certainly market and promote the Game.

**B.     Little Orbit Will Be Irreparably Injured Absent a Stay**

An irreparable injury is defined as an actual and concrete harm, or the imminent threat of an actual and concrete harm. *Los Angeles Memorial Coliseum Commission v. National Football League,* 634 F.2d 1197, 1200 (9th Cir. 1980). Absent a stay Descendent has already determined to back out of the Development Agreement as set forth in the email from their counsel. See **Exhibit A.** Furthermore, if a stay is not issued, the passage of time will essentially void the agreement and moot this appeal since all of the key dates set forth in the BSTS will have passed. If that happens, Little Orbit will lose the                          it has invested in the development of the game with no source of compensation since Descendent is a defunct entity with no resources to pay any money judgment to Little Orbit.

**C.     Issuance Of a Stay Will Not Substantially Injure Descendent**

Descendent is a defunct entity and is out of business. Little Orbit has been funding the development since Descendent ran out of funds years ago. Issuing a stay of the July 27, 2021, Order and BSTS pending this appeal will not injure Descendent in any way. However, Little Orbit will lose its entire investment of millions of dollars if a stay is not issued.

**D.     The Public Would Benefit From a Stay**

Issuing a stay will provide an opportunity for the parties to complete this appeal and obtain a definitive ruling on the disputed issues so they can jointly go forward to complete and disseminate the video game which the gaming public has been awaiting.

**E.** **Absent A Stay of The District Court's July 27, 2021, Order and The BSTS This Appeal Will Become Moot Resulting In Irreparable Injury To Little Orbit**

"A case becomes moot whenever it 'loses its character as a present, live controversy of the kind that must exist if we are to avoid advisory opinions on abstract propositions of law.' " *West v. Secretary of the DOT*, 206 F.3d 920, 924 (9th Cir. 2000) (citation omitted). If the July 27, 2021 Order and the BSTS are not stayed pending this appeal, the timeline for completion of the game under the BSTS will have expired of its own terms and the issues in this appeal will become moot. Little Orbit will lose the millions of dollars it has expended in development of the game with no means of recovery, as Descendent is a defunct entity. A stay of the July 27, 2021, Order and the BSTS is essential to avoid mooting this appeal and furthering the goal of dispensing equity and justice to the parties.

**V.** **CONCLUSION**

For the foregoing reasons, good cause exists for this Court to issue a stay of the July 27, 2021, Order and BSTS pending this appeal. If a stay is not issued this appeal will become moot, since the time to complete the game set out in the BTST will have expired and Little Orbit will suffer the irreparable loss of millions of dollars if it is not allowed to complete the video game. Based on potential mootness of this appeal or irreparable injury to Little Orbit the Court should enter

an Order staying the District Court's July 27, 2021, Order and tolling all deadline

under the BSTS until this appeal has been decided.

DATED: August 24, 2021        **LAW OFFICES OF M. DANTON
                              RICHARDSON**

                              By:  /s/ M. Danton Richardson
                                    M Danton Richardson
                                    ***Attorney for Plaintiff/Appellant,***
                                    LITTLE ORBIT LLC

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing motion does not comply with the type-volume limitation of Fed. R. App. P. 27 because it contains 7,865 words. Appellant is filing contemporaneously herewith a Motion for Permission to File Oversized Emergency Motion for Stay. This motion complies with the typeface and the type-style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

# EXHIBIT A

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES – GENERAL

Case No. 8:20-cv-00089-DOC-(JDEx)                    Date: July 27, 2021

Title: LITTLE ORBIT LLC V. DESCENDENT STUDIOS INC. AND ERIC
      PETERSON

---

PRESENT:

### THE HONORABLE DAVID O. CARTER, JUDGE

| Kelly Davis | Not Present |
|---|---|
| Courtroom Clerk | Court Reporter |

| ATTORNEYS PRESENT FOR PLAINTIFF: | ATTORNEYS PRESENT FOR DEFENDANT: |
|---|---|
| None Present | None Present |

---

**PROCEEDINGS (IN CHAMBERS):**   **ORDER DENYING PLAINTIFF'S MOTION TO SET ASIDE THE BINDING SETTLEMENT TERMS [88] AND GRANTING DEFENDANTS' SECOND MOTION TO ENFORCE THE BINDING SETTLEMENT TERMS [96]**

     Before the Court is Plaintiff Little Orbit LLC's ("Plaintiff") Motion to Set Aside the Binding Settlement Terms Sheet ("Motion to Set Aside") (Dkt. 88) and Defendants Descendant Studios and Eric Peterson's (collectively, "Defendants") Second Motion to Enforce the Binding Settlement Terms Sheet ("Motion to Enforce") (Dkt. 96). The Court finds this matter appropriate for resolution without oral argument. Fed. R. Civ. P. 78; C.D. Cal. R. 7-15. The Court hereby **DENIES** the Plaintiff's Motion to Set Aside and **GRANTS** the Defendants' Motion to Enforce.

Case 8:20-Cas8:0089585552,-JDSE242D2021mEnt 822 1PFFI320 07/2T/21ty: PatgePage 39 Page ID #:1424

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                    Date: July 27, 2021

                                                     Page 2

## II.    Background

### A. Facts

In 1995, major video game developer and publisher Interplay Productions Corp. ("Interplay") released Descent, a first-person shooter ("FPS") game. Mot. to Set Aside at 6. Descent was a commercial success: together with its sequel, Descent II, it sold over 1.1 million units as of 1998. *Id.* at 7.

In or around November 1994, several former game developers, including Defendant Eric Peterson ("Peterson"), announced that they were forming Defendant Descendent Studios ("Descendent") to work on a game ("Game") similar to Descent in play style. *Id.* Peterson is and was the CEO of Descendant. *Id.*

Through a Kickstarter campaign, Descendent raised over $600,000 for the development of this new game. *Id.* Descendent also entered into a license agreement with Interplay to use the "Descent" name for the Game. *Id.*

Plaintiff is a worldwide video game developer and publisher. *Id.* at 6. When Descendent ran out of funds by August 2017, it reached out to Plaintiff for financial support to complete the development of the game in return for which Plaintiff would publish the video game. *Id.* at 7. The parties entered into a "Development Agreement" effective September 1, 2017. *Id.*

Plaintiff contends that Descendent "failed to meet any of the delivery dates" required by the Development Agreement. *Id.* As a result, the parties entered into a "Terms Sheet" addendum to "salvage the project and allow Descendent more time to complete" the Game. *Id.* Plaintiff asserts that Descendent "still continued to fail to meet the deliverable requirements and specifications[,] thereby breaching the Terms Sheet." *Id.* Because of the resulting delays, Descendent "ultimately failed to timely deliver the completed Game required under the specifications of the Agreement or otherwise comply with the Terms Sheet," and Interplay has correspondingly cancelled the license agreement. *Id.* at 8.

Plaintiff alleges that it made several payments under the Terms Sheet addendum. *Id.* However, on January 30, 2019, Plaintiff sent half of the payroll amount, because Descendent had missed two deadlines in a row. *Id.* On February 1, Descendent sent a "Notice of Breach" for non-payment. *Id.* Plaintiff cured the alleged breach by paying the

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                                 Date: July 27, 2021

Page 3

remaining half on February 4, and then filed its own "Notice of Breach" for Descendent's failure to meet its delivery requirements. *Id.* Descendent, however, failed to cure the alleged breach. *Id.* Plaintiff contends that this failure to cure relieves it of any obligation to make any further payments to Descendent, and subsequently filed this lawsuit. *Id.*

With the help of Magistrate John D. Early, the parties ultimately reached a settlement agreement ("Settlement Terms Sheet"). *Id.* at 5. Under this agreement, Plaintiff was to take over and complete the development of the Game under a license from Descendent covering "all Game IP," and would make certain payments in that regard. *Id.* Plaintiff argues, however, that Defendants have "admitted" that all Game IP, except for a snapshot version of the game code as it existed as of some unknown time, no longer exists. *Id.* The original artwork and the project history, among other assets, are missing. *Id.* Thus, Plaintiff filed this Motion to Set Aside to be relieved from any obligation to make payments under the Settlement Terms Sheet due to Defendants' failure to deliver to Plaintiff "all Game IP" as provided in the Settlement Terms Sheet. *Id.*

### B. Procedural History

Plaintiff filed its complaint with this Court on January 16, 2020. Complaint. (Dkt. 1). Plaintiff filed a Motion to Set Aside the Binding Settlement Terms Sheet on June 24, 2021 ("Motion to Set Aside") (Dkt. 88). Defendants opposed the Motion to Set Aside on July 2, 2021 ("Opposition") (Dkt. 91). On July 13, 2021, Plaintiff replied ("Reply") (Dkt. 94). Defendant filed a Motion to Enforce the Binding Settlement Terms Sheet on July 21, 2021 ("Motion to Enforce") (Dkt. 96).

### III.   Legal Standard

Federal Rule of Civil Procedure 60(b) provides that the Court may relieve a party from a final judgment or order. Pursuant to Rule 60(b), a court may set aside a final judgment only under specific conditions, including a showing of "(1) mistake, inadvertence, surprise, or excusable neglect . . . (3) fraud, misrepresentation, or misconduct by an opposing party; . . . [and] (6) any other reason that justifies relief." Fed. R. Civ. P. 60(b)(1), (3), (6).

Rule 60(b)(6) "has been used sparingly as an equitable remedy to prevent manifest injustice." *U.S. v. Alpine Land & Reservoir Co.*, 984 F.2d 1047, 1049 (9th Cir. 1993). Deferring to the Supreme Court's admonitions, the Ninth Circuit has held that Rule 60(b)(6) relief "may be had 'to accomplish justice,' but only under 'extraordinary

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                              Date: July 27, 2021

                                                                            Page 4

circumstances.'" *Id.* (citing *Liljeberg v. Health Services Acquisition Corp.*, 486 U.S. 847, 864 (1988)).

## IV.  Discussion

### A. Alleged Failure of Consideration and Fraud by Defendants

Plaintiff contends that Defendants' inability to deliver the Game IP assets constitutes a failure of consideration on their part. Mot. to Set Aside at 9. Plaintiff asserts that under the Settlement Terms Sheet, Defendants were to deliver all the Game IP assets, including all original artwork and project history, to Plaintiff. *Id.* However, on June 15, 2021, Defendants produced only a snapshot copy of the game code as it existed on some unknown date. *Id.* Peterson allegedly "advised that the 'project history no longer exists' and that all Plaintiff needs is the code (even claiming there was no obligation to deliver anything to Plaintiff)." *Id.* (quoting Declaration of Matthew Scott, Ex. D.). As such, because of Defendants' failure of consideration in not delivering all Game IP assets, Plaintiff argues that it has the right to rescind the contract. *Id.* at 10.

Moreover, Plaintiff contends that Defendants' failure to deliver the full source code and the entire project history constitutes fraud. Plaintiff also claims that during the parties' settlement negotiations, Defendants "purposefully concealed the fact that the game assets had not been preserved as required by the Development Agreement." Mot. to Set Aside at 14. According to the Plaintiff, this "material omission" not only reflects Defendants' bad faith, but also constitutes fraud, because Defendants promised to deliver assets it knew it could not deliver. *Id.* Therefore, Plaintiff argues that the Court should set aside the Settlement Terms Sheet due to Defendants' fraudulent settlement. *Id.* at 11, 14.

Defendants assert that under the Settlement Terms Sheet, they were not obligated to provide "game software, revised game software, complete functional copies of each prior version of the game software, or separate files for the artwork." Opp'n. at 3. The deliverables were expressly stated and limited to "pre-order data, Kickstarter data, and early backer data," which have all been provided to Plaintiff. *Id.*; Settlement Terms Sheet § 10. Plaintiff "did not ask for copies of the game software during the negotiations of the [Settlement Terms Sheet]," and Plaintiff also neither sought nor demanded the "updated game code, the separate artwork, and the complete writable versions of all prior game code versions." *Id.* Defendants further argue that Plaintiff "does not need more than the [snapshot of the] game code [Defendants provided] to finish the game." *Id.* at 5. Defendants also point out that Plaintiff admitted that the "artwork already contained in

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                                    Date: July 27, 2021

Page 5

the code can be used to complete the game." *Id.* Regardless, after Plaintiff filed the
Motion to Set Aside, Defendants correspondingly delivered all the Game IP to Plaintiff.
Reply at 3. Therefore, because Defendants have recovered from a third party and
provided Plaintiff with the original artwork source files, Defendants argue that this point
is moot, and that they did not commit material breach. Opp'n. at 6.

Additionally, Defendants claim that they have not committed fraud. Opp'n. at 11.
Defendants point out that Plaintiff "admitted that it merely *assumed* that [the Game IP]
assets had been stored," and that Plaintiff could not identify any "representation by the
Defendants that they still had or had stored the artwork source or executable copies of
every prior version of the game software before the [Settlement Terms Sheet] was
signed." *Id.* Furthermore, "neither delivery nor the state of the reportedly missing
historical deliverables were ever discussed during the settlement conference nor included
in the [Settlement Terms Sheet]." *Id.* at 12. As such, Defendants argue that Plaintiff failed
to demonstrate that Defendants committed fraud in not preserving and delivering the full
source code and the entire project history.

The Court agrees with the Defendants and finds that Plaintiff's claims are moot. A
case is moot when (1) "the issues presented are no longer live" or (2) the parties lack a
"legally cognizable interest in the outcome." *United States Parole Comm'n v. Geraghty*,
445 U.S. 388, 396 (1980) (internal quotations omitted). Once a case becomes moot,
courts are "required to dismiss it." *Dufresne v. Veneman*, 114 F.3d 952, 954 (9th Cir.
1997). Here, Plaintiff contends that Defendants' inability to deliver all Game IP assets
constitutes a failure of consideration. Plaintiff also argues that Defendants, in not
delivering these assets, have committed fraud. However, these claims are moot, because
Defendants have now delivered all the requested Game IP assets to Plaintiff, and the
issues presented are no longer live. As such, Plaintiff's claims regarding Defendants'
failure to deliver Game IP assets are moot.

### B. Plaintiff's Mistaken Definition of "Revenue"

Plaintiff argues that the Settlement Terms Sheet should be set aside due to
Plaintiff's mistake in believing that the term "revenues" meant revenues after industry
standard and customary deductions. Mot. to Set Aside at 3. Defendants, on the other
hand, interpret "revenues" to mean that no such deductions are allowed. *Id.* Plaintiff
contends that Defendants' definition would "forc[e] Plaintiff to bear all of the expenses,
and would kill any hope of Plaintiff ever recovering its investment into the Game." Reply
at 7. As a result, Plaintiff claims that it will "suffer material harm if the agreement is

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                                   Date: July 27, 2021

Page 6

enforced" based on Defendants' definition. Mot. to Set Aside at 3. Thus, Plaintiff urges the Court to set aside the Settlement Terms Sheet due to Plaintiff's mistaken interpretation of the term "revenues."

Defendants argue that Plaintiff's basis for its interpretation of "revenues" is erroneous. Plaintiff claims that it construed "revenues" to be the same thing as "Net Sales" under the Development Agreement, which Defendants contend is "untrue, illogical[,] and objectively baseless." Mot. to Enforce at 6. The Development Agreement defines "Net Sales" to be "all monies paid to and received by [Plaintiff], including Net Payments, for sales and exploitation of the Game, net or less standard and customary deductions for returns . . .." Declaration of Matthew Scott, Ex. A. Defendants point out that the Development Agreement never defined "revenue" and its definition of "Net Sales" also does not use the terms "revenues" or "profits." Mot. to Enforce at 6. Furthermore, Defendants claim that the parties' relationship under the Settlement Terms Sheet "is not based on and looks nothing like their relationship under the Development Agreement." *Id.* at 7. In fact, Plaintiff's alleged breach and termination of the Development Agreement and the subsequent terms sheet addendum caused this litigation. *Id.* at 6. As such, there is no reasonable justification for Plaintiff to have defined "revenues" on the basis of the term "Net Sales" in the Development Agreement.

Additionally, Defendants assert that "it would be exceedingly inappropriate to set aside a settlement agreement based on a[n] *unilateral* mistake when the settlement was reached through lengthy negotiations including parties represented by counsel, with the assistance of the Court." Opp'n. at 9. Defendants argue that it is not unconscionable for Plaintiffs to pay Defendants a percentage of revenues or gross income, because the Settlement Terms Sheet was "carefully negotiated by skilled counsel at arm's length, Defendants own the relevant intellectual property to the [G]ame, and royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate." *Id.* at 10. Based on the agreement between the parties, "Defendants would receive royalties and payments based on a percentage of revenues, meaning gross income from sales and licensing." *Id.* at 11. Therefore, Defendants contend that there is no basis for setting aside the Settlement Terms Sheet based on Plaintiff's mistake. *Id.* at 10.

The Court finds that the Settlement Terms Sheet should not be set aside based on Plaintiff's mistaken definition of "revenues." Under Rule 60(b)(1), a court has the discretion to set aside a final judgment if there is a showing of "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). A court, however, can also deny

**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF CALIFORNIA**

**CIVIL MINUTES – GENERAL**

Case No. 8:20-CV-000089-DOC-(JDEx)                    Date: July 27, 2021

Page 7

a Rule 60(b)(1) motion if "(1) the [plaintiff's] culpable conduct led to the default; (2) the [plaintiff] has no meritorious defense; or (3) the [defendant] would be prejudiced if the judgment is set aside." *Price v. Seydel*, 961 F.2d 1470, 1473 (9th Cir. 1992) (citing *Meadows v. Dominican Republic*, 817 F.2d 517, 521 (9th Cir. 1987)). Additionally, this tripartite test is "disjunctive," so the court may deny the motion on any part. *In re Hammer*, 940 F.2d 524, 526 (9th Cir. 1991).

Here, the Court finds that Plaintiff does not have a meritorious defense for mistakenly defining "revenues" as revenues after industry standard and customary deductions. The Plaintiff erroneously argues that its definition reasonably arises from the parties' prior course of conduct, referring to the Development Agreement. California law permits the use of extrinsic evidence "'to explain the meaning of a written contract . . . [if] the meaning urged is one to which the written contract terms are reasonable susceptible.'" *Casa Herrera, Inc. v. Beydoun*, 32 Cal.4th 336, 343 (2004) (quoting *BMW of North America, Inc. v. New Motor Vehicle Bd.*, 162 Cal.App.3d 980, 990, n. 4 (1984)). Plaintiff, however, wrongly relied on the Development Agreement: the agreement does not explicitly refer to or define the term "revenues." *See* Declaration of Matthew Scott, Ex. A. Additionally, the Development Agreement had been terminated, and the parties' relationship under the Settlement Terms Sheet also differs from that under the Development Agreement. Mot. to Enforce at 7. There was no reasonable basis for Plaintiff to mistakenly define "revenues," and thus, Plaintiff does not have a meritorious defense. Therefore, the Court finds that Plaintiff's mistake does not warrant setting aside the Settlement Terms Sheet.

### C. Due Date of First Payment and of Game Development and Release

Finally, Plaintiff argues that the date of the first payment should not run until June 29, 2021, when Defendants delivered the Game IP assets. Reply at 2. Plaintiff similarly argues that the date on which the one year starts to run for Plaintiff to complete the development and commercially release the Game should be June 29, 2021, or, at the very earliest, May 24, 2021 (the date that Judge Early determined Plaintiff's payment obligation should begin). *Id.*

Defendants, on the other hand, argue that Plaintiff is not entitled to any extensions of time, given that Plaintiff had "made virtually no effort to develop the game in the past eight months since the [Settlement Terms Sheet] was signed in November of 2020." Mot. to Enforce at 10. It was "completely irresponsible" for Plaintiff to wait so long to "make any effort to develop the game." *Id.* Defendants claim that they have formally demanded

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

### CIVIL MINUTES – GENERAL

Case No. 8:20-CV-000089-DOC-(JDEx)                    Date: July 27, 2021

Page 8

Plaintiff to "disclose the status of its development efforts, its financial condition, and the status of its fundraising efforts." *Id.* at 11. Defendants point to Plaintiff's failure to respond as evidence that Plaintiff has "done virtually nothing to finish the game . . . and lacks the funds to complete the game." *Id.* Additionally, Plaintiff allegedly has not yet paid Descendant the money it owes, despite now having all the necessary game assets. *Id.* As such, Defendants contend that Plaintiff is not entitled to any deadline extension, and request the Court to order Plaintiff to pay Defendants the money it owes.

The Court agrees with Defendants and finds that Plaintiff is not entitled to any deadline extension. Plaintiff argues that the deadline should run from when Defendants delivered the game IP assets. However, under the Settlement Terms Sheet, the Defendants were not required to provide the Game IP assets; the Defendants' obligations were limited to licensing the Game and delivering only a few specified items of customer data. *Id.* at 10-11. After signing the Settlement Terms Sheet and receiving the game code, Plaintiff could have started developing the Game. However, Plaintiff waited for several months before demanding the Game IP assets from Defendants, reflecting Plaintiff's own lack of effort and initiative in completing the Game. Therefore, the Court finds that Plaintiff is not entitled to any deadline extension, and orders Plaintiff to pay what it owes to Defendants.

Moreover, the Court orders Plaintiff to provide Defendants with proof of funds, bank and financial statements, and adequate assurance of due performance. Defendants claim that an Experian Credit Report shows that Plaintiff has a "'high risk' business credit score," and Defendants are accordingly concerned that Plaintiff lacks the funds to pay them. *Id.* at 1. Plaintiff has also failed to make the first two settlement payments to Defendants and has "plainly stated that it has no intention of making any of the agreed upon monetary settlement payments". *Id.* Thus, given these concerning circumstances, the Court orders Plaintiff to provide Defendants with proof of funds, bank and financial statements, and adequate assurance of due performance.

///

///

///

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

CIVIL MINUTES – GENERAL

Case No. 8:20-CV-000089-DOC-(JDEx)                                    Date: July 27, 2021

                                                                     Page 9

## V.      Disposition

      For the reasons set forth above, the Court **DENIES** Plaintiff's Motion to Set Aside Binding Settlement Terms Sheet, and **GRANTS** Defendant's Motion to Enforce Binding Settlement Terms Sheet. Additionally, the Court **DENIES** granting attorneys' fees to both sides.

      The Clerk shall serve this minute order on the parties.

MINUTES FORM 11                                          Initials of Deputy Clerk: kd

CIVIL-GEN

# EXHIBIT B

8/24/2021          Case: 21-55852, 08/24/2021, Yahoo Mail 10820, DktEntry: 4-1, Page 48 of 52

## Little Orbit Noncompliance

From:  Michael Whitticar (mikew@novaiplaw.com)

To:     mdantonrichardson@yahoo.com

Cc:     leo.law.55@gmail.com; nishamonki@mintz.com

Date:  Monday, August 9, 2021, 11:20 AM PDT


**Descendent will be terminating the BSTS and the IP license contained therein for material breach based on Little Orbit not complying with the Court order.**

Please let me know when you are available to meet and confer on this.

Thanks!

Mike Whitticar


NOVA IP Law, PLLC
7420 Heritage Village Plaza
Suite 101
Gainesville, VA 20155
Telephone:  (571) 386-2980
Fax:  855-295-0740
www.novaiplaw.com
mikew@novaiplaw.com

# EXHIBIT C



1
2
3
4
5
6
7
8      UNITED STATES DISTRICT COURT
9      CENTRAL DISTRICT OF CALIFORNIA
10     SOUTHERN DIVISION
11  LITTLE ORBIT LLC,                    Case No. 8:20-cv-00089-DOC (JDE)
12            Plaintiff,                 ORDER ACCEPTING FINDINGS
13        v.                             AND RECOMMENDATION OF
                                         UNITED STATES MAGISTRATE
14  DESCENDENT STUDIOS INC., et          JUDGE
15  al.,
16            Defendants,
17  ─────────────────────────
18  And Related Counterclaims.
19
20          Pursuant to 28 U.S.C. § 636, the Court has reviewed the records on file,
21  including the Motion to Enforce Binding Settlement Terms Sheet filed by
22  Defendants Descendent Studios, Inc. and Eric Peterson ("Defendants") (Dkt.
23  61, 65 (under seal), collectively, "Motion"), all papers filed in support of an in
24  opposition to the Motion, and the Report and Recommendation of the
25  assigned United States Magistrate Judge filed after a hearing before the
26  Magistrate Judge and after the Court had referred the Motion to the Magistrate
27  Judge. No party filed timely objections to the Report and Recommendation.
28

1  The Court accordingly accepts the findings and recommendation of the
2  Magistrate Judge.

3      IT IS THEREFORE HEREBY ORDERED that:

4    1.    The Report and Recommendation (Dkt. 79) is approved and
5         accepted;

6    2.    The Motion (Dkt. 61, 65) is DENIED;

7    3.    To the extent the Settlement Agreement (Dkt. 48-1 (under seal))
8         used the phrase "within [__] days of signing [a] written
9         memorialization" or similar language as a triggering event, such
10        trigger date shall be the date of the Report and Recommendation,
11        that is, May 24, 2021; and

12   4.    The parties' cross-requests for an award of attorneys are denied.

13

14 Dated: June 17, 2021

15

16                         DAVID O. CARTER
17                         United States District Judge

18

19

20

21

22

23

24

25

26

27

28

## CERTIFICATE OF SERVICE

I hereby certify that on August 24, 2021, I electronically filed the foregoing document with the Clerk of the United States Court of Appeals for the Ninth Circuit by using the CM/ECF system. Counsel in this case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ M. Danton Richardson
M. Danton Richardson
Attorney for Plaintiff/Appellant
Little Orbit LLC

9th Circuit Case No. 21-55852

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on _____**September 3, 2021**_____.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)          _____/s/ Nada I. Shamonki_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on _____.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF users. I have mailed the foregoing document by First-Class Mail, postage prepaid, or have dispatched it to a third party commercial carrier for delivery within 3 calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)          _____