Appeal No. 21-55852

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT
_____

LITTLE ORBIT, LLC

Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,

Defendants – Appellees
_____

On Appeal from the United States District Court for the Central District of California

Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge
_____

**RESPONDENTS' OPPOSITION TO MOTION TO STAY PENDING APPEAL [REDACTED]**
_____

Michael C. Whitticar; VSB No. 32968
NOVA IP Law, PLLC
7420 Heritage Village Plaza, Suite 101
Gainesville, VA 20155
Tel: 571-386-2980
Fax: 855-295-0740
Email: mikew@novaiplaw.com

Nada I. Shamonki (SBN 205359)
Mintz Levin Cohn Ferris Glovsky and Popeo P.C.
2029 Century Park East, Suite 3100
Los Angeles, CA 90067
Telephone: (310) 586-3200
Facsimile: (310) 586-3202
Email: nshamonki@mintz.com

*Attorneys for Defendants/Appellees*
*Descendent Studios Inc. and Eric Peterson*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

Pursuant to Federal Rule of Appellate Procedure 26.1(a), Descendent Studios Inc., by and through its counsel of record, hereby states that there is no parent corporation or publicly held corporation that owns 10% or more of the equity interests in Descendent Studios Inc.

Dated: September 3, 2021        By: _____

Michael C. Whitticar
Nada I. Shamonki

*Attorneys for Defendants/Appellees*
*Descendent Studios Inc. and Eric Peterson*

# **TABLE OF CONTENTS**

I.     FACTS ................................................................................................... 1

II.   ARGUMENT .......................................................................................... 10

       NO FINAL ORDER ........................................................................... 12

       LITTLE ORBIT IS BOUND BY THE MAGISTRATE'S REPORT AND
       THE FIRST DISTRICT COURT DECISION ................................................ 14

       NO RISK OF COGNIZABLE IRREPARABLE HARM ............................ 15

       LITTLE ORBIT IS WRONG ON THE MERITS ......................................... 18

       LITTLE ORBIT WAS NOT ENTITLED TO ANY EXTENSIONS OF
       TIME ....................................................................................................... 27

III.  CONCLUSION ............................................................................................ 29

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Baxter v. Sullivan*,
   923 F. 2d 1391 (9th Cir. 1991) ........................................................................15

*Berman v. Bromborg*,
   56 Cal. App. 4th 936, 65 Cal. Rptr. 2d. 777 (2d. Dist. Ct. App.
   1997) ...............................................................................................................19

*Branley v. Crosby Research Foundation, Inc.*,
   73 Cal. App. 2d 103 (1st Div. Ct. App. 1946).................................................24

*Caplan v. Fellheimer, Eichen, Braverman & Kaskey*,
   68 F. 3d 828 (3d Cir. 1995) .......................................................................16, 30

*Catlin, v. U.S.*,
   324 U.S. 229 (1945).........................................................................................12

*Cobbledick v. U.S. ,*
   309 U.S. 323 (1940).........................................................................................13

*Cohen v. Benefit Indus. Loan Corp.*,
   337 U.S. 541 (1949).........................................................................................13

*Coker Equipment Co., v. Witting*,
   366 Fed. Appx. 727, 732 2010 U.S. App. LEXIS 2984 (9th Cir.
   2010) ...............................................................................................................29

*Coopers & Lybrand* v. *Livesay*,
   437 U.S. 463 (1978)...................................................................................12, 13

*Dannenberg v. Software Toolworks*,
   16 F. 3d 1073 (9th Cir. 1994) .........................................................................13

*Donovan v. RRL Corp.*,
   26 Cal. 4th 261 (Cal. Sup. Ct. 2001) ..............................................................21

*Ekland Marketing Company of California, Inc. v. Lopez*,
   2007 U.S. Dist. LEXIS 48391 (E.D. Cal. June 5, 2007) .................................24

*Firestone Tire & Rubber Co. v. Risjord*,
    449 U.S. 368 (1981) ........................................................................12, 13

*Hirschfeld v. Board of Elections*,
    984, F. 2d 25 (2d Cir. 1993) ................................................................16

*In re BGI, Inc.*,
    304 BR. 754 (S.D. N.Y. 2014) ...........................................................12

*In re Brooks*,
    2003 U.S. App. LEXIS 18343 (D.C. Cir. 2003)..................................12

*Lado v. Wolf*,
    952 F. 3d 999 (9th Cir. 2020) ..........................................16, 17, 28, 30

*Martinez v. Y1st*,
    951 F. 2d 1153 (9th Cir. 1991) ...........................................................15

*McCall v. Andrus*,
    628 F. 2d 1185 (9th Cir. 1980), *cert. denied*, 450 U.S. 996 (1981) ..................15

*Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*,
    324 U.S. 806 (1945)..............................................................................6

*Price v. U.S. Monolithics, LLC*,
    2005 U.S. Dist. LEXIS 53065 (S.D. Cal. 2005)..................................30

*Rodriguez v. Oto*,
    212 Cal. App. 4th 1020, 151 Cal Rptr. 3rd........................................19

*Second City Music, Inc. v. City of Chicago*,
    333 F. 3d 846 (7th Cir. 2003) .......................................................16, 30

*Shek v. Buchard*,
    2019 U.S. Dist. LEXIS 37866 (N.D. Cal. 2019) .................................12

*Smith v. Durkahm D&M LLC*,
    2020 U.S. App. LEXIS 1412 (6th Cir. 2020) ......................................12

*Smith v. Frank*,
    923 F. 2d 139 (9th Cir. 1991) .............................................................15

*Turner v. Duncan*,
    158 F. 3d 449 (9th Cir. 1998*)* ..............................................15, 18, 27

*Vaillette v. Fireman's Fraud Ins. Co.*,
  18 Cal. App. 4th 680, 22 Cal Rptr. 807 (4th Dist. Ct. App. 1993)...............19, 20

*Vectren Communications Services v. City of Alameda*,
  2009 U.S. Dist. LEXIS 72811 (N.D. Cal. August 18, 2009) ............................24

*Wolf v. Walt Disney Pictures & Television*,
  162 Cal. App. 4th 1107 (2nd Dist. Ct. App. 2008)............................................24

**Statutes and Rules**

9 U.S.C. § 15 ...................................................................................................12

28 U.S.C. § 1291.........................................................................................12, 13

Cal. Civ. Code § 1636.......................................................................................20

Cal. Civ. Code § 1638.......................................................................................20

Cal. Civ. Code § 1655.......................................................................................24

Cal. Civ. Code § 1656.......................................................................................24

Cal. Comm. Code § 2306(2)..............................................................................24

Central District Local Rule 7-3..........................................................................17

Fed. R. App. P. 8(a) ..........................................................................................11

Fed. R. App. P. 8(a)(1).......................................................................................10

Fed. R. App. P. 8(a)(2)(1)...................................................................................10

**Other Authorities**

B.A. Garner, Black's Law Dictionary (11th Ed. 2019)....................................20, 22

*Restatement (Second) of Contracts § 153*...............................................................21

*Restatement (Second) of Contracts § 251*...............................................................30

Respondents Descendent Studios, Inc. and Eric Peterson hereby respectfully submit their opposition to Petitioner's Motion for a Stay Pending Appeal.

## I. FACTS

1. Little Orbit never filed a motion for a stay pending appeal in the district court.

2. The June 27, 2021 district court order from which Little Orbit is attempting to appeal is not a final order. It did not decide the consequences of Little Orbit failing and refusing to make (at least the first) settlement payment(s) by the (extended) June 23, 2021 "Mulligan" deadline, nor for over a month after the district court's June 27, 2021 order, or at all. The district court also has not yet decided the consequences of Little Orbit failing and refusing to provide the court-ordered adequate assurance of due performance in the form of financial, development status and fundraising status documents and data for over one month after the district court's order, or at all.

3. The district court order is not an appealable collateral order under the collateral order doctrine because it directly relates to the main issue and the only issue left in the case, which is the enforcement and interpretation of the settlement agreement reflected in the Binding Settlement Terms Sheet ("BSTS").

4. Little Orbit admitted in the district court that it had all of the game assets purportedly necessary to complete the game, but it still failed to make the first settlement payment, and now seeks to be excused from it. (App. V. IV, p. 24).

5.     The BSTS was signed on November 17, 2020, over nine months ago.
It required three payments from Little Orbit ("LO") to Descendent, two of which
were due within 120 days of signing the original BSTS or first written
memorialization. Neither of these first two payments has been made, and Little
Orbit has plainly stated that it has no intention of making any of the agreed upon
monetary settlement payments. (App. V. III, p. 32).

6.     Now, more than a month after the challenged district court order was
entered, Little Orbit still has not made any settlement payments and has not
provided the development status or financial data and documents ordered by the
district court. (Ex. A: Whitticar Declaration); (Ex. B: Peterson Declaration).

7.     Because Little Orbit had failed for the prior eight months to make any
of the agreed-upon settlement payments, and again skipped the June 23, 2021
payment date as extended by the court, Respondents were gravely concerned that
Little Orbit lacked the funds to pay Descendent and needed to complete the game,
was stalling for time, and lacked the intent and ability to make the settlement
payments.[1]   The Respondents' concern was heightened by the fact that an Experian
Credit Report showed that Little Orbit had a "high risk" business credit score, and

---

[1] The email attached as Exhibit A to the Peterson Declaration also strongly
indicates that Little Orbit always planned to skip all three agreed-upon settlement
payments and to try to covertly impose its own misguided and erroneous definition
of "Revenues." (App V. IV. at p. 32).

kept less than ▮▮▮▮▮ in the bank. (App. V. IV at p. 34). For over a month now, Little Orbit has voluntarily disregarded the district court's order to make the settlement payments (at least the first one) and to produce adequate assurance of due performance by producing financial and development status data and documents. (Exs. A & B).

8.     Descendent requested the district court to order Little Orbit to pay (at least) the first settlement payment to the Defendants. In addition, pursuant to Section 4 of the BSTS, Little Orbit is obliged to pay Descendent ▮ percent of the first ▮▮▮▮▮ in revenue or gross income received after Little Orbit defaulted on its payment obligation for the second time on June 23, 2021 (originally on December 17, 2020).

9.     The 50/50 split provided for in Section 4 of the BSTS is <u>not</u>, however, Descendent's sole remedy for Little Orbit's complete failure to make **all three payments** required under the Binding Settlement Terms Sheet, at Sections 1 through 3.

10.     Section 4 of the BSTS simply provides as follows:

> If any <u>payment</u> not made <u>on time</u>, LO pays Descendent ▮ percent of the first ▮▮▮▮ in revenues after default.

(Docket No. 48-1) (App. V. IV at 164) (emphasis supplied).

11.     This was expressly stated as a remedy for any one "<u>payment</u>" (singular) that was not made "<u>on time</u>." It was never stated nor agreed to be Descendent's <u>sole or exclusive remedy</u> for three <u>payments</u> (plural) that are not

3

made <u>at all</u>, and especially not for all three payments not being made <u>at all</u>.  Little Orbit has tried to stretch the language of Section 4 of the BSTS  beyond its clear logical and plain grammatical meaning, because Little Orbit lacks the intention and also apparently lacked the funds necessary to make the required settlement payments. However, it is clear that Section 4 was intended to address mostly the *timing* of payments, and not to establish an exclusive remedy for Little Orbit failing to make all three payments <u>ever or at all</u>. (App. V. IV at p. 25).

12.     It should be noted that, if the game sells well, then the early █████ split of $700,000.00 provides Descendent with no additional funds at all. Rather, it only improves cash flow and helps Descendent get *part* of the back-end █████ revenue split paid *sooner*.  This potential "early" █████ split is exactly the same as Descendent's █████ back-end split on ████████ from the later revenue tranches.[2] Descendent did not intend to and would not have bargained away a minor advance in cash flow as the only and exclusive remedy for Little Orbit skipping, keeping and pocketing ████████ in settlement payments. This is especially true given that Little Orbit filed its frivolous claims in the original litigation after Little Orbit: (A) ran out of money, (B) shorted its payment due to Descendent, (C) apologized for shorting the payment, (D) admitted that Little Orbit

---

[2]  Because the early █████ split does not generate any additional or increased amount of overall payments due from Little Orbit to Descendent, it clearly does not constitute a penalty clause.

4

had run out of money, and then (E) sued the Respondents shortly after they formally notified Little Orbit of its payment default. (App. V. IV, pp. 25, 40-43).

13. Matt Scott's last reply declaration contained many clear falsehoods. (App V. IV at pp. 76-83). The most obvious and material of these, which the district court apparently recognized and remembered, is that Little Orbit purportedly bargained for the right to skip all three settlement payments in exchange for only the ▮▮ splits on the first ▮▮ in revenues. That was never discussed nor agreed upon. The ▮▮ split on the first ▮▮ in revenues was never discussed or deemed to be Defendants' only or exclusive remedy for payment breaches as to all three payments, and Section 4 of the BSTS makes this a remedy only for any single "payment" not being made "on time." It does not address, and was never discussed as applying to, the situation where all three payments are not made at all. While the parties discussed that Little Orbit may have trouble making the first settlement payments on time, they never discussed or agreed that Little Orbit could skip all three payments nor that the ▮▮ revenue split would be the Respondents' only or exclusive remedy. (App. V. IV at pp. 24-25).

14. The fact that Matt Scott would swear to this demonstrably false statement shows the fraudulent intent of Little Orbit in that it obviously lacked the intent to make the three settlement payments required by the BSTS. (App. V. IV at p. 79).

5

15.     Further evidence of Little Orbit's fraudulent intent and lack of intent to perform appears in the May 24, 2021 hearing transcript.  When pressed point blank by the magistrate judge on whether Little Orbit planned to make the settlement payment, counsel for Little Orbit gave a long-winded dodgy response. He evasively concluded with the non-responsive statement that:  "my client has every intent to comply with the agreement."  (Ex. C at p. 17).

16.     Viewed in light of the incredible testimony in the Matt Scott Reply Declaration about Little Orbit supposedly having the right not to make any of the three settlement payments expressly provided for in the BSTS, there is now clear and convincing evidence that Little Orbit never planned to make any of the three required settlement payments.  In other words, Little Orbit fraudulently induced the settlement agreement by making payment promises without the intent to perform them.  Therefore, Little Orbit is barred by its unclean hands from obtaining a stay pending appeal or any other equitable relief.[3]

17.     Because Little Orbit missed the first three payment due dates, and given its prior history of defaulting on debts to Descendent, the Respondents' demanded, and the district court ordered, Little Orbit to provide adequate

---

[3] *Precision Instr. Mfg. Co. v. Auto. Maint. Mach. Co.*, 324 U.S. 806, 814 (1945) (unclean hands doctrine "closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief").

assurance of due performance of Little Orbit's financial and development

obligations under the BSTS. (App. V. IV at pp. 45-46).

      18.    Specifically, the Respondents were and still are concerned that Little

Orbit lacks and has always lacked the funds necessary to both make the settlement

payments (█████████) and complete development of the game ($1 million). That

concern was based in part on an Experian Credit report, which put Little Orbit into

the "high risk" credit category and further indicated that Little Orbit kept less than

█████████ in its bank account, which is far less than the $1 million or more

necessary to complete the game and pay Descendent. (App. V. IV at p. 26). While

Little Orbit reportedly has now put the settlement payment funds into its attorney's

trust account, it still has not done anything to pay respondents nor to show that it

has the other $1 million necessary to  complete the game. (Ex. A).  This is

especially concerning given the projected $1 million or more in costs and expenses

that will be needed for Little Orbit to adequately complete and market the game.

(App. V. IV, p. 26).  Little Orbit has stubbornly disregarded the district court's

order to make the settlement payments (at least the first one) and to provide

adequate assurance of due performance in terms of financial and development

status data and documents. (Exs. A, B).

      19.    Therefore, the Respondents demanded but - in defiance of the district

court's order - have not received, the Little Orbit bank statements and its financial

accounting software and reports from November 1, 2020 through the present, plus

disclosures as to the status of Little Orbit's fund raising efforts and development efforts. By not providing the requested financial and development status data and documents as adequate assurance, Little Orbit has committed yet another material breach of the BSTS and also is in contempt of the district court's order. Paradoxically, Little Orbit claims that it was going to file bank statements with the district court, but it has withheld them for over a month in violation of the district court's order. (Stay Motion, p. 5).

20. The order from which Little Orbit purports to appeal is clearly not a final order and does not fall within the collateral order doctrine. Even as to the settlement issues, the district court has not yet decided at least the following issues:

(a) How much money and which settlement payments are now due from Little Orbit to Descendent?[4]

(b) What are the consequences of Little Orbit not making and not timely making the settlement payment?

(c) Did Little Orbit timely provide adequate assurance of due performance?

---

[4] Because Little Orbit had repudiated its payment obligations and did not comply with the Mulligan or do-over granted by the district court, Respondents contend that the first two settlement payments should be deemed due and payable by Little Orbit. (App. V. IV, p. 20).

(d)    Has Little Orbit provided adequate assurance of due performance at all?

(e)    What are the consequences of Little Orbit not providing or not timely providing adequate assurance of due performance?

(f)    Is Little Orbit now in material breach of the settlement agreement, giving Descendent the right to terminate the intellectual property (IP) license in the BSTS and develop the game on its own?

21.    As to the completion deadline and the payment deadlines, the district court found that the BSTS was a binding written settlement or the first "written memorialization." (Ex. C at pp. 5-6, 9-10, 12-13, 17, 19). The magistrate found as follows:

> [I]t acknowledges that what's being put on the record itself was – again, the words are important – a "written memorialization," and bear in mind that the payment obligation, the triggering language is what? "Written memorialization"
>
> . . . [T]he language "written memorialization" was the triggering language on the payment . . . .

(Ex. C at p. 13). *See also* Ex. C at p. 17:

> Well, there has been a written memorialization. The same term is used to describe the settlement agreement itself – "written memorialization." It describes "it" as a "written memorialization."

(Ex. C at p. 17).

22.    The more detailed writing that the parties attempted to negotiate was a "further" written memorialization that did not occur. (Ex. C at p. 17).  Due to

9

possible confusion between the first "written memorialization" (the BSTS), and the further written memorialization (which was not completed), the district court gave Little Orbit a do-over or a "Mulligan" and extended the first payment date to June 23, 2021. (*Id*).

23. Because Little Orbit did not comply by making the first settlement payment by the do-over or Mulligan date of June 23, 2021, it has been Respondents' position, and the district court apparently found, that the Mulligan or do-over should be rescinded, and/or that Little Orbit was in material breach, such that settlement payments were due or past due, and that Little Orbit needed to provide documents constituting adequate assurance of due performance.

## II.    <u>ARGUMENT</u>

A motion for a stay pending appeal must ordinarily be first filed in the district court. Fed. R. App. P. 8(a)(1). It may be filed first in the court of appeals only if the movant shows "that moving first in the district court would be impracticable." Fed. R. App. P. 8(a)(2)(1).

Here, other than the fact that it does not want to pay the money it owes or produce its financial and development data and documents, Little Orbit has made no factual showing that moving first in the district court would be "impracticable."

The only reason that Little Orbit could be subject to termination in the next two and one-half months is that it has voluntarily decided not to make any settlement payments and not to provide the court ordered financial, development

status and fundraising status data and document, in clear and voluntary violation of the district court order.

This type of entirely self-inflicted harm is not irreparable and is not cognizable for the purposes of granting equitable relief or a stay.[5]

The real reason that Little Orbit failed to first file in the district court is that the magistrate judge in the district court, who brokered the settlement agreement through a judicial settlement conference, is wholly familiar with the facts relevant to the settlement, and has already determined as a finding of fact that the settlement agreement is binding and enforceable, that there was a meeting of the minds, and that Little Orbit did not make a unilateral mistake but is merely trying to renegotiate the settlement agreement. (App. V. II, pp. 239-243). (Ex. C at pp. 4-5, 10-11, 19). In other words, Little Orbit knows that its assignments of error have no merit and repeatedly have been rejected by the district court, including by the magistrate judge who brokered the settlement agreement. Put simply, the fact that Little Orbit's appeal is wholly lacking in merit or any probability of success cannot constitute the type of impracticality required by Rule 8(a) for skipping over the district court.

Motions for stays pending appeal are routinely dismissed for failure to

---

[5] Unless and until Descendent receives court approval of the potential termination or cancellation, it is making no effort to independently release the game. (Ex. B).

adequately show that proceeding in the prescribed lower court was impracticable. *In re BGI, Inc.,* 304 BR. 754, 761, (S.D. N.Y. 2014). *See also Shek v. Buchard*, 2019 U.S. Dist. LEXIS 37866 *7 (N.D. Cal. 2019) ("That alone is grounds for denying his stay motion"). *See also Smith v. Durkahm D&M LLC,* 2020 U.S. App. LEXIS 1412 (6th Cir. 2020) (dismissing motion for stay pending appeal when movant did not adequately explain failure to first seek a stay from the district court); *In re Brooks,* 2003 U.S. App. LEXIS 18343 (D.C. Cir. 2003) (same).

The fact that the district court knows too much about the case and would rule adversely to Little Orbit's meritless motion and appeal does not constitute the type of impracticality permitting Little Orbit to skip over first seeking a stay from the district court. Its motion is thus due to be denied.

## NO FINAL ORDER

Appeals from a federal district court to a court of appeals generally do not lie unless and until the district court has rendered a "final decision" or a "final order." *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 374 (1981); *Coopers & Lybrand* v. *Livesay*, 437 U.S. 463, 467 (1978); [6] *Catlin, v. U.S.,* 324 U.S. 229, 233 (1945); 28 U.S.C. § 1291 (1976). Under the collateral order doctrine, interlocutory orders may be immediately appealable if they concern issues that are essentially unrelated to the issues of the main dispute, are final and conclusive, and

---

[6] (Superseded by 9 U.S.C. § 15 as to arbitration proceedings).

involve a right that will probably be irreparably lost if review is delayed. *Cohen v. Benefit Indus. Loan Corp.,* 337 U.S. 541, 546 (1949).

Under the final judgment rule embodied in 28 U.S.C. § 1291, parties may appeal only the "final decisions of the district courts." A final judgment under § 1291 is "a decision by the District Court that ends the litigation on merits and leaves nothing for the court to do but execute the judgment." *Coopers & Lybrand v. Livesay,* 437 U.S. 463, 467 (1978). By requiring parties to raise all claims of error in a single appeal following final judgment on the merits, *Firestone Tire & Rubber Co. v. Risjord*, 449 U.S. 368, 374 (1981), § 1291 "forbids piecemeal disposition on appeal of what for practical purposes is a single controversy. *Cobbledick v. U.S.*, 309 U.S. 323, 325 (1940)." *Dannenberg v. Software Toolworks,* 16 F. 3d 1073, 1075 (9th Cir. 1994). In this case, the district court order which Little Orbit is attempting to appeal did not resolve at least the following issues:

(a)     How much money and which settlement payments are now due from Little Orbit to Descendent?

(b)     What are the consequences of Little Orbit not making and not timely making the settlement payment?

(c)     Did Little Orbit timely provide adequate assurance of due performance?

(d)     Has Little Orbit provided adequate assurance of due performance at all?

(e)     What are the consequences of Little Orbit not providing or not timely providing  adequate assurance of due performance?

(f)      Is Little Orbit now in material breach of the BSTS settlement agreement, giving Descendent the right to terminate the intellectual property (IP) license in the BSTS and develop the game on its own?

Due to all of these unresolved issues, the order from which Little Orbit purports to appeal is clearly not a final order. Nor does it fall within the collateral order doctrine.  All of these open issues relate to the only remaining "main dispute" in the case: the meaning and enforcement of the BSTS settlement agreement. Therefore, the issues being appealed are not unrelated to the issues of the main dispute but are in fact directly and integrally related to and part of the same main dispute. Hence, Little Orbit's appeal satisfies neither the basic final decision requirement nor the collateral order doctrine.

## LITTLE ORBIT IS BOUND BY THE MAGISTRATE'S REPORT AND THE FIRST DISTRICT COURT DECISION

By failing to object to the magistrate's report and recommendation, Little Orbit waived its right to object to or appeal the findings made therein, including the findings that the parties intended to be bound by the BSTS,  that there was  a binding settlement agreement, that there was a meeting of the minds, that Little Orbit did not commit a unilateral mistake and that there was no ambiguity in the

14

BSTS settlement agreement.

"Failure to object to a magistrate judge's recommendation waives all objections to the magistrate judge's finding of fact." *Turner v. Duncan*, 158 F. 3d 449, 455 (9th Cir. 1998*); Smith v. Frank*, 923 F. 2d 139, 141 (9th Cir. 1991); *Baxter v. Sullivan*, 923 F. 2d 1391, 1394 (9th Cir. 1991). Even as to pure legal conclusions, a party's failure to object to the magistrate's report and recommendation "is a factor to be weighed in considering the propriety of finding waiver of an issue on appeal." *Martinez v. Y1st*, 951 F. 2d 1153, 1156 (9th Cir. 1991), *Turner*, 158 F. 3d at 455.

Little Orbit has waived its objections to the district court's factual findings by not making any timely objection to the magistrate judge's original report and recommendation finding that: (1) there was a meeting of the minds and therefore a binding and enforceable settlement agreement, (2) the terms of the settlement agreement were unambiguous, and (3) that Little Orbit did not make to a unilateral mistake; *McCall v. Andrus*, 628 F. 2d 1185, 1187 (9th Cir. 1980), *cert. denied*, 450 U.S. 996 (1981); *Turner,* 158 F. 3d at 455. That same report and order implicitly rejected Little Orbit's contentions that Descendent had breached the BSTS by not providing software deliverables. (App. V. II at 224).

## NO RISK OF COGNIZABLE IRREPARABLE HARM

Little Orbit's development rights and IP license are at risk primarily because it: (1) voluntarily chose not to pay the settlement payment(s); (2) voluntarily chose

not to provide financial and development status documents and data, or chose not to promptly commence development or ask for the game software (which it already had for years). This type of self-inflicted harm is not irreparable and does not warrant issuing a stay pending appeal.

When the movant's asserted harm is largely self-inflicted, it does not constitute irreparable injury and this fact "severely undermines" the movant's claim for a stay pending appeal or for other equitable relief. *Lado v. Wolf*, 952 F. 3d 999, 1008 (9th Cir. 2020), citing *Hirschfeld v. Board of Elections*, 984, F. 2d 25, 39 (2d Cir. 1993).

"Self-inflicted wounds are not irreparable injury." *Lado*, 952 F. 3d at 1008, citing *Second City Music, Inc. v. City of Chicago*, 333 F. 3d 846, 850 (7th Cir. 2003); *Caplan v. Fellheimer, Eichen, Braverman & Kaskey*, 68 F. 3d 828, 839 (3d Cir. 1995).

Little Orbit voluntarily has failed and refused to make any settlement payments or to provide adequate assurance of due performance documents, even after the district court gave it a "mulligan" do-over and extended the first payment deadline to June 23, 2021.

Even as to the November 2021 deadline for completing development of the game, which is over ten weeks away, Little Orbit's harm is largely self-inflicted in that it had the game code all along, (App. V. IV, pp. 28-29, 53-54) did not ask for anything relevant to development until April of 2021 (App V. IV at p. 28) and did

16

nothing to develop the game for at least eight months after the binding settlement agreement was signed. (App. V. IV, p. 77).

This type of blatant and voluntary disregard by Little Orbit of its contractual and court-ordered obligations is self-inflicted harm, is not irreparable, and does not warrant a stay pending appeal. *Lado, supra*.

In the unlikely event that Little Orbit somehow succeeded in evading all three of the settlement payments expressly required by the BSTS, and were entitled to a refund, it could recover any overpayments from Descendent's share of the revenues from the sale or licensing of the game.   Therefore, the miniscule risk of any overpayment does not constitute irreparable harm.

Exhibit B to Little Orbit's motion is a "meet and confer" email requesting Little Orbit to meet and confer about the consequences of it failing to make any settlement payments and failing to provide adequate assurance of due performance. It was sent pursuant to Central District Local Rule 7-3 so that the parties could meet and confer before Little Orbit files a motion in the district court to terminate the BSTS and the intellectual property ("IP") license contained therein.[7]  During the meet and confer, Little Orbit indicated that it has no intention to make the

---

[7]  No such motion has yet been filed.  But it is the position of Descendent that Little Orbit is in material breach and that the BSTS and the IP license contained therein are subject to cancellation, and that this is an issue which the district court should first address before any appeal is heard.

17

settlement payment nor to comply with the district court's adequate assurance

order. Violating the district court's order for over a month, Little Orbit still has

provided no adequate assurance documents and has made no settlement payments.

(Ex. A).

## LITTLE ORBIT IS WRONG ON THE MERITS

The magistrate judge and the district court found as follows:

I find there is a binding, enforceable settlement agreement, and that it's clear its terms were understood by the parties at the time, and there was a meeting of the minds.

(Ex. C at p. 5). The district court further found that: "you had a meeting of minds

on November 17th." (*Id.* at p. 19).

Little Orbit's failure to object to these factual findings mandates rejection of

its mistake argument and its argument that there is no binding settlement

agreement.

As the district court previously noted, through the magistrate who brokered

the settlement agreement, the "revenues" of which Descendent is entitled to 50

percent of means "income from any and all sources; gross receipts."

I think revenue - the meaning of it is clear. It's not ambiguous….. It appears to me that the--- there has been an effort made by Plaintiff to create an ambiguity where there was none….

(Ex. C at pp. 10-11).

Little Orbit's failure to object to these factual findings waives and mandates

rejection of its mistake argument and therefore its argument that there is no binding

settlement agreement. *Turner,* 158 F. 3d at 455.

The meaning of a contract is objectively determined based on the parties'

"objective manifestations" of assent and intent made at the time of contracting.

This rule exists primarily to prevent and foreclose the type of backsliding and re-

negotiating which Little Orbit is improperly attempting in this case.

> California recognizes the objective theory of contracts. It is the objective
> intent, as evidenced by the words of the contract, rather than the subjective
> intent of one of the parties, that controls interpretation.
>
> …
>
> Thus, evidence of undisclosed subjective intent of the parties is irrelevant to
> determining the meaning of contractual language. Rather, it is the outward
> manifestation or expression of assent which is controlling. With respect to
> the interpretation of a written settlement agreement, one court has stated that
> the true, subjective but unexpressed intent of a party is immaterial and
> irrelevant.

*Berman v. Bromborg,* 56 Cal. App. 4th 936, 948, 65 Cal. Rptr. 2d. 777, 783 (2d.

Dist. Ct. App. 1997)*,* citing and quoting (among others), *Vaillette v. Fireman's*

*Fraud Ins. Co.,* 18 Cal. App. 4th 680, 686, 690, 22 Cal Rptr. 807, 810 (4th Dist. Ct.

App. 1993).

"A signature on a written contract is an objective manifestation of assent."

*Rodriguez v. Oto*, 212 Cal. App. 4th 1020, 1027, 151 Cal Rptr. 3rd. 667, 672

(2013). "If the terms are unambiguous there is ordinarily no occasion for additional

evidence of the parties' intent." *Id.* Their "actual intent," for purposes of contract law, "is that to which they manifested assent by executing the agreement." *Id.*

Thus, a party's secret, unexpected subjective interpretation of words is irrelevant in interpreting a contract:

> Ordinarily, the words of the document are to be given their plain meaning and understood in their common sense; the parties' expressed objective intent, not their unexpressed subjective intent, governs.

*Vaillette, 18* Cal. App. 4th at 686, 690, 22 Cal Rptr. at, 810 (4th Dist. Ct. App. 1993); Cal. Civ. Code §§ 1636, 1638.

The true, subjective, but unexpressed intent of a party is immaterial and irrelevant. *Id.* Here, the plain meaning and dictionary definition of "revenue" is "income from any and all sources, gross receipts."[8]

In addition, there is no reason that Little Orbit paying Descendent a percentage of revenues or gross income would be unconscionable, as the BSTS was carefully negotiated by skilled counsel at arm's length, Descendent owns the relevant intellectual property to the game, and royalties are typically based on revenues and not on margins or profits, which are subjective and easy to manipulate. (App. V. IV at p. 27).

---

[8] According to Black's Law Dictionary, the very first definition of "Revenue" is "income from any and all sources; gross income or gross receipts." B.A. Garner, Black's Law Dictionary, p. 1577 (11th Ed. 2019).

Respondents' evidence would have clearly shown that Little Orbit's payment defaults and many unnecessary changes and failures to perform[9] were responsible for the cost overruns and delays based on which Little Orbit wrongfully terminated the Original Contracts in February of 2019. (App. V. IV. at pp. 27, 41-43). Furthermore, the very same definition of "revenues" will apply to Descendent if - as now seems likely - the development rights revert back to Descendent due to Little Orbit's material breaches or pursuant to Section 13 of the BSTS. Therefore, there is no basis for setting aside the BSTS based on Little Orbit's unilateral mistake nor as being unconscionable. *See Donovan v. RRL Corp.*, 26 Cal. 4th 261, 280-282 (Cal. Sup. Ct. 2001); *Restatement (Second) of Contracts § 153.*

Little Orbit's claim that it secretly construed "revenue" not by its common dictionary definition but rather to be the same thing as "Net Sales" under the Development Agreement is untrue, illogical and objectively baseless. First, the Development Agreement never defined or used the terms revenues or profits, but rather the very distinct and different term "Net Sales."

---

[9] Like failing to complete the application program interface "API" that Little Orbit demanded and promised to complete itself but then failed to complete. Because Little Orbit never completed the API, breached its payment obligations to Descendent, and wrongfully terminated the Original Contracts, Descendent never had any obligation to convey the trademark license because the game was never completed or released. (App. V. IV at p. 27, fn. 2).

Second, Little Orbit breached and then terminated the Development
Agreement and the subsequent terms sheet addendum (the "Original Contracts")
long ago in February of 2019, which is what caused this litigation, just after
Descendent notified Little Orbit of its payment default because Little Orbit
admittedly ran out of money and could not pay Descendent. (App V. IV at pp. 27,
41-43).

Third, the BSTS provided for "Mutual General Releases" (p. 2, ¶ 19), which
completely cancelled and novated the Original Contracts. (App. V. IV at p. 164).

Fourth, the parties' relationship under the BSTS is not based on and looks
nothing like their relationship under the Development Agreement. To the contrary,
under the BSTS, Descendent assumed absolutely no responsibility for performing
any development work or services after transferring (only) certain discrete, limited
items of customer information to Little Orbit. (BSTS ¶ 10). (App. V. IV at p. 164).

The BSTS was a completely different animal from the terminated
Development Agreement. The BSTS simply and objectively was not a continuation
of the Development Agreement in whole or in part. There is no objectively logical
or accurate reason that Little Orbit could have reasonably expected the meaning of
a word not used or defined in the Development Agreement (Revenues) to have the
same meaning as the Development Agreement's very different term (Net Sales)

when "Revenues" was used in the very different BSTS.[10]  In addition, the parties

simply did not base the payment splits in the BSTS on the Development

Agreement. Rather, they were the product of back-and-forth dickering and

negotiations. (App. V. IV, at pp. 27-28).

There is no standard definition or set of deductions from royalty income or

net sales in game software development contracts. In any event, the contract and

deal that the parties were negotiating in November of 2020 was not a development

agreement but a settlement agreement – **one which left the Respondents with no**

**obligation to deliver anything nor to provide any further services (other than**

**delivering a few discrete items of customer data).**  (BSTS § 10) (App. V. IV at

pp. 28, 164).

In short, as judged by the plain-language dictionary definition of the words

they chose and used, as properly judged by their objective manifestations of assent

and meaning, and properly disregarding post-hoc subjective statements of Little

Orbit's unexplained, baseless, purported secret meaning of "Revenues," the parties

_____

[9] Oddly, Little Orbit has argued at length about the meaning of the word "profits" and the parties' failure to discuss, "profits." Tellingly, "profits" is not a word that was ever used in the BSTS nor in the Development Agreement. Like "Net Sales," "profits" has a very different definition and connotation than revenues, as "profits" means profits or income after subtracting costs and operating expenses from "revenues." *See* Brian A. Garner, Black's Law Dictionary, p. 1463 (11th ed (2019) ("profit" means "the excess of revenues over expenditures in a business transaction; GAIN)."  Little Orbit and its counsel have repeatedly confused "Revenues" with other, very dissimilar words and concepts.

agreed, and the district court correctly found, that Descendent is entitled to receive royalties and payments based on a percentage of revenues, meaning gross income from sales and licensing.

The excuses given by Little Orbit for not paying were simply and totally without merit. Little Orbit trotted out one set of purportedly "crucial" missing deliverables after another as its latest excuse for not wanting to pay. It is important to note that Little Orbit did not complain about any of these allegedly missing purported deliverables for almost five (5) months after it was supposed to have started development. (App. V. IV at p. 28).

By not starting development for 8 months after the BSTS was signed (App. V. IV at p. 77), Little Orbit materially breached its good faith best efforts obligations, as an exclusive licensee, to deliver and market the game. *See Branley v. Crosby Research Foundation, Inc.,* 73 Cal. App. 2d 103, 112 (1st Div. Ct. App. 1946), citing Cal. Civ. Code §§ 1655,1656. *See also Wolf v. Walt Disney Pictures & Television*, 162 Cal. App. 4th 1107, 1120 (2nd Dist. Ct. App. 2008) (covenant to use good faith and best efforts is "routinely implied" when licensor grants exclusive licensing rights in exchange for a percentage of profits or royalties); *Vectren Communications Services v. City of Alameda,* 2009 U.S. Dist. LEXIS 72811 * 13 (N.D. Cal. August 18, 2009); *Ekland Marketing Company of California, Inc. v. Lopez,* 2007 U.S. Dist. LEXIS 48391 *4 (E.D. Cal. June 5,

2007). *Cf.* Cal. Comm. Code §2306(2) (exclusive dealing contracts for the sale of goods require the buyer "to use best efforts to promote their sales.").

As explained in more detail in the Respondents' last opposition (Docket No. 91) (App. V. IV at p. 85), none of these allegedly missing purported deliverables was either material to the development process nor due to be delivered by Descendent, and Little Orbit never actually provided any evidence that it did not already have them. (App. V. IV at p. 28).

The only asset that the Respondents had not previously completely delivered in response to Little Orbit's improper and illegitimate demands is the writable, executable copy of the game software archive history. This was lost (except for the read-only files) when Little Orbit stopped paying on the Original Contracts because it was out of money, terminated the Original Contracts and then completely stopped paying. As a result, Little Orbit rendered the Respondents unable to pay the $2, 000 per month server maintenance fees to maintain the writable, executable version of the game code history. (App. V. IV, p. 28).

The Respondents did make sure to keep and maintain the game code, because the Respondents knew that the game code is all that is necessary to finish the game. (App. V. IV, p. 28). The game code necessary to complete the development process actually had been delivered to and downloaded by Little Orbit in November of 2018. In fact, Matt Scott of Little Orbit downloaded the entire game software on or about November 20, 2018, with assistance from

25

Descendent, shortly before Little Orbit breached and then terminated the Original

Contracts by shorting a due payment. The game code automatically updated daily

through about February 15, 2019, the time of Little Orbit's wrongful termination.

Little Orbit had and needed access to the daily updated game code to build and

work on the different API that Little Orbit had insisted on, promised to complete

and then failed to complete. (App. V. IV at pp. 28-29).

Little Orbit's purported reliance on the storage requirement in Section 3.8 of

the Development Agreement that Little Orbit materially breached, terminated,

novated and displaced is erroneous and misplaced for all of the reasons stated

above as to why the Original Contracts no longer apply. In addition, Section 3.8 of

the Development Agreement is inapplicable by its express terms. (App. V. IV at p.

141). First, Little Orbit did not provide any "requirements" or directions for off-

site storage as required by Section 3.8. Second, the "final version" of the game was

never delivered due to Little Orbit's breach and wrongful termination of the

Original Contracts. (App. V. IV at p. 22). Therefore, the storage requirements and

Section 3.8 are inapplicable by their express terms.

Little Orbit's belated assertion that it is entitled an evidentiary hearing is

ironic at best. Little Orbit never made a single demand for an evidentiary hearing

on any aspect of the settlement disputes. Matt Scott, Little Orbit's only non-

attorney witness to the settlement negotiations, completely failed to appear (either

remotely or in person) at the one hearing that was held on Little Orbit's first

rejected motion to set aside the settlement agreement. (Ex. C at pp. 14-20). That

hearing at which Little Orbit's witness failed to appear resulted in the May and

June 2021 decisions rejecting Little Orbit's first motion to set aside the BSTS. In

those decisions, the district court already had rejected Little Orbit's erroneous

claims about: (1) unilateral mistake, (2) no meeting of the minds, and (3)

Descendent not providing the software deliverables it was not actually obligated to

provide. All of these claims already had been presented and rejected in connection

with Little Orbit's first motion to set aside (App. V. II at pp. 223-238), so by not

objecting to the May 24 report and recommendation, Little Orbit waived its right to

re-litigate them. *Turner,* 158 F. 3d at 455.

## LITTLE ORBIT WAS NOT ENTITLED TO ANY EXTENSIONS OF TIME

It was shocking and gravely disappointing when Little Orbit admitted in

Paragraph 3 to Matt Scott's declaration that Little Orbit had made virtually no

effort to develop the game in the first eight months since the BSTS was signed in

November, 2020 (App. V. IV at p. 77). This is truly inexcusable given that: (1) the

game software is the only asset that was actually needed to complete development

of the game; and, (2) Respondents have now established through documentary and

testimonial evidence that Little Orbit has had actual possession of the game

software since at least November of 2018. (App. V. IV at pp. 29, 53-54). That by

itself was a sufficient basis for denying Little Orbit's request for the court to again

extend its deadlines and thereby re-write the BSTS.

The BSTS was the first "written memorialization" from which Little Orbit's deadlines began to run (Ex. C at pp. 13, 17), and Little Orbit did not object to nor file any exceptions to that finding. It was completely irresponsible for Little Orbit to wait five to eight months after the BSTS was signed to make any effort to develop the game. Self-inflicted injury simply is not irreparable and does not warrant equitable relief. *Lado*, 952 F. 3d at 1008.

It is clear from the plain language of the BSTS that Respondents' obligations were limited to LICENSING the game IP and delivering ONLY a few specified items of customer data. (BSTS Sections 10 & 12) (App. V. IV at p. 164). *Inclusio unius est exclusio alterius* (the inclusion of one signifies the exclusion of the other). In the settlement of disputes or litigation, it is common to have IP licenses which are not accompanied by any obligation by the licensor to deliver the IP to the settling licensee. There is no implied obligation to deliver the licensed IP to the adverse party. (App. V. II at p. 19). Because Respondents had no obligation to DELIVER ANY game IP, Little Orbit cannot use its improper and illegitimate demands for made-up IP deliverables as an excuse for its lack of development efforts for the past eight months nor to extend its deadlines. (App. V. IV at p. 77).

The district court ordered that Little Orbit disclose the status of its development efforts, its financial condition, and the status of its fundraising efforts. (App. V. I at p. 10). Little Orbit's ongoing, voluntary failure to respond is only further evidence that it had done virtually nothing to finish the game for over eight

months and lacks the funds to complete the game. In fact, Little Orbit still has not made a single payment despite acknowledging that it now has as all the necessary IP assets and reportedly has $250,000 in its attorney's trust account. (Ex. B).

Respondents also noted in their opposition to the motion to set aside, and directly to Mr. Richardson by telephone, that Little Orbit had never actually testified that it had not in fact had possession of or access to any of the allegedly missing game IP assets.  Mr. Richardson said that that issue would be addressed in Little Orbit's reply brief. (App. V. II at p. 19).  **It was not.  Little Orbit provided no evidence stating that it did not actually have or have access to any of the allegedly missing game IP assets**. The district court was thus entitled to infer and conclude that Little Orbit actually had access to the game IP assets **(and it clearly was not entitled to them).**

III. **CONCLUSION**

In short, Little Orbit admits that it has all of the assets necessary to complete the game, and reportedly has the funds necessary to pay Descendent, but it still has not made any settlement payments. Therefore, the district court was correct to order Little Orbit and to pay Descendent the funds that should have been paid within 120 days (or at least within the first thirty days) after the BSTS was signed and to comply with the June 23, 2021 payment deadline.

In addition, due to Little Orbit's prior bad payment history, breaching of the BSTS, and poor credit report, the district court was correct to order Little Orbit to

provide the Respondents with the previously requested proof of funds, bank and financial statements, development status disclosure and fund-raising status disclosure, all as adequate assurance of due performance. *Coker Equipment Co., v. Witting*, 366 Fed. Appx. 727, 732 2010 U.S. App. LEXIS 2984 **4-6 (9th Cir. 2010) (the defendant "breached the contract by failing to provide adequate assurance of due performance"); *Price v. U.S. Monolithics, LLC*, 2005 U.S. Dist. LEXIS 53065 **1-8 (S.D. Cal. 2005) (party may demand adequate assurance of due performance under *Restatement (Second) of Contracts* § 251); *Restatement (Second) of Contracts* § 251.

Little Orbit's development rights and IP license are at risk solely because it voluntarily chose not to: (1) pay the settlement payment(s), (2) provide financial and development status data, or (3) timely commence development and ask for the game software (which it already had). This type of self-inflicted harm is not irreparable and does not warrant issuing a stay pending appeal. *Lado,* 952 F. 3d at 1008, *Hirschfeld,* 984, F. 2d at 39 (2d Cir. 1993); *Second City,* 333 F. 3d at 850; *Caplan,* 68 F. 3d at 839.

Even as to the November 2021 deadline for completing development of the game, which is over ten weeks away, Little Orbit's harm is largely self-inflicted in that it had the game code all along, (App V. IV at pp 28-29), did not ask for anything else relevant to development until April of 2021(App V. IV of p. 28) and

30

did nothing to develop the game for at least eight months after the binding settlement agreement was signed. (App V. IV at p. 77).

In addition, Little Orbit is highly unlikely to prevail on the merits of the appeal for the myriad of reasons stated above. It has no justification for not seeking a stay from the district court. The order it is appealing from is not final, and the magistrate who brokered the settlement agreement rejected Little Orbit's meritless challenges without timely objection.

Dated: September 3, 2021          By: _____

                                    Michael C. Whitticar
                                    Nada I. Shamonki

                                    *Attorneys for Defendants/Appellees*
                                    *Descendent Studios Inc. and Eric Peterson*

# EXHIBIT A



DEFENDANT'S EXHIBIT A

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

---

LITTLE ORBIT, LLC

Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,

Defendants – Appellees

---

On Appeal from the United States District Court for the Central District of California

Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge

## **DECLARATION OF MICHAEL C. WHITTICAR**

1.      I, Michael C. Whitticar, am over eighteen years of age, of sound mind, and competent to testify to the facts stated herein. I have personal knowledge of the facts stated in this declaration.

2.      More than a month after the challenged district court order was entered, Little Orbit still has not made any settlement payments and has not provided the development status or financial data and documents ordered by the district court on July 27, 2021.

3.     For over a month now, Little Orbit has voluntarily disregarded the district court's order to make the settlement payments (at least the first one) and to produce adequate assurance of due performance by producing financial and development status data and documents.

4.     Exhibit B to Little Orbit's motion is a "meet and confer" email requesting Little Orbit to meet and confer about the consequences of it failing to make any settlement payments and failing to provide adequate assurance of due performance. It was sent pursuant to Central District Local Rule 7-3 so that the parties could meet and confer before Little Orbit files a motion in the district court to terminate the BSTS and the intellectual property ("IP") license contained therein. No such motion has been filed.

5.     During the meet and confer, Little Orbit indicated that it has no intention to make the settlement payment nor to comply with the district court's adequate assurance order. Violating the district court's order for over a month, Little Orbit still has provided no adequate assurance documents and has made no settlement payments.

2

## **VERIFICATION**

I, Michael C. Whitticar, on this 3rd  Day of September, 2021 pursuant to the laws of the State of California, the Commonwealth of Virginia and the United States of America, hereby certify and declare under oath and under penalty of perjury that the foregoing is true and correct and that the facts stated in this Declaration are true and correct.

_____

Michael C. Whitticar

3

# EXHIBIT B



DEFENDANT'S
EXHIBIT
B

IN THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

_____

LITTLE ORBIT, LLC

Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,

Defendants – Appellees

_____

On Appeal from the United States District Court for the Central District of California

Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge

## DECLARATION OF ERIC PETERSON

1.     I, Eric Peterson, am over eighteen years of age, of sound mind, and competent to testify to the facts stated herein. I have personal knowledge of the facts stated in this declaration.

2.     Unless and until Descendent Studios receives court approval of the potential termination or cancellation of the Binding Settlement Terms Sheet, it is making no effort to independently release the game.

3.    Little Orbit still has not made a single settlement payment despite acknowledging that it now has as all the necessary intellectual property assets and $250,000 in its attorney's trust account.

4.    Little Orbit has not produced or provided to me or to Descendent Studios any bank statements, or any financial, development status or fundraising status data or documents since June 1, 2021.

## **VERIFICATION**

I, Eric Peterson, on this 3rd Day of September, 2021 pursuant to the laws of the States of California and Texas and the United States of America, hereby certify and declare under oath and under penalty of perjury that the foregoing is true and correct and that the facts stated in this Declaration are true and correct.

_____
Eric Peterson

2

# EXHIBIT C

**DEFENDANT'S EXHIBIT**

1      UNITED STATES DISTRICT COURT
       CENTRAL DISTRICT OF CALIFORNIA
2       SOUTHERN DIVISION - SANTA ANA

3

4   LITTLE ORBIT LLC,          )  Case No. SACV 20-89-DOC (JDEx)
                               )
5         Plaintiff,           )  Santa Ana, California
                               )  Monday, May 24, 2021
6            v.                )  12:00 P.M.
                               )
7   DESCENDENT STUDIOS INC.,   )  VIDEOCONFERENCE
    et al.,                    )
8                              )
          Defendants.          )
9   _____)

10

11

12

13                    TRANSCRIPT OF PROCEEDINGS
             BEFORE THE HONORABLE JOHN D. EARLY
14            UNITED STATES MAGISTRATE JUDGE

15

16  Appearances:              See Page 2

17  Deputy Clerk:             Maria Barr

18  Court Reporter:           Recorded; CourtSmart

19  Transcription Service:    JAMS Certified Transcription
                              16000 Ventura Boulevard #1010
20                            Encino, California  91436
                              (661) 609-4528
21

22

23

24
    Proceedings recorded by electronic sound recording;
25  transcript produced by transcription service.

1  APPEARANCES:

2

3  For the Plaintiff:       Law Office of M. Danton Richardson
                            By:   MICHAEL DANTON RICHARDSON
4                           131 North El Molino Avenue, Suite 310
                            Pasadena, California   91101
5                           (949) 677-6434
                            mdantonrichardson@yahoo.com
6

7
   For the Defendants:      Nova IP Law PLLC
8                           By:   MICHAEL C. WHITTICAR
                            7420 Heritage Village Plaza, Suite 101
9                           Gainsville, Virginia   20155
                            (571) 386-2980
10                          mikew@noaiplaw.com

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1       SANTA ANA, CALIFORNIA, MONDAY, MAY 24, 2021, 12:00 P.M.

2           THE COURT: I think we have -- Mr. Whitticar, is --

3   I don't see you. I see "Nova IP Law." Are you present,

4   Mr. Whitticar?

5           MICHAEL C. WHITTICAR: I am here. Yes, I am.

6   (Indecipherable) if I start video. One moment, Your Honor.

7   There we go. Sorry. (Indecipherable.)

8           THE COURT: Okay. Calling Case No. 8:20-CV-89-DOC-

9   JDE, Little Orbit LLC v. Descendent Studios Inc. and

10  Eric Peterson and related counter claim -- or claims. We are

11  here proceeding by videoconference in the United States

12  District Court for the Central District of California on

13  defendants' motion to enforce a settlement agreement. We

14  will start by taking appearances of counsel, please.

15          MICHAEL DANTON RICHARDSON: Yes, Your Honor.

16  Danton Richardson here on behalf of the plaintiff, Mr. --

17          THE COURT: All right. I just need counsel's

18  appearance all -- that's all I need.

19          MR. RICHARDSON: Okay. Fine.

20          THE COURT: And on behalf of defendants?

21          MR. WHITTICAR: Michael Whitticar, Your Honor.

22          THE COURT: All right. So there's a lot of under-

23  seal filings. I'm just going to tell you in general what

24  I've reviewed, and the reason why we're here is pursuant to a

25  referral by Judge Carter to proceed by way of videoconference

1  at 12:00. p.m. today, May 24, 2001 [sic] on the motion, and

2  there's a lot of ex parte and under-seal filings so some of

3  these references may be to sealed or redacted filings, but

4  I've reviewed defendants motion to enforce settlement

5  agreement with the request for attorneys' fees -- it's, like,

6  maybe, Docket 61 -- and the supporting memorandum and

7  evidence; I've received and reviewed plaintiff's opposition

8  to the motion with supporting evidence and objections to

9  defendants' evidence; I've received defendants' reply brief,

10  response to objections to evidence -- I think there was an

11  additional declaration submitted -- and defendants own

12  objections to plaintiff's evidence; and then, lastly, there

13  was a request for judicial notice filed by plaintiffs on

14  May 17, 2021.

15          Bearing in mind that there's a lot of sealed and

16  unsealed filings within that universe, starting with

17  defendant, because you're the moving parties, is there

18  anything that I should have considered that I haven't?

19          MR. WHITTICAR:  Well, the only -- no, Your Honor.

20  I think it's all covered in our briefs.  If I was -- my

21  opening argument --

22          THE COURT:  I just want -- of everything that I

23  just read off, is there anything else that's -- that I didn't

24  mention that I should have considered?

25          MR. WHITTICAR:  No, Your Honor.

1        THE COURT:  All right.

2        And from plaintiff?

3        MR. RICHARDSON:  That's everything, Your Honor.

4        THE COURT:  All right.  I'm going to start with

5   some procedural thoughts, and then we'll hear from you.

6        The plaintiff's request for judicial notice was

7   filed after the briefing was closed.  Under the Local Rules,

8   it's in violation of the Local Rules.  It's an improper

9   surreply.  I'm not going to consider that.

10       In terms of evidentiary objections, I'm going to

11  make a global ruling that I'm considering only admissible

12  evidence and not considering any evidence that's not

13  admissible.

14       In terms of a tentative, I'll tell you my tentative

15  is to deny the motion but not do what plaintiff seems to be

16  asking me to do, which is to declare that there's no

17  agreement.  I find there is a binding, enforceable settlement

18  agreement, and that it's clear its terms were understood by

19  the parties at the time, and there was a meeting of the

20  minds.

21       The only proviso to that is I do think the parties

22  anticipated at least the possibility of a more-detailed

23  written settlement agreement, and that's contained -- and I'm

24  going to stay in -- I'm not putting us under seal today

25  unless someone wants me to.  I'm going to focus on, I think,

6

1  what are not any way financial or things that could be
2  considered confidential, but the settlement agreement itself
3  contemplated the parties "may" -- and that was the term that
4  was used -- "may" attempt to have a "further" -- and they
5  used the term "further" -- writing but that the parties also
6  confirmed that they understood that the document that was
7  placed on the docket under seal was, in and of itself, a
8  binding and enforceable agreement.

9          So my inclination, though, is to deny the motion,
10 which wants it enforced, and here's why: I do think that it
11 would be fair to say the parties did contemplate the
12 possibility of a final -- more final, detailed settlement
13 agreement.  That didn't happen.  I'm not going to order
14 plaintiff to sign what's been attached as Exhibit C to the
15 declaration in support of the motion because that's not --
16 that's not the same thing as what's already a binding,
17 enforceable settlement agreement.  But I'm also not going to
18 say that plaintiff is in default by not making the initial or
19 follow-up payments.  I would run those -- the payment dates
20 -- I think the first one was due 60 days from the final
21 settlement agreement, and I'm going to run it from today.

22          So that's my tentative thoughts, and I would deny
23 -- neither party, I don't think, gave me a statutory basis
24 for attorneys' fees and I -- and even if there were one, I
25 would find it not warranted here.  So the motion would

1  technically be denied, but there is a binding, enforceable

2  settlement agreement that the parties need to comply with.

3       All right.  It's defendants' motion.  I'll hear

4  from defense counsel first.

5       MR. WHITTICAR:  Yes, Your Honor.  I guess where we

6  got here was from plaintiff taking the position that it

7  could, a -- that it could essentially not make any of the

8  three settlement payments and the only remedy for that was a

9  very limited advancement in the percentages of the funds paid

10  to my client, which would not result in any additional money

11  to my client but would only result in an acceleration of

12  payments to my client, but I think we have a dispute over the

13  meaning and interpretation of the settlement agreement with

14  respect to that very important term.

15       THE COURT:  Well, we haven't got there yet, as far

16  as I'm concerned.

17       MR. WHITTICAR:  Yeah.  And then we also have a

18  problem with --

19       MR. RICHARDSON:  Your Honor, if I may interrupt.

20  If --

21       THE COURT:  No, you may not, sir.  I'm hearing from

22  defendants.  Thank you.

23       MR. RICHARDSON:  Well, I was going to ask that it

24  be under seal if we're going to get into the particulars.

25       THE COURT:  I'm not going to place this under seal.

8

1  So I'm going to ask counsel to please be -- and I'm going to

2  be blunt.  The amount of sealing here is ridiculous.  Now,

3  maybe it was done as a courtesy to me because I placed a

4  settlement agreement under seal, but the parties here and how

5  things have been filed, it made it very difficult to follow

6  with the amount of redaction on things that clearly should

7  not be redacted, and I owe a duty to -- you owe a duty to

8  your clients.  I owe a duty to the public, and this is a

9  public courthouse, this is a public dispute, and barring, for

10  nondispositive matters, good cause -- and for dispositive

11  matters -- and you can certainly make a case -- I'm not

12  making a finding -- this is dispositive matter -- compelling

13  reasons, and we don't have compelling reasons for a lot of

14  what's been redacted.

15          So I'm going to suggest that the parties, if they

16  get into something specific, be careful, but I don't think

17  whether or not the parties fight over the meaning of a word

18  -- one word that is not, in and of itself, confidential or

19  even surprising that it's in a settlement agreement is not

20  good cause and certainly not compelling reasons to seal.

21          All right.  Let's proceed.  Back to counsel for

22  defendants, Mr. Whitticar.

23          MR. WHITTICAR:  Yes, Your Honor.  So I appreciate

24  that there's a binding settlement agreement based on the term

25  sheet, and I don't think our side has ever disputed that.

1  The question is that the plaintiff has announced in fairly
2  clear, unequivocal writings its intent not to abide by that
3  settlement agreement when they said they're not going to make
4  the three payments; when they said they're not going to
5  market the game; and when they said they're not going to
6  honor, you know, the common sense, ordinary, plain language
7  definition of "revenue" and --

8      THE COURT:  Well, here's what I'm telling you: that
9  the -- the first payment was due in -- and unfortunately my
10  CM -- my electronic filing system is down, and I don't have a
11  copy of the order in front of me, and it doesn't appear to be
12  included in the other things that I have, but the first
13  payment is due 60 days, as I recall, from -- and the language
14  that's used in --

15      MR. WHITTICAR:  It was 30 days --

16      THE COURT:  Let me speak, please, sir.

17      MR. WHITTICAR:  Sorry --

18      THE COURT:  The language that's used is from,
19  quote, "the signing" -- or -- and I'm paraphrasing now so I
20  should not say "quote," but the signing of a "written
21  memorialization," and then later on the parties say,
22  (reading) Each party intends to be bound by this agreement
23  and recognize that "it" -- the agreement -- is a final and
24  binding settlement agreement even though the parties (end
25  reading) -- and here's the key -- (reading) "may" draft and

1  execute a further, more detailed, written memorialization
2  (end reading).

3          So the parties contemplated it -- that it was
4  possible.  It didn't happen.  So now we're going to revert to
5  the settlement agreement that was put on the record way back
6  in -- on November 17th.  But in fairness to plaintiff, I'm
7  not going to make that retroactive -- that his payment was
8  due 60 days from November 17th.  I'm going to make that
9  payment due -- and I'm saying "60 days."  Maybe it was
10  30 days -- from today.  So plaintiff will have an opportunity
11  to comply.  If he doesn't make that payment, then we'll see
12  where we are, but that's what we're going to do.  I see --
13  I'm going to hold my tongue.

14          Please continue, Mr. Whitticar.

15          MR. WHITTICAR:  So the second issue, Your Honor,
16  was that the plaintiff said that they were going to treat
17  revenues as some kind of net sales under the original
18  development agreement which was of course --

19          THE COURT:  It's not -- that dispute is not ripe
20  for me.  Okay?  Come back to me, if you need to, if the first
21  payment is not made.  I think revenue -- the meaning of it is
22  clear.  It's not ambiguous.  It was clear from the context of
23  the agreement itself, and from the parties course of dealing,
24  it was not unclear.  It appears to me that the -- there's
25  been an effort made by plaintiff to create an ambiguity where

1   there was none, but it's not -- unless and until that first

2   payment is missed, you're asking me -- and I do think this is

3   fair from plaintiff -- you're asking me or Judge Carter to

4   make a advisory ruling when it's not before us. We make

5   rulings on actual, live disputes. Even if everybody says

6   it's going to be a dispute 60 days from now, I'm not walking

7   you guys through this.

8         You had a full and fair opportunity to put whatever

9   terms you wanted in a term sheet, in a settlement agreement,

10   and I said, I'll put whatever you -- whatever terms you want

11   will be what the settlement terms are. This is what is

12   before us. I find that it's not ambiguous and the meaning is

13   clear based on the course of dealing with the party and the

14   language used, and I'm not going beyond that unless there's

15   some particular ripe dispute.

16         MR. WHITTICAR: Okay. And then the third issue,

17   Your Honor, was them saying that they refused to market the

18   game or spend on marketing or user acquisition --

19         THE COURT: Again, I -- I'm just going to repeat

20   myself. It's not a ripe -- it's not ripe at this point. I'm

21   not going to get into that. The agreement is clear. If you

22   hit a point where that has been violated, as opposed to them

23   expressing their agreement about what the -- their views on

24   what the agreement means, so be it, but let's get first

25   things first. There's no more -- there's -- this is clear:

12

1  There's no more -- there's no more "further" written
2  settlement agreement.  It was contemplated, didn't happen.  I
3  think it's fair to give plaintiff time now to comply with the
4  first payment under the agreement.  It'll run from today,
5  May 24th, and if they don't make that payment, whatever the
6  remedies are, they are.

7          Anything further, Mr. Whitticar?

8          MR. WHITTICAR:  I understand Your Honor's ruling.
9  The only reason we contend that this was ripe and needs to be
10 addressed is they've already written us and told us they're
11 not going to do that, which I would consider an anticipatory
12 breach which makes --

13         THE COURT:  Nope.  I disagree.

14         All right.  Let's turn to Mr. Richardson.  Anything
15 you want to argue on any point or anything I've said?

16         MR. RICHARDSON:  Yes, Your Honor.  I -- there's
17 only one point that I really need to address.  I understand
18 the rest of everything you're saying and would concede, but
19 as far as singling out in the term sheet the language "may"
20 be a written agreement, it's unfortunate that the word "may"
21 was used.  I would point out in the very beginning of the
22 agreement the payment terms were all triggered based on the
23 signing of a "written memorialization."  That shows, to me, a
24 clear intent that the parties planned to have a written
25 agreement and everything was contingent on that.  So I --

1           THE COURT:  No.  But I'm going to -- here's where
2   I'm going to disagree with you.  There -- you -- there were
3   -- in addition to the word "may" -- that's not the only thing
4   I'm hanging my hat on.  In addition to the word "may," right
5   after the word "may," it says "draft" and "execute," and then
6   it says a "further, more detailed, written memorialization."
7   So it says a "further"; so it acknowledges that's what being
8   put on the record itself was -- again, the words are
9   important -- a "written memorialization," and bear in mind
10  that the payment obligation, the triggering language is what?
11  "Written memorialization."

12           So the fact that there may have been an intent to
13  have a "further" or a "possible" -- "may" have a further
14  written memorialization, the language "written
15  memorialization" was the triggering language on the payment
16  and -- again, this is where it's crystal clear -- (reading)
17  each party intends to be bound by this agreement and
18  recognize that "it" is a final and binding settlement
19  agreement (end reading).

20           So I disagree with your interpretation, and, again,
21  I think it's clear, and we're going to use that language, and
22  I'm going to give your client -- and I think it's only fair
23  now that this determination has been made to run the payment
24  obligation from today, rather than from the date of the
25  settlement agreement.

1    MR. RICHARDSON:  Thank you, Your Honor.  That's all
2  I have.

3        THE COURT:  All right.  So I guess I wish we had a
4  representative from plaintiff beyond counsel here so that
5  maybe I could talk -- we're on the record, and we're in open
6  court; so I'm not going to be getting into anything that
7  happened in our settlement conference but --

8        MR. RICHARDSON:  I'll relay anything you would like
9  to share, Your Honor, with Mr. Scott.  He wanted to be here,
10  but unfortunately he was en route traveling at this time.

11        THE COURT:  Well, I'm just going to leave it with
12  this: You folks need to work this out and finalize it, and
13  I'm not here to blame, but I am here to say that the --
14  although not lengthy, the settlement agreement is clear, and
15  maybe nothing will come of the issues -- the substantive
16  issues that are discussed in the settlement agreement, but
17  trying to declare it unclear or unworkable and go back to a
18  status quote ante back in November when you're all going to
19  suddenly be trying to prepare for a trial that's in no one's
20  interest and that is going to result in no one being happy --
21  and I'll give you a perfect example.  I think you've told me
22  combined you'd spent close to $15,000 on this motion, and
23  maybe I missed it: On what statutory basis is there a request
24  for fees from either side?

25        MR. WHITTICAR:  It'd have been the settlement

1   agreement itself, Your Honor.

2         THE COURT: Well, but that -- the terms that are --

3   the settlement agreement -- maybe I missed it. Does the --

4   what was put on the record at Docket 48-1 -- did that have

5   attorneys' --

6         MR. WHITTICAR: Paragraph 18, Your Honor.

7         THE COURT: -- fee provision?

8         MR. WHITTICAR: Yes, Your Honor. Paragraph 18.

9         THE COURT: Oh, okay. Well, let me look at that.

10   See if my CM is back up. Maybe I'll revisit that one.

11         Oh, you know what? You're right. I'm sorry,

12   Mr. Whitticar. You are correct. So maybe we should revisit

13   that. So tell me -- Mr. Whitticar, tell me why -- even

14   though I'm going to deny the motion, why I should award your

15   client attorneys' fees in connection with the language in the

16   settlement agreement, which is prevailing party may recover

17   attorneys' fees and expenses.

18         MR. WHITTICAR: Because we're now six months after

19   the first written memorialization and the binding settlement

20   term sheet and we haven't received any money and we haven't

21   received any payments. They've sent at least two emails

22   stating that they don't intend to abide by the clear --

23         THE COURT: Well, you're rearguing the motion.

24   I've told you I'm going to deny the motion. So in light of

25   the fact that the motion is going to be denied, why your

16

1  client would be the prevailing party on the motion.

2          MR. WHITTICAR:  I think the definition of

3  "revenues" is about a hundred-million-dollar -- sorry --

4  about a million-dollar question as we would expect there to

5  be about a --

6          THE COURT:  Well, maybe you'll be able to take care

7  of that in the future, but for right now I'm denying the

8  motion.  So how is your client the prevailing party?

9          MR. WHITTICAR:.  If that's the Court's ruling, then

10  I would say that we're not, Your Honor.

11          THE COURT:  All right.

12          Mr. Richardson, you had a cross-request for

13  attorneys' fees.  In light of the fact that I'm not granting

14  the relief that your client requested on the motion and I'm,

15  in fact, directing that the running date -- I'm doing your

16  client a favor in having the running date for its -- for his

17  -- or its payment run from today, rather than November 17th,

18  do you contend your client is the prevailing party?

19          MR. RICHARDSON:  Yes, as to the defendants' motion,

20  we are.  It was premature.  It should have been clear it's

21  premature.

22          THE COURT:  Well, maybe -- you know what?  In light

23  of that argument, maybe I should get to the claim of

24  anticipatory breach.  Maybe it's not premature anymore.  And

25  I didn't say it was premature, but maybe we should get --

1        MR. RICHARDSON:  Well, it's not ripe yet.  There's

2  a payment obligation that was triggered based on a written

3  memorialization, and there's been no written memorialization.

4  So now we have a finite date --

5        THE COURT:  Well, there has been a written

6  memorialization.  The same term is used to describe the

7  settlement agreement itself -- "written memorialization."  It

8  describes "it" as a "written memorialization."  The question

9  was whether there would be a "further" written

10  memorialization.  Maybe I should reach the issue of the

11  anticipatory breach if we're just going to be back here --

12  what I'm trying to get a sense of, Mr. Richardson: Is your

13  client going to make the payment?

14        MR. RICHARDSON:  We certainly have the ability to

15  make the payment.  What counsel is referring to, this email

16  traffic back and forth, came about when the parties were

17  trying to work out their differences about what deductions

18  could be made and those type of issues, and so it was said by

19  my client without consulting his attorney, and it was

20  basically said, "Well, if you're going to do X, then here's,"

21  you know, "what we can do."  And saying it is one thing;

22  doing it is something different.  For there to be a breach,

23  it takes action.  And so we're not there yet, but my client

24  has every intent to comply with the agreement.

25        MR. WHITTICAR:  May I respond to that, Your Honor?

```
 1          THE COURT:  No.

 2          Here's what plaintiffs wrote in their opposition:

 3   (reading) Defendants' motion is basically asking this Court

 4   to rewrite and also add terms to the settlement term sheet

 5   entered between -- into between the parties (end reading) --

 6   and I'm reading from page 2 of the opposition brief.

 7   (Reading) This is not authorized under the law, and the

 8   motion should be denied.  In fact, what the motion clearly

 9   establishes is that there was never a meeting of the minds

10   between the parties as to the essential terms required for

11   settlement of this action, and the Court should therefore

12   declare the settlement term sheet not valid and set a new

13   trial and related dates in this matter (end reading).

14          So that's what plaintiff's requested and I --

15   that's not warranted.  Defendants not getting what they

16   wanted because of the only issue about whether there would be

17   a final written settlement -- a "further" final written

18   settlement agreement.

19          So I'm finding neither party is the prevailing

20   party in the context of this motion, and I would strongly

21   urge the parties to, rather than spending money filing serial

22   sealing documents and objections to evidence, and sealing

23   objection -- portions of objections to evidence, and

24   responding to objections to evidence, and belated -- late

25   not-permitted requests for judicial notice attaching pages
```

1  upon pages of dictionary -- copies of online dictionaries --
2  you had a meeting of the minds on November 17th.  The terms
3  as set forth in the binding written settlement agreement that
4  everyone agreed was a binding written settlement agreement
5  are clear, are sufficient, and should be complied with.  I'm
6  -- we're going to run that compliance date for the first
7  payment from today, and if the parties declare a breach, then
8  I guess we'll be back, but I'm not going to recommend that
9  the -- either that the motion itself, as written, be granted,
10  that the relief sought by plaintiff be granted, or that
11  either side's attorneys' fee request be granted.

12        But I will offer, if anyone thinks it's of
13  assistance, outside the context of this hearing -- and it was
14  referred to me by Judge Carter; so I will be providing to him
15  a further response about today's proceedings.  If the parties
16  want my further assistance to try to work through issues on a
17  -- what I would call a "continuing settlement conference" --
18  so covered by the California state mediation privilege -- I'm
19  available.  Send an email to my courtroom deputy the same way
20  you set up the initial settlement conference.

21        But that's likely to be the ruling from the Court.
22  I'll give each side one more opportunity to not repeat things
23  that are in your papers that we've already covered.

24        Mr. Whitticar, is there anything further from
25  defendants, as the moving party, having heard my tentative

1    thoughts?

2         MR. WHITTICAR:  The only addition I would have,

3    Your Honor, is that in an email attached as Exhibit A to

4    Mr. Peterson's first declaration, Little Orbit clearly said,

5    "I am not going to make the payments."  So I understand the

6    Court's ruling, but I do think that him having unequivocally

7    said that he's not going to make the payments, it is ripe for

8    adjudication.

9         THE COURT:  Well, as I mentioned, the issue about

10   whether there would be a final written settlement agreement,

11   even though that's not what the agreement says, left open

12   sufficient ambiguity for the parties to continue to discuss.

13   So I'm not finding that that was an anticipatory breach.

14        And, Mr. Richardson, anything further on behalf of

15   plaintiff?

16        MR. RICHARDSON:  That's all.  We'll submit,

17   Your Honor.

18        THE COURT:  All right.  So technically the matter

19   is under submission, but there will be a written ruling in

20   some form as soon as possible.  But again, I wish there was a

21   representative from plaintiff here so that we could talk

22   about it, we could even go off the official record and switch

23   into mediation mode, but I'm not going to do that without the

24   actual party being here.  So I appreciate everyone's

25   thoughts.  There will be an order forthcoming.

1          Is there anything further on behalf of plaintiff?

2          MR. RICHARDSON:  Nothing, Your Honor.

3          THE COURT:  Anything further on behalf of

4    defendants?

5          MR. WHITTICAR:  No, Your Honor.  Thank you for your

6    --

7          THE COURT:  All right.  Thank you.  We are

8    concluded.

9        (Proceedings adjourned.)

10   ///

11   ///

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1

2

3

4                                   CERTIFICATE

5               I certify that the foregoing is a correct

6    transcript from the electronic sound recording of the

7    proceedings in the above-entitled matter.

8

9    /s/ Julie Messa                    May 29, 2021
     Julie Messa, CET**D-403            Date
10   Transcriber

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

9th Circuit Case No. 21-55852

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

When All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on _____ **September 3, 2021**_____.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Signature (use "s/" format)          /s/ Nada I. Shamonki_____

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

## CERTIFICATE OF SERVICE

When <u>Not</u> All Case Participants are Registered for the Appellate CM/ECF System

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on _____.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

I further certify that some of the participants in the case are not registered CM/ECF

users. I have mailed the foregoing document by First-Class Mail, postage prepaid,

or have dispatched it to a third party commercial carrier for delivery within 3

calendar days to the following non-CM/ECF participants:

Signature (use "s/" format)          _____