**REDACTED**                    Appeal No. 21-55852

_____

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT
_____

LITTLE ORBIT, LLC
Plaintiff – Appellant,

vs.

DESCENDENT STUDIOS INC. and ERIC PETERSON,
Defendants – Appellees

_____

On Appeal from the United States District Court for the Central District of
California
Civil Action No. 8:20-cv-00089-DOC-JDE, Hon. David O. Carter, Judge

_____

**APPELLANT'S OPENING BRIEF**

**[REDACTED]**
_____

M. DANTON RICHARDSON (State Bar No. 141709)
mdantonrichardson@yahoo.com
LAW OFFICES OF M. DANTON RICHARDSON
131 N. El Molino Ave., Suite 310
Pasadena, CA 91101
Telephone: (949) 677-6434

Attorneys for Plaintiff/Appellant, LITTLE ORBIT LLC

## **TABLE OF CONTENTS**

Contents

I.   INTRODUCTION ........................................................6

II.   JURISDICTIONAL STATEMENT ...........................8

III.   STATEMENT OF ISSUES.....................................8

IV.   STATEMENT OF THE CASE ...............................10

V.   SUMMARY OF THE ARGUMENT.........................21

VI.   STANDARDS OF REVIEW ..................................24

VII.   ARGUMENT........................................................25

A.   The District Court Violated Little Orbit's Right To Due Process By Granting Descendent's Motion To Enforce The BSTS Before Little Orbit Had Filed An Opposition Thereto And The Time For Filing An Opposition Had Not Yet Expired ........................................................25

B.   The District Court Abused Its Discretion By Considering New Issues And Arguments Raised By Descendent In Its Motion To Enforce The BSTS After The Completion Of Briefing On Little Orbit's Motion To Set Aside The BSTS, And Relying On Descendent's New Issues And Arguments In Denying Little Orbit's Motion to Set Aside The BSTS, Without Allowing Little Orbit To Respond And Rebut Descendent's New Issues And Arguments ................................28

C.   Paragraph 4 Of The BSTS Provides An Alternative To The Initial Payments Called For In The BSTS Rather Than A Penalty For Missing Initial Payments To Be Paid In Addition To Those Initial Payments ...................................30

D.   Interpretation Of Paragraph 4 Of The BSTS To Require Payment of The Initial Payments In Addition To An Increased Percentage Of The First $700,000 In Income From Sales Of The Game Would Constitute An Unlawful Penalty Under California Law .............................................................................33

E.   The Deadline to Release the Game Runs from May 24, 2021, as Provided in the District Court's June 17, 2021, Order .............................................................36

F.   The BSTS Is Unenforceable Because There Was No Meeting Of The Minds Of The Contracting Parties As To The Meaning Of The Essential Term "Revenues"...................................................................................................37

VIII.  CONCLUSION ...............................................................................43

# <u>TABLE OF AUTHORITIES</u>

## Cases

*Balistreri v. Nev. Livestock Prod. Credit Ass'n*, 214 Cal.App.3d 635, 641-42, 262
Cal.Rptr. 862 (1989) ..........................................................................37

*Berry v. Dep't of Social Services*, 447 F.3d 642, 648 (9th Cir. 2006)....................24

*Chicago Title Ins. Co. v. AMZ Ins. Services, Inc. (*2010) 188 Cal.App.4th 401, 422
[115 Cal. Rptr. 3d 707] .....................................................................37

*Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) .............................................26

*Conrad v. Ace Property & Cas. Ins. Co*., 532 F.3d 1000, 1004 (9th Cir. 2008).....24

*Crime Justice & Am., Inc. v. Honea*, 876 F.3d 966, 971 (9th Cir. 2017)...............24

*Dusenbery v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 151 L. Ed. 2d 597
(2002) ........................................................................................ 26, 29

*Ginoyan v. Barclays Bank Del*., 443 F. Supp. 3d 1136, 1140 (C.D. Cal. 2020) .....37

*Khup v. Ashcroft*, 376 F.3d 898, 902 (9th Cir. 2004) .............................................24

*Krug v. Lutz*, 329 F.3d 692, 695 (9th Cir. 2003) ...................................................24

*Lamantia v. Voluntary Plan Administrators, Inc.*, 401 F.3d 1114, 1118 (9th Cir.
2005)....................................................................................................24

*Lambright v. Ryan*, 698 F.3d 808, 817 (9th Cir. 2012) ..........................................28

*Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976) .............. 25, 26

*Moritz v. Universal City Studios LLC*, 54 Cal. App. 5th 238, 246, 268 Cal. Rptr. 3d
467 (2020) ............................................................................................37

*Orloff v. Cleland*, 708 F.2d 372, 378-79 (9th Cir. 1983)........................................25

*Platero-Cortez v. INS*, 804 F.2d 1127, 1132 (9th Cir. 1986) ..................................26

*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378, 953 P.2d 484) ...............................................................................35

*Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 933 (9th Cir. 2017).......................25

*S.D. Myers, Inc. v. City & County of San Francisco,* 253 F.3d 461, 466 (9th Cir. 2001)........................................................................................................24

*Shaw v. City of Sacramento*, 250 F.3d 1289, 1293 (9th Cir. 2001).......................25

*Southern California Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir. 2002)........24

*Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1021 (9th Cir. 2016).........................24

*United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1264 (9th Cir. 2003) ... 24, 25

*United States v. James Daniel Good Real Prop.*, 510 U.S. 43, 48, 114 S. Ct. 492, 126 L. Ed. 2d 490, (1993) ......................................................................26

*United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012)..............................28

**Statutes**

15 U.S.C. § 1332...................................................................................................8

28 U.S.C. §1291....................................................................................................8

Cal. Civ. Code § 1580 ........................................................................................37

Civ. Code, §§ 1550, 1565 ..................................................................................37

Cal. Civil Code § 1671........................................................................................34

Code Civ. Proc., § 1281 .....................................................................................37

## I.     INTRODUCTION

Appellant, LITTLE ORBIT, LLC ("Little Orbit"), appeals from a July 27, 2021, Order denying Little Orbit's Motion to Set Aside a Binding Settlement Terms Sheet ("BSTS") and granting Defendants/Appellees DESCENDENT STUDIOS INC. and ERIC PETERSON's (collectively "Descendent") subsequently filed Second Motion to Enforce the BSTS ("Motion to Enforce") without even waiting for Little Orbit to submit an opposition thereto.  The Binding Settlement Terms Sheet ("BSTS") in issue was hastily drafted during a settlement conference with Magistrate Judge John D. Early and merely set forth a short-hand version of key deal points lacking details or specifics and for which there was no meeting of the minds on key issues or involved a clear mistake on the part of Little Orbit.

In fact, rather than produce finality between the parties, the BSTS has resulted in no less than five motions before the District Court already and will also lead to even further litigation between the parties given the on-going disputes regarding the requirements of the BSTS.  [See Docket, ER Vol III, pp 317-22] Those multiple disputes include whether Defendants needed to turn over Game IP they licensed (an obligation they have denied since it was not expressly spelled out in the BSTS notwithstanding the fact the very purpose of the BSTS for to license the game IP assets for their further development and release), the structure of

payment remedies, and more recently the amount of finished game features required to meet Plaintiff's obligation to "release and sell" the game within one year.

The District Court considered Descendent's Second Motion to Enforce in ruling on Little Orbit's Motion, effectively treating it as a sur-reply, as was obviously intended by Defendants since their Motion to Enforce expressly referred to and addressed points raised in Little Orbit's reply papers in violation of the Court's own courtroom rules and Local Rule 7-10. The essence of Descendent's Motion to Enforce was that Little Orbit was insolvent because it had not paid the initial payment required under the BSTS and had not proceeded to produce the Game. Had Little Orbit been given a chance to respond, it would have supplied bank statements to show financial stability and ample funds to complete the Game. Little Orbit would have proved via email communications from Defendants that they refused to turn over the game code multiple times until well into June 2021, and the game related assets in July 2021, more than six and seven full months after the BSTS was signed, and the lack of current game code was the reason Little Orbit could not start development.

Not only did the District Court grant Descendent's Motion to Enforce without providing Little Orbit an opportunity to respond, but thereby deprived Little Orbit the opportunity to show the falsity of Defendants' newly raised

arguments. The District Court even expressly and repeatedly referred to points made in Descendent's Motion to Enforce as grounds for denying Little Orbit's Motion to set aside the BSTS. The District Court's handling of the two Motions was blatantly unfair, deprived Little Orbit of due process and resulted in a ruling based on a one sided and false set of facts. Such a ruling should be reversed and remanded for the sake of due process and substantial fairness.

## II.      JURISDICTIONAL STATEMENT

This Court has subject matter jurisdiction in this action pursuant to 15 U.S.C. § 1332, and the amount in controversy exceeds $75,000, exclusive of interest and costs. [ER Vol III, p. 311]

This is an appeal from an Order entered by the District Court on July 27, 2021, enforcing a settlement agreement between the parties. [ER Vol I, p. 2] Appellant timely filed its Corrected Notice of Appeal on August 5, 2021. [ER Vol III, p. 298] Fed.R.App.P. 4(a)(1)(A). Therefore, this Court has jurisdiction pursuant to 28 U.S.C. §1291.

## III.    STATEMENT OF ISSUES

1. Whether the District Court violated Little Orbit's right to due process by granting Descendent's Motion to Enforce the BSTS before Little Orbit had

filed an Opposition thereto and the time for filing an Opposition had not yet expired.

2. Whether the District Court abused its discretion by considering new issues and arguments raised by Descendent in its Motion to Enforce the BSTS after the completion of briefing on Little Orbit's Motion to Set Aside the BSTS, and relying on Descendent's new issues and arguments in denying Little Orbit's Motion to Set Aside the BSTS, without allowing Little Orbit to respond and rebut Descendent's new issues and arguments.

3. Whether Paragraph 4 of the BSTS provides an alternative to the initial payments called for in the BSTS rather than a penalty for missing initial payments to be paid in addition to those initial payments.

4. Whether the District Court's ruling that Little Orbit was not entitled to "any deadline extension" Means that the One Year for the Release of the Game Runs from the Signing of the BSTS or, in Accordance with the Court's June 17, 2021, ORDER ACCEPTING FINDINGS AND RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE from May 24, 2021 based on the following: "To the extent the Settlement Agreement (Dkt. 48-1 (under seal)) used the phrase "within [___] days of signing [a] written memorialization" or similar language as a triggering event, such trigger date shall be the date of the Report and Recommendation, that is, May 24, 2021"

5. Whether an interpretation of Paragraph 4 of the BSTS which requires payment of the initial payments in addition to an increased percentage of the first ███████ in income from sales of the game constitutes an unlawful penalty under California law.

6. Whether the BSTS is unenforceable because there was no meeting of the minds of the contracting parties as to the meaning of the essential term "revenues."

## IV. STATEMENT OF THE CASE

This dispute arises out of a Development Agreement for a video Game. Little Orbit is a video game publisher which has released over 20 titles over the last ten plus years on all relevant gaming platforms including "Kung Fu Panda: Showdown of Legendary Legends", "Adventure Time: Finn and Jake Investigations", "Young Justice", "Falling Skies the Game", "APB Reloaded," and "Fallen Earth." [ER Vol IV, at 446] Little Orbit continues to pioneer electronic entertainment for consumers of all ages. Descendent was (it is now out of business) an unproven video game developer whose one and only project was the video Game in dispute. [ER Vol I, p. 3 and IV, p. 401] Little Orbit invested over two million dollars into the development, but Descendent consistently failed to meet contract requirements ultimately resulting in the termination of the

Development Agreement for cause and this lawsuit by Little Orbit.  [ER Vol I, p. 3; Vol IV, p. 447]

In 1995 Interplay Productions Corp., a major video game developer and publisher, released "Descent," a first-person shooter ("FPS") game.  Descent popularized a subgenre of FPS games using the "six degrees of freedom" which is the movement of a rigid body (the game player's avatar) in three-dimensional space in six different ways: forward/back, up/down, left/right, yaw, pitch, roll.  Descent was also the first FPS to entirely feature 3D graphics.  Descent was a commercial success, selling over 1.1 million units, together with its sequel, Descent II, as of 1998.  [ER Vol I, p. 3; Vol III, p. 281 (¶¶ 7-8)]

In or around November of 2014, several former game developers working on a game known as Star Citizen, including Defendant Eric Peterson ("Peterson"), announced they were forming Descendent Studios ("Descendent") to work on a game similar to Descent in play style, with the working title "Ships That Fly Underground."  Peterson was the CEO of Descendent.  [ER Vol III, p. 252; Vol IV, p 428]

In or around early 2015, Descendent raised funds through a Kickstarter campaign which raised over $600,000 based on the popularity of Descent among fans.  [ER Vol I, p 3; Vol IV, pp 428 and 446] Descendent also entered into a

license agreement with Interplay to use the "Descent" name for the new game. [ER Vol IV, p. 428]

By the end of 2015, Descendent was out of money, so they released the game on Steam Early Access. This site allows game developers to start building a community around their game by releasing a partially finished game that players can purchase to help fund completion. Over the course of two years, Descendent attempted to keep their community happy, but still never released the full game. [ER Vol IV, p 446]

By August of 2017, Descendent was out of funds again. Peterson/Descendent approached Little Orbit for financial support to complete development of the Game in return for which Little Orbit would publish the video game, re-named "Descent: Underground." The parties' discussions led to a "Development Agreement" effective September 1, 2017 (the "Agreement"). [*Id.*]

To induce Little Orbit into the Agreement Peterson/Descendent made numerous representations regarding staff and capabilities to complete the Game which Little Orbit later discovered were false, given the inexperience of those working on the Game and the constant problems and shortcomings in the work by Descendent, including missing various milestones and multiple planned release dates. [Vol IV, p 428]

Little Orbit paid all sums required under the Agreement, but Descendent failed to meet any of the specified delivery dates.  [ER Vol I, p 3, Vol III, p 285 and Vol IV, p 428] In an effort to salvage the project and allow Descendent more time to complete the Game, the parties entered into a "Terms Sheet" addendum which modified and supplemented the Agreement.  Little Orbit committed to fund Descendent's payroll of $60,000 per month "in return for services and deliverables by Descendent in connection with the Game…so long as such services and deliverables are provided in a timely manner and provided Descendent does not materially breach its obligations in providing such services and deliverables." Descendent continued to fail to meet the deliverable requirements and specifications, breaching the Terms Sheet.  [ER Vol I, pp 3-4]

The Game was originally planned for a May 2018 release date, but was pushed back to November 2018 and then a final time to a February 2019, which likewise was not met.  Descendent ultimately failed to deliver the completed Game or otherwise comply with the Terms Sheet.  [ER Vol IV, p 447]

Little Orbit made a couple of payments under the Terms Sheet addendum but on January 30, 2019, Little Orbit sent 50% of the payroll amount because Descendent had missed two deadlines in a row.  Instead of trying to fix the problems in its deliverables and earn the entirety of the payment, on February 1st, Descendent sent a "Notice of Breach" for non-payment.  After months of extended

support and flexibility, this move stunned Little Orbit. However, on February 4th,

Little Orbit paid the remaining 50% to cure the alleged breach and then filed its

own "Notice of Breach" for Descendent's failure to meet its delivery requirements.

[ER Vol IV, p 429] Without warning, Descendent removed all Little Orbit access

from the repository containing the Game's code and source assets. [ER Vol IV, pp

447-48] This was an intentional action designed to block Little Orbit from

proceeding with the Game. [*Id.*] Descendent then tried to turn in an incomplete

Game but claimed they had developed all features and content required by the

Agreement. Upon review, Little Orbit determined the Game was missing its

signature selling point, a Co-op multiplayer mode. It was also missing significant

content and contained broken logic that prevented a complete playthrough. As

such, Descendent failed to cure within the allowed 30-day period thereby relieving

Little Orbit of any obligation to make any further payments to Descendent. [ER

Vol IV, p 429]

Descendent also breached the Terms Sheet by repeatedly failing to provide

the assignment of the Trademark License Agreement by and between Interplay

Entertainment Corp. and Descendent. Interplay later cancelled that license

agreement so the Game could not be released using the "Descent" trademark

absent a new agreement being entered into with Interplay. [ER Vol IV, p 399]

By the time the Notice of Termination was given, Little Orbit had invested more than ███████████ into the Game including over ██████ paid directly to Descendant and hundreds of thousands more paid to other development teams to help Descendant ship on time. [ER Vol IV, 447447] The total investment ended up at nearly three times the amount agreed upon in the Development Agreement. Most of those funds came from loans Little Orbit took out, including the first $500,000 loan which used Matthew Scott's personal real estate as collateral (which he was later forced to liquidate). Since February 2019, Little Orbit has been carrying this enormous debt that has further increased its losses. [ER Vol IV, p 401]

Between the months of March and December 2019, Little Orbit made multiple attempts to reach a settlement with both Descendent and Interplay that would allow the Game to be published. All efforts failed.

With no recourse left, in January 2020, Little Orbit filed a lawsuit against Descendent and Peterson. [ER Vol III, pp 279 and 312]

The parties participated in a settlement conference before Magistrate John D. Early on November 17, 2020, which resulted in the parties agreeing to certain "deal points" set forth in the BSTS. [ER Vol I, p 4 and Vol IV, pp 484-87] Under the BSTS Little Orbit was enormously generous in assuming the responsibility to complete the game, which was estimated to require an investment of an additional

███████████████, and by agreeing to pay Descendent royalty percentages similar to that provided under the Agreement. [ER Vol IV, 448] Given the history between the parties, agreeing to anything more favorable to Descendent was out of the question.

Between December 2019 and March 2020, the parties attempted to flesh out the substance of the BSTS into a long form agreement, but the parties were never able to agree due to a couple of key disputes as to the "fine print" regarding some of the terms. [ER Vol IV, p 449] During this same time, Little Orbit attempted to negotiate a new trademark license agreement with InterPlay, but those efforts were ultimately unsuccessful as InterPlay demanded significantly more onerous terms than under the original license agreement. [ER Vol IV, p 400]

Descendent brought their first motion to enforce the BSTS once the parties' efforts to enter into a long form agreement broke down, claiming Little Orbit was in breach for not having made the initial payment provided for under the BSTS. That motion was referred to Magistrate Judge Early and was denied as premature. [ER Vol II, p 238] Given the parties' failure to enter into a long form agreement, Magistrate Early also determined that the triggering date for the timing of the payments due under the BSTS would run from the date of the hearing (May 24, 2021). [*Id.*]

Even though Little Orbit previously and repeatedly asked Descendent to deliver all of the game IP assets covered by the BSTS, no game code or assets were delivered. Finally on June 15, 2021, Descendent produced a snapshot copy of the game code as it existed on some unknown date. [ER Vol I, p 5, and Vol IV, p 451] It is critical to note that up until that time, Little Orbit was not in possession of the current game code to meet its obligation under the BSTS to finish development of the Game. When Little Orbit demanded Descendent deliver "the full source code and the entire project history," Mr. Peterson advised that the "project history no longer exists" and that all Little Orbit needed is the code (even claiming there was no obligation to deliver anything to Little Orbit). [ER Vol IV, pp 451-52] The code alone is inadequate for a number of reasons but most importantly, the terms of the BSTS provides for a license of "all game IP" – not just the code. [ER Vol IV, pp 453-54] Little Orbit was left no choice but to file its Motion to Set Aside the BSTS.

Descendent argued that it had provided all that was needed to complete the game in providing the un-editable "snapshot" of the game code from some earlier date and later filed its own second motion to enforce the BSTS. [ER Vol I, p 5 and Vol II, p 63] This second motion argued new claims and asserted that Little Orbit owed Descendent the first two payments totaling ███████ despite the fact that the second payment in the BSTS is due 120 days from signing the long form

agreement, or May 24, 2021, according to Judge Early's ruling. [ER Vol IV, p 329; Vol II, p 235] 120 days from May 24, 2021, is September 21, 2021. Lastly, Defendants argued that Little Orbit had failed to make "best efforts" to develop the Game and that they had serious financial concerns about Little Orbit's ability to complete it. [ER Vol IV, p 329] As such, they argued that Little Orbit was not entitled to any "extension" of the 12-month timeline for completing development dating from the signing of the BSTS on November 17, 2020, notwithstanding the fact the Defendants had only recently delivered a copy of the development history and source art repository on June 29, 2021. [ER Vol IV, p 338] In fact, Defendants made this argument knowing they intentionally withheld the game code and other assets until June 15, 2021, because by shortening the development time, Defendants obliviously hoped to prevent Little Orbit from completing the Game on time.

The District Court granted Defendants' Motion to Enforce just 6 days after it was filed and before Little Orbit's opposition was due, in violation of FRCP (Rule

6(c)(2)),[1] Central District Local Rule 7-10,[2] and the Judge's own procedural rules.[3]

[Compare ER Vol I, p 2 with Vol II, p 63] Had Little Orbit been given the

opportunity to oppose the motion, it would have clearly proven Defendants'

repeated refusal to turn over the current game code until June 15, 2021 [ER Vol I,

p 5], and Little Orbit would have pointed out the obvious discrepancy between

Judge Carter's earlier June 17, 2021, Order (which was then final) providing that

May 24, 2021, would be the "trigger" date for all obligations in the BSTS running

from the execution of a "written memorialization" which included the one year

deadline to release the Game.  [ER Vol II, p 235]

     Little Orbit would have also pointed out the disingenuous nature of

Defendants' argument that Little Orbit had failed to respond to Defendants'

demand on July 9, 2021.  [ER Vol II, p 34]  That request was made during the

---

[1] FRCP 6(c)(2) provides: "*Supporting Affidavit.* Any affidavit supporting a motion must be served with the motion. Except as Rule 59(c) provides otherwise, any opposing affidavit must be served at least 7 days before the hearing, unless the court permits service at another time."  (Emphasis added.)

[2] Central District of California Local Rule 7-10 provides, in pertinent part, as follows: "Absent prior written order of the Court, the opposing party shall not file a response
to the reply."

[3] Judge Carter's Procedural Rule No. 6 provides, in pertinent part, as follows: "No supplemental brief(s) or sur-reply briefs may be filed without leave of Court. Local Rule 7-10."  https://www.cacd.uscourts.gov/honorable-david-o-carter

pendency of Little Orbit's Motion to Set Aside the BSTS, so there was no reason for Little Orbit to respond to it until after the District Court could rule on Little Orbit's Motion. Unfortunately, however, Little Orbit never had that chance considering the Court granted Defendants' Motion at the same time it denied Little Orbit's Motion. Moreover, Little Orbit could have easily shown proof of sufficient funds to cover the estimated cost to develop and market the game.

It is clear Judge Carter was mistaken in his ruling citing "After signing the Settlement Terms Sheet ***and receiving the game code***, Plaintiff could have started developing the Game." [ER Vol I, p 9] The parties signed the BSTS on November 17, 2020, but Descendent did not deliver game code until June 15, 2021 [ER Vol I, pp 9], nearly seven months later, and did not deliver the rest of the Game IP and source assets until June 29, 2021. [ER Vol IV, p 350] This latter delivery of the full game IP and source assets on June 29, 2021, was obviously prompted by and only occurred as a result of Little Orbit filing its Motion to Set Aside. Prior to the filing of Plaintiff's Motion Defendants had maintained that such assets "no longer exist." It took a motion for the Defendants to finally locate and provide such assets.

The District Court issued its Order denying Little Orbit's Motion and granting Descendent's Second Motion to Enforce the BSTS without allowing Little Orbit to file an opposition thereto. [ER Vol 1, p 2]

This appeal followed.

## V.    SUMMARY OF THE ARGUMENT

The District Court violated Little Orbit's right to due process by ruling on Descendent's Second Motion to Enforce the BSTS before Little Orbit had an opportunity to file an opposition to that motion and set the record straight regarding the facts.  The District Court violated not only the Federal Rules of Civil Procedure but its own local rules by treating Descendent's Motion as a Sur-Reply which is not authorized by the Central District's Local Rules or the Judge's own courthouse rules.  The Order should therefore be reversed.

The District Court also abused its discretion by considering new issues and arguments raised by Descendent in its Second Motion to Enforce the BSTS after the completion of briefing on Little Orbit's Motion to Set Aside the BSTS, and relying on Descendent's new issues and arguments in denying Little Orbit's Motion without allowing Little Orbit to respond and rebut Descendent's new issues and arguments.

Paragraph 4 of the BSTS provides an alternative to the initial payments called for in the BSTS rather than a penalty for missing initial payments to be paid in addition to those initial payments.

An interpretation of Paragraph 4 of the BSTS to require payment of the initial payments in addition to an increased percentage of the first ████ in income from sales of the game would constitute an unlawful penalty under California law.

The District Court's July 27, 2021, Order provides that Little Orbit "is not entitled to any deadline extension" which the Defendants have interpreted as overruling the June 17, 2021, Order and instead mandating that the game must be released by November 17, 2021. That is not the case as the context of the District Court's Order shows the only "extension" in issue was Little Orbit's argument that the deadlines under the BSTS should not start to run until the time Defendants finally produced the game IP assets which was June 29, 2021. The District Court even made a specific reference to the earlier ruling but did not in any way, shape or form, say that the Court's July 27th Order in any way deviated from let alone over-ruled that prior ruling. In fact, the District Court's June 17, 2021, Order establishing May 24, 2021, as the "trigger" date for deadlines provided by the BSTS had become final and binding on the parties, given no party had appealed that Order or challenged the underlying Magistrate's Recommendation, and the District Court therefore lacked jurisdiction to modify the "trigger" date as has since been claimed by Defendants.

The BSTS is unenforceable because there was no meeting of the minds of the contracting parties as to the meaning of the essential term "revenues." In fact, the use of "revenues" alone and without more is inherently ambiguous as parties will commonly define "revenues" as either "net revenues" or "gross revenues." Absent such qualifying terms, the BSTS left the meaning of "revenues" open for dispute. Defendants' interpretation goes against all prior understanding between the parties as to how the income would be divided. Little Orbit sued Descendent because it failed to live up to its end of the bargain, missing numerous contract dates to provide elements of the game. Little Orbit would certainly not give Descendent a bonus for its repeated failure to live up to its contractual commitments. The BSTS was to be supplemented by a more comprehensive settlement agreement, but the parties could not agree based in large part upon Descendent's unreasonable and unwarranted interpretation of "revenues" which was not in line with the parties' prior course of dealing, agreement and understanding nor with industry custom and practice.

The District Court abused its discretion by considering new issues and arguments raised by Descendent in its Motion to Enforce the BSTS after the completion of briefing on Little Orbit's Motion to Set Aside the BSTS, and relying on Descendent's new issues and arguments in denying Little Orbit's Motion to Set

Aside the BSTS, without allowing Little Orbit to respond and rebut Descendent's new issues and arguments.

## VI. STANDARDS OF REVIEW

The court reviews due process claims de novo. See *Khup v. Ashcroft*, 376 F.3d 898, 902 (9th Cir. 2004); *S.D. Myers, Inc. v. City & County of San Francisco*, 253 F.3d 461, 466 (9th Cir. 2001); *Krug v. Lutz*, 329 F.3d 692, 695 (9th Cir. 2003).

Constitutional issues are reviewed de novo. See *Crime Justice & Am., Inc. v. Honea*, 876 F.3d 966, 971 (9th Cir. 2017); *Berry v. Dep't of Social Services*, 447 F.3d 642, 648 (9th Cir. 2006).

A district court's exercise of its inherent powers is reviewed for an abuse of discretion. See *Southern California Edison Co. v. Lynch*, 307 F.3d 794, 807 (9th Cir. 2002).

The district court's interpretation and meaning of contract provisions are questions of law reviewed de novo. See *Tompkins v. 23andMe, Inc.*, 840 F.3d 1016, 1021 (9th Cir. 2016); *Conrad v. Ace Property & Cas. Ins. Co.*, 532 F.3d 1000, 1004 (9th Cir. 2008); *Lamantia v. Voluntary Plan Administrators, Inc.*, 401 F.3d 1114, 1118 (9th Cir. 2005); *United States v. 1.377 Acres of Land*, 352 F.3d 1259, 1264 (9th Cir. 2003) (noting no deference accorded to decision of district court).

When extrinsic evidence is not considered and the court limits its review to the four corners of the contract, review is de novo.  See *1.377 Acres of Land*, 352 F.3d at 1264; *Shaw v. City of Sacramento*, 250 F.3d 1289, 1293 (9th Cir. 2001).

## VII.  ARGUMENT

### A.  The District Court Violated Little Orbit's Right To Due Process By Granting Descendent's Motion To Enforce The BSTS Before Little Orbit Had Filed An Opposition Thereto And The Time For Filing An Opposition Had Not Yet Expired

The fundamental requirement of due process is the opportunity to be heard "at a meaningful time and in a meaningful manner." *Mathews v. Eldridge*, 424 U.S. 319, 333, 96 S. Ct. 893, 902 (1976) (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965). "[U]nder federal law, what process is due is determined by context, to be analyzed in accordance with the three-part balancing test described in *Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). *Orloff v. Cleland*, 708 F.2d 372, 378-79 (9th Cir. 1983)."  *Roybal v. Toppenish Sch. Dist.*, 871 F.3d 927, 933 (9th Cir. 2017).

"[I]dentification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or

substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail." *Mathews v. Eldridge*, 424 U.S. 319, 335, 96 S. Ct. 893, 903 (1976).

The essence of procedural due process is that "[persons] whose property interests are at stake are entitled to 'notice and an opportunity to be heard.'" *Dusenbery v. United States*, 534 U.S. 161, 167, 122 S. Ct. 694, 151 L. Ed. 2d 597 (2002) (quoting *United States v. James Daniel Good Real Prop*., 510 U.S. 43, 48, 114 S. Ct. 492, 126 L. Ed. 2d 490, (1993)). It is a violation of procedural due process where the procedure is so fundamentally unfair that a party is prevented from reasonably presenting his case. See, e.g. *Colmenar v. INS*, 210 F.3d 967, 971 (9th Cir. 2000) (quoting *Platero-Cortez v. INS*, 804 F.2d 1127, 1132 (9th Cir. 1986).)

Here, consideration of each of the factors identified in *Mathews* leads to the conclusion that Little Orbit's right to due process was violated and that Little Orbit was prevented from reasonably presenting its case regarding Defendants Motion to Enforce. First, the private interest affected is the loss of Little Orbit's rights under the Development Agreement and the BSTS. Descendent has threatened termination of the Development Agreement and BSTS based on Little Orbit's failure to pay the initial payments as set forth in the BSTS. But as Littler Orbit has

interpreted the BSTS, Paragraph 4 provides an alternative to the upfront cash payments of a greater percentage of revenues generated from sales of the Game.

Second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards weighs in favor of reversal. The District Court violated the Federal Rules of Civil Procedure, the procedural rules establish by the District Court for the Central District of California, and Judge Carter's own procedural rules by considering Descendent's Motion to Enforce without allowing Little Orbit to present evidence which refuted Descendent's assertions.

Lastly, the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail require reversal. The function is the District Court's procedural rules relating to the determination of motions filed by the parties. There would be no additional fiscal or administrative burden upon the District Court nor any additional or substitute procedural requirement to follow. The District Court merely had to follow its own existing establish procedural rules.

The District Court granted Defendants' Motion to Enforce without warning or opportunity for Little Orbit to be heard just 6 days after it was filed and before Little Orbit's opposition was due, in violation of FRCP (Rule 6(c)(2)), Central District Local Rule 7-10, and the Judge's own procedural rule No. 6. The Court's

premature ruling denied Little Orbit due process and fundamental fairness and should be reversed.

**B. The District Court Abused Its Discretion By Considering New Issues And Arguments Raised By Descendent In Its Motion To Enforce The BSTS After The Completion Of Briefing On Little Orbit's Motion To Set Aside The BSTS, And Relying On Descendent's New Issues And Arguments In Denying Little Orbit's Motion to Set Aside The BSTS, Without Allowing Little Orbit To Respond And Rebut Descendent's New Issues And Arguments**

"In general terms we have held that a district court abuses its discretion when it makes an error of law, when it rests its decision on clearly erroneous findings of fact, or when we are left with a definite and firm conviction that the district court committed a clear error of judgment." *United States v. Ressam*, 679 F.3d 1069, 1086 (9th Cir. 2012) (en banc) (internal quotation marks, alteration, and citation omitted). See also *Lambright v. Ryan*, 698 F.3d 808, 817 (9th Cir. 2012).

Here, the District Court committed a clear error of judgment by ruling on the Motion to Enforce before the time for Little Orbit's Opposition was due. The District Court granted Defendants' Motion to Enforce just 6 days after it was filed, apparently treating Descendent's Motion to Enforce as a sur-reply in violation of FRCP (Rule 6(c)(2)), Central District Local Rule 7-10, and the Judge's own procedural rules. Little Orbit was denied due process and fundamental fairness.

The essence of procedural due process is that "[persons] whose property interests are at stake are entitled to 'notice and an opportunity to be heard.'" *Dusenbery, supra*, 534 U.S. at 167.

Descendent's Motion to Enforce the BSTS raised essentially four (4) issues: 1) the meaning of the term "revenues";  2) the remedy for failure to make the upfront payments called for in the BSTS; 3) whether the ██████ split of the first ████████ in revenues provided for in Paragraph 4 of the BSTS is Descendent's sole remedy for Little Orbit's failure to make any of the three payments required under the BSTS, at Paragraphs 1 through 3; and 4) Little Orbit's alleged failure to provide "adequate assurance" as had been recently requested by Defendants. Defendants' position on each of these issues was untenable and without merit.  If Little Orbit had been able to file its opposition it would have presented facts and argument to the District Court to rebut Descendent's arguments.  The District Court's failure to allow Little Orbit to do so was an abuse of the District Court's discretion.

**C.** **Paragraph 4 Of The BSTS Provides An Alternative To The Initial Payments Called For In The BSTS Rather Than A Penalty For Missing Initial Payments To Be Paid In Addition To Those Initial Payments**

Descendent has attempted to paint Little Orbit as a manipulative and bad faith partner in the BSTS looking to stiff them on guaranteed payments. This is simply not true. Little Orbit has every intent of complying with its obligations under the BSTS but there is a substantial question as to whether the payments ordered by the District Court are due given the BSTS also provides for an alternative method of payment which was not addressed by the District Court, *i.e.*, Paragraph 4 of the BSTS.

Had Little Orbit been given the opportunity to respond it would have shown that the structure of the payment provisions in the BSTS, which includes not only upfront payments but an alternative method of payment, exists for a reason. At the time of settlement between the parties, there was no agreement with InterPlay in place for the use of the famous DESCENT brand name. Without that name, the underlying Game and IP would be worth substantially less and would likely see a dramatic reduction in sales. Little Orbit specifically negotiated a remedy of an alternative method of payment in the BSTS for the upfront payments to account for

this uncertainty.[4] Post settlement, when Little Orbit attempted to secure the license, InterPlay demanded abusive, expensive terms far more costly than the original license for the DESCENT name. Over the course of several weeks, InterPlay refused to negotiate, and ultimately Little Orbit was unable to secure the name. As a result, Little Orbit determined to skip the upfront payments in favor of the pre-agreed alternative remedy. The BSTS includes a remedy provision should any of the required "upfront" payments not be paid timely, and that is for Descendent to be paid a bigger share of the initial revenues to make up for those missed payments.

It is important to understand the nature of the payment structure provided in the BSTS. Defendants negotiated for several upfront payments as part of the BSTS (paragraphs 1-3). On the other hand, Little Orbit negotiated for - and the parties agreed to - paragraph 4 which was intended as an alternative form of payment should any of the advance payments not be made on time. Specifically,

---

[4] Defendants have argued that Little Orbit "fraudulently induced the settlement agreement by making payment promises without the intent to perform them." [See Defendants' Opposition to Little Orbit's Emergency Motion for Stay ("Opp to Stay Motion") filed in this Court at 4:12-13]. Negotiating for and receiving an agreement to an alternative method of payment can by no means be considered fraudulent especially considering the subject clause was agreed to by the Defendants.

paragraph 4 provides that Descendent would receive a larger portion (███) of the

first ███████ in revenues instead of the lessor amount (███) that would have

otherwise been the applicable royalty rate.  That difference was intended to make

up for any late advance payments and was not intended to provide Defendants with

a more than "double recovery" which is how Defendants are arguing the clause

should be read – *i.e.*, that Descendent is entitled to both the upfront payments and

the sums provided for in the alternative payment clause, paragraph 4 of the BSTS.

Defendants' have argued paragraph 4 "makes this a remedy only for any single

'payment' not being made 'on time.'" [ER Vol IV, p 331] However, the express

language is to the contrary.  The clause expressly states that if "ANY" payment is

not made on time Little Orbit is to pay Descendent ███ of the first ███████ in

revenues (in leu of the otherwise applicable ███).  The language expressly

provides for Descendent's remedy in the event Little Orbit defaults on ANY

payment.  "Any" by definition would also include "all".

It is also critical to know that Defendants' interpretation of paragraph 4 has

changed since the BSTS was negotiated.  Their original interpretation is clearly

stated in the first draft of the settlement long form which Defendants proposed.

That draft (which is not part of the record given the fact Little Orbit was denied the

opportunity to submit any opposition so Little Orbit submits this offer of proof)

was created in December 2020 exclusively by Defendants' counsel with no input

32

from Little Orbit.  In it, defense counsel outlines that the ███ split was the sole

remedy for missed payments, and further that there was no way for Little Orbit to

materially breach the agreement.  Defendant's counsel also inaccurately stated that

the first payment was mandatory, and if it was missed then Defendant had the right

to proceed with publishing the game and splitting revenue with Little Orbit ███.[5]

Since the parties' negotiations broke down around March – April of 2021,

Defendants changed tactics and argued a much more abusive interpretation of

paragraph 4 when they presented their Second Motion to Enforce.  Unfortunately,

Little Orbit was never able to present opposition and evidence contradicting

Defendants' assertions before that motion was ruled upon on July 27, 2021.


    **D.**    **Interpretation Of Paragraph 4 Of The BSTS To Require Payment of The Initial Payments In Addition To An Increased Percentage Of The First ███ In Income From Sales Of The Game Would Constitute An Unlawful Penalty Under California Law**


The purpose of the paragraphs 1-3 in the BSTS read together with the

alternative payment provision of paragraph 4 was to provide for either money

upfront to Descendent or, if those upfront payments were not timely paid, then for

---

5 There is no such distinction between the first, and the second and third payments
in the BSTS and what is key is the Defendants admission that paragraph (4)
provided an alternative remedy to the at least 2 of the 3 upfront payments.

Defendants to receive a bigger share of the first ███████ revenues (███████

as provided by ▶ 4) as opposed to the otherwise applicable split (████ as provided

by ▶ 5) to cover such payments. [ER Vol IV, p 485] To read the remedy clause as

Defendants are now trying to do – *i.e.*, Descendent gets the upfront payments AND

the bigger percentage of the first ███████ in revenues – is both contradictory to

their prior interpretation at the time of settlement and would turn the remedy clause

into an unenforceable illegal penalty under Cal. Civil Code section 1671,

subdivision (b): "[A] provision in a contract liquidating the damages for the breach

of the contract is valid unless the party seeking to invalidate the provision

establishes that the provision was unreasonable under the circumstances existing at

the time the contract was made."

In interpreting this statute, the California Supreme Court has noted: "A

liquidated damages clause will generally be considered unreasonable, and hence

unenforceable under section 1671 [, subdivision](b), if it bears no reasonable

relationship to the range of actual damages that the parties could have anticipated

would flow from a breach. The amount set as liquidated damages 'must represent

the result of a reasonable endeavor by the parties to estimate a fair average

compensation for any loss that may be sustained.' [Citation.] In the absence of

such relationship, a contractual clause purporting to predetermine damages 'must

be construed as a penalty.' " (*Ridgley v. Topa Thrift & Loan Assn.* (1998) 17 Cal.4th 970, 977, 73 Cal.Rptr.2d 378, 953 P.2d 484).

That is clearly the case here just on the face of such clause as it would add up to a ▮▮▮▮▮▮ penalty for simply being late with any one or more of the advance payments required under paragraphs 1-3 of the BSTS. A penalty of almost double the total amount due of ▮▮▮▮▮▮ (or 7 times either of the required ▮▮▮▮▮▮ payments) simply cannot be, as a matter of law, an estimate of "a fair average compensation for any loss that may be sustained" for simply being late with a payment. Rather, as is clear, such remedy clause provided for an alternative form of payment and was to make up for any or all missed payments (note the alternative provision kicks in only after "default"). It would be an unenforceable illegal penalty as the amount bears no rational relation to any alleged loss that could be suffered by Defendants simply for a payment being late. In fact, Defendants have never argued, let alone presented any evidence, that such clause was the result of "a reasonable endeavor by the parties to estimate a fair average compensation for any loss that may be sustained" as a result of any or all of the advance payments not being timely paid.

**E.    The Deadline to Release the Game Runs from May 24, 2021, as Provided in the District Court's June 17, 2021, Order**

The BSTS provides Little Orbit with a deadline of one year form the signing of a "written memorialization" to release the game.  [ER Vol IV, p 486] The District Court's June 17, 2021, Order provided that any such deadline would run from May 24, 2021, which means that Little Orbit has until May 24, 2022, to release the game.  [ER Vol II, p 235] The District Court's July 27, 2021, Order, however, provides that Little Orbit "is not entitled to any deadline extension" [ER Vol I, p 9] which the Defendants have interpreted as overruling the June 17, 2021, Order and instead mandates that the game must be released by November 17, 2021. That is not the case as the context of the District Court's Order clearly shows the only extension in issue was Little Orbit's argument the deadlines under the BSTS should not start to run until the time Defendants finally produced the game IP assets which was June 29, 2021.  The District Court even made a specific reference to the earlier ruling but did not in any way, shape or form, say that the Court's July 27th Order in any way deviated from that prior ruling.  The Court should clarify the meaning of the District Court's Order that Little Orbit is not entitled any extension.

**F.   The BSTS Is Unenforceable Because There Was No Meeting Of The Minds Of The Contracting Parties As To The Meaning Of The Essential Term "Revenues"**

> To form a valid contract there must be a meeting of the minds, i.e., mutual assent. (Code Civ. Proc., § 1281; see Civ. Code, §§ 1550, 1565.) "'Mutual assent is determined under an objective standard applied to the outward manifestations or expressions of the parties, i.e., the reasonable meaning of their words and acts … .'" (Chicago Title Ins. Co. v. AMZ Ins. Services, Inc. (2010) 188 Cal.App.4th 401, 422 [115 Cal. Rptr. 3d 707].)

*Moritz v. Universal City Studios LLC*, 54 Cal. App. 5th 238, 246, 268 Cal. Rptr. 3d 467 (2020).

> "Consent is not mutual, unless the parties all agree upon the same thing in the same sense." *Balistreri v. Nev. Livestock Prod. Credit Ass'n*, 214 Cal.App.3d 635, 641-42, 262 Cal.Rptr. 862 (1989) (internal quotation marks omitted) (quoting Cal. Civ. Code § 1580). "In certain cases where there is a mutual misunderstanding regarding the identity of the subject matter of the contract, and either both parties are at fault in creating the mistake, or neither of the parties is at fault, there is no meeting of the minds as to a material matter, and no contract is formed." *Id*. at 642 (internal quotation marks and alteration omitted).

*Ginoyan v. Barclays Bank Del*., 443 F. Supp. 3d 1136, 1140 (C.D. Cal. 2020).

Descendent readily admitted the interpretation of "revenues" was never discussed during the mediation that led to the BSTS.[6]  Descendant further admitted

---

[6] [ER Vol II at 129:10 fn. 1 (Opp 2 Mtn to Set Aside)]

the original Agreement used the term "Net Sales"[7] but jumped to the conclusion that because "Net Revenues" was never discussed during the mediation and settlement negotiations "Revenues" as used in the BSTS means gross income and gross receipts.[8] That is not the case. Little Orbit always believed the primary terms dealing with the income would be consistent with the parties' original Agreement which allowed Little Orbit to deduct certain costs prior to splitting income. The language was clear on payments and the splitting revenues in the Agreement and did not need redefinition. It is quite apparent there was never a meeting of the minds regarding the essential term "revenues" and, therefore, no binding agreement at the Settlement Conference. The very fact that Descendent had to define "revenues" as meaning "gross revenues" in its Motion to Enforce evidences the term "revenues" - in and of itself – is not clear and needed further definition, which the parties were unable to resolve in trying to enter into a long form agreement.

The settlement discussions focused on the percentages to be split between the Parties – not on changing the definition or calculation applicable to income to

---

[7] [ER Vol II at 129:18-20]

[8] [ER Vol II at 129:10 fn. 1]

be generated by the game. In fact, there was not a single mention of changing the type of deductions that would be made before paying out royalties to Descendent. Little Orbit's intention in the settlement and its understanding of "revenues" was to give Descendent the same general split they would have earned from the agreement in dispute between the parties. In doing so Little Orbit made a very generous offer to erase any penalty for Descendent's misconduct alleged in the Complaint and made clear it would continue to pursue the lawsuit if settlement negotiations failed. Descendent's later claim that no deductions should be allowed would give it exponentially better terms than the original Agreement and saddle Little Orbit with all costs associated with the release and maintenance of the game. That would be grossly unfair and totally contrary to the parties' prior Agreement and course of conduct, which provided the starting point for the parties' negotiations, not to mention industry custom and practice. [ER Vol IV, pp 448-49]

It also would be contrary to the spirit of cooperation the parties came to in agreeing to the BSTS, which requires Little Orbit to fully fund the approximately additional ██████████ it will take to complete the development of the game, on top of the already more than ████████ Little Orbit invested in the development of the game. There was simply no logical reason for Little Orbit to assume all the liabilities yet give such a one-sided reward to Descendant especially considering Little Orbit believed it would prevail in the lawsuit. If "revenues" is

going to be given such an interpretation, agreeing to same was clearly a mistake on the part of Little Orbit.  [ER Vol IV, pp 449-50]

Some examples of industry standard deductions include ongoing monthly User Acquisition marketing costs that can cost upwards of 30% of gross revenue. Without initial and ongoing marketing, the Game will fail to attract players and stop earning money.  Furthermore, the Game requires ongoing content and features to be added.  Without new content, players get bored and leave the Game. Additionally, the Game provides multi-player functionality which must be supported by servers in "hosting sites" that allow players from around the world to access the game through the internet.  The costs associated with maintaining such host sites are a standard "cost of doing business" which are customarily deducted before any royalty payments are determined.  Without the servers, the multi-player functionality, which accounts for half of the Game's features, will not work.  [ER Vol IV, pp 447 and 449]

In support of their Motion Little Orbit supplied the Mirriam-Webster's dictionary definition for "revenues" as "the gross income returned by an investment".  [ER Vol II, p 176-77; and Request for Judicial Notice, Exhibits A – D, ER Vol II, pp 133-71].  This view is consistent with Little Orbit's perspective while negotiating the BSTS.  It acknowledges that both parties have invested funds

or time into the Game, and like all investments, income is returned as profits after deducting the costs of operating the investment.

The original Development Agreement contained royalties for Descendent that scaled up to ███ after removing defined deductions. Despite the horrific history of working together, Little Orbit intended the BSTS to essentially give Descendent their original terms which consisted of royalties that scaled up to ███ However, Defendants' attempt to recast the definition of "revenues" to "gross revenues" radically changes the ███ split contemplated in the BSTS. [ER Vol IV, p 400]

In Defendants' scenario, Descendent would get ███ of the money charged to the end player regardless of the distribution and other costs required to keep the Game online. Descendent's definition not only ignores the previous context of the agreements between the parties, but it also dismisses the definition for "revenues" that Little Orbit supplied which matches the previous agreement. It also presents a scenario that is far from sustainable as a business model. Defendants' definition would leave Little Orbit in a situation where, after spending an additional ███ ███ to launch the game, Little Orbit would lose money every month. It would be the equivalent of two investors agreeing to put money into a restaurant, but one investor arguing they get ███ of every ███ spent by customers, while the other investor spends all their time actually operating the restaurant, paying for

food, funding the staff, and covering the rent all out of their ▮▮▮. Companies make money based on their profit margin, the percentage difference between the cost of bringing something to market and the money they collect from it being sold. Companies rarely achieve profit margins over 20-30%. Using Descendent's definition of "revenues", which only leaves ▮▮▮ of gross revenue for Little Orbit, it would be impossible to pay for 30% distribution and 30% User Acquisition marketing without losing money, and that does not take into account any costs for ongoing development or server hosting. [ER Vol IV, pp 402-01]

It is important to note that Descendent is out of business and has no staff or other overhead. By contrast, Little Orbit has millions in debt related to Descendent's failure to ship the Game. This means that any money earned by Descendent from the Game will be profit. But Little Orbit would need to earn 3.5 million dollars just to break even on their investment. It is critical that Little Orbit be given a fair chance to finish development and take the Game to market. Descendent has no revenue to finish the Game. If Defendants take control of the development, they will need to seek a third party like InterPlay to pay for the remaining work and to publish the game. InterPlay or any other publisher would require the same definition of "revenues" that Little Orbit reasonably believed was appliable as that is the way this business operates - such publisher will deduct all costs before paying royalties to Descendent. This will drastically reduce the

amount of money received by Little Orbit and all but insure there will be no chance for Little Orbit to recoup the money it has invested.

The District Court abused its discretion in not setting aside the BSTS. At bottom, there was never a meeting of the minds on all essential terms of the settlement agreement or was a clear mistake on the part of Little Orbit and therefore the BSTS is not an enforceable agreement under California law.

## VIII.    CONCLUSION

For the foregoing reasons, Little Orbit asks that the Court reverse the Order of the District Court and remand the matter with direction to enter an Order denying Descendent's Motion to Enforce the BSTS and to grant Little Orbit's Motion to Set Aside the BSTS or alternative for further proceedings in accordance with this Court's directives.

DATED: November 12, 2021        LAW OFFICES OF M. DANTON
                                RICHARDSON


                                By:   /s/ M. Danton Richardson
                                    M Danton Richardson
                                    Attorney for Plaintiff/Appellant,
                                    LITTLE ORBIT LLC

## CERTIFICATE OF COMPLIANCE

I hereby certify that the foregoing Appellant's Opening Brief complies with the type-volume limitation of Fed. R. App. P. 27 because it contains 8,739 words. This motion complies with the typeface and the type-style requirements of Fed. R. App. P. 27 because this brief has been prepared in a proportionally spaced typeface using Word 14-point Times New Roman typeface.

LAW OFFICES OF
M. DANTON RICHARDSON


By:/s/ M. Danton Richardson
   M. Danton Richardson
Attorney for Plaintiff/Appellant
LITTLE ORBIT, LLC

# CERTIFICATE OF SERVICE

I hereby certify that on November 12, 2021, I electronically filed the

foregoing document with the Clerk of the United States Court of Appeals for the

Ninth Circuit by using the CM/ECF system.  Counsel in this case are registered

CM/ECF users and service will be accomplished by the CM/ECF system.


LAW OFFICES OF
M. DANTON RICHARDSON


By:/s/ M. Danton Richardson
   M. Danton Richardson
Attorney for Plaintiff/Appellant
LITTLE ORBIT, LLC